**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | |
|---|---|
| In re: | Chapter 11 |
| CONN'S, INC., et al.[1] | Case No. 24-33357 (ARP) |
| Debtors. | (Joint Administration Requested) (Emergency Hearing Requested) |

**DECLARATION OF NORMAN L. MILLER IN SUPPORT OF**
**DEBTORS' CHAPTER 11 PETITIONS AND FIRST DAY PLEADINGS**

I, Norman L. Miller, declare under penalty of perjury:

1.      I am the President and Chief Executive Officer of Conn's, Inc.  ("Conn's", together with the above-captioned debtors-in-possession the "Debtors" and together with their non-debtor wholly owned subsidiaries, the "Company").  I have previously held the roles of President, Interim President, Chairman and Executive Chairman of Conn's: President and CEO, from September 2015 until August 2021 and from December 18, 2023 through the present; Interim President and CEO, from October 18, 2022 until December 18, 2023; Chairman, from May 2016 until August 2021; and, Executive Chairman, from August 2021 until April 2022.  I have more than 35 years of diversified experience in the retail and consumer finance industries, with many of those years implementing turnaround plans and improvement strategies.  Prior to joining the Company, I was President and Chief Operating Officer of Dollar Financial Group from January 2007 to December 2013 and President of Sears Automotive from January 2014 through August 2015.  I have held

---

[1]     The Debtors in this chapter 11 case, together with the last four digits of the Debtors' federal tax identification number, are:  Conn's, Inc. (2840), Conn Appliances, Inc. (0706), CAI Holding, LLC (2675), Conn Lending, LLC (9857), Conn Credit I, LP (0545), Conn Credit Corporation, Inc. (9273), CAI Credit Insurance Agency, Inc. (5846), New RTO, LLC (6400), W.S. Badcock LLC (2010), W.S. Badcock Credit LLC (5990), and W.S. Badcock Credit I LLC (6422).  The Debtor's service address is 2445 Technology Forest Blvd., Suite 800, The Woodlands, TX 77381.

executive and leadership positions with other entities such as Aramark, Pepsi, Nestle and Kraft.  I hold a Bachelor of Science in Engineering from the United States Military Academy at West Point.

2.     As an officer of the Debtors, I am familiar with the Debtors' businesses and financial affairs, debt structure, assets, liabilities, contractual arrangements, day-to-day operations, recapitalization and restructuring efforts, and books and records.  Except as otherwise indicated herein, the facts set forth in this declaration (this "Declaration") are based on my personal knowledge, my review of relevant documents and the Debtors' books and records, information provided to me by the Debtors, or advisors to the Debtors, or my opinion based upon my experience, knowledge, and information concerning the Debtors.  If called upon to testify, I would testify competently to the facts set forth in this Declaration.  I am duly authorized to submit this Declaration on behalf of the Debtors.

3.     On the date hereof (the "Petition Date"), the Debtors each commenced with the United States Bankruptcy Court for the Southern District of Texas (the "Court") a voluntary case (collectively, the "Chapter 11 Cases") under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code").  I am advised that the Debtors are authorized to continue to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  I submit this declaration to provide an overview of the Debtors, their businesses, and these Chapter 11 Cases, as well as to support the Debtors' petitions and the motions and applications that the Debtors have filed with the Court, including the "first-day pleadings" (the "First Day Pleadings").

4.     This Declaration is divided into five sections:

    a.   Section I provides an overview of the Debtors and these Chapter 11 Cases;

    b.   Section II describes the Debtors' business, its history, and its corporate structure;

c. <u>Section III</u> summarizes the Debtors' prepetition capital structure;

d. <u>Section IV</u> describes the financial and operational circumstances leading to the need for the filing of these Chapter 11 Cases; and

e. <u>Section V</u> summarizes the relief requested in the First Day Motions.

I.   **Overview**

5.    The Company has grown from a home appliance retailer operating out of a single storefront in Beaumont, Texas in the early 1900s to a national retailer with over 553 corporate and dealer stores across 15 states, in addition to the Company's online retail presence.[2]   The Company's diverse retail product offerings include: home appliances, furniture, mattresses, a wide array of consumer electronics and accessories, as well as personal computing devices and related software.  In addition to offering market leading customer service, Conn's distinguishes itself from the highly competitive retail environment by offering flexible payment alternatives through the Company's proprietary in-house credit programs and third-party financing alternatives.

6.    In recent years, however, the Company's continued growth and success has faced significant headwinds.  As discussed more fully below,  those headwinds include drastic shifts in consumer behavior brought on by macro-economic trends, including changes to consumer spend as a result of multiple rounds of government stimulus associated with the COVID-19 pandemic, market-wide interest rate pressures, inflation, and integration delays and increased costs associated with Conn's 2023-24 merger with W.S. Badcock LLC ("<u>WSB</u>").  The resulting slowdown in the Company's growth has placed a strain on the Company's sales and liquidity position.  Moreover, the Debtors' original $650 million First Lien Facility was reduced to $555 million, with a cap of $400 million, subsequent to the merger with WSB, causing the Debtors to have to source junior

---

[2]    The Company was started as a plumbing business in 1890 and opened its first storefront in 1937.

capital at a higher cost.[3]   In response to these dynamics, the Company pursued supplemental financing transactions as well as amending its existing financing facilities with its lenders.  Most recently, the Company has pursued additional alternative financing arrangements with its existing stakeholders (including its first lien lender group agented by JPMorgan Chase Bank, N.A. (the "First Lien Agent"), second lien term loan lender BRF Finance Co., LLC ("BRF"), Stephens Investments Holdings LLC ("Stephens Investments"), as administrative agent, and Stephens Investments and Stephens Group, LLC as lenders, under the Debtors' third lien delayed draw term loan), various potential securitization counterparties, and numerous third parties approached by the Debtors and their professionals in advance of these Chapter 11 Cases.  The Debtors progressed toward the closing of incremental credit facilities with two parties (to take advantage of the Debtors current and extensive suppressed collateral in the form of accounts receivable), but ultimately, those alternative transactions were not able to be consummated.   In light of the poor M&A environment in the consumer retail sector and macroeconomic headwinds faced by the Company, the Debtors have commenced these Chapter 11 Cases to obtain the time and breathing room necessary to continue store closing sales at their retail locations, as well as pursue a Court supervised marketing and sale process for the Company's assets for the benefit stakeholders.

7.     Given the Company's liquidity position and, as discussed in the DIP Declaration, the need to use the cash collateral of the Company's prepetition lenders during these Chapter 11 Cases and available postpetition financing, the Debtors determined that the continuance of a pre-petition sale process while taking steps to wind down their business in an orderly fashion would maximize the value of their assets.   Prepetition and post-merger, the Debtors had already

---

[3]    The cap is scheduled for further reduction to $375 million, $350 million, and $300 million in September 2024, November 2024 and February 2025, respectively.

commenced the process of closing up to 20% of their retail stores and liquidating inventory through store closure sales. Additionally, the Debtors commenced a prepetition process to run going out of business sales at the remainder of their locations and to market and sell substantially all of their assets, including their owned loan portfolio, lease designation rights, servicing business, and all other assets. The Debtors anticipate seeking to continue that process under the supervision of the Court in order to maximize the value of their assets and, ultimately, seeking confirmation of a liquidating plan.

## II.     The Company's Business, Corporate Structure and History

8.      Initially conceived as a small heating and plumbing business in 1890, the Company began selling home appliances out of its Beaumont store in 1937. From that single store, the Company grew to become a national retailer and e-commerce business with 553 corporate and dealer retail stores, 22 distribution and service centers and 6 corporate offices across the Southeast, Mid-Atlantic and Southwest United States. The Company is headquartered in The Woodlands, Texas and employs approximately 3,800 people in 15 states.



9.      Through its retail stores and e-commerce operations (the "Retail Segment"), the Company offers home furnishings and mattresses, appliances, consumer electronics and related product offerings. In addition to the Retail Segment, the Company differentiates itself in the marketplace through its in-house and third-party financing products (the "Credit Segment"). The in-house portion of the Credit Segment is complimented by the Company's relationships with

third-party payment solutions providers, increasing the overall financing product offerings available to customers, while mitigating the Company's overall exposure to potential credit risks.

### A.    Retail Segment

10.    The brick and mortar stores and the Company's eCommerce platform are carefully tailored to meet the needs of Conn's core consumer base and provide a diverse array of durable and modern consumer products for the home.  Among the over 550 retail stores, 244 are corporate owned and 310 are dealer owned.  These stores vary in size and offerings based on geographic location and consumer demands.



11.    The primary retail products offered through the Retail Segment, sourced from vendors both domestically and internationally, can be broken out into the following categories:

- Home appliance, including refrigerators, freezers, washers, dryers, dishwashers and ranges from each of the leading consumer brands;

- Furniture and mattress, including furniture and related accessories for the living room, dining room and bedroom, as well as both lay flat mattresses and mattress-in-a-box offerings;

- Consumer electronics, including multiple television offerings, home theater audio, video game consoles, arcade gaming products, and portable audio equipment;

- Home office, including computers, tablets, monitors and accessories; and

- Seasonal product offerings.

12.     These products are further complimented by the Debtors suite of consumer-focused service offerings.  For example, to the extent any item is not directly stocked in the relevant location, the Debtors operate a number of regional distribution centers and small cross-dock facilities that enable quick delivery, including next day delivery in many markets, of ordered product directly to the customer and the related in-home installation services.



13.     In addition to delivery and installation services, the Debtors also provide additional product support services to their customers.  Such services and offerings include a la cart product repair service, repair service contracts and extended warranties.  Further, also through third-party providers, the Debtors offer customers property, life, disability, and involuntary unemployment

credit insurance, which is required for those purchases financed through the Company's in-house credit offerings.

**B.     Credit Segment**

14.     As noted, in conjunction with its consumer product offerings, the Company offers its customers financing through its proprietary in-house credit programs, third-party financing, and by taking cash or credit card payments.  Customer purchases are made utilizing some form of offered financing account for the substantial majority of the overall customer purchases with the Debtors.[4]

15.     The in-house credit programs offer a much needed form of financing to consumers in need of household items they may otherwise not have access to through other retailers or lenders, as well as provide the Debtors with a significant competitive advantage in the marketplace.

16.     Through its own internal credit underwriting department and developed credit strategy, which is separate and distinct from the Debtors' retail operations, the Company underwrites and determines whether to extend installment loans and credit capacity levels for retail customers.  In addition to auto-decision algorithms in the vast majority of instances, the Company employs credit underwriting personnel to make credit granting decisions using the Debtors' proprietary underwriting process.  That underwriting process evaluates a number of factors and elements, including, but not limited to, a calculus from: credit bureau information; income and address verification; current income and debt levels; the customer's previous credit history with the Company; and the particular product or products being purchased and financed.  Based on the Debtors' underwriting process, the applied models determine the finance terms, including down

---

[4]     For the fiscal year 2024, approximately 61.3% of purchases were financed through the Company's proprietary in-house credit programs, approximately 23.1% of purchases were financed through the use of third-party financing and lease-to-own, and approximately 15.6% of purchases were made with cash or credit card.

payment, limit amounts and credit terms for which consumers may qualify.   The Debtors' credit underwriting arm is supported by its servicing and collections departments.  Its credit department also monitors the credit portfolio to identify delinquent accounts and either initiates collection efforts or implements mitigation efforts with delinquent consumers if specific criteria are satisfied.

17.     In connection with the WSB Merger (defined below), the Company acquired open revolving credit accounts, distinguishable from Conn's traditional installment loan credit accounts. Those revolving accounts were originated under WSB's separate underwriting model.  Although the WSB revolving credit accounts remain open while maintaining a zero balance, the balances are generally paid by the customer over an eighteen (18) month period from the initial purchase. The Debtors have been in the process of phasing out the revolving credit accounts historically offered by WSB and transitioning into the historical Conn's credit alternatives.

### C.     W.S. Badcock

18.     W.S. Badcock was founded in 1904 in Mulberry, Florida and operates in approximately 374 stores in the Southeastern United States, primarily in Florida and Georgia. Prior to merging with the Company, WSB operated approximately 64 corporate locations and 310 independent dealer owned stores.   These WSB stores, branded "Badcock Home Furniture & more", provide customers with similar home furnishing merchandise to those offerings found in Conn's stores—furniture, appliances, bedding, electronics, home office equipment, accessories, and seasonal items.  Historically, WSB focused primarily on selling various furniture and related products, while Conn's started with stronger core appliance offerings.   Through the years, however, the product offerings of both expanded substantially, and as noted, in connection with the WSB Merger (defined below), an integration process has been initiated and continues to

develop to utilize Conn's credit infrastructure, including underwriting, loan processing, and collections in Badcock stores.



19.     On December 18, 2023, as part of a strategic expansion and growth initiative of the Company, Conn's executed a transaction through which W.S. Badcock LLC became a wholly-owned subsidiary of the Company (the "<u>WSB Merger</u>").  The WSB Merger was consummated as an all-stock deal with Conn's issuing 1,000,000 of its non-voting senior preferred shares convertible into a to-be created and issued class of non-voting common, subject to shareholder vote, representing 49.99% of Conn's outstanding common stock.  Through the WSB Merger the Company sought to strengthen and widen the Company's existing operations and customer reach and benefit from significant synergies around credit, merchandise, logistics and more.

**D.    Corporate Structure**

20.     As set forth on the organizational chart below, Conn's, Inc. wholly owns, directly or indirectly, each of the Debtors.



Conn's, Inc. & Subs

21.     Certain non-debtor subsidiaries, who are neither borrowers nor guarantors under the Debtors' debt facilities, facilitate certain securitization transactions with respect to customer accounts receivables.  Periodically, selected customer accounts receivable are transferred to non-debtor subsidiaries and bankruptcy-remote special purpose entities.  In turn, those special purpose entities issue asset-backed notes secured by the transferred customer accounts receivables and restricted cash held by those special purpose entities.  As a result, a major line of the business of the Debtors is the packaging of receivables to SPE's in transactions for cash to fund prior expansion plans, capital expenditures and increased liquidity.  Under the terms of the securitization

transactions, generally, all cash collections and other cash proceeds of the customer accounts receivables go first to the trustee, then the servicer, then the holders of issued notes, and then, if any, to residual equity held typically by the Debtors.  The Company retains the servicing of the securitized portfolios and receives a servicing fee based on the outstanding balance of the securitized receivables.

III.    **The Debtors' Prepetition Capital Structure**

A.    **Equity Ownership**

22.    Debtor Conn's, Inc., a Delaware corporation with shares publicly listed on the NASDAQ Stock Market (NASDAQ) under the ticker CONN, is the ultimate equity owner of each of the other Debtors and their non-debtor subsidiaries.  As of April 1, 2024, 100,000,000 shares of Conn's, Inc.'s common stock had been authorized with 24,885,975 shares of common stock issued and outstanding.

B.    **Prepetition Funded Debt**

23.    As of the Petition Date, Conn's has approximately $530 million in total funded debt obligations.  Substantially all of the Debtors' assets constitute collateral for the funded debt obligations.  The relative amounts and priorities of each debt obligation set forth herein are as follows:

| Funded Debt | Maturity | Approximate Outstanding Principal Amount |
|---|---|---|
| **First Lien Facility (Non-Extending Class)** | March 29, 2025[5] | $386,756,411.99[6] |
| **Second Lien Facility** | February 20, 2027 | $93,000,000 |
| **Third Lien Facility** | May 22, 2027 | $50,000,000 |
| | **Total Funded Debt** | $529,756,411.99 |

---

[5]    The maturity date for the First Lien Facility with respect to the Extending Class (defined herein) is December 18, 2026.

[6]    In addition to principal draw and outstanding, $27,787,684.36 of face amount of letters of credit were issued and available to be drawn under the First Lien Facility.

1.      *First Lien Revolving Credit Facility*

24.      On March 29, 2021, Debtors Conn Appliances, Inc. ("CAI") Conn Credit I, LP ("CCI"), Conn Credit Corporation, Inc. ("CCC") and Conn's entered into the Fifth Amended and Restated Loan and Security Agreement (the "Original JPM Loan Agreement" and the Original JPM Loan Agreement as amended or otherwise modified by the First JPM Amendment, the Second JPM Amendment and Third JPM Amendment being referred to hereinafter as the "First Lien Loan Agreement") with the First Lien Agent, as the administrative agent and collateral agent to the lender parties thereto and certain lenders party thereto, which provided for a $650 million[7] asset-based revolving credit facility (the "First Lien Facility") pursuant to which the lenders would extend revolving loans from time to time in an aggregate amount not to exceed the borrowing base.

25.      The Original JPM Loan Agreement was amended on November 21, 2022 (the "First JPM Amendment"), again on February 21, 2023 (the "Second JPM Amendment"), again on December 18, 2023 (the "Third JPM Amendment") and most recently on July 9, 2024 (the "Fourth JPM Amendment" and together with the First JPM Amendment, Second JPM Amendment and Third JPM Amendment, collectively being the "JPM Amendments").  The JPM Amendments provided for, among other things, the adjustment to the applicable interest rates and margins, the addition of WSB as a borrower thereto and additional financial covenants.  The Third JPM Amendment also resulted in a group of lenders that extended the maturity date of their revolving loans (the "Extending Class") and a group of lenders that declined to extend the maturity date of their revolving loans (the "Non-Extending Class").  The maturity date of revolving loans held by the Non-Extending Class is March 29, 2025.  The maturity date of revolving loans held by the

---

[7]    The First Lien Facility, through subsequent amendments, currently provides for a $555 million asset-based revolving credit facility, but is currently capped at $415 million.

Extending Class is December 18, 2026.  The Fourth JPM Amendment, executed July 16, 2024, among other things, (a) increases the applicable margin rate by 100 bps in respect of the revolving loans held by lenders consenting to the Fourth JPM Amendment and instituted other associated fees, (b) increased the maximum amount of revolving loans outstanding at any one time outstanding by $15 million to $415 million, and (c) requires WSB to execute two mortgages in respect of certain real property owned by WSB.

26.     The obligations of Debtors CAI, CCI, CCC and WSB under the First Lien Facility are guaranteed by Parent and certain subsidiaries.  The First Lien Facility is secured by liens on substantially all of the assets of the Debtors.

2.     *Second Lien Term Loan*

27.     On February 21, 2023, Debtors Conn's, CAI, CCI and CCC, entered into a second-lien term loan and security agreement with Pathlight Capital LP, as administrative agent and collateral agent, and the financial institutions party thereto, as lenders (the "Pathlight Term Loan"). The Pathlight Term Loan provided for an aggregate commitment of $100 million pursuant to a three-year secured term loan credit facility, which was fully drawn as of February 21, 2023.  The Pathlight Term Loan was satisfied in full on December 18, 2023 with the proceeds from the Second Lien Loan Agreement (as defined below).

28.     On December 18, 2023, Debtors Conn's, CAI, CCI, CCC and WSB entered into a term loan and security agreement (the "Second Lien Loan Agreement") with BRF as administrative agent and collateral agent, and the financial institutions party thereto, as lenders.[8]

---

[8]     As disclosed in the *Declaration of Timothy J. Shilling in Support of Debtors' Emergency Motion for Entry of interim and Final Orders (I) Approving and Authorizing the Debtors to Assume and Perform Under the Store Closing Consulting Agreement, (II) Approving Procedures for Store Closing Sales, (III) Approving Modifications to Certain Customer Programs, (IV) Authorizing Bonuses for Non-Insider Employees of Closing Stores, and (V  Granting Related Relief*, the liquidator selected to conduct the going out of business sales, B. Riley Retail Solutions, LLC, is an indirect, wholly owned subsidiary of BRF.

29.     The Second Lien Loan Agreement provides for term loans in the aggregate amount of $93 million (the "Second Lien Facility") with such term loans maturing on February 20, 2027. The Second Lien Facility was fully drawn as of December 18, 2023.  Except as set forth therein, outstanding amounts under the Second Lien Facility will bear interest at an aggregate rate per annum equal to the Term SOFR Rate (defined therein), subject to a 4.80% floor, plus 8.00%.

30.     The obligations of Debtors CAI, CCI, CCC and WSB under the Second Lien Facility are guaranteed by Conn's and certain subsidiaries.  The Second Lien Facility is secured by liens (subject to and second in priority to those liens under the First Lien Facility) on substantially all of the assets of the Debtors.

3.     *Third Lien Delayed Draw Term Loan*

31.     On July 31, 2023, Debtors Conn's, CAI, CCI and CCC entered into a delayed draw term loan and security agreement (the "Original Stephens Loan Agreement" and the Original Stephens Loan Agreement as amended or otherwise modified by the First Stephens Amendment being referred to hereinafter as the "Third Lien Loan Agreement") with Stephens Investments Holdings LLC, as administrative agent and a lender and Stephens Group, LLC, as a lender.  The Third Lien Loan Agreement provides for an aggregate commitment of $50 million (the "Third Lien Facility") and the delayed draw term loans were permitted to be funded in one or more borrowings until 90 days prior the maturity date (unless otherwise terminated in accordance with the terms thereof). The delayed draw term loans mature on May 22, 2027.

32.     The Original Stephens Loan Agreement was amended on December 18, 2023 in connection with the WSB Merger and, among other things, joined WSB as a new borrower to the Third Lien Loan Agreement and added a required minimum EBITDA financial covenant.

33.     Outstanding amounts under the Third Lien Facility bear interest at an aggregate rate per annum equal to the Term SOFR Rate (defined therein), subject to a 5.00% floor, plus 10.00%.

Any undrawn amounts are subject to a monthly commitment fee of 5.00% per annum.  The Third Lien Facility has been fully drawn.

34.     The obligations of Debtors CAI, CCI, CCC, and WSB under the Third Lien Facility are guaranteed by Conn's and certain subsidiaries.  The Delayed Draw Term Loan is secured by liens on substantially all of the assets of the Debtors (subject to and third in priority to those liens under the First Lien Facility and Second Lien Facility).

### C.      Asset-Backed Securitization Transactions

#### 1.     *Customer Receivables*

35.     The Company, in the ordinary course of business and as permitted under the First Lien Facility, causes the transfer of certain customer accounts receivable to bankruptcy remote special purposes entities (the "SPEs"), which then issue asset-backed notes secured by those transferred customer accounts receivables and restricted cash held by the SPEs (collectively, the "ABS Securitizations").  Specifically, under the ABS Securitizations Debtors Conn Credit I, LP and W.S. Badcock LLC each sell the selected receivables to Conn Appliances Receivables Funding, LLC ("CARF"), a non-debtor, and W.S. Badcock Credit LLC and W.S. Badcock Credit I LLC, respectively (CARF, W.S. Badcock Credit LLC and W.S. Badcock Credit I LLC each a "Depositor").  The Depositor will then transfer the purchased receivables to a designated trust (the "Receivables Trust") pursuant to another purchase agreement.  The Receivables Trust will then issue a certificate to the Depositor representing 100% interest in the Receivables Trust (the "Receivables Trust Certificate").  The Depositor will then sell the Receivables Trust Certificate to the issuer of the asset-backed notes (the "Issuer").  The purchase price for the Receivables Trust

Certificate will be paid by the Issuer to the Depositor in cash from the proceeds of the sale of the assert-backed notes.

36.     Debtor CAI retains the servicing of the securitized portfolio and, in turn, receives a monthly servicing fee of 4.75% based on the outstanding balance of the securitized receivables.[9] Debtor CAI also holds all residual equity in each of the SPEs.  Additionally, the Company retains refunds and rebates of earned premium with respect to the cancellation of credit insurance and repair service agreements and unearned commissions with respect to repair service agreements related to charged-off receivables.

37.     The terms of the ABS Securitizations, generally, provide for all cash collections and other cash proceeds of the customer receivables <u>first</u> to satisfy certain fees and expenses for the trustee, receivables trust trustee, back-up servicer, and issuer for certain fees and expenses on a *pari passu* basis, <u>second</u> to the servicer on account of the servicing fee, <u>third</u> to holders of issued notes in priority order, <u>fourth</u> to satisfy certain reserve requirements, <u>fifth</u> to pay certain additional fees and expenses to the trustee, receivables trust trustee, back-up servicer, and issuer, <u>sixth</u> to the Company as the holder of non-issued notes, if any, and <u>seventh</u> to residual equity.

2.     *The Motus Term Loan to Non-Debtor CARF COL LLC*

38.     Non-debtor CARF pursuant to that certain term loan and security agreement dated as of April 9, 2024, (the "<u>Motus Term Loan</u>") with Motus Advisors, Inc. ("<u>Motus</u>"), as administrative agent, sells charged-off receivables to Debtor CCI which, in turn, sells those charged-off receivables to SPE non-debtor CARF COL LLC.

39.     The Motus Term Loan provides for an aggregate commitment of $13,333,333.33 to CARF COL LLC pursuant to a secured term loan credit facility maturing on April 9, 2026,

---

[9]     In additional to Conn's securitizations, the Company also services pre- and post WSB Merger WSB securitizations.

which was fully drawn on April 9, 2024.  Outstanding amounts under the Motus Term Loan will bear interest at an aggregate rate per annum equal to 15.0%.  CARF COL LLC is required to make monthly scheduled amortization payments of the Motus Term Loan beginning May 2024.  In connection with the amounts payable by SPE CARF COL LLC to the lenders under the Motus Term Loan, CARF COL LLC is required to pay the lenders an additional amount (the "MOIC Amount"), which represents a minimum guaranteed return on the Motus Term Loan.[10]  Assuming the lenders receive the MOIC Amount on or prior to April 30, 2025, all remaining obligations under the Motus Term Loan, including all outstanding amounts under the Motus Term Loan and accrued interest thereon, will extinguish and will be deemed paid in full.

### D.  Trade and Related Debt

40.    In connection with the operation of the Retail Segment, the Company purchases products from third-party vendors located in the United States and internationally.  The Company places orders with those vendors based on actual and forecasted consumer demand and broader economic trends.  As of the Petition date, the Debtors estimate that they have approximately $200 million in obligations to trade and other general unsecured creditors.  These amounts consist primarily of accounts payable to various trade creditors, utility providers, and other third-party service providers.

### IV.  Circumstances Leading to Commencement of These Chapter 11 Cases

41.    A convergence of factors contributed to the Debtors' need to commence these Chapter 11 Cases.  Significant macroeconomic factors that have disrupted the retail industry generally have also impacted the Company, including temporal shifts in consumer spending,

---

[10]    The MOIC Amount is calculated as a multiple of certain amounts payable by non-debtor CARF COL LLC to the lenders under the Motus Term Loan that, if calculated on or before April 30, 2025, is equal to 1.40x, and if calculated after April 30, 2025, is equal to 1.50x.

particularly with respect to furniture and other discretionary purchases, and increased costs of goods, wages, and services due to inflation among other factors.  The increasing cost of capital and funds related to higher interest rates have also contributed to reduced liquidity.  Internal factors, including costs associated with the post-WSB Merger integration, have further constrained the Debtors' liquidity.  Although the Company has been through cost-cutting initiatives and explored (and in certain instances executed on) a number of other potential alternatives to address the dire and immediate liquidity needs, including negotiating and executing amendments to existing debt facilities, none of those alternatives provide the necessary liquidity and time for the Company to restructure its business and develop an actionable turnaround strategy.  The commencement of these Chapter 11 Cases provides the necessary breathing room to fully develop the path forward to benefit stakeholders.

### A.    Changes in Consumer Behavior

42.    When the COVID-19 pandemic commenced in March 2020, many aspects of the U.S. and global economies came to halt.  Among other things, millions of workers stayed home and businesses shuttered to protect the health and safety of the general public.

43.    As the initial shock of the pandemic subsided with stay at home orders still in place in many locations, consumer spending, particularly on durable goods, skyrocketed.  Buoyed by COVID-19 economic stimulus programs in the approximate aggregate amount of $5 trillion into the economy and consumers with excess funds due to physical lockdowns limiting the ability to consume services at pre-pandemic levels, demand for discretionary goods such as housewares, electronics and most products for the home increased to unprecedented levels as people sought to make purchases to improve their homes where they were now spending a significant portion of their time.  This shift in consumer spending "pulled-forward" demand for a number of purchases

that would have otherwise been made over an extended period of time, artificially inflating demand in the short term to unsustainable levels.

44.     As stay at home orders began lifting across the country, followed by the waning of the federal stimulus measures, consumers began to refocus their time and money on services versus goods and discretionary spending has steadily decreased.  The increase in spending on consumer goods during the height of the pandemic also "pulled forward" consumer spending on many of the Debtors' best-selling items in time, including furniture and appliances, leading to a lull in the following period.  At the same time, consumers also had less spending power as inflationary pressure on goods coupled with increases in prevailing interest rates took hold.  The result of the foregoing was a sharp decline in demand for the Company's products and, relatedly, its credit offerings.

**B.     Costs of Integrating the WSB Merger**

45.     The WSB Merger was part of a strategic initiative to expand, among other things, the Company's geographic footprint, customer base and product offerings, and to achieve over time material cost and operational synergies.  The combination of the two businesses sought to enhance WSB's in-house credit offering with Conn's sophisticated credit infrastructure built through investments over the past six years and leverage the reach of a more diverse and larger organization with best-in-class payment solutions, broad product assortment and a leading eCommerce platform.

46.     Although the WSB Merger enabled the Company to realize certain synergies across the Conn's and WSB platforms, the full realization of all cost and revenue synergies is estimated to take approximately 12-18 months.

### C.     Macroeconomic Factors

47.    Like many retailers and larger commercial businesses, Conn's has been met with challenging macroeconomic factors in recent years that have negatively impacted the Company. Although the COVID-19 pandemic saw dramatic spike and "pull-forward" in consumer expenditures with respect to home remodeling and decorating, the steady increase of inflationary pressures and interest rates following the pandemic has had a substantial impact on consumer discretionary spending—resulting in consumers delaying financing for discretionary purchases.

48.    Additionally, the Company has also relied upon cashflows generated by its ongoing activities and the issuance of debt (*e.g.*, the Delayed Draw Term Loan) to fund its operations and strategic initiatives over the past several years.  As discussed herein, the Company has approximately $530 million owed as of the Petition Date in connection with its funded debt obligations, and after the reduction of the commitment of the First Lien Facility, the cost of capital increased substantially with the other, junior, facilities.  The interest of those obligations fluctuate based on certain base rates (*i.e.*, SOFR).  As interest rates have steadily increased, so too have the expenses with the Company's credit alternatives.

49.    Due to increased interest rate pressures in the past 12 months, interest rate expense has increased from approximately $25.7 million in the year ended January 31, 2021 to approximately $81.7 million in the year ended January 31, 2024.  The steady increase in interest rates and costs of capital, with minimal to no relief in the near term, has detrimentally impacted the Company's ability to service its debt obligations.

### D.     Operational Challenges

50.    The cost of the Company's approximate 350 leases are exacerbated by the underperforming leased stores and location functionality.  In FY 2024, the Company spent approximately $77.4 million in lease obligations, over which $35 million relate to

underperforming stores.  Moreover, the WSB Merger resulted in certain redundant store locations that increase the drag on the Company's operations from lease expenses.  Although the Company pursued two separate initiatives in the last twelve (12) months to engage with counterparties and reduce lease expense, each of those initiatives fell short in substantively reducing the impact of lease terms.  Given the Company's operational headwinds and financial position, payment of lease obligations associated with non-performing leases has caused significant strains on the Company's liquidity.

### E.      Proposed Financing Transactions

51.     In December 2023, having identified a need for additional liquidity, the Company attempted to secure additional financing to address liquidity needs.  Ultimately, however, those transaction were not able to be consummated.

### F.      Exploration of Strategic Alternatives

52.     In the wake of the shift in consumer behavior and preferences, macroeconomic headwinds, continuing liquidity pressures, and anticipated needs for additional funding in the near term, the Company faced an urgent need for restructuring efforts to stabilize the Company and assess the long-term viability of the business.  In connection with these efforts, the Company engaged with its various stakeholders on its current situation and potential solutions.  After extensive negotiations with lender constituencies, third-party lenders, and potential stalking horse purchases, however, the Debtors determined it was not feasible to obtain an actionable transaction that provided for the necessary liquidity to fund a going concern sale process under the supervision of the Court.  Accordingly, the Debtors determined that an orderly wind down of their business would maximize the value of their assets.

1.   *Board Hires Advisors*

53.   The Company hired Berkeley Research Group ("BRG") as financial advisor in May 2023 to assist with liquidity management and other related financial advisory services.  The Company subsequently later engaged further advisors to explore other strategic alternatives, including bankruptcy.  Specifically, in June 2024, Houlihan Lokey, Inc. ("Houlihan") was hired as investment banker to assist in the exploration of an in- or out-of-court restructuring transaction and debtor-in-possession financing, and law firm Sidley Austin LLP ("Sidley Austin") was selected to assist with strategic alternatives and with the Company's potential contingency planning efforts.

2.   *Alternative Transactions and Right Sizing the Company's Footprint*

54.   The Company, with the assistance of its advisors, investigated and executed on numerous alternatives to address its liquidity needs.  Together with BRG, the Company worked on optimizing workstreams and streamlining processes and efficiencies to reduce costs.  In an exercise to reduce lease liabilities, improve cash flows and extend the runway to achieve an actionable transaction, the Company engaged advisors to negotiate with landlords and exit unprofitable locations that were a cash drag on operations.

55.   Additionally, as discussed above, the Debtors initiated going out of business sales at certain of the Debtors' retail stores.  In order to facilitate the orderly liquidation of inventory at those initial retail locations (and, subsequently, all of the Debtors' retail locations), the Debtors selected a liquidator from several proposals they received.  The Debtors are seeking Court authorization to continue and initiate those going out of business sales pursuant to the milestones provided for by the DIP Facility.

56.   As discuss herein, the Company also pursued additional financing transactions to gain access to liquidity and ease restrictive financial covenants under the existing financing

agreements. Those transactions, however, failed to materialize or were paused due to liquidity challenges faced by the Company.

57.     The Company was able to secure an additional $15 million from JPM under the Fourth JPM Amendment, which afforded the Company more time to pursue a process and strategic alternatives.

3.     *Post-Petition Financing and Funding a Going Concern Sale*

58.     In pursuit of a going concern sale of the Debtors' business, the Company and Houlihan were engaged in extensive negotiations with a potential stalking horse purchaser, certain of its junior stakeholders, as well as third-party lenders, in order to fund and conduct a pre-and post-petition marketing and in-court sale process.

59.     To facilitate the Debtors' efforts to obtain the best financing terms currently available to them, in consultation with the Debtors, Houlihan developed a targeted list of third parties outside of the Debtors' existing capital structure that may have been potentially interested in providing actionable postpetition financing to the Debtors (the "Prepetition Marketing Process"). Houlihan's strategy to obtain the best financing terms available from the market was reflective of the practical realities of the Debtors' existing capital structure and the facts and circumstances of these chapter 11 cases, including the challenges associated with attempting to "prime" the Debtors' existing debt and the benefits of achieving consensus among key constituencies on the terms of a holistic restructuring transaction. I understand that Houlihan solicited interest from approximately forty (40) potential lenders, including third-party financial institutions experience in distressed lender and financing. Ultimately, the Debtors, in consultation with their advisors, determined there was no better alternative financing other than that being

offered by those prepetition first lien lenders lending under the DIP Facility (as defined in the DIP Motion).

60.     In the days leading up to the Petition Date, the Debtors and their advisors engaged in negotiations with the DIP Lenders around the terms of the DIP Facility (each as defined in the DIP Motion).  The parties engaged in hard-fought, arm's-length negotiations in an effort to reach the best available material terms under the circumstances.  As discussed in the DIP Declaration (as defined in the DIP Motion), the DIP Facility is subject to certain milestone requirements, including, but not limited to, the requirement that the Debtors file a motion seeking authority from the Court to continue and / or initiate store closing sales at all retail locations and that such store closure sales be completed by October 31, 2024, as well as motion seeking approval of procedures for rejection of the Debtors' leases.  I was involved in those negotiations and believe the DIP Facility represents the best option available to address the Debtors' near-term liquidity needs and provide near-term runway for the Debtors to finalize a path forward through these Chapter 11 Cases.

## V.     First Day Motions

61.     Contemporaneously herewith, the Debtors have filed a number of First Day Motions seeking orders granting various forms of relief intended to stabilize the Debtors' business operations, facilitate the efficient administration of these Chapter 11 Cases, including the following:

- "Cash Management Motion": Debtors' Emergency Motion for Entry of Interim and Final  Orders (I) Authorizing the Debtors to (A) Continue to Operate Their Cash Management System and Maintain Existing Bank Accounts and (B) Continue to Perform Intercompany Transactions and (II) Granting Related Relief

- "Claims and Noticing Agent Application": Debtors' Emergency Application for Entry of an Order Authorizing the Retention and Employment of Epiq Corporate Restructuring, LLC as Claims, Noticing, and Solicitation Agent

- "Contract Rejection and Rejection Procedures Motion": Debtors' Motion for Entry of an Order (I) Authorizing Rejection of Certain Executory Contracts and Unexpired Leases on Nonresidential Real Property, (II) Approving Procedures for Future Rejection of Additional Executory Contracts and Unexpired Leases, and (III) Granting Related Relief

- "Customer Programs Motion": Debtors' Emergency Motion for Entry of an Order (I) Authorizing the Debtors to Honor Certain Prepetition Obligations to Customers and Continue Certain Customer Programs in the Ordinary Course of Business and (II) Granting Related Relief

- "Dealer Motion": Debtors' Emergency Motion for Entry of an Order (I) Authorizing the Debtors to (A) Pay Prepetition Dealer Claims in the Ordinary Course and (B) Continue Dealer Programs in the Ordinary Course; and (II) Granting Related Relief

- "DIP Motion": Debtors' Emergency Motion for Entry of Interim and Final Orders (I) Authorizing Debtors to (A) Obtain Postpetition Financing and (B) Utilize Cash Collateral; (II) Granting Adequate Protection; and (III) Scheduling a Final Hearing

- "Equity and Creditor Matrix Motion": Debtors' Emergency Motion for Entry of an Order (A) Authorizing the Debtors to (I) File a Consolidated Creditor Matrix and (II) File a Consolidated List of 30 Largest Unsecured Creditors; (B) Waiving the Requirement to File a List of Equity Security Holders for Conn's Inc.; (C) Authorizing the Debtors to Redact Certain Personal Identifying Information; (D) Approving the Form and Manner of Notifying Customers of the Commencement of the Chapter 11 Case and Other Information; and (E) Granting Related Relief

- "Extension of Time to File Schedules and Statements": Debtors' Emergency Motion for Entry of an Order (I) Extending Time to File Schedules of Assets and Liabilities and Statements of Financial Affairs and (II) Granting Related Relief

- "First Day Notice of Complex Ch. 11 Case": Notice of Designation as Complex Chapter 11 Bankruptcy Case

- "Insurance Motion": Debtors' Emergency Motion for Entry of an Order (I) Authorizing the Debtors to (A) Continue Their Prepetition Insurance Coverage and Surety Bond Program and Satisfy Prepetition Obligations Related Thereto, (B) Authorizing the Debtors to Renew, Supplement, or Enter Into New Insurance Policies and Surety Bonds, (C) Continue Their Workers' Compensation Program, and (D) Authorizing Continuation of Premium Financing Agreements; and (II) Granting Related Relief

- "Joint Administration Motion": Debtors' Emergency Motion for Entry of an Order (I) Directing Joint Administration of Chapter 11 Cases and (II) Granting Related Relief

- "<u>Lien Claims Motion</u>": Debtors' Emergency Motion for Entry of an Order (I) Authorizing the Debtors to Pay or Honor Certain Prepetition Lien Claims in the Ordinary Course of Business and (II) Granting Related Relief

- "<u>NOL Motion</u>": Debtors' Emergency Motion for Entry of an Order (I) Approving Notifications and Hearing Procedures for Certain Transfers of Common Stock and (II) Granting Related Relief

- "<u>Servicing Motion</u>": Debtors' Emergency Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Continue Servicing and Administration Activities in the Ordinary Course of Business and (B) Pay Certain Prepetition Amounts Due to Servicing Vendors; and (II) Granting Related Relief

- "<u>Store Closure Motion</u>": Debtors' Emergency Motion for Entry of Interim and Final Orders (I) Approving and Authorizing the Debtors to Assume and Perform Under the Store Closing Consulting Agreement, (II) Approving Procedures for Store Closing Sales, (III) Approving Modifications to Certain Customer Programs, and (IV) Authorizing Bonuses for Non-Insider Employees of Closing Stores, and (V) Granting Related Relief

- "<u>Tax Motion</u>": Debtors' Emergency Motion for Entry of an Order (I) Authorizing the Debtors to Pay Certain Taxes and Fees and (II) Granting Related Relief

- "<u>Utilities Motion</u>": Debtors' Emergency Motion for Entry of an Order (I) Approving the Debtors' Proposed Adequate Assurance of Payment for Future Utility Services, (II) Prohibiting Utility Companies form Altering, Refusing, or Discontinuing Services, (III) Approving the Debtors' Proposed Procedures for Resolving Additional Assurance Requests, and (IV) Granting Related Relief

- "<u>Wages Motion</u>": Debtors' Emergency Motion for Entry of an Order (I) Authorizing the Debtors to (A) Pay Prepetition Wages, Salaries, and Employee Benefits and (B) Continue the Postpetition Maintenance of Employee Benefit Programs, Policies, and Procedures in the Ordinary Course, and (II) Granting Related Relief

62.     Several of the First Day Motions request authority to pay certain prepetition claims.

I understand that Federal Rule of Bankruptcy Procedure 6003 provides, in relevant part, that the

Court shall not consider motions to pay prepetition claims during the first 21 days following the

filing of a chapter 11 petition, "except to the extent relief is necessary to avoid immediate and

irreparable harm."  In light of this requirement, the Debtors have narrowly tailored its requests for

immediate authority to pay certain prepetition claims to those circumstances where the failure to

pay such claims would cause immediate and irreparable harm to the Debtors and their estates.  I believe such circumstances exist with the Debtors' requests herein for immediate authority.  Other relief will be deferred for consideration at a later hearing.

63.     I have consulted with the Debtors' advisors regarding the relief requested in the First Day Motions.  To the best of my knowledge and belief, the factual statements contained in each of the First Day Motions are true and accurate, and each such factual statement is incorporated herein by reference.

64.     I believe that the relief requested in the First Day Motions is necessary, in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and will allow the Debtors to operate with minimal disruption and maximize value preservation during the pendency of these Chapter 11 Cases.  Failure to grant the relief requested in any of the First Day Motions may result in immediate and irreparable harm to the Debtors, their businesses, and their estates. Accordingly, for the reasons set forth herein and in each respective First Day Motion, the Court should grant the relief requested in each of the First Day Motions.

[*Remainder of this page intentionally left blank*]

Dated:  July 23, 2024
Woodland, Texas

/s/ Norman L. Miller

Norman L. Miller,
President and Chief Executive Officer
Conn's, Inc.