## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | |
|---|---|
| In re: | Chapter 11 |
| CONN'S, INC., et al.[1] | Case No. 24-33357 (ARP) |
| Debtors. | (Jointly Administered)<br>(Emergency Hearing Requested) |

**DEBTORS' AMENDED <u>EMERGENCY</u> MOTION
FOR ENTRY OF INTERIM AND FINAL ORDERS
(I) AUTHORIZING THE DEBTORS TO (A) OBTAIN
POSTPETITION FINANCING, (B) UTILIZE CASH COLLATERAL, AND
(C) GRANT LIENS AND PROVIDE SUPERPRIORITY ADMINISTRATIVE
EXPENSE CLAIMS; (II) GRANTING ADEQUATE PROTECTION TO CERTAIN
PREPETITION SECURED PARTIES; (III) MODIFYING THE AUTOMATIC STAY;
<u>(IV) SCHEDULING A FINAL HEARING; AND (V) GRANTING RELATED RELIEF</u>**

---

**Emergency relief has been requested. Relief is requested not later than July 24, 2024.**

**If you object to the relief requested or you believe that emergency consideration is not warranted, you must appear at the hearing if one is set, or file a written response prior to the date that relief is requested in the preceding paragraph. Otherwise, the Court may treat the pleading as unopposed and grant the relief requested.**

**A hearing will be conducted on this matter on July 24, 2024 at 11:00 a.m. (prevailing Central Time) in Courtroom 400, floor four, 515 Rusk Avenue, Houston, TX 77002.**

**Participation at the hearing will only be permitted by an audio and video connection.**

**Audio communication will be by use of the Court's dial-in facility. You may access the facility at 832-917-1510. Once connected, you will be asked to enter the conference room number. Judge Perez's conference room number is 282694. Video communication will be by use of the GoToMeeting platform. Connect via the free GoToMeeting application or click the link on Judge Perez's home page. The meeting code is "JudgePerez". Click the settings icon in the upper right corner and enter your name under the personal information setting.**

**Hearing appearances must be made electronically in advance of both electronic and in-person hearings. To make your appearance, click the "Electronic Appearance" link on Judge Perez's home page. Select the case name, complete the required fields and click "Submit" to complete your appearance.**

---

[1] The Debtors in this chapter 11 case, together with the last four digits of the Debtors' federal tax identification number, are: Conn's, Inc. (2840), Conn Appliances, Inc. (0706), CAI Holding, LLC (2675), Conn Lending, LLC (9857), Conn Credit I, LP (0545), Conn Credit Corporation, Inc. (9273), CAI Credit Insurance Agency, Inc. (5846), New RTO, LLC (6400), W.S. Badcock LLC (2010), W.S. Badcock Credit LLC (5990), and W.S. Badcock Credit I LLC (6422). The Debtor's service address is 2445 Technology Forest Blvd., Suite 800, The Woodlands, TX 77381.

Conn's Inc., and its debtor affiliates, as debtors and debtors in possession (collectively, the "Debtors") in the above-captioned chapter 11 cases (the "Chapter 11 Cases"), hereby submit this motion (this "Motion"). In support of this Motion, the Debtors submit the (i) *Declaration of Norman L. Miller in Support of the Debtors' Chapter 11 Petition and First Day Pleadings* (the "Miller Declaration"), (ii) *Declaration of Saul Burian in Support of the Debtors' Motion to Obtain Postpetition Financing* (the "Burian Declaration," and together with the Miller Declaration, the "First Day Declarations"), filed contemporaneously herewith and incorporated herein by reference.[2] In further support of this Motion, the Debtors state as follows:

### Relief Requested

1.     By this Motion, the Debtors seek entry of an interim order (the "Interim Order"), substantially in the form attached hereto as **Exhibit A** and a final order (the "Final Order," and together with the Interim Order, the "DIP Orders"):[3]

a. authorizing Conn's, Inc., as parent (the "Parent"), Conn Appliances, Inc. ("CAI"), Conn Credit I, LP ("CCI"), Conn Credit Corporation, Inc. ("CCCI"), W.S. Badcock LLC ("Badcock" and, together with CAI, CCI, and CCCI, the "Borrowers" and each, a "Borrower"), and the Debtors in connection with the Chapter 11 Cases to obtain postpetition financing  ("DIP Financing") pursuant to a senior secured superpriority, priming debtor-in-possession ABL credit facility (the "DIP Facility") to be documented pursuant to that certain Amendment No. 5 to Fifth Amended and Restated Loan and Security Agreement to be entered into following entry of the Interim Order and attached to the Interim Order in substantially final form as Exhibit 1 (the "Fifth Amendment" and the revised credit agreement attached thereto as Exhibit A, as the same may be amended, restated, amended and restated, supplemented, or otherwise modified from time to time, the "DIP Credit Agreement"), consisting of (x) new money term loans in an aggregate principal amount of $5 million (the commitments in respect thereof, the "New Money DIP Commitment" and such loans, the "New Money DIP Loans") which will be available immediately upon entry of the Interim Order, by the several financial institutions or other entities who have agreed to provide such New Money DIP

---

[2]   Capitalized terms used but not otherwise defined herein shall have the respective meanings ascribed to such terms in the First Day Declarations, as applicable.

[3]   To the extent of any conflict between the descriptions and definitions in this Motion and the DIP Orders, DIP Credit Agreement, or DIP Loan Documents, then the DIP Orders, DIP Credit Agreement, or DIP Loan Documents, as applicable, will control.

Loans from time to time as party thereto as "Lenders" (the "DIP Lenders"), JPMorgan Chase Bank, N.A., in its capacity as administrative agent and collateral agent (in such capacity, together with its successors and permitted assigns, the "DIP Agent" and, collectively with the DIP Lenders, the "DIP Secured Parties") and (y) non-cash loans in an aggregate amount equal to $20,000,000 (the "Non-Cash DIP Loans") through the relief provided with respect to the revised prepayment under Section 5.2.2 of the DIP Credit Agreement, in each case as set forth in the DIP Credit Agreement;

b.   authorizing, subject to the terms and conditions set forth in the DIP Credit Agreement and the other DIP Documents (as defined herein), the repayment and refinancing of the Prepetition ABL Obligations (as defined herein) on an incremental basis via a "creeping" roll-up pursuant to the ABL Roll-Up (as defined herein) (all amounts so repaid and refinanced, the "Roll-Up DIP Loans" and, together with the New Money DIP Loans, the "DIP Loans");

c.   authorizing the non-Borrower Debtors to jointly and severally guarantee the DIP Loans and the other DIP Obligations (such Debtors, the "DIP Guarantors," and together with the Borrowers, the "DIP Loan Parties");

d.   authorizing the DIP Loan Parties, as applicable, to execute, deliver, and perform under the DIP Credit Agreement and all other loan documentation related to the DIP Facility, any fee letters and such other documents that may be reasonably requested by the DIP Agent and the DIP Lenders in connection with the DIP Facility, in each case, as amended, restated, supplemented, waived, or otherwise modified from time to time in accordance with the terms thereof and hereof (collectively, together with the DIP Credit Agreement, the Interim Order, the Final Order, and any other agreements and documents executed or delivered in connection therewith, the "DIP Documents");

e.   authorizing the DIP Loan Parties to incur and guarantee loans, advances, extensions of credit, financial accommodations, reimbursement obligations, fees and premiums (including, without limitation, commitment fees, backstop fees or premiums, administrative agency fees, and any other fees payable pursuant to the DIP Documents), costs, expenses and other liabilities, and all other obligations (including indemnities and similar obligations, whether contingent or absolute) due or payable under the DIP Documents (collectively, the "DIP Obligations"), and to perform such other and further acts as may be necessary, desirable or appropriate in connection therewith;

f.   subject to the Carve-Out (as defined herein), granting to the DIP Agent, for itself and for the benefit of the DIP Secured Parties, allowed superpriority administrative expense claims pursuant to section 364(c)(1) of the Bankruptcy Code in respect of all DIP Obligations of the DIP Loan Parties;

g.   granting to the DIP Agent, for itself and for the benefit of the DIP Secured Parties, valid, enforceable, non-avoidable and automatically perfected liens pursuant to

sections 364(c)(2) and 364(c)(3) of the Bankruptcy Code and priming liens pursuant to section 364(d) of the Bankruptcy Code on all DIP Collateral (as defined herein), including, without limitation, all Cash Collateral (as defined herein), on the terms described herein, and subject only to and effective upon entry of the Final Order, liens on any Avoidance Proceeds (as defined herein), in each case subject to the Carve-Out;

h.  waiving (a) the Debtors' right to surcharge the Prepetition Collateral (as defined herein) and the DIP Collateral (together, the "Collateral") pursuant to section 506(c) of the Bankruptcy Code and (b) any "equities of the case" exception under section 552(b) of the Bankruptcy Code; *provided* that the foregoing waiver shall be without prejudice to any provisions of the Final Order with respect to costs or expenses incurred following the entry of such Final Order;

i.  except as provided in the Interim Order, waiving the equitable doctrine of "marshaling" and other similar doctrines (a) with respect to the DIP Collateral for the benefit of any party other than the DIP Secured Parties and (b) with respect to any of the Prepetition Collateral (including the Cash Collateral) for the benefit of any party other than the Prepetition Secured Parties (as defined herein); *provided* that the foregoing waiver shall be without prejudice to any provisions of the Final Order;

j.  authorizing the Debtors to use proceeds of the DIP Facility and Cash Collateral (as defined herein) solely in accordance with the DIP Documents;

k.  authorizing the Debtors to pay the principal, interest, fees, expenses, reimbursements, and other amounts payable under the DIP Documents as such become earned, due, and payable to the extent provided in, and in accordance with the DIP Documents;

l.  subject to the restrictions set forth in the DIP Documents and the Interim Order, authorizing the Debtors to use the Prepetition Collateral (as defined herein), including Cash Collateral of the Prepetition Secured Parties under the Prepetition Credit Documents (as defined herein), and provide adequate protection to the Prepetition Secured Parties for any diminution in value of their respective interests in the applicable Prepetition Collateral (including Cash Collateral), for any reason provided for under the Bankruptcy Code, including resulting from the imposition of the automatic stay under section 362 of the Bankruptcy Code (the "Automatic Stay"), the Debtors' use, sale, or lease of the Prepetition Collateral (including Cash Collateral), and, where applicable, the priming of their respective interests in the Prepetition Collateral (including Cash Collateral);

m. vacating and modifying the Automatic Stay to the extent set forth herein and as necessary to permit the Debtors and their affiliates, the DIP Secured Parties, and the Prepetition Secured Parties to implement and effectuate the terms and provisions of the Interim Order, the DIP Documents, and, upon entry, the Final

Order, and to delivery any notices of termination described below and as set forth herein;

n.   waiving any applicable stay (including under Bankruptcy Rule 6004) and providing for immediate effectiveness of the Interim Order and, upon entry, the Final Order; and

o.   scheduling a final hearing (the "<u>Final Hearing</u>") to consider final approval of the DIP Facility and use of Cash Collateral pursuant to a proposed final order (the "<u>Final Order</u>"), as set forth in this Motion and the DIP Documents filed with this Court.

## <u>Jurisdiction and Venue</u>

2.      On the date hereof (the "<u>Petition Date</u>"), each of the Debtors filed a voluntary petition for relief under sections 101–1532 of the Bankruptcy Code in the United States Bankruptcy Court for the Southern District of Texas (the "<u>Court</u>").   The Debtors continue to operate their business and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.   No party has requested appointment of a trustee or examiner in these cases, and no statutory committee has been appointed.

3.      The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334.   This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).

4.      Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

5.      The bases for the relief requested herein are sections 102(1), 105, 361, 362, 363, 364, 503, and 507 of title 11 of the United States Code (the "<u>Bankruptcy Code</u>"), rules 2002, 4001, 6004, and 9014 of the Federal Rules of Bankruptcy Procedure (the "<u>Bankruptcy Rules</u>"), rules 4002-1 and 9013-1 of the Bankruptcy Local Rules for the Southern District of Texas (the "<u>Local Rules</u>"), and the Procedures for Complex Cases in the Southern District of Texas (the "<u>Complex Case Procedures</u>").

**Preliminary Statement**

6.      The terms of the DIP Facility, including the budget restrictions, interest rate, and fees, were negotiated in good faith and at arm's length and are, taken as a whole, fair and reasonable under the circumstances of these Chapter 11 Cases. Despite canvassing the market, the Debtors were unable to secure any alternative source of financing, much less any other sources available on both better and executable terms than those being provided in the DIP Facility. Specifically, given the existing funded debt, the Debtors were unable to secure postpetition financing on a junior or unsecured basis in the time required, and any senior financing offered would require a costly and value-destructive priming fight with the existing prepetition lenders, which the Debtors sought to avoid. Accordingly, the Debtors have no available options for funding these Chapter 11 Cases other than the DIP Facility.

7.      Absent entry into the DIP Facility, the Debtors will have insufficient capital to fund operations or the administration of these Chapter 11 Cases. Such lack of capital will be to the detriment of all parties in interest as it will have a significant adverse impact on the completion of a value-maximizing sale and wind-down of the Debtors' business and assets.

8.      Accordingly, the DIP Facility is not just the best financing currently available to the Debtors, is the only option available to facilitate a sale of the Debtors' assets and an orderly wind-down of the Debtors' business while providing the maximum recovery possible for the Debtors' stakeholders and other parties in interest.

**Concise Statement Pursuant to Complex Case Procedures and Bankruptcy Rule 4001**

9.      Pursuant to paragraph 8 of the Complex Case Procedures, the proposed DIP Facility and/or Interim DIP Order contains the following provisions:[4]

---

[4]    Capitalized terms used in this summary chart but not otherwise defined have the meanings ascribed to them in the DIP Documents or the Interim DIP Order, as applicable.

| Material Provision | Summary |
|---|---|
| **Sale or Plan Confirmation Milestones**<br><br>Complex Case Procedures, ¶ 8(a) | The DIP Credit Agreement will include the following milestones related to these Chapter 11 Cases (the "Milestones"):<br><br>• Within one (1) day of the Petition Date, the Debtors shall have filed (i) the DIP Motion, (ii) a motion seeking authority but not the requirement, to continue or commence, as applicable, going out of business ("GOB") sales at all retail locations, and (iii) a motion seeking approval of procedures for the rejection of the Debtors' leases in each case in form and substance reasonably acceptable to the DIP Agent and the DIP Lenders.<br><br>• On the date that the DIP Loans are first drawn, the Debtors shall have commenced the GOB sales in accordance with the Approved Budget;<br><br>• The Bankruptcy Court shall enter the Interim Order and the GOB sales order on an interim basis, in each case in form and substance acceptable to the DIP Agent and the DIP Lenders within 3 Business Days of the Petition Date;<br><br>• On or before 14 days after the Petition Date, the Debtors shall have filed a motion or motions seeking entry of an order approving bidding and sale process with respect to the sale by the Debtors of all or substantially all of the Debtors' assets not subject to GOB sales which, for the avoidance of doubt, shall include all owned real property, intellectual property, customer receivables and residual interests in any securitizations of such receivables, leases not rejected and other assets of the Debtors (the "Additional Assets"), which shall, in each case, to the extent available, provide for a stalking horse bidder for the assets subject to the motion or motions on terms acceptable to the DIP Agent and the Required DIP Lenders (as defined in the DIP Credit Agreement).<br><br>• The Debtors shall have selected a "back-up servicer" for its pool of receivables acceptable to the Prepetition ABL Agent to service any receivables that may not be sold pursuant to the procedures approved in the Bidding Procedures Order, by no later than 30 days from the Petition Date.<br><br>• The Bankruptcy Court shall enter a Final Order in form and substance acceptable to the DIP Agent and the DIP Lenders within 35 days of the Petition Date;<br><br>• The Bankruptcy Court shall have entered within 35 days of the Petition Date, (i) bidding procedures orders (the "Bidding Procedures Orders") for the Additional Assets, (ii) the GOB sales order on a final basis, and (iii) the lease rejection procedures order, in each case in form and substance acceptable to the DIP Agent and the Required DIP Lenders (as defined in the DIP Credit Agreement);<br><br>• On or before 45 days after the Petition Date, the deadline for submission of bids for the Additional Assets shall have occurred pursuant to the Bidding Procedures Orders;<br><br>• On or before the first business day occurring not more than 5 days after the deadline for bid submissions, the Debtors shall conduct an initial auction for the Additional Assets pursuant to the Bidding Procedures Order and shall conduct each additional auction for the Additional Assets within 5 days of the prior auction, in each case on terms and conditions and in accordance with procedures reasonably acceptable to the DIP Agent and the Required DIP Lenders; and<br><br>• The Debtors shall have completed all GOB sales by October 31, 2024.<br><br>*Interim DIP Order, Schedule 3* |
| **Cross-Collateralization** | Purchase Money Lien:  a Lien that secures Purchase Money Debt, encumbering only the fixed or capital assets acquired with such Debt (and any construction, repairs, replacements, additions, accessions and improvements thereto, any proceeds thereof or |

| | |
|---|---|
| Complex Case Procedures, ¶ 8(b) | of the foregoing) or constituting a Capital Lease (it being understood that individual financings that constitute Purchase Money Debt or a Capital Lease provided by any lender may be cross collateralized to other financings of such type provided by such lender or its affiliates). |
| | *DIP Credit Agreement § 1.1* |
| **Roll-Ups / Refinance**<br><br>Complex Case Procedures, ¶ 8(c) | (c)      In addition, subject to the DIP Order, on and after the Interim DIP Facility Effective Date, any and all cash expenditures expended by the Debtors shall automatically be deemed to be a borrowing of Revolver Loans under the DIP Facility (such deemed borrowings, the "Roll-Up Loans" and, together with the New Money DIP Loans and the Non-Cash DIP Loans, collectively, the "DIP Loans") and added to the DIP Obligations, with all such Roll-Up Loans being deemed made by the DIP Lenders on a Pro Rata basis based on their respective New Money DIP Commitments. |
| | *DIP Credit Agreement § 2.4.1* |
| **Liens on Avoidance Actions or Proceeds Thereof**<br><br>Complex Case Procedures, ¶ 8(d) | Pursuant to section 364(c)(1) of the Bankruptcy Code, subject to the Carve-Out, all of the DIP Obligations shall constitute allowed superpriority administrative expense claims against the DIP Loan Parties on a joint and several basis (without the need to file any proof of claim) with priority over any and all claims against the DIP Loan Parties, now existing or hereafter arising, of any kind whatsoever, including, without limitation, all administrative expenses of the kind specified in sections 503(b) and 507(b) of the Bankruptcy Code and any and all administrative expenses or other claims arising under sections 105, 326, 327, 328, 330, 331, 365, 503(b), 506(c), 507(a), 507(b), 726, 1113 or 1114 of the Bankruptcy Code (including the Adequate Protection Obligations), whether or not such expenses or claims may become secured by a judgment lien or other non-consensual lien, levy or attachment, which allowed claims (the "<u>DIP Superpriority Claims</u>") shall for purposes of section 1129(a)(9)(A) of the Bankruptcy Code be considered administrative expenses allowed under section 503(b) of the Bankruptcy Code, and which DIP Superpriority Claims shall be payable from and have recourse to all prepetition and postpetition property of the DIP Loan Parties and all proceeds thereof (excluding claims and causes of action under sections 502(d), 544, 545, 547, 548 and 550 of the Bankruptcy Code, or any other avoidance actions under the Bankruptcy Code (collectively, "<u>Avoidance Actions</u>") but, subject to the entry of the Final Order, including any proceeds or property recovered, unencumbered or otherwise from Avoidance Actions, whether by judgment, settlement or otherwise ("<u>Avoidance Proceeds</u>")) in accordance with the DIP Documents and this Interim Order, subject only to the Carve-Out. The DIP Superpriority Claims shall be entitled to the full protection of section 364(e) of the Bankruptcy Code in the event that this Interim Order or any provision hereof is vacated, reversed, or modified, on appeal or otherwise. |
| | *Interim DIP Order ¶ 8* |
| **Default Provisions and Remedies**<br><br>Complex Case Procedures, ¶ 8(e) | The DIP Credit Agreement provides for customary events of default and remedies available to the DIP Lender. |
| | *DIP Credit Agreement § 11.1* |
| **Release of Claims**<br><br>Complex Case Procedures, ¶ 8(f) | Effective as of the date of entry of this Interim Order, each of the Debtors and (subject to the Challenge Period in paragraph **Error! Reference source not found.**) the Debtors' estates, on its own behalf and on behalf of its and their respective past, present and future predecessors, successors, heirs, subsidiaries, and assigns, hereby absolutely, unconditionally and irrevocably releases and forever discharges and acquits the Prepetition Secured Parties, the DIP Secured Parties, and each of their respective Representatives (collectively, the "**Released Parties**"), from any and all obligations and |

| | |
|---|---|
| | liabilities to the Debtors (and their successors and assigns) and from any and all claims (as defined in section 101(5) of the Bankruptcy Code), counterclaims, demands, defenses, offsets, debts, accounts, contracts, liabilities, actions and causes of action arising prior to the Petition Date of any kind, nature or description, whether matured or unmatured, known or unknown, asserted or unasserted, foreseen or unforeseen, accrued or unaccrued, suspected or unsuspected, liquidated or unliquidated, pending or threatened, arising in law or equity, upon contract or tort or under any state or federal law or otherwise, in each case arising out of or related to (as applicable) the Prepetition Credit Documents, the DIP Documents, the obligations owing and the financial obligations made thereunder, and the negotiation thereof and of the transactions and agreements reflected thereby, in each case that the Debtors at any time had, now have or may have, or that their predecessors, successors or assigns at any time had or hereafter can or may have against any of the Released Parties for or by reason of any act, omission, matter, cause or thing whatsoever arising at any time on or prior to the date of this Interim Order; *provided* that any Released Party's obligations to comply with the Prepetition Credit Documents and/or DIP Documents, as applicable, on or after the Petition Date shall not be released by the foregoing.<br><br>*Interim DIP Order ¶ G(xv)* |
| **Limitations on Use of Cash Collateral or DIP Proceeds**<br><br>Complex Case Procedures, ¶ 8(g) | No DIP Loans, DIP Collateral, Prepetition Collateral (including Cash Collateral) or any portion of the Carve-Out, may be used directly or indirectly, including without limitation through reimbursement of professional fees of any non-Debtor party, in connection with (a) the investigation, threatened initiation or prosecution of any claims, causes of action, adversary proceedings or other litigation (i) against any of the DIP Secured Parties, or the Prepetition Secured Parties, or their respective predecessors-in-interest, agents, affiliates, Representatives, attorneys, or advisors, in each case in their respective capacities as such, or any action purporting to do the foregoing in respect of the DIP Obligations, DIP Liens, DIP Superpriority Claims, Prepetition Secured Debt, and/or the Adequate Protection Obligations and Adequate Protection Liens granted to the Prepetition Secured Parties, as applicable, or (ii) challenging the amount, validity, perfection, priority or enforceability of or asserting any defense, counterclaim or offset with respect to the DIP Obligations, the Prepetition Secured Debt and/or the liens, claims, rights, or security interests securing or supporting the DIP Obligations granted under this Interim Order, the Final Order, the DIP Documents or the Prepetition Credit Documents in respect of the Prepetition Secured Debt, including, in the case of each (i) and (ii), without limitation, for lender liability or pursuant to section 105, 510, 544, 547, 548, 549, 550 or 552 of the Bankruptcy Code, applicable non-bankruptcy law or otherwise (provided that, notwithstanding anything to the contrary herein, the proceeds of the DIP Loans and/or DIP Collateral (including Cash Collateral) may be used by the Creditors' Committee to investigate but not to prosecute (A) the claims and liens of the Prepetition Secured Parties and (B) potential claims, counterclaims, causes of action or defenses against the Prepetition Secured Parties, up to an aggregate cap of no more than $50,000); (b) attempts to prevent, hinder, or otherwise delay or interfere with the Prepetition ABL Agent's, the Prepetition 2L Agent's, the Prepetition 3L Agent's, the Prepetition Secured Parties', the DIP Agent's, or the DIP Secured Parties', as applicable, enforcement or realization on the Prepetition Secured Debt, Prepetition Collateral, DIP Obligations, DIP Collateral, and the liens, claims and rights granted to such parties under the Interim Order or Final Order, as applicable, each in accordance with the DIP Documents, the Prepetition Credit Documents and this Interim Order; (c) attempts to seek to modify any of the rights and remedies granted to the Prepetition ABL Agent, the Prepetition 2L Agent, the Prepetition 3L Agent, the Prepetition Secured Parties, the DIP Agent, or the DIP Secured Parties under this Interim Order, the Prepetition Credit Documents or the DIP Documents, as applicable, other than in accordance with this Interim Order; (d) to apply to the Court for authority to approve superpriority claims or grant liens (other than the liens and claims granted hereunder or permitted pursuant to the DIP Documents) or security interests in the DIP Collateral or |

| | |
|---|---|
| | any portion thereof that are senior to, or on parity with, the DIP Liens, DIP Superpriority Claims, Adequate Protection Liens and Prepetition 507(b) Claims granted to the Prepetition Secured Parties; or (e) to pay or to seek to pay any amount on account of any claims arising prior to the Petition Date unless such payments are approved or authorized by the Court, agreed to in writing by the DIP Lenders, expressly permitted under this Interim Order or permitted under the DIP Documents (including the Approved Budget, subject to permitted variances), in each case unless all DIP Obligations, Prepetition Secured Debt, Adequate Protection Obligations, and claims granted to the DIP Agent, DIP Secured Parties, Prepetition ABL Agent, Prepetition 2L Agent, Prepetition 3L Agent, and Prepetition Secured Parties under this Interim Order, have been refinanced or paid in full in cash (including the cash collateralization of any letters of credit) or otherwise agreed to in writing by the DIP Secured Parties.<br><br>*Interim DIP Order ¶ 22* |
| **Non-Consensual Priming Liens**<br><br>Complex Case Procedures, ¶ 8(h) | N/A |
| **Any Other Provision That Limits Estate Fiduciaries to Fulfill Duties**<br><br>Complex Case Procedures, ¶ 8(i) | Upon execution and delivery of the DIP Documents, the DIP Documents shall constitute legal, valid, binding and non-avoidable obligations of the DIP Loan Parties, enforceable against each DIP Loan Party and their estates in accordance with the terms of the DIP Documents and this Interim Order, and any successors thereto, including any trustee appointed in the Chapter 11 Cases, or in any case under Chapter 7 of the Bankruptcy Code upon the conversion of any of the Chapter 11 Cases, or in any other proceedings superseding or related to any of the foregoing (collectively, the "**Successor Cases**"). Upon execution and delivery of the DIP Documents, the DIP Obligations will include all loans and any other indebtedness or obligations, contingent or absolute, which may now or from time to time be owing by any of the DIP Loan Parties to any of the DIP Agent or DIP Secured Parties, in such capacities, in each case, under, or secured by, the DIP Documents (including this Interim Order), including all principal, interest, costs, fees, expenses, premiums, indemnities and other amounts under the DIP Documents (including this Interim Order), the New Money DIP Loans, the Non-Cash DIP Loans, and the Roll-Up DIP Loans. The DIP Loan Parties shall be jointly and severally liable for the DIP Obligations. Except as permitted in this Interim Order, no obligation, payment, transfer, or grant of security hereunder or under the DIP Documents to the DIP Agent and/or the DIP Secured Parties (including their Representatives) shall be stayed, restrained, voidable, avoidable, or recoverable, under the Bankruptcy Code or under any applicable law (including, without limitation, under sections 502(d), 544, and 547 to 550 of the Bankruptcy Code or under any applicable state Uniform Voidable Transactions Act, Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act, or similar statute or common law), or subject to any defense, avoidance, reduction, setoff, recoupment, offset, recharacterization, subordination (whether equitable, contractual, or otherwise), disallowance, impairment, claim, counterclaim, cross-claim, or any other challenge under the Bankruptcy Code or any applicable law or regulation by any person or entity.<br><br>*Interim DIP Order ¶ 5* |

10.     Each of the foregoing provisions is customary for DIP financings in cases of this complexity and appropriate under the circumstances; in addition, the provisions were negotiated

in good faith and at arm's length and are part of the overall deal with respect to the DIP Facility. Where possible, the Debtors have sought to defer the effectiveness of such provisions to entry of a Final DIP Order to ensure that parties in interest have a full and fair opportunity to be heard. Accordingly, the foregoing provisions should be approved.

11.     Additionally, the following chart contains a summary of the material terms of the proposed DIP Facility, with references to the applicable sections of the relevant documents:

| Material Provision | Summary |
| --- | --- |
| **Parties to the DIP Term Sheet**<br><br>Bankruptcy Rule 4001(c)(1)(B) | <u>Borrowers</u>: Conn's, Inc., as parent (the "<u>Parent</u>"), Conn Appliances, Inc. ("<u>CAI</u>"), Conn Credit I, LP ("<u>CCI</u>"), Conn Credit Corporation, Inc. ("<u>CCCI</u>"), and W.S. Badcock LLC ("<u>Badcock</u>")<br><br><u>Guarantors</u>: The other Debtors in these Chapter 11 Cases that are not Borrowers.<br><br><u>Agent</u>: JPMorgan Chase Bank, N.A.<br><br><u>Lenders</u>: The financial institutions and other entities from time to time party to the DIP Credit Agreement.<br><br>*Interim DIP Order* |
| **Term**<br><br>Bankruptcy Rule 4001(b)(1)(B)(iii), 4001(c)(1)(B) | The later of (a) the date falling 90 day after the Petition Date and (b) if agreed by the Required DIP Lenders in writing (which may be via email) in their sole discretion, the date falling 135 days after the Petition Date.<br><br>*DIP Credit Agreement § 1.1* |
| **Commitment**<br><br>Bankruptcy Rule 4001(c)(1)(B) | The DIP Facility shall be available as follows upon entry of an interim order by the Bankruptcy Court approving the DIP Facility:<br><br>(a)      $5 million of new borrowings under a term loan to be provided by the DIP Lenders on a pro rata basis; and<br><br>(b)      $20 million of additional availability for the duration of the chapter 11 cases, which shall be made available by modifying the covenant in Section 10.3.5 of the Prepetition ABL Credit Agreement to require, at all times, Availability of no less than $80,000,000.<br><br>In addition, for each dollar of unrestricted cash from collections received by the Debtors and used for cash expenditures (rather than being used to repay then outstanding debt owed under the Prepetition ABL Facility and held by DIP Lenders), one dollar of existing obligations under the Prepetition ABL Facility shall be converted on a 1:1 basis to loans under the DIP Facility. |
| **Conditions of Borrowing**<br><br>Bankruptcy Rule 4001(c)(1)(B) | • The Petition Date shall have occurred.<br>• The Interim DIP Order shall have been entered on the docket of the Bankruptcy Court.<br>• All "first day" motions filed by the Debtors in the Chapter 11 Cases shall be in form and substance reasonably satisfactory to the Agent, including, without limitation the DIP Motion, the Bidding Procedures Motion, the Cash |

|  | Management Motion submitted by the Debtors to the Bankruptcy Court on the first day of the Chapter 11 Cases. |
|---|---|
|  | • The Agent, the DIP Lenders and the DIP Arranger shall have received all fees due and payable on or prior to the Interim DIP Facility Effective Date and, to the extent invoiced at least two (2) Business Days prior to the Interim DIP Facility Effective Date, reimbursement or payment of all out of pocket expenses required to be reimbursed or paid by the Obligors hereunder, including all reasonable and documented fees, expenses and disbursements of Simpson Thacher & Bartlett LLP, counsel for the Agent, and FTI Consulting, Inc., financial advisor to the Agent. |
|  | • The Agent shall have received the Initial DIP Budget (as defined in the DIP Order), which shall be in a form and substance satisfactory to the Agent, which shall be certified by a financial officer of the Debtors as being prepared on a reasonable basis and in good faith based on assumptions believed by the Debtors to be reasonable at the time made and from the best information then available to the Debtors and such other supporting documentation as may be reasonably requested by the Agent. |
|  | • Other than the Chapter 11 Cases, there shall not exist any actions, suits, investigations or proceedings by or before any arbitrator or Governmental Authority pending against or, to the knowledge of the Debtors, threatened in writing against or affecting any Debtor, (i) after giving effect to insurance, as to which there is a reasonable possibility of an adverse determination and that, if adversely determined, could reasonably be expected, individually or in the aggregate, to result in a Material Adverse Effect, (ii) that involve this Agreement or the transactions contemplated herein or (iii) which is not otherwise subject to the automatic stay as a result of the Chapter 11 Cases. |
|  | • All DIP Obligations shall be secured by a perfected lien and security interest on all DIP Collateral of the Obligors pursuant to, with the priority set forth in, the Interim DIP Order. |
|  | • A chief restructuring officer of the Debtors acceptable to the Agent and the Required DIP Lenders (it being understood that Mark Renzi is acceptable) (it being understood that such chief restructuring officer shall report only to the board of the Debtors and have a scope of powers acceptable to the Agent in its reasonable discretion) shall have been appointed without the need for any further action to effectuate such appointment. |
|  | *DIP Credit Agreement § 6.3* |
| **Interest Rates**<br><br>Bankruptcy Rule 4001(c)(1)(B) | Base Rate + 4.75% |
| **Use of Proceeds**<br><br>Bankruptcy Rule 4001(b)(1)(B)(ii) | No DIP Loans, DIP Collateral, Prepetition Collateral (including Cash Collateral) or any portion of the Carve-Out, may be used directly or indirectly, including without limitation through reimbursement of professional fees of any non-Debtor party, in connection with (a) the investigation, threatened initiation or prosecution of any claims, causes of action, adversary proceedings or other litigation (i) against any of the DIP Secured Parties, or the Prepetition Secured Parties, or their respective predecessors-in-interest, agents, affiliates, Representatives, attorneys, or advisors, in each case in their respective capacities as such, or any action purporting to do the foregoing in respect of the DIP Obligations, DIP Liens, DIP Superpriority Claims, Prepetition Secured Debt, and/or the Adequate Protection Obligations and Adequate Protection Liens granted to the Prepetition Secured Parties, as applicable, or (ii) challenging the amount, validity, perfection, priority or enforceability of or asserting any defense, counterclaim or offset with respect to the DIP Obligations, |

|  | the Prepetition Secured Debt and/or the liens, claims, rights, or security interests securing or supporting the DIP Obligations granted under this Interim Order, the Final Order, the DIP Documents or the Prepetition Credit Documents in respect of the Prepetition Secured Debt, including, in the case of each (i) and (ii), without limitation, for lender liability or pursuant to section 105, 510, 544, 547, 548, 549, 550 or 552 of the Bankruptcy Code, applicable non-bankruptcy law or otherwise (provided that, notwithstanding anything to the contrary herein, the proceeds of the DIP Loans and/or DIP Collateral (including Cash Collateral) may be used by the Creditors' Committee to investigate but not to prosecute (A) the claims and liens of the Prepetition Secured Parties and (B) potential claims, counterclaims, causes of action or defenses against the Prepetition Secured Parties, up to an aggregate cap of no more than $50,000); (b) attempts to prevent, hinder, or otherwise delay or interfere with the Prepetition ABL Agent's, the Prepetition 2L Agent's, the Prepetition 3L Agent's, the Prepetition Secured Parties', the DIP Agent's, or the DIP Secured Parties', as applicable, enforcement or realization on the Prepetition Secured Debt, Prepetition Collateral, DIP Obligations, DIP Collateral, and the liens, claims and rights granted to such parties under the Interim Order or Final Order, as applicable, each in accordance with the DIP Documents, the Prepetition Credit Documents and this Interim Order; (c) attempts to seek to modify any of the rights and remedies granted to the Prepetition ABL Agent, the Prepetition 2L Agent, the Prepetition 3L Agent, the Prepetition Secured Parties, the DIP Agent, or the DIP Secured Parties under this Interim Order, the Prepetition Credit Documents or the DIP Documents, as applicable, other than in accordance with this Interim Order; (d) to apply to the Court for authority to approve superpriority claims or grant liens (other than the liens and claims granted hereunder or permitted pursuant to the DIP Documents) or security interests in the DIP Collateral or any portion thereof that are senior to, or on parity with, the DIP Liens, DIP Superpriority Claims, Adequate Protection Liens and Prepetition 507(b) Claims granted to the Prepetition Secured Parties; or (e) to pay or to seek to pay any amount on account of any claims arising prior to the Petition Date unless such payments are approved or authorized by the Court, agreed to in writing by the DIP Lenders, expressly permitted under this Interim Order or permitted under the DIP Documents (including the Approved Budget, subject to permitted variances), in each case unless all DIP Obligations, Prepetition Secured Debt, Adequate Protection Obligations, and claims granted to the DIP Agent, DIP Secured Parties, Prepetition ABL Agent, Prepetition 2L Agent, Prepetition 3L Agent, and Prepetition Secured Parties under this Interim Order, have been refinanced or paid in full in cash (including the cash collateralization of any letters of credit) or otherwise agreed to in writing by the DIP Secured Parties.<br><br>*Interim DIP Order ¶ 22* |
| **Entities with Interests in Cash Collateral**<br><br>Bankruptcy Rule 4001(b)(1)(B)(i) | DIP Secured Parties |
| **Fees**<br><br>Bankruptcy Rule 4001(c)(1)(B) | **Arrangement Fee**: The Arrangement Fee is as set forth in the DIP Agent Fee Letter, which has been filed under seal substantially contemporaneous herewith.<br><br>**Commitment Fee**: The Commitment Fee is as set forth in the DIP Credit Agreement. |
| **Budget**<br><br>Bankruptcy Rule 4001(c)(1)(B) | The Initial DIP Budget reflects, among other things, the Debtors' anticipated operating receipts, anticipated operating disbursements, anticipated non-operating disbursements, net operating cash flow and liquidity for each calendar week covered thereby. The Initial DIP Budget may be modified, amended, extended, and updated from time to time in accordance with the DIP Credit Agreement and this Interim Order, and once approved by the Required DIP Lenders (as defined in the DIP Credit Agreement) in accordance with |

| | |
|---|---|
| | the DIP Credit Agreement and this Interim Order or deemed approved in the event the Required DIP Lenders shall fail to respond in writing to any such modification, amendment, extension or update to the Initial DIP Budget or later-approved Approved Budget within five (5) business days of a request therefor by the Debtors to counsel to the DIP Agent, shall modify, replace, supplement or supersede, as applicable, the Initial DIP Budget for the periods covered thereby (the Initial DIP Budget and each subsequent approved budget shall constitute, without duplication, an "<u>Approved Budget</u>"). <br><br> *Interim DIP Order* |
| **Reporting Information** <br><br> Bankruptcy Rule 4001(c)(1)(B) | So long as any DIP Obligations remain outstanding, the Debtors shall: <br><br> (a) provide the DIP Lenders, the Agent and their respective advisors with daily reports (which may be by email) from the Great American Group, LLC, to the extent received by the Debtors, with respect to the Liquidation; and <br><br> (b) participate in teleconference calls with the Agent, the DIP Lenders, the Debtors and their respective advisors, to be held at such times as may be reasonably agreed by the parties, on a weekly basis or more frequently at the reasonable request of the Agent or its advisors. <br><br> *DIP Credit Agreement § 10.1.18* |
| **Variance Covenant** <br><br> Bankruptcy Rule 4001(c)(1)(B) | The Debtors shall at all times use Cash Collateral solely for the purposes included in the Approved Budget. By not later than 5:00 p.m. (Eastern Time) on July 31, 2024, and no later than 5:00 p.m. (Eastern Time) on the third business day of each week thereafter, the Debtors shall deliver to the DIP Agent, Prepetition ABL Agent, Prepetition 2L Agent, Prepetition 3L Agent, counsel to the Committee, and the U.S. Trustee, a variance report for the applicable Testing Period (as defined below) in form and detail consistent to such prepetition reporting and reasonably acceptable to the DIP Agent (a "<u>Variance Test</u>") showing comparisons of (a) aggregate actual cash receipts since the Petition Date and for the Testing Period then most recently ended on a line by line basis, compared to the aggregate projected cash receipts of the Debtors since the Petition Date on a line by line basis and for such Testing Period as set forth in the Approved Budget (any such difference on an aggregate basis, a "<u>Receipts Variance</u>") and (b) aggregate actual cash disbursements on a line by line basis of the Debtors since the Petition Date and for such Testing Period compared to the projected cumulative cash disbursements on a line by line basis since the Petition Date and for such Testing Period as set forth in the Approved Budget (any such difference on an aggregate basis, a "<u>Disbursements Variance</u>" and, together with the Receipts Variance, a "<u>Variance</u>"). Each "<u>Variance Test</u>" shall indicate whether there are any adverse Variances that exceed the Permitted Deviation (as defined below) and shall provide a written explanation for such variances. "<u>Permitted Deviation</u>" shall mean, excluding professional fees and payments made pursuant to this Interim Order, (a) with respect to the aggregate Variance Test for any applicable Testing Period, based on receipts, an aggregate unfavorable Variance equal to or less than (i) 20% for the first two weeks, and (ii) 15% thereafter (the "<u>Receipts Permitted Deviation</u>"); and (b) with respect to the aggregate Variance Test for any applicable Testing Period based on disbursements, an aggregate unfavorable Variance equal to or less than (i) 20% for the first two weeks, and (ii) 15% thereafter (the "<u>Disbursements Permitted Deviation</u>"). It shall be a condition precedent to the effectiveness of the DIP Facility that the Debtors shall have delivered an Approved Budget in form and substance acceptable to the DIP Agent. A Variance Test showing noncompliance with the Permitted Deviations, shall constitute an automatic Event of Default hereunder. A "<u>Testing Period</u>" means each rolling cumulative four-week period beginning with the first full week after the Petition Date; provided that for the initial week of the Chapter 11 Cases, the Testing Period shall be the prior one-week period, for the initial two weeks of the Chapter 11 Cases, the Testing Period shall be the prior rolling cumulative two-week period and for the initial |

| | |
|---|---|
| | three weeks of the Chapter 11 Cases, the Testing Period shall be the prior rolling cumulative three-week period.<br><br>*Interim DIP Order ¶ 7* |
| **Chapter 11 Milestones**<br><br>Bankruptcy Rule 4001(c)(1(B) | • Within one (1) day of the Petition Date, the Debtors shall have filed (i) the DIP Motion, (ii) a motion seeking authority but not the requirement, to continue or commence, as applicable, going out of business ("GOB") sales at all retail locations, and (iii) a motion seeking approval of procedures for the rejection of the Debtors' leases in each case in form and substance reasonably acceptable to the DIP Agent and the DIP Lenders.<br><br>• On the date that the DIP Loans are first drawn, the Debtors shall have commenced the GOB sales in accordance with the Approved Budget;<br><br>• The Bankruptcy Court shall enter the Interim Order and the GOB sales order on an interim basis, in each case in form and substance acceptable to the DIP Agent and the DIP Lenders within 3 Business Days of the Petition Date;<br><br>• On or before 14 days after the Petition Date, the Debtors shall have filed a motion or motions seeking entry of an order approving bidding and sale process with respect to the sale by the Debtors of all or substantially all of the Debtors' assets not subject to GOB sales which, for the avoidance of doubt, shall include all owned real property, intellectual property, customer receivables and residual interests in any securitizations of such receivables, leases not rejected and other assets of the Debtors (the "Additional Assets"), which shall, in each case, to the extent available, provide for a stalking horse bidder for the assets subject to the motion or motions on terms acceptable to the DIP Agent and the Required DIP Lenders (as defined in the DIP Credit Agreement).<br><br>• The Debtors shall have selected a "back-up servicer" for its pool of receivables acceptable to the Prepetition ABL Agent to service any receivables that may not be sold pursuant to the procedures approved in the Bidding Procedures Order, by no later than 30 days from the Petition Date.<br><br>• The Bankruptcy Court shall enter a Final Order in form and substance acceptable to the DIP Agent and the DIP Lenders within 35 days of the Petition Date;<br><br>• The Bankruptcy Court shall have entered within 35 days of the Petition Date, (i) bidding procedures orders (the "Bidding Procedures Orders") for the Additional Assets, (ii) the GOB sales order on a final basis, and (iii) the lease rejection procedures order, in each case in form and substance acceptable to the DIP Agent and the Required DIP Lenders (as defined in the DIP Credit Agreement);<br><br>• On or before 45 days after the Petition Date, the deadline for submission of bids for the Additional Assets shall have occurred pursuant to the Bidding Procedures Orders;<br><br>• On or before the first business day occurring not more than 5 days after the deadline for bid submissions, the Debtors shall conduct an initial auction for the Additional Assets pursuant to the Bidding Procedures Order and shall conduct each additional auction for the Additional Assets within 5 days of the prior auction, in each case on terms and conditions and in accordance with procedures reasonably acceptable to the DIP Agent and the Required DIP Lenders; and<br><br>• The Debtors shall have completed all GOB sales by October 31, 2024.<br><br>*Interim DIP Order, Schedule 3* |
| **Liens and Priorities**<br><br>Bankruptcy Rule 4001(c)(1)(B)(i) | *Liens on Unencumbered Property.* Pursuant to section 364(c)(2) of the Bankruptcy Code, a valid, binding, continuing, enforceable, fully-perfected first priority senior security interest (subject only to the Carve-Out) in, and lien upon, all tangible and intangible prepetition and postpetition property of the DIP Loan Parties, whether existing on the |

Petition Date or thereafter acquired, and the proceeds, products, rents, and profits thereof, that, on or as of the Petition Date, is not subject to (i) a valid, perfected and non-avoidable lien or (ii) a valid and non-avoidable lien in existence as of the Petition Date that is perfected subsequent to the Petition Date as permitted by section 546(b) of the Bankruptcy Code, including, without limitation, any and all unencumbered cash of the DIP Loan Parties (whether maintained with any of the DIP Secured Parties or otherwise) and any investment of cash, inventory, accounts receivable, other rights to payment whether arising before or after the Petition Date, contracts, properties, plants, fixtures, machinery, equipment, general intangibles, documents, instruments, securities, goodwill, causes of action, insurance policies and rights, claims and proceeds from insurance, commercial tort claims and claims that may constitute commercial tort claims (known and unknown), chattel paper (including electronic chattel paper and tangible chattel paper), interests in leaseholds, real properties, deposit accounts, patents, copyrights, trademarks, trade names, rights under license agreements and other intellectual property, equity interests of subsidiaries, joint ventures and other entities, wherever located, and the proceeds, products, rents and profits of the foregoing, whether arising under section 552(b) of the Bankruptcy Code or otherwise (the "Unencumbered Property"), in each case other than the Avoidance Actions and any Excluded Collateral (as defined in the DIP Documents) and the Professional Fee Reserve Account and any amounts held therein (but, for the avoidance of doubt, subject to entry of the Final Order, "Unencumbered Property" shall include Avoidance Proceeds). Notwithstanding anything in this Interim Order or the DIP Documents to the contrary, in no event shall DIP Collateral (and the DIP Liens and Adequate Protection Liens thereon) include: (a) any leasehold interest in non-residential real property that prohibits or restricts the granting of liens thereon (except as permitted pursuant to applicable non-bankruptcy law), but shall include the proceeds of the sale or other disposition of such leases, (b) any security deposits held by a landlord under any non-residential real property lease or the Debtors' interest in any pre-paid rent under any such lease (but shall include the Debtors' reversionary interests therein), to the extent prohibited under such lease or applicable law, and (c) the Professional Fee Reserve Account or contents thereof.

*Liens Priming Certain Prepetition Secured Parties' Liens.*  Pursuant to section 364(d)(1) of the Bankruptcy Code, a valid, binding, continuing, enforceable, fully-perfected first priority senior priming security interest (subject only to the Carve-Out and valid, perfected and non-avoidable Prepetition Permitted Senior Liens) in, and lien upon, all tangible and intangible prepetition and postpetition property of the DIP Loan Parties of the same nature, scope, and type as the Prepetition Collateral, regardless of where located (the "DIP Priming Liens"). Notwithstanding anything herein to the contrary, the DIP Priming Liens shall be (A) senior in all respects to the other Prepetition Liens, (B) senior to any Adequate Protection Liens and (C) not subordinate to any lien, security interest or mortgage that is avoided and preserved for the benefit of the Debtors and their estates under section 551 of the Bankruptcy Code. The Prepetition Liens shall be primed by and made subject and subordinate to the DIP Priming Liens.

*Liens Junior to Certain Other Liens.*  Pursuant to section 364(c)(3) of the Bankruptcy Code, a valid, binding, continuing, enforceable, fully perfected security interest in and lien (subject to the Carve-Out) upon all tangible and intangible prepetition and postpetition property of the DIP Loan Parties that, on or as of the Petition Date, is subject to either (i) valid, perfected and non-avoidable Prepetition Permitted Senior Liens, or (ii) valid and non-avoidable Prepetition ABL Permitted Senior Liens in existence immediately prior to the Petition Date that are perfected subsequent to the Petition Date, as permitted by section 546(b) of the Bankruptcy Code, which shall be (x) immediately junior and subordinate to any such ABL Prepetition Permitted Senior Liens but (y) senior to the ABL Adequate Protection Liens and the Prepetition Liens on all Prepetition Collateral subject to such Prepetition Permitted Senior Liens.

| | |
|---|---|
| | *Liens Senior to Certain Other Liens.* The DIP Liens shall not be (i) subject or subordinate to or made *pari passu* with (A) any lien or security interest that is avoided and preserved for the benefit of the Debtors or their estates under section 551 of the Bankruptcy Code, (B) unless otherwise provided for in the DIP Documents or in this Interim Order, any liens or security interests arising after the Petition Date, including, without limitation, any liens or security interests granted in favor of any federal, state, municipal or other governmental unit (including any regulatory body), commission, board or court for any liability of the DIP Loan Parties, or (C) any intercompany or affiliate liens of the DIP Loan Parties or security interests of the DIP Loan Parties; or (ii) subordinated to or made *pari passu* with any other lien or security interest under section 363 or 364 of the Bankruptcy Code.<br><br>*Interim DIP Order ¶ 9* |
| **Carve Out**<br><br>Bankruptcy Rule 4001(c)(1)(B) | As used in the Interim DIP Order, "Carve Out" means the sum of (a) the payment of unpaid fees required to be paid to the Clerk of the Court and to the U.S. Trustee pursuant to 28 U.S.C. § 1930(a) with interest at the statutory rate pursuant to 31 U.S.C. § 3717; (b) reasonable fees and expenses up to $100,000 incurred by a trustee under section 726(b) of the Bankruptcy Code; (c) to the extent allowed at any time, whether by interim order, procedural order, or otherwise, but subject to final allowance by the Court, all unpaid fees and expenses (the "<u>Allowed Professional Fees</u>") incurred by persons or firms retained by the Debtors pursuant to section 327, 328, or 363 of the Bankruptcy Code (the "<u>Debtor Professionals</u>"), and any Creditors' Committee (the "<u>Committee Professionals</u>" and, together with the Debtor Professionals, the "<u>Estate Professionals</u>") at any time before the delivery by any Prepetition Secured Party or DIP Secured Party of a Carve-Out Trigger Notice (defined below) and without regard to whether such fees and expenses are provided for in any Approved Budget or were invoiced after the Carve-Out Trigger Notice Date (the amounts set forth in this clause (c) being the "<u>Pre Carve-Out Trigger Notice Cap</u>"); (d) the Allowed Professional Fees of Debtor Professionals in an aggregate amount not to exceed $2,750,000, less the amount of any retainer held by such Debtor Professional and not previously returned or applied to fees and expenses, incurred on or after the first business day following delivery by any Prepetition Secured Party or DIP Secured Party of the Carve-Out Trigger Notice to the extent allowed at any time, whether by interim order, procedural order, or otherwise, but subject to final allowance by the Court, (the amount set forth in this clause (d) being the "<u>Debtor Post Carve-Out Trigger Notice Cap</u>"); and (e) Allowed Professional Fees of Committee Professionals in an aggregate amount not to exceed $100,000 incurred on or after the first business day following delivery by the any Prepetition Secured Party or DIP Secured Party of the Carve-Out Trigger Notice to the extent allowed at any time, whether by interim order, procedural order, or otherwise, but subject to final allowance by the Court (the amount set forth in this clause (e) being the "<u>Committee Post Carve-Out Trigger Notice Cap</u>" and together with the Debtor Post Carve-Out Trigger Notice Cap, such amount, the "<u>Post Carve-Out Trigger Notice Cap</u>" and the Pre Carve-Out Trigger Notice Cap together with the Post Carve-Out Trigger Notice Cap and the amounts set forth in clauses (a) and (b), the "<u>Carve-Out Cap</u>") (the foregoing clauses (a) through (e), collectively, the "<u>Carve-Out</u>"). The term "<u>Carve-Out Trigger Notice</u>" shall mean a written notice stating that the Post Carve-Out Trigger Notice Cap has been invoked, delivered by hard copy or email by any Prepetition Secured Party or DIP Secured Party or their counsel to lead bankruptcy counsel for the Debtors, the U.S. Trustee, DIP Secured Parties, Prepetition Secured Parties, and counsel to the Creditors' Committee, if any, which notice may be issued following the occurrence and during the continued existence of an Event of Default (as defined herein) under the terms of this Interim Order. The term "<u>Carve-Out Trigger Notice Date</u>" shall mean the day on which a Carve-Out Trigger Notice is delivered by any Prepetition Secured Party or DIP Secured Party or their advisors, as applicable.  On the Carve-Out Trigger Notice Date, the Carve-Out Trigger Notice shall constitute a demand to the Debtors to transfer cash in an amount equal to the Carve-Out Cap (which |

| | |
|---|---|
| | shall be determined by the applicable Estate Professional in its reasonable discretion based on the amount of then-unpaid Allowed Professional Fees plus a reasonable estimate of fees and expenses not yet allowed) less any amount then held in the Professional Fee Reserve Account (defined below) to the Professional Fee Reserve Account. All amounts required to be paid to Houlihan Lokey Capital, Inc. ("Houlihan Lokey") on account of any fees earned in connection with any Transaction under and as defined in that certain engagement letter between Houlihan Lokey and the Debtors, dated as of June 14, 2024, incurred at any time (whether before or after delivery of a Carve-Out Trigger Notice) and payable under sections 328, 330, and/or 331 of the Bankruptcy Code, shall be paid to Houlihan Lokey or deposited into the Professional Fee Reserve Account (defined below) solely for the benefit of Houlihan Lokey, out of the gross proceeds of such Transaction. For the avoidance of doubt, solely the sale of inventory through the going out of business sales at retail locations shall not trigger a Transaction Fee under Houlihan Lokey's engagement letter.<br><br>*Interim DIP Order ¶ 6* |
| **Challenge Period**<br><br>Bankruptcy | The Debtors' stipulations, admissions, agreements, and releases contained in this Interim Order shall be binding upon the Debtors in all circumstances and for all purposes. The Debtors' stipulations, admissions, agreements and releases contained in this Interim Order shall be binding upon all other parties in interest, including, without limitation, any statutory or non-statutory committees appointed or formed in the Chapter 11 Cases and any other person or entity acting or seeking to act on behalf of the Debtors' estates including any chapter 7 or chapter 11 trustee or examiner appointed or elected for any of the Debtors, in all circumstances and for all purposes unless: (a) a party in interest with standing or the requisite authority (other than the Debtors, as to which any right to challenge the stipulations, admissions, and releases contained herein is irrevocably waived and relinquished) has, under the appropriate Bankruptcy Rules, timely and properly filed an adversary proceeding or contested matter (subject to the limitations contained herein, including, *inter alia*, in this paragraph) by no later than the earlier of (x) as to the Creditors' Committee only, 60 calendar days after the appointment of the Creditors' Committee or, if longer, 75 days from entry of this Interim Order, (y) if the Chapter 11 Cases are converted to chapter 7 and a chapter 7 trustee or a chapter 11 trustee is appointed or elected prior to the end of the Challenge Period, then the Challenge Period for any such chapter 7 trustee or chapter 11 trustee shall be extended (solely as to such chapter 7 trustee and chapter 11 trustee) to the date that is the later of (1) 75 calendar days after entry of this Interim Order, or (2) the date that is 30 calendar days after its appointment, and (z) as for all other parties in interest, 75 calendar days after entry of this Interim Order; and (ii) any such later date as (x) has been agreed to by the Prepetition Secured Parties with respect to the Prepetition Secured Debt or the Prepetition Liens, or (y) has been ordered by the Court for cause upon a motion filed and served within any applicable period (the time period established by the foregoing clauses (i)-(ii), the "Challenge Period"), (b) objecting to or challenging the amount, validity, perfection, enforceability, priority or extent of the Prepetition Secured Debt or the Prepetition Liens, or otherwise asserting or prosecuting any action for preferences, fraudulent transfers or conveyances, other avoidance power claims or any other claims, counterclaims or causes of action, objections, contests or defenses (collectively, the "Challenges") against the Prepetition Secured Parties or their respective subsidiaries, affiliates, officers, directors, managers, principals, employees, agents, financial advisors, attorneys, accountants, investment bankers, consultants, representatives and other professionals and the respective successors and assigns thereof, in each case in their respective capacity as such (each, a "Representative" and, collectively, the "Representatives") in connection with matters related to the Prepetition Credit Documents, the Prepetition Secured Debt, the Prepetition Liens and the Prepetition Collateral; and (c) there is a final non-appealable order in favor of the plaintiff sustaining any such Challenge in any such timely filed adversary proceeding or contested matter; *provided*, *however*, that any pleadings filed in |

connection with any Challenge shall set forth with specificity the basis for such challenge or claim and any challenges or claims not so specified prior to the expiration of the Challenge Period shall be deemed forever, waived, released and barred. If no such Challenge is timely and properly filed during the Challenge Period or the Court does not rule in favor of the plaintiff in any such proceeding then: (x) the Debtors' stipulations, admissions, agreements and releases contained in this Interim Order shall be binding on all parties in interest; (y) the obligations of the DIP Loan Parties under the Prepetition Credit Documents, including the Prepetition Secured Debt, shall constitute allowed claims not subject to defense avoidance, reduction, setoff, recoupment, recharacterization, subordination (whether equitable, contractual, or otherwise, except under the Intercreditor Agreements), disallowance, impairment, claim, counterclaim, cross-claim, or any other challenge under the Bankruptcy Code or any applicable law or regulation by any person or entity for all purposes in the Chapter 11 Cases, and any subsequent chapter 7 case(s); and (z) the Prepetition Liens on the Prepetition Collateral shall be deemed to have been, as of the Petition Date, legal, valid, binding, perfected, security interests and liens, not subject to defense, avoidance, reduction, setoff, recoupment, recharacterization, subordination (whether equitable, contractual (other than pursuant to the Intercreditor Agreements), or otherwise), disallowance, impairment, claim, counterclaim, cross-claim, or any other challenge under the Bankruptcy Code or any applicable law or regulation by any person or entity, including any statutory or non-statutory committees appointed or formed in the Chapter 11 Cases or any other party in interest acting or seeking to act on behalf of the Debtors' estates, including, without limitation, any successor thereto (including, without limitation, any chapter 7 trustee or chapter 11 trustee or examiner appointed or elected for any of the Debtors) and any defense, avoidance, reduction, setoff, recoupment, recharacterization, subordination (whether equitable, contractual, or otherwise), disallowance, impairment, claim, counterclaim, cross-claim, or any other challenge under the Bankruptcy Code or any applicable law or regulation by any statutory or non-statutory committees appointed or formed in the Chapter 11 Cases or any other party acting or seeking to act on behalf of the Debtors' estates, including, without limitation, any successor thereto (including, without limitation, any chapter 7 trustee or chapter 11 trustee or examiner appointed or elected for any of the Debtors), whether arising under the Bankruptcy Code or otherwise, against any of the Prepetition Secured Parties and their Representatives arising out of or relating to any of the Prepetition Credit Documents, the Prepetition Secured Debt, the Prepetition Liens and the Prepetition Collateral shall be deemed forever waived, released and barred. If any such Challenge is timely filed during the Challenge Period, the stipulations, admissions, agreements and releases contained in this Interim Order shall nonetheless remain binding and preclusive (as provided in the second sentence of this paragraph) on each other statutory or nonstatutory committee appointed or formed in the Chapter 11 Cases and on any other person or entity, except to the extent that such stipulations, admissions, agreements and releases were expressly and successfully challenged in such Challenge as set forth in a final, non-appealable order of a court of competent jurisdiction. Nothing in this Interim Order vests or confers on any Person (as defined in the Bankruptcy Code), including any statutory or non-statutory committees appointed or formed in these Chapter 11 Cases, standing or authority to pursue any claim or cause of action belonging to the Debtors or their estates, including, without limitation, Challenges with respect to the Prepetition Credit Documents, the Prepetition Secured Debt or the Prepetition Liens, and any ruling on standing, if appealed, shall not stay or otherwise delay the Chapter 11 Cases or confirmation of any plan of reorganization

*Interim DIP Order ¶ 21*

| | |
|---|---|
| **Adequate Protections** | *ABL Adequate Protection Liens*. The Prepetition ABL Agent, for itself and for the benefit of the Prepetition ABL Lenders, is hereby granted (effective and perfected upon the date of this Interim Order and without the necessity of the execution of any mortgages, security agreements, pledge agreements, financing statements or other agreements), to |

| | |
|---|---|
| Bankruptcy Rules 4001(b)(1)(B)(iv), 4001(c)(1)(B)(ii) | secure its Adequate Protection Claims, a valid, perfected replacement security interest in and lien upon all of the DIP Collateral (the "ABL Adequate Protection Liens"), subject and subordinate to (i) the Prepetition ABL Permitted Senior Liens, (ii) the Carve-Out, and (iii) the DIP Liens.

*2L Adequate Protection Liens*. The Prepetition 2L Agent, for itself and for the benefit of the Prepetition 2L Lenders is hereby granted (effective and perfected upon the date of this Interim Order and without the necessity of the execution of any mortgages, security agreements, pledge agreements, financing statements or other agreements), to secure its Adequate Protection Claims, a valid, perfected replacement security interest in and lien upon all of the DIP Collateral (the "2L Adequate Protection Liens"), subject and subordinate to (i) the Prepetition 2L Permitted Senior Liens, (ii) the Carve-Out, (iii) the DIP Liens, (iv) the ABL Adequate Protection Liens, and (v) the Prepetition ABL Liens.

*3L Adequate Protection Liens*. Prepetition 3L Agent, for itself and for the benefit of the Prepetition 3L Lenders is hereby granted (effective and perfected upon the date of this Interim Order and without the necessity of the execution of any mortgages, security agreements, pledge agreements, financing statements or other agreements), to secure its Adequate Protection Claims, a valid, perfected replacement security interest in and lien upon all of the DIP Collateral (the "3L Adequate Protection Liens" and, together with the 2L Adequate Protection Liens and 3L Adequate Protection Liens, the "Adequate Protection Liens"), subject and subordinate to (i) the Prepetition 3L Permitted Senior Liens, (ii) the Carve-Out, (iii) the DIP Liens, (iv) the ABL Adequate Protection Liens, (v) the Prepetition ABL Liens, (vi) the 2L Adequate Protection Liens, and (vii) the Prepetition 2L Liens.

*Prepetition ABL Secured Parties' Section 507(b) Claim*. Prepetition ABL Agent, for itself and for the benefit of the Prepetition ABL Lenders, is hereby granted an allowed superpriority administrative expense claim on account of such Prepetition ABL Secured Parties' Adequate Protection Claims as provided for in section 507(b) of the Bankruptcy Code (the "Prepetition ABL 507(b) Claim") which Prepetition ABL 507(b) Claim shall be payable from and have recourse to all DIP Collateral and all proceeds thereof (excluding Avoidance Actions but including, without limitation, subject to entry of the Final Order, the Avoidance Proceeds). The Prepetition ABL 507(b) Claim shall be subject and subordinate only to the (i) Carve-Out and (ii) the DIP Superpriority Claims.

*Prepetition 2L Secured Parties' Section 507(b) Claim*. The Prepetition 2L Agent, for itself and for the benefit of the Prepetition 2L Lenders, is hereby granted an allowed superpriority administrative expense claim on account of such Prepetition 2L Secured Parties' Adequate Protection Claims as provided for in section 507(b) of the Bankruptcy Code (the "Prepetition 2L 507(b) Claim") which Prepetition 2L 507(b) Claim shall be payable from and have recourse to all DIP Collateral and all proceeds thereof (excluding Avoidance Actions but including, without limitation, subject to entry of the Final Order, the Avoidance Proceeds). The Prepetition 2L 507(b) Claim shall be subject and subordinate only to the (i) Carve-Out, (ii) the DIP Superpriority Claims, and (iii) the Prepetition ABL 507(b) Claims.

*Prepetition 3L Secured Parties' Section 507(b) Claim*. The Prepetition 3L Agent, for itself and for the benefit of the Prepetition 3L Lenders, is hereby granted an allowed superpriority administrative expense claim on account of such Prepetition 3L Secured Parties' Adequate Protection Claims as provided for in section 507(b) of the Bankruptcy Code (the "Prepetition 3L 507(b) Claim" and, together with the Prepetition ABL 507(b) Claims and the Prepetition 2L 507(b) Claims, the "Prepetition 507(b) Claims") which Prepetition 3L 507(b) Claim shall be payable from and have recourse to all DIP Collateral and all proceeds thereof (excluding Avoidance Actions but including, without limitation, subject to entry of the Final Order, the Avoidance Proceeds). The Prepetition 3L 507(b) Claim shall be subject and subordinate only to the (i) Carve-Out, (ii) the DIP |

Superpriority Claims, (iii) the Prepetition ABL 507(b) Claims, and (iv) the Prepetition 2L 507(b) Claims.

*Prepetition ABL Secured Parties' Adequate Protection Fees and Expenses*. As further adequate protection, the DIP Loan Parties shall provide the Prepetition ABL Agent, for the benefit of the Prepetition ABL Lenders, current cash payments of the reasonable and documented prepetition and postpetition out-of-pocket fees and expenses of the Prepetition ABL Agent under the Prepetition ABL Credit Documents, including, but not limited to, the reasonable and documented fees and out-of-pocket expenses of Simpson Thacher & Bartlett LLP (solely in its capacity as counsel to the Prepetition ABL Agent), and one local counsel to the Prepetition ABL Agent, and FTI Consulting, Inc. as financial advisor (the "ABL Adequate Protection Fees and Expenses"), subject to the review procedures set forth in paragraph **Error! Reference source not found.** of this Interim Order.

*Prepetition 2L Secured Parties' Adequate Protection Fees and Expenses*. As further adequate protection, the DIP Loan Parties shall provide the Prepetition 2L Agent, for the benefit of the Prepetition 2L Lenders, current cash payments of the reasonable and documented out-of-pocket prepetition and postpetition fees and expenses of the Prepetition 2L Agent under the Prepetition 2L Credit Documents, including, but not limited to, the reasonable and documented fees and out-of-pocket expenses of Choate Hall & Stewart LLP (solely in its capacity as counsel to the Prepetition 2L Agent), and one local counsel to the Prepetition 2L Agent (the "2L Adequate Protection Fees and Expenses"), subject to the review procedures set forth in paragraph **Error! Reference source not found.** of this Interim Order.

*Prepetition 3L Secured Parties' Adequate Protection Fees and Expenses*. As further adequate protection, the DIP Loan Parties shall provide the Prepetition 3L Agent, for the benefit of the Prepetition 3L Lenders, current cash payments of the reasonable and documented out-of-pocket prepetition and postpetition fees and expenses of the Prepetition 3L Agent under the Prepetition 3L Credit Documents, including, but not limited to, the reasonable and documented fees and out-of-pocket expenses of Holland & Knight LLP (solely in its capacity as counsel to the Prepetition 3L Agent) (the "3L Adequate Protection Fees and Expenses" and, together with the ABL Adequate Protection Fees and Expenses and the 2L Adequate Protection Fees and Expenses, the "Adequate Protection Fees and Expenses"), subject to the review procedures set forth in paragraph **Error! Reference source not found.** of this Interim Order.

*ABL Postpetition Interest Payments*. From and after entry of this Interim Order, the Prepetition ABL Agent, on behalf of itself and the Prepetition ABL Lenders, shall receive current cash payment during the Chapter 11 Cases of all accrued interest on the Prepetition ABL Obligations under the Prepetition ABL Credit Agreement as such interest becomes due and payable and as set forth in the following sentence, at the applicable contractual default rate thereunder.  The first such interest payment date shall be August 1, 2024 and thereafter, the first business day of every calendar month.

*2L Postpetition Interest Accrual*.  From and after entry of this Interim Order, the Prepetition 2L Agent, on behalf of itself and the Prepetition 2L Lenders, shall be permitted during the Chapter 11 Cases to accrue interest on the Prepetition 2L Obligations under the Prepetition 2L Credit Documents as such interest becomes due and payable under the Prepetition 2L Credit Documents, at the applicable contractual default rate thereunder.

*3L Postpetition Interest Accrual*.  From and after entry of this Interim Order, the Prepetition 3L Agent, on behalf of itself and the Prepetition 3L Lenders, shall be permitted during the Chapter 11 Cases to accrue interest on the Prepetition 3L Obligations under the Prepetition 3L Credit Documents as such interest becomes due and payable

| | |
|---|---|
| | under the Prepetition 3L Credit Documents, at the applicable contractual default rate thereunder. |
| | *Borrowing Base Reporting*. The Debtors shall deliver to the Prepetition ABL Agent and DIP Agent, a Borrowing Base Certificate, with all the information required to be provided in connection therewith under the Prepetition ABL Credit Agreement, in each case in the format customarily delivered with each Borrowing Base Certificate delivered prior to the Petition Date, setting forth the Cash Collateral Borrowing Base (i) calculated as of the last day of the immediately preceding calendar week (with weeks, for purpose of the Borrowing Base Certificate, beginning on Sunday and ending on Saturday) on the third business day of each week commencing on July 31, 2024 for the week ending July 28, 2024; and (ii) calculated as of the last business day of the immediately preceding fiscal month, promptly, but in no event later than August 20, 2024 with respect to the fiscal month ended July 31, 2024 and twenty calendar days (or, if such day is not a business day, the next business day) following the end of each subsequent fiscal month which monthly Borrowing Base Certificates shall reconcile all weekly inventory roll forwards. |
| | *Appraisals*. Notwithstanding anything to the contrary in the Prepetition ABL Credit Agreement, the Prepetition ABL Agent will not be entitled to implement the results of any new inspections, appraisals and field examinations (including, without limitation, with respect to Prepetition Collateral) for a period of ninety (90) days from the Petition Date, but any ongoing appraisals and field examinations may continue in accordance with the Prepetition ABL Credit Agreement and may be implemented after the ninetieth day from the Petition Date (a "<u>Permitted Reappraisal</u>"). |
| | *ABL Adequate Protection Information Rights*. The Debtors shall provide to the Prepetition ABL Agent at the same time as such reporting is provided to the DIP Lenders and/or the DIP Agent (in each case, as may be extended by the advisors to the DIP Lenders and the DIP Agent (which may be by email)) all reporting required to be provided to the DIP Lenders or DIP Agent under the DIP Documents. |
| | *Maintenance of Insurance for Collateral*. The DIP Loan Parties shall continue to maintain and insure the Prepetition Collateral and DIP Collateral in amounts and for the risks, and by the entities, as required under the Prepetition Credit Documents and the DIP Documents. |
| | *Interim DIP Order ¶ 15* |
| **Events of Default** <br><br> Bankruptcy Rule 4001(c)(1)(B) | The DIP Credit Agreement provides for customary events of default and remedies available to the DIP Lender. <br><br> *DIP Credit Agreement § 11.1* |
| **Waiver/Modification of the Automatic Stay** <br><br> Bankruptcy Rule 4001(c)(1)(B)(iv) | Upon the occurrence and during the continuation of an Event of Default (as defined in the DIP Credit Agreement) (a "<u>DIP Event of Default</u>") that has not been waived by the Required DIP Lenders and following delivery of written notice (a "<u>DIP Termination Notice</u>") (including by e-mail) on not less than five (5) business days' notice (such five (5) business day period, the "<u>DIP Agent Remedies Notice Period</u>") to lead restructuring counsel to the Debtors, lead restructuring counsel to the Prepetition ABL Agent, lead restructuring counsel to the Prepetition 2L Agent, lead restructuring counsel to the 3L Agent, lead counsel to the Creditors' Committee (if any), and the U.S. Trustee, (the "<u>Remedies Notice Parties</u>"), the DIP Agent may (and any automatic stay otherwise applicable to the DIP Secured Parties, whether arising under sections 105 or 362 of the Bankruptcy Code or otherwise, but subject to the terms of this Interim Order (including this paragraph) is hereby modified), without further notice to, hearing of, or order from this Court, unless the Court orders otherwise (*provided* that during the DIP Agent Remedies Notice Period, the Debtors, the Creditors' Committee (if appointed) and/or any party in interest shall be entitled to seek an emergency hearing (with the DIP Agent hereby consenting to such emergency hearing) with the Court for the purpose of contesting whether, in fact, an Event of Default has occurred and is continuing and any |

other appropriate relief (including, without limitation, the Debtors' non-consensual use of Cash Collateral); and *provided further that* if a request for such hearing is made prior to the end of the DIP Agent Remedies Notice Period, the DIP Agent Remedies Notice Period shall be continued until the Court hears and rules with respect thereto), subject to the Carve-Out: (i) immediately terminate and/or revoke the Debtors' right under this Interim Order and any other DIP Loan Documents to use any Cash Collateral (subject to the Carve-Out and related provisions); (ii) terminate the DIP Facility and any DIP Loan Document as to any future liability or obligation of the DIP Secured Parties but without affecting any of the DIP Obligations or the DIP Liens securing such DIP Obligations; and (iii) declare all DIP Obligations to be immediately due and payable, *provided* that the ABL Roll-Up shall continue.  As soon as reasonably practicable following receipt of a DIP Termination Notice, the Debtors shall file a copy of same on the docket.

*Interim DIP Order ¶ 10(c)*

Upon the occurrence and during the continuation of a Cash Collateral Event of Default that has not been waived by (i) the Prepetition ABL Agent, (ii) following the payment in full of the Prepetition ABL Obligations, the Prepetition 2L Agent, or (iii) following the payment in full of the Prepetition ABL Obligations and Prepetition 2L Obligations, the Prepetition 3L Agent (the "Directing Cash Collateral Agent"), following delivery of written notice (a "Cash Collateral Termination Notice") (including by e-mail) on not less than five (5) business days' notice (such five (5) business day period, the "Cash Collateral Remedies Notice Period") to lead restructuring counsel to the Debtors, lead restructuring counsel to the DIP Agent, lead restructuring counsel to the Prepetition ABL Agent, lead restructuring counsel to the Prepetition 2L Agent, lead restructuring counsel to the 3L Agent, lead counsel to the Creditors' Committee (if any), and the U.S. Trustee, (the "Cash Collateral Remedies Notice Parties"), the Prepetition Agents may, subject to this Interim Order, (and any automatic stay otherwise applicable to the Prepetition Secured Parties, whether arising under sections 105 or 362 of the Bankruptcy Code or otherwise, but subject to the terms of this Interim Order (including this paragraph) is hereby modified), without further notice to, hearing of, or order from this Court, unless the Court orders otherwise (*provided* that during the Cash Collateral Remedies Notice Period, the Debtors, the Creditors' Committee (if appointed) and/or any party in interest shall be entitled to seek an emergency hearing (with the Prepetition Agents consenting to such emergency hearing) with the Court for the purpose of contesting whether, in fact, a Cash Collateral Event of Default has occurred and is continuing and any other appropriate relief (including, without limitation, the Debtors' non-consensual use of Cash Collateral); and *provided further that* if a request for such hearing is made prior to the end of the Cash Collateral Remedies Notice Period, the Cash Collateral Remedies Notice Period shall be continued until the Court hears and rules with respect thereto), subject to the Carve-Out and Professional Fee Reserve Account, and the DIP Liens, immediately terminate and/or revoke the Debtors' right under this Interim Order and any other Prepetition Credit Documents to use any Cash Collateral (subject to the Carve-Out).  As soon as reasonably practicable following receipt of a Cash Collateral Termination Notice, the Debtors shall file a copy of same on the docket.

*Interim DIP Order ¶ 16(d)*

The Debtors, the DIP Secured Parties and the Prepetition Secured Parties are authorized to take all reasonable actions as are necessary or appropriate to implement the terms of this Interim Order.  In addition, the Automatic Stay is modified to permit affiliates of the Debtors who are not debtors in these Chapter 11 Cases to take all actions as are necessary or appropriate to implement the terms of this Interim Order.

*Interim DIP Order ¶ 37*

| **Waiver/Modification of Applicability of** | As security for the DIP Obligations, effective and automatically and properly perfected upon the entry of this Interim Order and without the necessity of the execution, |

23

| | |
|---|---|
| **Nonbankruptcy Law Relating to Perfection or Enforceability of Liens**<br><br>Bankruptcy Rule 4001(c)(1)(B)(vii) | recordation or filing by the DIP Loan Parties or any of the DIP Secured Parties of mortgages, security agreements, control agreements, pledge agreements, financing statements, intellectual property filing or other similar documents, any notation of certificates of title for titled goods or other similar documents, instruments, deeds, charges or certificates, or the possession or control by the DIP Agent of, or over, any Collateral, without any further action by the DIP Agent or the DIP Secured Parties, the valid, binding, continuing, enforceable and non-avoidable security interests and liens on the DIP Collateral (all security interests and liens granted to the DIP Agent, for its benefit and for the benefit of the other DIP Secured Parties, pursuant to this Interim Order and the DIP Documents, the "<u>DIP Liens</u>") are hereby granted to the DIP Agent, in each case subject to the Carve-Out, for its own benefit and the benefit of the DIP Secured Parties.<br><br>*Interim DIP Order ¶ 9* |
| **Indemnification**<br><br>Bankruptcy Rule 4001(c)(1)(B)(ix) | The Prepetition Secured Parties and the DIP Secured Parties have acted in good faith and without negligence, misconduct, or violation of public policy or law, in respect of all actions taken by them in connection with or related in any way to negotiating, implementing, documenting, or obtaining requisite approvals of the DIP Facilities and the use of Cash Collateral, including in respect of the granting of the DIP Liens and the Adequate Protection Liens, any challenges or objections to the DIP Facilities or the use of Cash Collateral, the DIP Documents, and all other documents related to and all transactions contemplated by the foregoing. Accordingly, without limitation to any other right to indemnification, the Prepetition Secured Parties and the DIP Secured Parties shall be and hereby are indemnified (as applicable) as provided in the Prepetition Credit Documents and the DIP Documents, as applicable, including, without limitation, Section 9.03 of the DIP Credit Agreement. The Debtors agree that no exception or defense in contract, law, or equity exists as of the date of this Interim Order to any obligation set forth, as the case may be, in this paragraph **Error! Reference source not found.** or in the DIP Documents, or in the Prepetition Credit Documents to indemnify and/or hold harmless the DIP Agent, any other DIP Secured Party, or any Prepetition Secured Party, as the case may be, and any such defenses are hereby waive.<br><br>*Interim DIP Order ¶ 23* |
| **Section 506(c) and 552(b) Waiver**<br><br>Bankruptcy Rule 4001(c)(1)(B)(x) | Except to the extent of the Carve-Out and Professional Fee Reserve Account, no costs or expenses of administration of the Chapter 11 Cases or any Successor Cases or any future proceeding that may result therefrom, including liquidation in bankruptcy or other proceedings under the Bankruptcy Code, shall be charged against or recovered from the DIP Collateral (including Cash Collateral) or Prepetition Collateral pursuant to section 506(c) of the Bankruptcy Code or any similar principle of law, without the prior written consent of the DIP Agent, the Prepetition ABL Agent, the Prepetition 2L Agent, and the Prepetition 3L Agent, as applicable, and no consent shall be implied from any other action, inaction or acquiescence by the DIP Agent, the DIP Secured Parties, the Prepetition ABL Agent, the Prepetition 2L Agent, the Prepetition 3L Agent, or the Prepetition Secured Parties, and nothing contained in this Interim Order shall be deemed to be a consent by the DIP Agent, the DIP Secured Parties, the Prepetition ABL Agent, the Prepetition 2L Agent, the Prepetition 3L Agent, or the Prepetition Secured Parties to any charge, lien, assessment or claims against the Collateral under section 506(c) of the Bankruptcy Code or otherwise; *provided* that the foregoing waiver shall be without prejudice to any provisions of the Final Order.<br><br>*Interim DIP Order ¶ 11*<br><br>In no event shall the "equities of the case" exception in section 552(b) of the Bankruptcy Code apply to the Prepetition ABL Agent, the Prepetition 2L Agent, the Prepetition 3L Agent, or the Prepetition Secured Parties with respect to proceeds, products, offspring or |

| | |
|---|---|
| | profits of any Prepetition Collateral; *provided* that the foregoing waiver shall be without prejudice to any provisions of the Final Order.<br><br>*Interim DIP Order ¶ 12* |

**The Debtors' Prepetition Capital Structure**

**I.     The Debtors' Prepetition Capital Structure**

12.     As of the Petition Date, the Company's capital structure includes approximately $530,000 of funded debt obligations, as summarized below.

| Funded Debt | Maturity | Approximate Outstanding Principal Amount |
|---|---|---|
| **First Lien Facility (Non-Extending Class)** | March 29, 2025[5] | $386,756,411.99[6] |
| **Second Lien Facility** | February 20, 2027 | $93,000,000 |
| **Third Lien Facility** | May 22, 2027 | $50,000,000 |
| **Total Funded Debt** | | $529,756,411.99 |

Substantially all of the Debtors' assets constitute collateral for the funded debt obligations.

**II.     Prepetition First Lien ABL Revolving Credit Facility**

13.     On March 29, 2021, Debtors Conn's, Inc., Conn Appliances, Inc. ("CAI") Conn Credit I, LP ("CCI"), and Conn Credit Corporation, Inc. ("CCC") entered into the Fifth Amended and Restated Loan and Security Agreement (the "Original JPM Loan Agreement" and the Original JPM Loan Agreement as amended or otherwise modified by the First JPM Amendment, the Second JPM Amendment and Third JPM Amendment being referred to hereinafter as the "Prepetition ABL Credit Agreement") with JPMorgan Chase Bank, N.A., as administrative agent and collateral agent (the "Prepetition ABL Agent"), and the lenders party thereto (the "Prepetition ABL Lenders," and collectively with the Prepetition ABL Agent and all other holders of debt under the Prepetition ABL Credit Agreement, the "Prepetition ABL Secured Parties" and, together with the

---

[5]     The maturity date for the First Lien Facility with respect to the Extending Class is December 18, 2026.

[6]     In addition to principal drawn and outstanding, $27,787,684.36 of face amount of letters of credit were issued and available to be drawn under the First Lien Credit Facility.

Prepetition 2L Secured Parties and the Prepetition 3L Secured Parties (each as defined herein), the "Prepetition Secured Parties"), which provided for a $650 million[7] asset-based revolving credit facility (the "Prepetition ABL Facility") pursuant to which the lenders would extend revolving loans from time to time in an aggregate amount not to exceed the borrowing base. *See* Miller Decl., ¶ 24.

14.     The Original JPM Loan Agreement was amended on November 21, 2022 (the "First JPM Amendment"), again on February 21, 2023 (the "Second JPM Amendment"), again on December 18, 2023 (the "Third JPM Amendment") and most recently on July 9, 2024 (the "Fourth JPM Amendment" and together with the First JPM Amendment, Second JPM Amendment and Third JPM Amendment, collectively being the "JPM Amendments"). *Id.* at ¶ 25.  The JPM Amendments provided for, among other things, the adjustment to the applicable interest rates and margins, the addition of WSB as a borrower thereto and additional financial covenants. *Id.*  The Third JPM Amendment also resulted in a group of lenders that extended the maturity date of their revolving loans (the "Extending Class") and a group of lenders that declined to extend the maturity date of their revolving loans (the "Non-Extending Class"). *Id.*  The maturity date of revolving loans held by the Non-Extending Class is March 29, 2025. *Id.*  The maturity date of revolving loans held by the Extending Class is December 18, 2026. *Id.*  The Fourth JPM Amendment, executed July 16, 2024, among other things, (a) increases the applicable margin rate by 100 bps in respect of the revolving loans held by lenders consenting to the Fourth JPM Amendment and instituted other associated fees, (b) increased the maximum amount of revolving loans outstanding

---

[7]     The First Lien Facility, through subsequent amendments, currently provides for a $555 million asset-based revolving credit facility, but is currently capped at $415 million.

at any one time outstanding by $15 million to $415 million, and (c) required WSB to execute two mortgages in respect of certain real property owned by WSB. *Id.*

15.     The obligations of Debtors CAI, CCI, CCC and WSB under the Prepetition ABL Credit Agreement are guaranteed by Parent and certain subsidiaries. *Id.* at ¶ 26.  The Prepetition ABL Facility is secured by liens on substantially all of the assets of the Debtors. *Id.*

**III.    Pathlight Term Loan and Prepetition 2L Term Loan**

16.     On February 21, 2023, Debtors Conn's, Inc., CAI, CCI and CCC, entered into a second-lien term loan and security agreement (the "Pathlight Term Loan") with Pathlight Capital LP, as administrative agent and collateral agent, and the lenders party thereto. *Id.* at ¶ 27.  The Pathlight Term Loan provided for an aggregate commitment of $100 million to the borrowers pursuant to a three-year secured term loan credit facility, which was fully drawn on February 21, 2023. *Id.*  The Pathlight Loan was paid in full on December 18, 2023 with the proceeds from the Prepetition 2L Term Loan (as defined below). *Id.*

17.     On December 18, 2023, Debtors Conn's, Inc., CAI, CCI, CCC and WSB, entered into a second-lien term loan and security agreement (the "Prepetition 2L Credit Agreement") with BRF Finance Co., LLC, as administrative agent and collateral agent (the "Prepetition 2L Agent"), and the lenders party thereto (the "Prepetition 2L Lenders," and collectively with the Prepetition 2L Agent and all other holders of debt under the Prepetition 2L Credit Agreement, the "Prepetition 2L Secured Parties"), pursuant to which the Prepetition 2L Lenders extended $93 million to the Debtors (the "Prepetition 2L Term Loan"). *Id.* ¶¶ 28–29.  The obligations under the Prepetition 2L Credit Agreement are guaranteed by Conn's, Inc. and certain subsidiaries. *Id.* at ¶ 30.  The Prepetition 2L Term Loan is secured by liens (subject to and second in priority to the those liens under the Prepetition ABL Facility) on substantially all of the assets of the Debtors. *Id.*  The Prepetition 2L Term Loan has a maturity date of February 20, 2027, which was fully drawn on

December 18, 2023.  *Id.* at ¶ 29.  Outstanding amounts under the Prepetition 2L Term Loan bear interest at an aggregate rate per annum equal to the Term SOFR Rate (as defined in the Prepetition 2L Term Loan), subject to a 4.80% floor, plus a margin of 8.00%.  *Id.*  The Debtors are required to make quarterly scheduled amortization payments of the Prepetition 2L Term Loan prior to the maturity thereof in an amount equal to $1.35 million beginning January 2025.  *See* Conn's, Inc. Form 10-K for Fiscal Year Ended January 31, 2024 (available at https://www.sec.gov/ix?doc=/Archives/edgar/data/1223389/000122338924000028/conn-20240131.htm).

18.     The Prepetition 2L Term Loan contains customary covenants regarding the Debtors that are generally based upon and are comparable to those contained in the Prepetition ABL Credit Agreement, including, without limitation: financial covenants, such as the maintenance of a minimum interest coverage ratio, subject to a covenant relief period through the fiscal quarter ending April 30, 2025, a maximum leverage ratio, a minimum excess availability covenant and a springing, minimum fixed charge coverage ratio; and negative covenants, such as limitations on indebtedness, liens, mergers, asset transfers, certain investing activities and other matters customarily restricted in such agreements.  *Id.*

## IV.     Prepetition 3L Delayed Draw Term Loan

19.     On July 31, 2023, Debtors Conn's, Inc., CAI, CCI and CCC, entered into a delayed draw term loan and security agreement (the "Prepetition 3L Credit Agreement") with Stephens Investment Holdings LLC and Stephens Group, LLC, and the other lenders party thereto from time to time (the "Prepetition 3L Lenders"), and Stephens Investments as administrative agent (the "Prepetition 3L Agent," and collectively with the Prepetition 3L Lenders and all other holders of debt under the Prepetition 3L Credit Agreement, the "Prepetition 3L Secured Parties"), pursuant to which the Third Lien Lenders extended $50 million to the Debtors (the "Prepetition 3L Delayed

Draw Term Loan"). *See* Miller Decl., ¶ 31. The Prepetition 3L Delayed Draw Term Loan has a maturity date of May 22, 2027. *Id.* The Prepetition 3L Credit Agreement was amended on December 18, 2023 in connection with the WSB Merger and, among other things, joined WSB as a new borrower to the Prepetition 3L Credit Agreement and required a minimum EBITDA financial covenant. *Id.* at ¶ 32. The Prepetition 3L Delayed Draw Term Loan is secured by liens on substantially all of the assets of the Debtors (subject to and third in priority to those liens under the Prepetition ABL Facility and the Prepetition 2L Term Loan). *Id.* at ¶ 34. Outstanding amounts under the Prepetition 3L Delayed Draw Term Loan bear interest at an aggregate rate per annum equal to the Term SOFR Rate (as defined in the Prepetition 3L Delayed Draw Term Loan), subject to a 5.00% floor, plus a margin of 10.00%, payable monthly in arrears in cash except to the extent such payment in cash would result in a default or event of default under any of the Prepetition ABL Facility or the Prepetition 2L Term Loan, in which case such portion may be paid-in-kind and added to the outstanding principal amount of the Prepetition 3L Delayed Draw Term Loan. *Id.* at ¶ 33; *see also* Conn's, Inc. Form 10-K for Fiscal Year Ended January 31, 2024 (available at https://www.sec.gov/ix?doc=/Archives/edgar/data/1223389/000122338924000028/conn-20240131.htm). Any undrawn amounts are subject to a monthly commitment fee of 5.00% per annum. *Id.* The Prepetition 3L Delayed Draw Term Loan has been fully drawn. *See* Miller Decl., ¶ 33.

## V. Intercreditor Agreements

20. The Debtors are party to senior Intercreditor Agreement, by and among the Prepetition ABL Agent and the Prepetition 2L Agent, and acknowledged by the Debtors, dated as of December 18, 2023 (the "Senior Intercreditor Agreement"). The Debtors are also party to a junior intercreditor agreement, by and among the Debtors, the Prepetition ABL Agent, the Prepetition 2L Agent, and the Prepetition 3L Agent, dated as of December 18, 2023 (the "Junior

Intercreditor Agreement," and together with the Senior Intercreditor Agreement, the "Intercreditor Agreements"). The Intercreditor Agreements govern, among other things, distributions of payments and treatment of collateral between the lenders under the Prepetition ABL Credit Agreement, the Prepetition 2L Credit Agreement, and the Prepetition 3L Credit Agreement.

**The Debtors' Immediate Need for Postpetition Financing**

21. The Debtors have an immediate and critical need to obtain the financing pursuant to the DIP Facility and to continue to use the Collateral (as defined in the Prepetition ABL Credit Agreement) (which, for the avoidance of doubt, includes certain Cash Collateral)[8] and all proceeds, products, accessions, rents, and profits thereof, in each case whether then owned or existing or thereafter acquired or arising (collectively, the "Prepetition Collateral"). The Debtors' businesses are cash intensive, with significant daily costs required to satisfy obligations to vendors, landlords and employees, and to have cash available for extensions of credit to the Debtors' customer base. *See* Burian Decl., ¶ 10. As described in the Burian Declaration, without the financing provided through the DIP Facility, the Debtors would not be able to continue to operate in the ordinary course. *Id.* Moreover, the Debtors need additional liquidity to cover the expenses of these Chapter 11 Cases in order to effectuate the orderly wind-down of the Debtors' business. *Id.* at ¶ 11.

22. As such, and given their current limited liquidity, the incurrence of new debt under the DIP Credit Agreement and use of cash collateral is necessary and vital to the preservation and maintenance of the going concern value of the Debtors. Further, the failure to obtain access to the DIP facility and the Prepetition Collateral will result in immediate and irreparable harm to the Debtors and will materially diminish the value of the Debtors' estates.

---

[8] As used herein, the term "Cash Collateral" shall mean all of the Debtors' cash, wherever located and held, including cash in deposit accounts, that constitutes or will constitute "cash collateral" of any of the Prepetition Secured Parties or DIP Secured Parties within the meaning of section 363(a) of the Bankruptcy Code.

23.     Accordingly, the proposed DIP Facility is necessary to provide the Debtors with the liquidity they need to fund these Chapter 11 Cases.

<strong><u>Efforts to Obtain Postpetition Financing</u></strong>

24.     Prior to filing these Chapter 11 Cases, the Debtors explored numerous options for both out-of-court sale and financing transactions to obviate the need for a bankruptcy filing. Concurrent with the exploration of these strategic alternatives, the Debtors, with the assistance of their advisors, worked diligently to evaluate options for debtor-in-possession financing. *Id.* at ¶ 13.  More specifically, the Debtors engaged Houlihan Lokey Capital, Inc. ("<u>Houlihan</u>") to work with the Debtors' management and other advisors to estimate the Debtors' postpetition financing needs, including by analyzing the effect of these chapter 11 filings on the operations of the Debtors' business, postpetition financing costs associated with the DIP Facility, and other costs and expenses associated with these Chapter 11 Cases. *Id.*  Houlihan relied on these estimates and projections in its conversations with potential financing providers and with the Debtors' existing lenders. *Id.*

25.     Following the estimation and analysis, Houlihan developed a targeted list of third parties outside of the Debtors' existing capital structure that may have been potentially interested in providing actionable postpetition financing to the Debtors (the "<u>Prepetition Marketing Process</u>"). *Id.* at ¶ 14.  Houlihan's strategy to obtain the best financing terms available from the market was reflective of the practical realities of the Debtors' existing capital structure and the facts and circumstances of these Chapter 11 Cases, including the lack of unencumbered collateral, the challenges associated with attempting to "prime" the Debtors' existing debt, and the benefits of achieving consensus among key constituencies on the terms of a holistic transaction. *Id.*

26.     Specifically, in connection with the Prepetition Marketing Process, Houlihan solicited interest from forty (40) potential lenders, including third-party financial institutions

31

experienced in distressed lending and financing, to determine the extent to which third parties would be willing to provide postpetition financing to the Debtors. *Id.* at ¶ 15. To ensure an exhaustive process, Houlihan presented the potential lenders with multiple potential financing structures and communicated a willingness to be flexible on the approach to financing. *Id.* Of those forty (40) potential lenders, thirty-one (31) executed nondisclosure agreements and received confidential information. *Id.* The Debtors also received, and the Debtors, Houlihan, and the Debtors' other professionals negotiated, term sheets from parties with a preexisting relationship with the Debtors other than the DIP Lenders. *Id.* However, as of the Petition Date, all parties declined or were otherwise unable to provide competing debtor-in-possession financing within the required timeline. *Id.* There was no financing party willing to provide financing on a junior or unsecured basis. *Id.*

27.     Ultimately, the Debtors, in consultation with their advisors, determined there was no better alternative financing other than that being offered by those prepetition first lien lenders lending under the DIP Facility (the "<u>DIP Lenders</u>"). *Id.* at ¶ 16. As such, the Debtors, Houlihan, and the Debtors' other advisors focused their efforts on negotiating the terms and provisions of the DIP Facility with the DIP Lenders. *Id.*

**Alternative Financing is Not Available on Better Terms**

28.     Given the Debtors' prepetition capital structure and the challenges facing their business, the DIP Facility represents the best and only actionable postpetition financing. *Id.* at ¶ 21. As discussed in greater detail in the First Day Declaration, prior to the Petition Date, the Debtors, with the aid of their advisors, reviewed and considered several potential alternatives with the goal of maximizing enterprise value. *See* First Day Decl., ¶¶ 54, 56. None of those alternatives proved actionable. *Id.* at ¶ 56. As a result, the Debtors determined that conducting an orderly sale process

for the Debtors' assets in these Chapter 11 Cases and winddown of their estates was the best path forward to maximize the value of the Debtors' assets.

**Basis for Relief Requested**

**I.     The Debtors Should Be Authorized to Obtain Postpetition Financing Pursuant to the DIP Documents.**

**A.     Entering into the DIP Documents is an Exercise of the Debtors' Sound Business Judgment.**

29.     The Court should authorize the Debtors, as an exercise of their sound business judgment, to enter into the DIP Documents, obtain access to the DIP Facility, and continue using the Cash Collateral.  Courts grant considerable deference to a debtor's business judgment in obtaining postpetition secured credit, so long as the agreement to obtain such credit does not run afoul of the provisions of, and policies underlying, the Bankruptcy Code.  *See*, *e.g.*, *In re L.A. Dodgers LLC*, 457 B.R. 308, 313 (Bankr. D. Del. 2011) ("Courts will almost always defer to the business judgment of a debtor in the selection of the lender."); *In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) ("Cases consistently reflect that the court's discretion under section 364 is to be utilized on grounds that permit reasonable business judgment to be exercised so  long as the financing agreement does not contain terms that leverage the bankruptcy process and powers or its purpose is not so much to benefit the estate as it is to benefit a party-in-interest."). This Court has approved postpetition financing as a sound exercise of debtors' business judgment. *See*, *e.g.*, *In re Air Methods Corp.*, No. 23-90886 (MI) (Bankr. S.D. Tex. Nov. 14, 2023); *In re SmileDirectClub, Inc.*, No. 23-90786 (CML) (Bankr. S.D. Tex. Nov. 7, 2023); *In re Noble Home Furnishings LLC*, No. 23-90773 (CML) (Bankr. S.D. Tex. Oct. 4, 2023).

30.     Further, in considering whether the terms of postpetition financing are fair and reasonable, courts consider the terms in light of the relative circumstances of both the debtor and the potential lender.  *See In re Farmland Indus., Inc.*, 294 B.R. 855, 886 (Bankr. W.D. Mo. 2003);

*see also Unsecured Creditors' Comm. Mobil Oil Corp. v. First Nat'l Bank & Trust Co. (In re Elingsen McLean Oil Co., Inc.)*, 65 B.R. 358, 365 n.7 (W.D. Mich. 1986) (recognizing a debtor may have to enter into "hard bargains" to acquire funds for its reorganization).

31.     The Debtors' determination to move forward with the DIP Facility is a sound exercise of their business judgment following a careful evaluation of alternatives.  Specifically, the Debtors and their advisors determined that it would not be possible to rely solely on Cash Collateral to fund these cases and that the Debtors would need additional postpetition financing to support their operations and chapter 11 activities.  The proceeds of the proposed DIP Facility will allow the Debtors to pay employees, landlords, vendors, and other critical operating expenses in the ordinary course, each of which is necessary to avoid disruptions to the Debtors' business operations.

32.     The terms and conditions of the DIP Facility are favorable to the Debtors and in the best interests of their estates.  Specifically, the DIP Facility:

   a)     is being funded by a group of the Debtors' prepetition secured lenders, who have a vested interest in the success of these Chapter 11 Cases;

   b)     will provide the Debtors the necessary runway to conduct a value-maximizing sale, to the benefit of all parties in interest;

   c)     is anticipated to provide sufficient liquidity for the Debtors to orderly wind-down their business operations post sale; and

   d)     avoids the prospect of a costly and value-destructive priming fight with the Debtors' senior lenders and/or a substantially more costly adequate protection package.

*See* Burian Decl., ¶¶ 11–12, 16–17.

33.     Overall, the Debtors negotiated the DIP Documents with the DIP Lenders in good faith, at arms' length, and with the assistance of their respective advisors.  The Debtors believe that they have obtained the best financing available, given the circumstances.  Absent the proceeds

of the DIP Facility, the Debtors' ability to continue operating as a going concern will be jeopardized to the detriment of all parties in interest. *Id.* at ¶ 11. Accordingly, the Court should authorize the Debtors' entry into the DIP Documents as a reasonable exercise of the Debtors' business judgment.

**B.      The Debtors Should Be Authorized to Grant Liens and Superpriority Claims to DIP Lenders.**

34.      The Debtors propose to obtain financing under the DIP Facility, in part, by granting superpriority claims and liens pursuant to sections 364(c) and 364(d) of the Bankruptcy Code. Significantly, the Debtors propose to provide first priority liens on substantially all of the Debtors' assets, including liens on previously unencumbered property and "priming" liens on other property (subject to the terms of the DIP Orders).

35.      Section 364(c) of the Bankruptcy Code provides that, if a debtor is unable to obtain unsecured credit allowable as an administrative expense under section 503(b)(1) of the Bankruptcy Code, a court:

> May authorize the obtaining of credit or the incurring of debt (1) with priority over any or all administrative expenses of the kind specified in section 503(b) or 507(b) [of the Bankruptcy Code]; (2) secured by a lien on property of the estate that is not otherwise subject to a lien; or (3) secured by a junior lien on property of the estate that is subject to a lien.

11 U.S.C. § 364(c); *see also In re Crouse Group, Inc.*, 71 B.R. 544, 549 (Bankr. E.D. Pa. 1987) (secured credit under section 364(c) of the Bankruptcy Code is authorized, after notice and a hearing, upon showing that unsecured credit cannot be obtained); *In re Snowshoe Co., Inc.*, 789 F.2d 1085, 1088 (4th Cir. 1986) (debtor need only demonstrate "by a good faith effort that credit was not available without" the protections of 364(c)).

36.      Further, section 364(d) of the Bankruptcy Code provides that a debtor may obtain credit secured by a senior or equal lien on property of the estate already subject to a lien where the

debtor is "unable to obtain such credit otherwise" and "there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted."  11 U.S.C. § 364(d)(1).  Accordingly, the Debtors may "prime" the liens of the Prepetition Secured Parties if the Debtors are unable to obtain unsecured or junior secured credit and either (a) the Prepetition Secured Parties have consented or (b) the Prepetition Secured Parties' interests in collateral are adequately protected.

37.     First, the Debtors are not able to obtain unsecured or junior secured credit.  *See* Burian Decl., ¶ 15.  Despite the Prepetition Marketing Process, the Debtors do not have any actionable financing alternative, even though such financing is necessary to provide the Debtors with the liquidity they need to engage in an orderly wind-down of their business operations.  *Id.* The Debtors' prepetition lenders were not willing to provide postpetition financing on an unsecured or junior basis, nor has any third party presented such a proposal.  *Id.*

38.     Second, the Prepetition Secured Parties have consented (or are deemed to consent) to their prepetition liens and claims being primed on the terms set forth in the DIP Orders, which includes a negotiated consensual adequate protection package.  As further described in the Interim DIP Order, the proposed adequate protection package for the Prepetition Secured Parties includes, subject to the Carve Out, (a) valid and perfected security interests in and liens on DIP Collateral in accordance with the priorities set forth in the DIP Orders, (b) superpriority administrative expense claims under sections 503(b) and 507(b) of the Bankruptcy Code, in accordance with the priorities set forth in the DIP Orders, and (c) payment of the reasonable and documented fees and expenses of counsel and other professionals to the DIP Lenders as set forth in the DIP Orders.  *See* Interim DIP Order, ¶ 15.

39.     Absent such consent, the Debtors risk a potentially costly and difficult nonconsensual priming dispute with any potential postpetition priming lenders and the Prepetition Secured Parties at a time when the Debtors' liquidity is severely limited.  Following extended negotiations with the Prepetition Secured Parties, the Debtors were able to negotiate the proposed DIP Facility and obtain concessions that materially improved the terms of the proposed financing, including concessions allowing for a forty-five (45) day postpetition marketing process for the sale of the Debtors' assets as a going concern.  Thus, as a result of these negotiations and the Prepetition Marketing Process, the Debtors determined that the DIP Facility is the best actionable alternative available to fund these cases under the circumstances.

40.     Overall, the DIP Facility is the only actionable financing under the circumstances, will avoid the risk of a costly and value-destructive priming fight with the Debtors' prepetition lenders, and will provide the Debtors with the liquidity needed to administer these Chapter 11 Cases.  Accordingly, the Debtors submit that the DIP Facility (including the superpriority claims and priming liens granted thereunder) is both warranted and appropriate under the circumstances.

**II.     The Debtors Should Be Authorized to Continue to Use the Cash Collateral.**

41.     The Debtors' use of property of their estates, including the Cash Collateral, is governed by section 363 of the Bankruptcy Code, which provides in relevant part that:

> If the business of the debtor is authorized to be operated under section … 1108 … of this title and unless the court orders otherwise, the [debtor] may enter into transactions, including the sale or lease of property of the estate, in the ordinary course of business, without notice or a hearing, and may use property of the estate in the ordinary course of business without notice or a hearing.

11 U.S.C. § 363(c)(1).  Pursuant to section 363(c)(2) of the Bankruptcy Code, a debtor may not use cash collateral unless "(A) each entity that has an interest in such cash collateral consents; or

(B) the court, after notice and a hearing, authorizes such use, sale, or lease in accordance with the provisions of this section."  11 U.S.C. § 363(c)(2).

42.     In general, what constitutes adequate protection is decided on a case-by-case basis. While section 361 of the Bankruptcy Code provides examples of forms of adequate protection, such as granting replacement liens and administrative claims, courts decide what constitutes sufficient adequate protection in each case.  *See In re Timbers of Inwood Forest Assocs., Ltd.*, 793 F.2d 1380, 1393 (5th Cir. 1986) (citing legislative history for proposition that the form of adequate protection is determined on a case-by-case basis); *see also In re Las Torres Dev., L.L.C.*, 413 B.R. 687, 696–97 (Bankr. S.D. Tex. 2009) (noting that the Bankruptcy Code "contains no specific, definitive definition of adequate protection").  Adequate protection is designed to shield a secured creditor from diminution in value of its interest in collateral during the period of a debtor's use of the collateral.  *See Timbers*, 793 F.2d at 1412 (citing to Adequate Protection Under the Bankruptcy Reform Act, in W. Norton, 1978 Annual Survey of Bankruptcy Law 171, 173 ("Section 361 is designed to prevent loss or diminution of assets.")).

43.     For the same reasons set forth above regarding the Prepetition Secured Parties' consensually negotiated adequate protection package, the Prepetition Secured Parties will be adequately protected by the Debtors' use of Cash Collateral and other Prepetition Collateral.  In light of the foregoing, the Debtors submit that the proposed adequate protection provided for the benefit of the Prepetition Secured Parties is appropriate under the circumstances of these Chapter 11 Cases.  The Debtors' provision of the adequate protection obligations ensures that the Debtors are able to avail themselves of the DIP Facility and to continue using Cash Collateral, subject to the terms and limitations set forth in the Interim DIP Order and the DIP Documents, for the benefit of all parties in interest and their estates.

**III.    The Debtors Should Be Authorized to Pay the Interest and Fees Required by the DIP Agent and the DIP Lenders under the DIP Documents.**

44.    Under the DIP Documents, the Debtors have agreed, subject to Court approval, to pay certain interest and fees to the DIP Agent and the DIP Lenders:

    a)    *Interest Rate*.  The interest rate is the Base Rate + 4.75%.

    b)    *Arrangement Fee*.  The Debtors shall pay a fee, payable in cash upon entry of the Interim DIP Order, which has been filed under seal.

    c)    *Commitment Fee*.    The Commitment Fee is as set forth in the DIP Credit Agreement.

45.    As set forth in the Burian Declaration, the interest rates and fees were the subject of arm's-length and good-faith negotiations, are integral components of the overall terms of the DIP Facility and were required by the proposed DIP Lenders as consideration for the extension of postpetition financing.  *See* Burian Decl., ¶ 19.  Further, the protections granted through the DIP Facility, including the "roll up" of prepetition claims and the adequate protection set forth therein, are essential features of the DIP Facility, without which the DIP Lenders would not have committed to provide funding for the Debtors.  *Id.*   These terms, including the "roll up," will benefit the Debtors and their estates because they will enable the Debtors to obtain urgently needed financing critical to the administration of these Chapter 11 Cases, which financing would not otherwise be available.  *Id.*  Accordingly, the Court should authorize the Debtors to pay the interest and fees provided under the DIP Documents in connection with the DIP Facility.

**IV.    The DIP Agent and the DIP Lenders Should Be Afforded Good-Faith Protection Under Section 364(e).**

46.    Section 364(e) of the Bankruptcy Code protects a good-faith lender's right to collect on loans extended to a debtor, and its right in any lien securing those loans, even if the

authority of the debtor to obtain such loans or grant such liens is later reversed or modified on appeal.  Section 364(e) of the Bankruptcy Code provides that:

> The reversal or modification on appeal of an authorization under [section 364 of the Bankruptcy Code] to obtain credit or incur debt, or of a grant under this section of a priority or a lien, does not affect the validity of any debt so incurred, or any priority or lien so granted, to an entity that extended such credit in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and the incurring of such debt, or the granting of such priority or lien, were stayed pending appeal.

11 U.S.C. § 364(e).

47.     The DIP Facility is the result of (i) the Debtors' reasonable and informed determination that the proposed DIP Lenders offered the most favorable terms on which to obtain vital postpetition financing and (ii) extensive arm's-length, good-faith negotiations between the Debtors and the proposed DIP Lenders.  *S*ee Burian Decl., ¶¶ 19–20.  The terms and conditions of the DIP Facility are reasonable and appropriate under the circumstances, and the proceeds of the DIP Facility will be used only for purposes that are permissible under the Bankruptcy Code. Accordingly, the Court should find that the obligations arising under the DIP Facility and other financial accommodations made to the Debtors have been extended by the proposed DIP Lenders in "good faith" within the meaning of section 364(e) of the Bankruptcy Code and therefore the DIP Lenders are entitled to all of the protections afforded thereby.

**V.     The Automatic Stay Should Be Modified on a Limited Basis.**

48.     The Interim DIP Order provides that the automatic stay provisions of section 362 of the Bankruptcy Code will be modified to allow the DIP Lenders to file any financing statements, security agreements, notices of liens, and other similar instruments and documents in order to validate and perfect the liens and security interests granted to them under the DIP Orders.  The Interim DIP Order further provides that the automatic stay is modified to the extent necessary to

implement and effectuate the terms of the Interim DIP Order.  Finally, the Interim DIP Order provides that the automatic stay shall be modified, subject to certain limitations, to the extent necessary to permit the DIP Agent to exercise certain remedies upon the occurrence of an event of default by the Debtors under the DIP Documents, subject to the procedures set forth in the Interim DIP Order (including the requirement to seek relief from the stay).

## VI.   Failure to Obtain Immediate Interim Access to the DIP Facility and Cash Collateral Would Cause Immediate and Irreparable Harm.

49.     Bankruptcy Rule 4001(b) provides that a final hearing on a motion to use cash collateral pursuant to section 363 of the Bankruptcy Code may not be commenced earlier than 14 days after the service of such motion.  Upon request, however, the court is empowered to conduct an interim expedited hearing on the motion at which it may authorize a debtor to use cash collateral to the extent necessary to avoid immediate and irreparable harm to a debtor's estate.  *See* Fed. R. Bankr. P. 4001(b)(2).  Section 363(c)(3) of the Bankruptcy Code authorizes the court to conduct a preliminary hearing and to authorize the use of cash collateral "if there is a reasonable likelihood that the [debtor] will prevail at the final hearing under [section 363(e) of the Bankruptcy Code]." 11 U.S.C. § 363(c)(3).  Furthermore, the Complex Case Procedures provide that on motion by a debtor, a hearing will "routinely be conducted as a first-day hearing to consider either cash collateral use and/or interim debtor-in-possession financing."  Complex Case Procedures, ¶ 5.

50.     The Debtors require immediate access to the DIP Facility.  As of the Petition Date, the Debtors have insufficient liquidity to continue operating the business as a going concern.  The Debtors' business is cash intensive, with significant daily costs required to satisfy obligations to, among other things, employees, customers, and vendors.  *See* Burian Decl., ¶ 11.  Without the financing under the Interim DIP Order, the Debtors would be unable to pay the operating expenses,

which could result in a value destructive interruption to their business and, simultaneously, eliminate their best chance for consummating the proposed value-maximizing sale. *Id.*

51.     For these reasons, the Debtors require immediate access to the DIP Facility and the use of Cash Collateral to operate their business, preserve value, and avoid irreparable harm pending the Final Hearing.  The Debtors, with the assistance of their advisors and through negotiations with the DIP Secured Parties, developed the DIP Budget (attached to the Interim DIP Order as <u>Schedule 2</u>).  The DIP Budget contains line items for each category of cash flows anticipated to be received or disbursed during the time period for which the DIP Budget is prepared.  The DIP Budget includes all reasonable, necessary, and foreseeable expense to be incurred in connection with the operation of their business for the period set forth in the DIP Budget.  The DIP Budget establishes that the Debtors will have adequate liquidity during the expected duration of these Chapter 11 Cases (including the interim period before the Final Hearing) if the Debtors are allowed to use the Cash Collateral and access the proceeds of the DIP Facility.

52.     Accordingly, pursuant to section 363(c)(3) of the Bankruptcy Code and Bankruptcy Rule 4001(b), the Debtors request that the Court conduct an expedited hearing on this Motion and enter the Interim DIP Order authorizing the Debtors to enter into the DIP Facility and use Cash Collateral.

**<u>Request for Final Hearing</u>**

53.     Pursuant to Bankruptcy Rules 4001(b)(2) and 4001(c)(2), the Debtors request that the Court (i) set a date for the Final Hearing that is as soon as practicable but not later than 35 days after the Petition Date and (ii) fix the time and date prior to the Final Hearing for parties to file objections to this Motion.

**Request for Bankruptcy Rule 6004 Waivers**

54.     The Debtors request a waiver of any applicable notice requirements under Bankruptcy Rule 6004(a) and any stay of the order granting the relief requested herein pursuant to Bankruptcy Rule 6004(h).   As explained above and in the First Day Declaration, the relief requested herein is necessary to avoid immediate and irreparable harm to the Debtors' ongoing operations and value-maximization process.   Accordingly, ample cause exists to justify the waiver of the notice requirements under Bankruptcy Rule 6004(a) and the 14-day stay imposed by Bankruptcy Rule 6004(h), to the extent such notice requirements and such stay apply.

**Reservation of Rights**

55.     Nothing contained herein or any action taken pursuant to relief requested is intended to be or shall be construed as (a) an admission as to the validity of any claim against the Debtors; (b) a waiver of the Debtors' or any party in interest's rights to dispute the amount of, basis for, or validity of any claim or interest under applicable law or nonbankruptcy law; (c) a promise or requirement to pay any claim; (d) a waiver of the Debtors' or any other party in interest's rights under the Bankruptcy Code or any other applicable law; (e) a request for or granting of approval for assumption of any agreement, contract, program, policy, or lease under section 365 of the Bankruptcy Code; or (f) an admission as to the validity, priority, enforceability, or perfection of any lien on, security interest in, or other encumbrance on property of the Debtors' estates.   Likewise, if the Court grants the relief sought herein, any payment made pursuant to the Court's order is not intended to be and should not be construed as an admission to the validity of any claim or a waiver of the Debtors' or any party in interest's rights to subsequently dispute such claim.

## **Notice**

56.    Notice of this Motion has been provided by email, facsimile, or overnight courier to: (a) the Office of the United States Trustee; (b) the holders of the thirty (30) largest unsecured claims against the Debtors; (c) JP Morgan Chase Bank, N.A. and counsel thereto; (d) BRF Finance Co., LLC and counsel thereto; (e) Stephens Investments Holdings LLC and counsel thereto; (f) the United States Attorney's Office for the Southern District of Texas; (g) the Internal Revenue Service; and (h) any party that has requested notice pursuant to Bankruptcy Rule 2002.  The Debtors submit that, in light of the nature of the relief requested, no other or further notice need be given.

## **No Prior Request**

57.    No prior request for the relief sought in this Motion has been made by the Debtors to this or any other court.

WHEREFORE, the Debtors respectfully request entry of interim and final orders, substantially in the forms of the Interim DIP Order filed with this Motion and the Final DIP Order, granting the relief requested herein and granting such other relief as is just and proper.

Dated: July 24, 2024
Houston, Texas

/s/ *Jeri Leigh Miller*

**SIDLEY AUSTIN LLP**
Duston McFaul (TX Bar No. 24003309)
Jeri Leigh Miller (TX Bar No. 24102176)
Maegan Quejada (TX Bar No.  24105999)
1000 Louisiana Street, Suite 5900
Houston, Texas 77002
Telephone:    (713) 495-4500
Facsimile:    (713) 495-7799
Email:          dmcfaul@sidley.com
                     jeri.miller@sidley.com
                     mquejada@sidley.com
William E. Curtin (*pro hac vice* pending)
Michael Sabino (*pro hac vice* pending)
787 Seventh Avenue
New York, New York 10019
Telephone: (212) 839-5300
Facsimile: (212) 839-5599
Email:          wcurtin@sidley.com
                     msabino@sidley.com

Jackson T. Garvey (*pro hac vice* pending)
One South Dearborn
Chicago, Illinois 60603
Telephone:    (312) 853-7000
Facsimile:    (312) 853-7036
Email:          jgarvey@sidley.com

*Proposed Counsel to the Debtors and Debtors in Possession*

**<u>Certificate of Accuracy</u>**

      I certify that the foregoing statements are true and accurate to the best of my knowledge. This statement is being made pursuant to Bankruptcy Local Rule 9013-1(i).

                                   */s/ Jeri Leigh Miller*
                                   Jeri Leigh Miller


**<u>Certificate of Service</u>**

      I certify that on July 24, 2024, I caused a copy of the foregoing document to be served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas.

                                     */s/ Jeri Leigh Miller*
                                   Jeri Leigh Miller