IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| In re: | Chapter 11 |
| CONN'S, INC., *et al.*.[1] | Case No. 24-33357 (ARP) |
| Debtors. | (Jointly Administered) |

**AMENDED DECLARATION OF SAUL BURIAN IN SUPPORT OF
THE DEBTORS' MOTION TO OBTAIN POSTPETITION FINANCING**

I, Saul Burian, hereby declare under penalty of perjury as follows:

1. I am a Managing Director at Houlihan Lokey ("Houlihan"), where I specialize in advising public and private companies and creditor groups in complex restructurings, financings, and other transactions. I am also the head of Houlihan's real estate, lodging & leisure group, which is a leading independent advisor to middle-market and larger real estate companies. I have thirty-six (36) years of experience in the industry.

2. I submit this declaration (this "Declaration") in support of the *Debtors' Amended Emergency Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (a) Obtain Postpetition Financing and (B) Utilize Cash Collateral; (II) Granting Adequate Protection; and (III) Scheduling a Final Hearing* (the "DIP Motion"), filed contemporaneously herewith.[2] Specifically, I submit this Declaration as evidence that the proposed approximately $25 million senior secured superpriority, priming debtor-in-possession ABL credit facility (the "DIP Facility")

---

[1] The Debtors in these chapter 11 cases, together with the last four digits of each Debtor's federal tax identification number, are: Conn's, Inc. (2840), Conn Appliances, Inc. (0706), CAI Holding, LLC (2675), Conn Lending, LLC (9857), Conn Credit I, LP (0545), Conn Credit Corporation, Inc. (9273), CAI Credit Insurance Agency, Inc. (5846), New RTO, LLC (6400), W.S. Badcock LLC (2010), W.S. Badcock Credit LLC (5990), and W.S. Badcock Credit I LLC (6422). The Debtors' service address is 2445 Technology Forest Blvd., Suite 800, The Woodlands, TX 77381.

[2] Capitalized terms used but not defined herein have the meanings ascribed to them in the DIP Motion.

comprised of $5 million of new money term loans (the "New Money DIP Loans") and $20 million of non-cash loans (the "Non-Cash DIP Loans") (a) is in the best interests of the Debtors, their estates, and all parties in interest in these chapter 11 cases, and (b) will provide the Debtors with access to sufficient working capital and liquidity to operate during these chapter 11 cases.

3. Unless otherwise indicated, the statements in this Declaration are based upon (a) my personal knowledge of the Debtors' operations and finances, (b) my personal knowledge or opinion based on my experience and expertise as a restructuring professional, (c) information provided to me by employees of Houlihan working under my supervision, (d) information I received from, or discussed with, the Debtors, members of the Debtors' management team, or the Debtors' other advisors, and/or (e) my review of relevant public and non-public documents. I am not being specifically compensated for this testimony other than through the proposed compensation Houlihan receives in its capacity as an advisor to the Debtors. I am over the age of 18 and am authorized to submit this declaration on behalf of the Debtors. If I were called to testify, I would testify competently to the facts set forth below.

**I.     Background and Qualifications**

4. Houlihan is an internationally recognized investment banking and financial advisory firm with offices worldwide and more than 2,500 professionals. Houlihan provides corporate finance and financial advisory services, as well as execution capabilities, in a variety of areas, including financial restructuring. In 2023, Houlihan ranked as the No. 1 investment banking M&A advisor (excluding accounting firms and brokers) for global transactions under $1 billion, according to LSEG (formerly Refintiv). The firm is one of the leading providers of M&A fairness opinions and has the largest worldwide financial restructuring practice of any investment bank. Houlihan annually serves more than 2,000 clients ranging from closely held companies to Global 500 corporations.

5. Houlihan's Financial Restructuring Group, which has more than 300 professionals, is one of the leading advisors and investment bankers to debtors, secured and unsecured creditors, acquirers, and other parties-in-interest involved in financially troubled companies based in a variety of industries and requiring complex financial restructurings, both in and outside of bankruptcy. Houlihan has been, and is, involved in a number of large restructuring cases in the United States, including many in the retail and consumer financing sectors. I have been employed by Houlihan for twenty-three (23) years and currently serve as a Managing Director in the financial restructuring group. During the course of my career, I have advised both debtors and creditors in financial restructurings and distressed mergers and acquisitions, raised capital for troubled businesses, and represented debtors and creditor constituencies in bankruptcy proceedings. My restructuring experience includes the representation of distressed companies, debtors, official committees of creditors, and other significant stakeholders in a number of complex financial restructurings, including the following: Jo-Ann Stores, Barneys New York, JCPenney, J. Crew, Party City, Payless Shoes, Toys "R" Us, Sears Holdings, Lehman Brothers, Hollander Sleep Products, FULLBEAUTY Brands, Sungard Availability Services, Nine West Holdings, Mark IV Automotive, Extended Stay America, MSR Hotels & Resorts Inc., Buffets Holdings, RCS Capital Corporation, Kaisa Group Holdings, TI Automotive, Global Power, and Magellan Health, among others.

6. Prior to my time at Houlihan, I was a bankruptcy and restructuring partner at Kramer Levin Naftalis & Frankel, LLP, where I specialized in creditors' rights and bankruptcy. During my time there, I represented a broad spectrum of clients who were often the primary at-risk constituency in the relevant in- and out-of-court restructurings, including debtors, bank lenders, creditor committees, and secondary purchasers of distressed indebtedness.

7. Over the course of my career, I have also advised companies and creditor groups in connection with a variety of financing-related issues, including assisting chapter 11 debtors in obtaining and negotiating the terms of debtor-in-possession loans. I have submitted declarations and provided expert testimony related to those matters in a number of chapter 11 cases.

## II. The Debtors' Prepetition Capital Structure

8. The Debtors operate a complex business, with 553 corporate and dealer retail stores across fifteen (15) states, in addition to the Debtors' online retail presence. Through these sales channels, the Debtors offer home furnishings and mattresses, appliances, consumer electronics, and related product offerings. To support the stores and e-commerce operations, the Debtors have twenty-two (22) distribution and service centers and six (6) corporate offices. In addition to the retail business, the Debtors provide customers with in-house and third-party financing products. The Debtors employ approximately 3,800 people.

9. As described in the First Day Declaration,[3] I understand that, as of the Petition Date, the Debtors' capital structure includes approximately $530 million of funded debt obligations, as summarized below.

| Funded Debt | Maturity | Approximate Outstanding Principal Amount |
|---|---|---|
| **First Lien Facility (Non-Extending Class)** | March 29, 2025[4] | $386,756,411.99[5] |
| **Second Lien Facility** | February 20, 2027 | $93,000,000 |
| **Third Lien Facility** | May 22, 2027 | $50,000,000 |
| **Total Funded Debt** | | $529,756,411.99 |

Substantially all of the Debtors' assets constitute collateral for the funded debt obligations.

---

[3] The "First Day Declaration" means the *Declaration of Norman L. Miller in Support of the Debtors' Chapter 11 Petitions and First Day Pleadings*, filed contemporaneously herewith.

[4] The maturity date for the First Lien Facility with respect to the Extending Class is December 18, 2026.

[5] In addition to principal drawn and outstanding, $27,787,684.35 of face amount of letters of credit were issued and available to be drawn under the First Lien Credit Facility.

**III.     The Debtors' Need for DIP Financing and Access to Cash Collateral**

10.     Based on discussions with the Debtors' management and other advisors, I understand that the Debtors require immediate access to liquidity to fund their ongoing operations, working capital needs, and the projected costs of these chapter 11 cases. I understand that these needs are immediate and that without prompt relief, the Debtors will have insufficient cash to operate their enterprise and continue paying their debts as they come due.

11.     Based on my discussions with the Debtors' management and other advisors, it is my belief that administering these chapter 11 cases solely on a cash collateral basis without access to any postpetition financing and without access to relief from the prepayment requirements under the First Lien Facility in the form of the Non-Cash DIP Loans would be insufficient to fund operations or the administration of these chapter 11 cases. Finally, I believe that the filing of these chapter 11 cases themselves will further constrain liquidity due to, among other things, tightening of trade terms from vendors and the administrative expenses of conducting these cases, further highlighting the immediate need for postpetition financing.

12.     It is my belief that continuing operations in these chapter 11 cases with postpetition financing is necessary to effectuate an orderly and value-maximizing sale of the Debtors' assets and winddown of their estates.

**IV.     The Debtors' Efforts to Obtain Postpetition Financing**

13.     Prior to filing these chapter 11 cases, the Debtors explored numerous options for both out-of-court sale and financing transactions to obviate the need for a bankruptcy filing. Concurrent with the exploration of these strategic alternatives, the Debtors, with the assistance of their advisors, worked diligently to evaluate options for debtor-in-possession financing. More specifically, Houlihan worked with the Debtors' management and other advisors to estimate the Debtors' postpetition financing needs, including by analyzing the effect of these chapter 11 filings

on the operations of the Debtors' business, postpetition financing costs associated with the DIP Facility, and other costs and expenses associated with these chapter 11 cases. Houlihan relied on these estimates and projections in its conversations with potential financing providers and with the Debtors' existing lenders.

14. Following the estimation and analysis, Houlihan developed a targeted list of third parties outside of the Debtors' existing capital structure that may have been potentially interested in providing actionable postpetition financing to the Debtors (the "Prepetition Marketing Process"). Houlihan's strategy to obtain the best financing terms available from the market was reflective of the practical realities of the Debtors' existing capital structure and the facts and circumstances of these chapter 11 cases, including the lack of material unencumbered collateral, the challenges associated with attempting to "prime" the Debtors' existing secured debt, and the benefits of achieving consensus among key constituencies on the terms of a holistic transaction.

15. Specifically, in connection with the Prepetition Marketing Process, I, along with others on my team under my supervision, solicited interest from forty (40) potential lenders, including third-party financial institutions experienced in distressed lending and financing, to determine the extent to which third parties would be willing to provide postpetition financing to the Debtors. To ensure an exhaustive process, Houlihan presented the potential lenders with multiple potential financing structures and communicated a willingness to be flexible on the approach to the financing. Of those forty (40) potential lenders, thirty-one (31) executed nondisclosure agreements and received confidential information. The Debtors also received, and the Debtors, Houlihan, and the Debtors' other professionals negotiated, term sheets from parties with a preexisting relationship with the Debtors other than the DIP Lenders (defined below). However, as of the Petition Date, all parties declined or were otherwise unable to provide

competing debtor-in-possession financing within the required timeline. There was no financing party willing to provide financing on a junior or unsecured basis.

16. Ultimately, the Debtors, in consultation with their advisors, determined there was no better alternative financing other than that being offered by those prepetition first lien lenders lending under the DIP Facility (the "<u>DIP Lenders</u>"). As such, the Debtors, Houlihan, and the Debtors' other advisors focused their efforts on negotiating the terms and provisions of the DIP Facility with the DIP Lenders.

17. I believe that there are no alternative sources of financing currently available to the Debtors, much less any other actionable sources on better terms than those being provided by the DIP Facility. No party that Houlihan communicated with as part of the Prepetition Marketing Process, and no other party that Houlihan is currently aware of, is currently interested in providing and willing to provide postpetition financing to the Debtors, whether on an unsecured, junior, or secured basis. Notably, no party was interested in providing financing on a priming basis given the risk and uncertainty attendant to a priming fight with the Debtors' prepetition secured lenders. Although the Debtors' existing secured lenders are consenting to the priming liens granted under the DIP Facility, to the best of my knowledge, the existing secured lenders are not willing to commit to being primed by postpetition liens under an alternative debtor-in-possession financing.

**V.    The Economic Terms of the Financings Are, Taken as a Whole, Reasonable and Appropriate Under the Circumstances**

18. I believe that the principal economic terms proposed under the DIP Facility, such as the contemplated fees and interest rates, are customary and usual for financings of this type. Specifically, I understand that the Debtors have agreed, subject to approval by the Bankruptcy Court, to pay certain costs, interests, and fees to the DIP Lenders, with such fees and material terms summarized below:

| Material Provision | Summary |
|---|---|
| **Commitment** | The DIP Facility shall be available as follows upon entry of an interim order by the Bankruptcy Court approving the DIP Facility:<br><br>(a) $5 million of new borrowings under a term loan to be provided by the DIP Lenders on a pro rata basis; and<br><br>(b) $20 million of additional availability for the duration of the chapter 11 cases, which shall be made available by modifying the covenant in Section 10.3.5 of the Prepetition ABL Credit Agreement to require, at all times, Availability of no less than $80,000,000.<br><br>In addition, for each dollar of unrestricted cash from collections received by the Debtors and used for cash expenditures (rather than being used to repay then outstanding debt owed under the First Lien Revolving Credit Facility and held by DIP Lenders), one dollar of existing obligations under the First Lien Revolving Credit Facility shall be converted on a 1:1 basis to loans under the DIP Facility. |
| **Interest Rates** | Base Rate + 4.75% |
| **Fees and Premiums** | **Arrangement Fee**: The Arrangement Fee is as set forth in the DIP Agent Fee Letter, which has been filed under seal substantially contemporaneous herewith.<br><br>**Commitment Fee**: The Commitment Fee is as set forth in the DIP Credit Agreement. |
| **Current Interest and Expenses as Adequate Protection** | In addition to the other forms of adequate protection described in the DIP Motion, including replacement liens, granting of super priority administrative expense claim status, and certain prepayment requirements, the Debtors shall pay to the DIP Lenders as protection in respect of the imposition of the automatic stay and the Debtors' use of the collateral (including cash collateral) during the pendency of the Debtors' bankruptcy cases:<br><br>(a) payment of current interest in cash at the default rate;<br><br>(b) payment of the lenders and agent's reasonable and documented fees and expenses, including the fees and expenses of Simpson Thatcher & Bartlett LLP and FTI Consulting, Inc. without any obligation for such parties to seek Bankruptcy Court approval, but subject to customary notice procedures in favor of the U.S. Trustee and any official committee appointed in the chapter 11 cases; and<br><br>(c) on each Waterfall Determination Date (as defined in the DIP Motion), payment of the DIP Obligations and Prepetition ABL Obligations pursuant to the waterfall specified at Paragraph 3 of the proposed order approving the DIP Facility filed contemporaneously herewith using all cash of the Debtors in excess of $30 million. |

19.  It is my understanding that the interest rates and fees were the subject of arms'-length and good-faith negotiations, are integral components of the overall terms of the proposed

DIP Facility and were required by the DIP Lenders as consideration for the extension of postpetition financing.  Further, I believe that the protections granted through the DIP Facility, including the "roll up" of prepetition claims and the adequate protection set forth therein, were essential features of the DIP Facility, without which the DIP Lenders may not have committed to provide funding for the Debtors.  These terms, including the "roll up" will benefit the Debtors and their estates because they will enable the Debtors to obtain urgently needed financing and consensual use of cash collateral critical to the administration of these chapter 11 cases, which financing and consensual use of cash collateral would not otherwise be available.

20.  Accordingly, based on my experience with debtor-in-possession financing transactions, as well as my involvement in the negotiation of the DIP Facility and pursuit of alternative post-petition financing proposals, I believe the DIP Facility is the best financing available to the Debtors under the circumstances and will allow the Debtors to commence an orderly, value-maximizing sale and wind-down of its business and assets.  I believe that the terms of the DIP Facility, taken as a whole, are fair and reasonable under the circumstances, and are the most favorable terms the Debtors could obtain under the circumstances.  Accordingly, I believe the DIP Facility should be approved.

[*Remainder of page intentionally left blank.*]

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Dated: July 24, 2024
Houston, Texas

*/s/ Saul Burian*
Saul Burian
Managing Director
Houlihan Lokey
