**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| IN RE: | § | CASE NO. |
| | § | |
| CONN'S, INC., *et al.*, [1] | § | 24-33357 (ARP) |
| | § | (Chapter 11) |
| | § | Jointly Administered |
| DEBTORS. | § | |

**UNITED STATES TRUSTEE'S OBJECTION TO CONDITIONAL APPROVAL OF**
**DISCLOSURE STATEMENT FOR THE JOINT CHAPTER 11 PLAN AND**
**RELATED SOLICITATION PROCEDURES**
Related ECF Nos. 1727, 1728, and 1749

TO THE HONORABLE ALFREDO R. PEREZ
UNITED STATES BANKRUPTCY JUDGE:

      Kevin M. Epstein, the United States Trustee for the Southern District of Texas (the "U.S.

Trustee") hereby files this Objection to the *Joint Chapter 11 Plan of Distribution (*the "Plan")

[ECF No. 1728], *Disclosure Statement for Joint Chapter 11 Plan of Distribution of Conn's Inc.*

*and Its Debtor Affiliates* (the "Disclosure Statement") [ECF No. 1729] and *Debtors' Motion for*

*Entry of Order (I) Scheduling Combined Disclosure Statement Approval and Plan Confirmation*

*Hearing; (II) Conditionally Approving Disclosure Statement; (III) Establishing a Plan and*

*Disclosure Statement Objection Deadline and Related Procedures; and (IV)) Granting Related*

*Relief* (the "Solicitation Motion") [ECF No. 1729] and represents as follows:

---

[1] The Debtors in these chapter 11 cases, together with the last four digits of each Debtor's federal tax identification number, are:  Conn's, Inc. (2840), Conn Appliances, Inc. (0706), CAI Holding, LLC (2675), Conn Lending, LLC (9857), Conn Credit I, LP (0545), Conn Credit Corporation, Inc. (9273), CAI Credit Insurance Agency, Inc. (5846), New RTO, LLC (6400), W.S. Badcock LLC (2010), W.S. Badcock Credit LLC (5990), and W.S. Badcock Credit I LLC (6422).  The Debtors' service address is 2445 Technology Forest Blvd., Suite 800, The Woodlands, TX 77381.

## <u>INTRODUCTION</u>

1.      In *Harrington v. Purdue Pharma L.P.*, 603 U.S. 204, 216–27 (2024) ("*Purdue*"), the United States Supreme Court was unequivocal that, except in asbestos cases, chapter 11 plans may not include nonconsensual releases of claims against non-debtor third parties. The Supreme Court held that bankruptcy courts cannot involuntarily alter the relationships between non-debtors by imposing releases of claims between them. *Purdue*, 603 U.S. at 209, 227. Conn's Inc. and its affiliated debtors (collectively, the "<u>Debtors</u>") present this Court with a patently unconfirmable plan that imposes releases on non-debtor third parties without their affirmative and voluntary consent. As drafted, the Plan binds thousands of holders of claims or interests to release countless third parties, including untold numbers of unidentified parties, unless they timely exercise an option to opt out of such releases. Inasmuch as the plan is not confirmable, the Court should not conditionally approve the Disclosure Statement and the solicitation procedures that facilitate an unconfirmable plan. Specifically, the U.S. Trustee objects for the following reasons:

A.    The Bankruptcy Code does not authorize the nonconsensual release of non-debtor third parties by other non-debtor third parties;

B.    The Debtors' proposed opt out provisions in the Ballots and the Non-Voting Notices[2] proposed in the Solicitation Motion are ineffective to confer affirmative consent to the Third-Party Releases;

C.    To the extent that exculpation is permitted beyond the authorization contained in section 1125(e) of the Bankruptcy Code, the exculpation provision impermissibly includes parties or entities not entitled to exculpation in the Fifth Circuit;

D.    The Plan has permanent injunction and gatekeeper provisions that violate Fifth Circuit precedent set forth in *Highland II*[3] and the Bankruptcy Code; and

E.    The Plan has discharge and permanent discharge injunction provisions that violate 11 U.S.C. 1141(d)(3) because Debtors are not operating, have sold substantially all of their

---

[2] Capitalized terms are given the same meaning as in the Solicitation Motion or later defined below.

[3] *Highland Cap. Mgmt. Fund Advisors, L.P. v. Highland Cap. Mgmt., L.P. (In re Highland Cap. Mgmt., L.P.),* No. 23-10534, 2025 U.S. App. LEXIS 6320 (5th Cir. Mar. 18, 2025) ("*Highland II*")

assets, and the primary purpose of the Plan is the make distributions of the proceeds from their liquidation efforts.

## BACKGROUND

### A. General Background

2.      On July 23, 2024, the Debtors filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code. The cases are jointly administered.

3.      The Debtors are authorized to continue to operate their businesses and manage their properties as debtors-in-possession pursuant to §§ 1107(a) and 1108 of the Bankruptcy Code.

4.      On May 19, 2025, the Debtors filed the Plan, Disclosure Statement, and the Solicitation Motion. ECF Nos. 1727, 1728, and 1729, respectively.

5.      The Solicitation Motion seeks approval of the following dates and deadlines:

| PROPOSED SOLICITATION AND CONFIRMATION TIMETABLE | |
|---|---|
| Voting Record Date | June 4, 2025 |
| Requested Conditional Disclosure Statement Hearing | June 9, 2025 |
| Solicitation Deadline | June 13, 2025 |
| Voting Resolution Deadline | June 20, 2025 |
| Plan Supplement Filing Deadline | July 3, 2025 |
| Voting Deadline | July 11, 2025 at 4:00 p.m. CST |
| Release Opt-Out Deadline | July 11, 2025 at 4:00 p.m. CST |
| Objection Deadline | July 11, 2025 at 4:00 p.m. CST |
| Confirmation Brief and Voting Report Deadline | July 16, 2025 |
| Combined Hearing | July 18, 2025 at 10:00 a.m. CST |

6. A hearing to consider conditional approval of the Disclosure Statement and Solicitation Motion is scheduled for June 9, 2025, at 9:00 am (CST). ECF No. 1729.

**B. Solicitation and Opt-Out Notices**

7. The Solicitation Motion seeks approval of: (a) the form of notice of the confirmation hearing, (b) the forms of ballots for voting classes (the "<u>Ballots</u>"), and (c) the form of non-voting status notice and accompanying opt-out form (the "<u>Non-Voting Notice</u>"), all of which contain the language describing the releases, exculpation, and injunction from Article IX of the Plan (referred to as the "<u>Solicitation Procedures</u>").

8. The following chart summarizes the Classes of Claims and Interests under the Plan, and whether they are entitled to vote:

| Class | Claims and Interests | Status | Voting Rights |
|---|---|---|---|
| Class 1 | Other Secured Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| Class 2 | Other Priority Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| Class 3 | Prepetition ABL Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| Class 4 | Prepetition 2L Claims | Impaired | Entitled to Vote |
| Class 5 | Prepetition 3L Secured Claims | Impaired | Entitled to Vote |
| Class 6 | General Unsecured Claims | Impaired | Entitled to Vote |
| Class 7 | Intercompany Claims | Impaired | Not Entitled to Vote (Deemed to Reject) |
| Class 8 | Section 510(b) Claims | Impaired | Not Entitled to Vote (Deemed to Reject) |
| Class 9 | Existing Equity Interests | Impaired | Not Entitled to Vote (Deemed to Reject) |
| Class 10 | Intercompany Interests | Unimpaired/Impaired | Not Entitled to Vote (Deemed to Accept/Deemed to Reject) |

9. Under the Debtors' proposed Solicitation Procedures, the Debtors will transmit the Ballots to holders of claims in Classes 4, 5, and 6, which classes are entitled to vote on the Plan.

4

The Debtors do not intend to solicit votes from holders of claims in Classes 1, 2, 3, 7, 8, 9, and 10. Instead, the Debtors would serve these classes with the Non-Voting Notice and Opt-Out Form.

10.     Article I of the Plan at 1.1 defines "Exculpated Party," "Released Party", and "Releasing Party" as follows:

"**Exculpated Party**" means collectively, and in each case, in its capacity as such: (a) the Debtors; (b) the Wind-Down Debtors; (c) the Committee; and (d) the members of the Committee in their capacity as such.

"**Released Party**" means, each of, and in each case in its capacity as such: (a) the Debtors and each of the Debtors' Estates; (b) the Wind-Down Debtors; (c) the DIP Lenders; (d) the DIP Agent; (e) the Prepetition ABL Secured Parties; (f) the Prepetition 2L Agent, (g) the Prepetition 2L Secured Parties; (h) the Plan Sponsor,  (i) the Prepetition 3L Parties;  (j) the Committee and its members, each in their capacities as such; (k) any other Releasing Party; (l) each current and former Affiliate of each Entity in clauses (a) through the following clause (m); and (m) each Related Party of each Entity in clauses (a) through this clause (m); *provided*, that, in each case, an Entity shall not be a Released Party if it:  (i) elects to opt out of the releases provided by the Plan or (ii) objects to the releases provided by the Plan through a formal objection Filed on the docket of these Chapter 11 Cases that is not resolved before the Confirmation Hearing. Notwithstanding the foregoing, any party who is a Released Party shall also be a Releasing Party and any party who is a Releasing Party shall also be a Released Party.

"**Releasing Party**" means each of, and in each case in its capacity as such: (a) the Debtors and each of the Debtors' Estates; (b) the Wind-Down Debtors; (c) the DIP Lenders; (d) the DIP Agent; (e) the Prepetition ABL Secured Parties; (f) the Prepetition 2L Agent; (g) the Prepetition 2L Secured Parties; (h) the Plan Sponsor; (i) the Prepetition 3L Parties; (j) the Committee and its members, each in their capacities as such; (k) all Holders of Claims or Interests that vote to accept the Plan and who do not affirmatively execute and timely return a Release Opt-Out Form; (l) all Holders of Claims or Interests that are deemed to accept the Plan and who do not affirmatively execute and timely return a Release Opt-Out Form; (m) all Holders of Claims or Interests whose vote to accept or reject the Plan is solicited but who do not vote either to accept or to reject the Plan and do not affirmatively execute and timely return a Release Opt-Out Form; (n) all Holders of Claims or Interests that vote to reject the Plan or are deemed to reject the Plan and who do not affirmatively execute and timely return a Release Opt-Out Form; (o) each current and former Affiliate of each Entity in clause (a) through the following clause (p); and (p) each Related Party of each Entity in clauses (a) through this clause (p) solely to the extent such Related Party may assert Claims or Causes of Action on behalf of or in a derivative capacity by or through an Entity in clause (a) through clause (n); *provided* that, in each case, an Entity shall not be a Releasing Party if it: (i) elects to opt out of the Third Party Release; or (ii) timely objects to the Third Party Release through a formal objection Filed on the docket of the Chapter 11 Cases that is not resolved before the Confirmation Hearing. Notwithstanding the foregoing, any party

who is a Released Party shall also be a Releasing Party and any party who is a Releasing Party shall also be a Released Party.

11. Based on the definition of "Releasing Party" the Plan would impose third-party releases on all those who do not opt-out of the release, either on the Ballot or the Non-Voting Notice. Specifically, the Plan will impose the third-party releases on all holders of claims who (i) vote to reject the Plan; (ii) vote to accept the plan; (iii) are deemed to accept or reject the Plan; or (iv) abstain from voting on the Plan, unless they exercise the opt-out.

12. Additionally, the definition of "Exculpated Party" seeks to exculpate individuals and entities that are otherwise prohibited by applicable law in the Fifth Circuit. The definition includes "Wind-Down Debtors," which is defined to mean, "on or after the Effective Date, any Debtor or any successor or assign thereto, by merger, consolidation, or otherwise, including any liquidating trust that may be established pursuant to Article IV of this Plan." The Wind-Down Debtors thus do not even come into existence until the Effective Date of the Plan and pursuant to Fifth Circuit law (and the terms of the Plan itself), the exculpation provided under the Plan applies only to actions taken during the period from the Petition Date through the Effective Date.

13. Finally, Art. IX.E. of the Plan provides for a discharge of Debtors in violation of Section 1141(d)(3) of the Bankruptcy Code because Debtors have liquidated substantially all of their assets and the Plan simply sets forth how the proceeds received from the liquidation of Debtors' assets are to be distributed.

## **OBJECTION**

### A. Statutory Standards

14. Pursuant to Section 1125(b) of the Bankruptcy Code, the proponent of a plan may not solicit its acceptance unless there is transmitted to creditors "the plan or a summary of the plan, and a written disclosure statement approved, after notice and a hearing by the court as containing

adequate information." 11 U.S.C. § 1125(b). Implicitly, such adequate information includes a representation that the proposed plan is one that can be confirmed.

15.      If there is a defect that makes a plan patently or inherently unconfirmable, the Court may consider and resolve that issue at the disclosure statement stage before requiring parties to proceed with solicitation of the plan and a contested confirmation hearing. *In re Am. Cap. Equip.*, LLC, 688 F.3d 145, 153–54 (3d Cir. 2012). *See also In re U.S. Brass Corp.*, 194 B.R. 420, 422 (Bankr. E.D. Tex. 1996).

16.      If the plan is patently unconfirmable on its face, then approval of the disclosure statement must be denied. *In re Beyond.com Corp.*, 289 B.R. 138, 140 (Bankr. N.D. Cal. 2003) (collecting cases); *Am. Cap. Equip., LLC*, 688 F.3d at 154 (3d Cir. 2012) (the Court's equitable powers under 11 U.S.C. § 105 permit the Court to control its own docket and, therefore, to decline to approve a disclosure statement when the plan it supports may not be confirmable). A plan is patently unconfirmable when confirmation defects cannot be overcome by creditor voting and the confirmation defects relate to matters upon which the material facts are not in dispute or have been fully developed at the disclosure statement hearing. *Am. Cap. Equip., LLC*, 688 F.3d at 154–55.

17.      Section 1129(a) of the Bankruptcy Code sets forth the requirements for confirming a chapter 11 plan. Among other things, a plan must comply with the applicable provisions of the Bankruptcy Code. 11 U.S.C. § 1129(a)(1). The Debtors bear the burden of establishing that the Plan complies with all elements of section 1129. *In re Cypresswood Land Partners*, I, 409 B.R. 396, 422 (Bankr. S.D. Tex. 2009).

## B.  The Bankruptcy Code Does Not Authorize Nonconsensual Third-Party Releases.

18.      Nonconsensual third-party releases are not authorized under the Bankruptcy Code. *Purdue*, 603 U.S. at 216–27.  This has long been the conclusion held by the Fifth Circuit Court of

Appeals. *See Bank of N.Y. Tr. Co. v. Off. Unsecured Creditors' Comm. (In re Pac. Lumber Co.)*, 584 F.3d 229, 252 (5th Cir. 2009) (observing that prior Fifth Circuit authority "seem broadly to foreclose non-consensual non-debtor releases and permanent injunctions").

19.     The Court in *Purdue* did not prohibit chapter 11 plans from memorializing consensual third-party releases, and it did not "express a view on what qualifies as a consensual release." *Id.* at 226.

20.     A consensual third-party release is a separate agreement between non-debtors governed by nonbankruptcy law.  As the Supreme Court recognized in *Purdue*, a release is a type of settlement agreement.  *Purdue*, 603 U.S. at 223 (explaining that what the Sacklers sought was not "a traditional release" because "settlements are, by definition, consensual") (cleaned up).  A bankruptcy court can acknowledge the parties' agreement to a third-party release, but the authority for a consensual release is the agreement itself, not the Bankruptcy Code.  If a claim has been extinguished by virtue of the agreement of the parties, then the court is not using the forcible authority of the Bankruptcy Code or the bankruptcy court to extinguish the property right of non-debtors.

21.     For the reasons discussed below, a creditor's failure to check an opt-out box on a ballot or Non-Voting Notice does not constitute consent to a non-debtor release in a chapter 11 plan. Although opt-out provisions have been approved in some cases in the Southern District of Texas, a careful analysis of applicable law warrants reconsideration of the conclusion that imposing non-debtor releases based on a failure to opt out is permissible.  As explained below, state contract law should govern whether non-debtors have agreed to a release.  There is no federal law that preempts the requirements of state contract law for such releases.

22.     Here, there is no existing release agreement between non-debtors.  Debtors instead seek a confirmation order that would use the power of the court to impose a third-party release on claimants without their affirmative and voluntary consent.  Such a confirmation order would impermissibly alter the relations between non-debtors because a valid release does not exist under non-bankruptcy law.

### C.  State Contract Law Applies

23.     "[T]he basic federal rule in bankruptcy is that state law governs the substance of claims."  *Travelers Cas. & Sur. Co. of America v. Pac. Gas & Elec. Co.*, 549 U.S. 443, 450-451 (2007) (cleaned up); *accord Butner v. United States*, 440 U.S. 48 (1979).  Thus, courts apply state law when the question is whether a debtor has entered a valid settlement agreement.  *See Houston v. Holder (In re Omni Video, Inc.)*, 60 F.3d 230, 232 (5th Cir. 1995) ("Federal bankruptcy law fails to address the validity of settlements and this gap should be filled by state law."); *De La Fuente v. Wells Fargo Bank, N.A. (In re De La Fuente)*, 409 B.R. 842, 845 (Bankr. S.D. Tex. 2009) ("Where the United States is not a party, it is well established that settlement agreements in pending bankruptcy cases are considered contract matters governed by state law.").

24.     The rule is no different for third-party releases.  They are separate agreements between non-debtors governed by state law.   Unlike a bankruptcy discharge, which "is an involuntary release by operation of law," "[i]n the case of voluntary releases, the nondebtor is released from a debt, not by virtue of 11 U.S.C. § 1141(b), but because the *creditor agrees to do so*."  *In re Arrowmill Dev. Corp.*, 211 B.R. 497, 503, 507 (Bankr. D.N.J. 1997) (emphasis in original).  *See also Continental Airlines Corp. v. Air Line Pilots Assn., Int'l (In re Continental Airlines Corp.)*, 907 F.2d 1500, 1508 (5th Cir. 1990) (holding that for settlement provisions "unrelated to substantive provisions of the Bankruptcy Code," "the settlement itself is the source

of the bankruptcy court's authority").  Thus, "the Bankruptcy Code has not altered the contractual obligations of third parties, the parties themselves have so agreed."  *Arrowmill*, 211 B.R. at 507.

25.     Because the Bankruptcy Code does not authorize the imposition of an involuntary release, *Purdue*, 603 U.S. at 209, 227, the release must be consensual under non-bankruptcy law. There is no Bankruptcy Code provision that preempts otherwise applicable state contract law governing releases between non-debtors.  *See, e.g., Shady Grove Orthopedic Assocs. v. Allstate Ins. Co.*, 559 U.S. 393, 416 (2010) (plurality) ("For where neither the Constitution, a treaty, nor a statute provides the rule of decision or authorizes a federal court to supply one, 'state law must govern because there can be no other law.'") (quoting *Hanna v. Plumer*, 380 U.S. 460, 471-72 (1965)); *Erie R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938) ("Except in matters governed by the Federal Constitution or by acts of Congress, the law to be applied in any case is the law of the state.").  Section 105(a), for example, "serves only to carry out authorities expressly conferred elsewhere in the code."  *Purdue*, 603 U.S. at 216 n.2 (quotation marks omitted).  But the Code does not confer any authority to impose a release of claims between non-debtors that would not be valid under state law.  The Bankruptcy Code does not define a "consensual release."  *See* 11 U.S.C. § 101.  "There is no rule that specifies an 'opt out' mechanism or a 'deemed consent' mechanism" for third-party releases in chapter 11 plans.  *In re Chassix Holdings, Inc.*, 533 B.R. 64, 78 (Bankr. S.D.N.Y. 2015).  And no Code provision authorizes bankruptcy courts to deem a non-debtor to have consented to release claims against other non-debtors where such consent would not exist as a matter of state law.

26.     Some courts have held that federal rather than state law applies to determine whether a third-party release is consensual.  But because there is no applicable Code provision, whether a non-debtor has consented to release another non-debtor is not, as one court concluded,

10

a "matter of federal bankruptcy law." *In re Spirit Airlines, Inc.*, No. 24-11988, 2025 WL 737068, at *18, *22 (Bankr. S.D.N.Y Mar. 7, 2025); *see also In re Robertshaw US Holding Corp.*, 662 B.R. 300, 323 (Bankr. S.D. Tex. 2024) (relying on caselaw in the district rather than any provision of the Bankruptcy Code). Absent express authority in the Code, federal courts cannot simply make up their own rules for when parties have given up property rights by releasing claims. Bankruptcy courts cannot "create substantive rights that are otherwise unavailable under applicable law," nor do they possess a "roving commission to do equity." *In re Dairy Mart Convenience Stores, Inc.*, 351 F.3d 86, 92 (2d Cir. 2003) (quotation omitted). Indeed, nearly a hundred years ago, the Supreme Court rejected the notion that federal courts can displace state law as "an unconstitutional assumption of powers by the Courts of the United States which no lapse of time or respectable array of opinion should make us hesitate to correct." *Erie*, 304 U.S. at 79 (cleaned up); *accord Rodriquez v. FDIC*, 589 U.S. 132, 133 (2020) (holding state law applies to determine allocation of federal tax refund resulting from consolidated tax return). Courts thus may not invent their own rule for when parties may be "deemed" to have given up property rights by releasing claims.

27. Accordingly, state-law contract principles govern whether a third-party release is consensual. *See, e.g.*, *Patterson v. Mahwah Bergen Retail Grp., Inc.,* 636 B.R. 641, 684-85 (E.D. Va. 2022) (describing bankruptcy courts in the District of New Jersey as "look[ing] to the principles of contract law rather than the bankruptcy court's confirmation authority to conclude that the validity of the releases requires affirmative consent"); *In re Smallhold, Inc.*, 665 B.R. 704, 720 (Bankr. D. Del. 2024) (recognizing that "some sort of affirmative expression of consent that would be sufficient as a matter of contract law" is required); *In re SunEdison, Inc.,* 576 B.R. 453, 458 (Bankr. S.D.N.Y. 2017) ("Courts generally apply contract principles in deciding whether a creditor consents to a third-party release."); *Arrowmill*, 211 B.R. at 506, 507 (explaining that a

third-party release "is no different from any other settlement or contract" and thus "the validity of the release . . . hinge[s] upon principles of straight contract law or quasi-contract law rather than upon the bankruptcy court's confirmation order") (internal quotation marks omitted) (alterations in original).  Because "'nothing in the bankruptcy code contemplates (much less authorizes it)' . . . any proposal for a non-debtor release is an ancillary offer that becomes a contract upon acceptance and consent." *In re Tonawanda Coke Corp.*, 662 B.R. 220, 222 (Bankr. W.D.N.Y. 2024) (quoting *Purdue*, 603 U.S. at 223).  And "any such consensual agreement would be governed by state law." *Id.*

28.     Even if federal law applied, however, it would not lead to a different result.  That is because "federal contract law is largely indistinguishable from general contract principles under state common law." *Young v. BP Expl. & Prod., Inc. (In re Deepwater Horizon)*, 786 F.3d 344, 354 (5th Cir 2015) (cleaned up).  *See also Deville v. United States*, 202 F. App'x 761, 763 n.3 (5th Cir. 2006) ("The federal law that governs whether a contract exists 'uses the core principles of the common law of contracts that are in force in most states.' . . . These core principles can be derived from the Restatements.") (quoting *Smith v. United States*, 328 F.3d 760, 767 n.8 (5th Cir. 2003)).

29.     In analyzing whether the third-party releases in the Plan are permissible, the Court should determine whether there is consent under state law. Here, the Debtors' use of the opt-out mechanism is insufficient for this Court to make a finding of consent, which is fatal to the confirmation of the Plan.

### D. Under State Law, Silence Does Not Confer Consent in Contracts, Except in Limited Circumstances Not Applicable Here

30.     Debtors bear the burden to prove that their plan is confirmable.  *Cypresswood Land Partners*, I, 409 B.R. at 422.  They have not met this burden because they have failed to establish that the third-party release is consensual under applicable state law.

31.     Under Texas state law, like in other states, silence does not equate to consent except under limited circumstances not applicable in these cases. *See Tex. Ass'n of Ctys. Cty. Gov't Risk Mgmt. Pool v. Matagorda Cty.*, 52 S.W.3d 128, 132–33 (Tex. 2000). Further, the Commission of Appeals of Texas stated that:

> A contract implied in fact is one in which, under the circumstances, the acts of the parties are such as to indicate according to the ordinary course of dealing and the common understanding of men a mutual intention to contract, as where one accepts the tendered service of another under circumstances justifying the inference that such other expected to be paid for such services. Of course, in implied contracts as well as express contracts there must be shown the element of mutual agreement. But the only difference is that such agreement is expressly stated, in the one instance, and is inferred from the circumstances, in the other. A contract implied from the facts and circumstances in evidence is as binding as would be an expressed one.

*Marr-Piper Co. v. Bullis*, 1 S.W.2d 572, 575 (Tex. Comm'n App. 1928).

32.     Silence and inaction, however, will generally not be deemed assent to an offer because, with silence, there is no meeting of the minds. *Matagorda Cty.*, 52 S.W.3d at 132–33 (quoting 2 Williston on Contracts § 6:49 (4th ed. 1991)). "[A]s a matter of law, when a party is unilaterally informed of [a contract term], 'mere failure to object within a reasonable time . . ., without more, could not establish an agreement between the parties.'" *In re Couture Hotel Corp.*, 554 B.R. 369, 381 (Bankr. N.D. Tex. 2016) (quoting *Triton Oil & Gas Corp. v. Marine Contractors & Supply, Inc.*, 665 S.W. 2d 443, 445–46 (Tex. 1982)). "[A] meeting of the minds is an essential element of an implied in fact contract." *Id.* (quoting *Excess Underwriters at Lloyd's, London v. Frank's Casing Crew & Rental Tools, Inc.*, 246 S.W.3d 42, 49 (Tex. 2008)) (internal quotation omitted); *see also Beverick v. Koch Power, Inc.*, 186 S.W.3d 145, 152 (Tex. App.—Houston [1st Dist.] 2005, pet. denied) ("Silence cannot satisfy the basic requirements of contract creation.").

33.     As the Fifth Circuit explained: "Tacit acquiescence between relative strangers ignores the basic tenets of contract law . . . . While there may be exceptions in cases involving parties with longstanding relationships, generally speaking, 'silence or inaction does not constitute acceptance of an offer.'"  *Imperial Ind. Supply Co. v. Thomas*, 825 F. App'x 204, 207 (5th Cir. Sept. 2, 2020) (quoting *Norcia v. Samsung Telecomms Am., LLC*, 845 F.3d 1279, 1284 (9th Cir. 2017)).  As another District Court within this Circuit explained, "[t]his idea that [the plaintiff] can unilaterally bind another party to a contract, however, is contrary to law.  It is a fundamental principle of contract law that to create an enforceable contract, there must be a clear and definite offer followed by a clear and definite acceptance in accordance with the offer's terms." *Redmond v. Williams*, No. 22-cv-00910, 2023 LW 7984388, at *6 (E.D. Tex. Sept. 13, 2023).  Acceptance of an offer "is established only by conforming to the rules governing acceptance, not a separate theory of 'waiver and ratification.'"  *Houston Dairy, Inc. v. John Hancock Mut. Life Ins. Co.*, 643 F.2d 1185, 1186 (5th Cir. 1981).

34.     Thus, "[o]rdinarily[,] an offeror does not have power to cause the silence of the offeree to operate as acceptance."  RESTATEMENT (SECOND) OF CONTRACTS § 69 cmt. a (1981). *See also Reichert v. Rapid Investments, Inc.*, 56 F.4th 1220, 1227 (9th Cir. 2022) ("[T]he offeror cannot prescribe conditions so as to turn silence into acceptance."); *Jacques v. Solomon & Solomon P.C.*, 886 F. Supp. 2d 429, 433 n.3 (D. Del. 2012) ("Merely sending an unsolicited offer does not impose upon the party receiving it any duty to speak or deprive the party of its privilege of remaining silent without accepting."); *Elfar v. Wilmington Trust, N.A.*, No. 20-0273, 2020 WL 7074609, at *2 n.3 (E.D. Cal. Dec. 3, 2020) ("The court is aware of no jurisdiction whose contract law construes silence as acceptance of an offer, as the general rule."), *adopted by* 2020 WL

1700778, at *1 (E.D. Cal. Feb. 11, 2021); *accord* 1 Corbin on Contracts § 3.19 (2018); 4 Williston on Contracts § 6:67 (4th ed.).

35.     There are only very limited exceptions to the "general rule of contracts . . . that silence cannot manifest consent." *Patterson*, 636 B.R. at 686; *see also, e.g.*, *McGurn v. Bell Microproducts, Inc.*, 284 F.3d 86, 90 (1st Cir. 2002) (recognizing "general rule" that "silence in response to an offer . . . does not constitute acceptance of the offer"). "[T]he exceptional cases where silence is acceptance fall into two main classes: those where the offeree silently takes offered benefits, and those where one party relies on the other party's manifestation of intention that silence may operate as acceptance. Even in those cases the contract may be unenforceable under the Statute of Frauds." RESTATEMENT (SECOND) OF CONTRACTS § 69 cmt. a (1981).

36.     But absent such extraordinary circumstances, "[t]he mere receipt of an unsolicited offer does not impair the offeree's freedom of action or inaction or impose on him any duty to speak." *Id.* Further, "[t]he mere fact that an offeror states that silence will constitute acceptance does not deprive the offeree of his privilege to remain silent without accepting." *Id.* § 69, cmt. c. *See also Patterson*, 636 B.R. at 686 (explaining how contract law does not support consent by failure to opt out); *Jacques*, 886 F. Supp. 2d at 433 n.3.

### E.  Failing to Opt Out Does Not Provide the Required Affirmative Consent

37.     The Plan provides that all holders of claims who do not opt out will provide broad non-debtor third-party releases to numerous known and unknown third parties on conduct that may not be related to the bankruptcy cases or the reorganization. In other words, Debtors purport to impose an otherwise non-existent duty to speak on claimants regarding the offer to release non-debtors, and their silence—the failure to opt out—is "deemed" consent. But under black-letter law that silence is not acceptance of the offer to release non-debtors. *See, e.g.*, *Patterson*, 636 B.R.

at 688 ("Whether the Court labels these 'nonconsensual' or based on 'implied consent' matters not, because in either case there is a lack of sufficient affirmation of consent.").

38.     The Ninth Circuit's decision in *Norcia*, cited by the Fifth Circuit in *Imperial Ind. Supply Co. v. Thomas*, 825 F. App'x 204, 207 (5th Cir. 2020), illustrates the point.  In *Norcia*, a consumer bought a Samsung phone from a Verizon Wireless store and signed the Verizon Wireless Customer Agreement.  *Norcia*, 845 F.3d at 1282.  Among the contents of the phone's box was a Samsung "Product Safety & Warranty Information" brochure that contained an arbitration provision, which "stated that purchasers could opt out of the arbitration agreement by providing notice to Samsung within 30 calendar days of purchase, either through email or by calling a toll-free telephone number."  *Id*.  It also stated that opting out would not affect the warranty coverage.  *Id*.  The customer did not take any steps to opt out.  *Id*.  When the customer later sued Samsung, Samsung argued that the arbitration provision applied.  *Id*. at 1282-83.

39.     The Ninth Circuit in *Norcia* further held that the customer's failure to opt out did not constitute consent to arbitrate.  The court applied the "general rule," applicable under California law, that "silence or inaction does not constitute acceptance of an offer."  845 F.3d at 1284 (quotation marks omitted); *accord Tex. Ass'n of Ctys. Cty. Gov't Risk Mgmt. Pool v. Matagorda Cty*., 52 S.W.3d 128, 132–33 (Tex. 2000).  The customer did not agree to arbitrate because he did not "sign the brochure or otherwise act in a manner that would show his intent to use his silence, or failure to opt out, as a means of accepting the arbitration agreement."  *Norcia*, 845 F.3d at 1285 (quotation marks omitted).  This was true, even though the customer *did* take action to accept the offered contract from Verizon Wireless.  "Samsung's offer to arbitrate all disputes with [the customer] cannot be turned into an agreement because the person to whom it is made or sent makes no reply, even though the offer states that silence will be taken as consent,

16

unless an exception to this general rule applies."  845 F.3d at 1286 (quotation marks and citation omitted).

40.     The Ninth Circuit held that none of the exceptions to this rule applied.  *Norcia*, 845 F.3d at 1284-85.  There was no state law imposing a duty on the customer to act in response to the offer, the parties did not have a prior course of dealing that might impose such a duty, and the customer did not retain any benefits by failing to act given that the warranty applied whether or not he opted out of the arbitration provision.  *Id*. at 1286.

41.     Here, too, the Debtors' creditors have not signed an agreement to release the non-debtor releasees nor acted in any other manner to suggest that their silence manifests acceptance of an offer to release them.

42.     If confirmed, the Plan would impose broad non-debtor releases on every type of creditor who does not affirmatively opt out. Plan, Art. IX.B.

**F.  Not Voting and Not Opting Out is Not Consent to Release Non-Debtors.**

43.     Third-party releases cannot be imposed on those who do not vote and do not opt out.  *See Smallhold,* 665 B.R. at 709[4]; *SunEdison*, 576 B.R. at 458–61; *Chassix*, 533 B.R. at 81–82; *In re Washington Mut., Inc.*, 442 B.R. 314, 355 (Bankr. D. Del. 2011).  442 B.R. 314, 355 (Bankr. D. Del. 2011).  This applies both to those creditors who simply abstain from voting and

---

[4] *Smallhold* also found that, in at least some circumstances, a failure to opt out constitutes consent when a claimant votes—either to accept or reject a plan—but not if they do not vote.  *See Smallhold,* 665 B.R. at 723.  The *Smallhold* court incorrectly reasoned that because the act of voting on a debtor's plan is an "affirmative step" taken after notice of the third-party release, failing to opt out binds the voter to the release.  *Id.*  But while voting is an "affirmative step" with respect to the debtor's plan, it is not a "*manifestation of intention* that silence may operate as acceptance" of a third-party release.  RESTATEMENT (SECOND) OF CONTRACTS § 69 cmt. a (1981) (emphasis added).  That is because "[t]he mere receipt of an unsolicited offer does not impair the offeree's freedom of action or inaction," *id.*—in this case, the federal right to vote on a chapter 11 plan.  11 U.S.C. § 1126(a).  Nor does it "impose on him any duty to speak," RESTATEMENT (SECOND) OF CONTRACTS § 69 cmt. a, such as by checking an opt out box.  Thus, as discussed below, consent to release *third-party* claims (which are governed by *nonbankruptcy* law) cannot properly be inferred from a party's failure to check an opt-out box on a ballot to vote on the proposed treatment of claims against the *debtor* (governed by *bankruptcy* law).

those creditors who are not entitled to vote on a plan. There is no basis to infer consent by those who do not vote and are taking no action with respect to the plan.

44.     Even where there are conspicuous warnings that a party will be bound if they remain silent, that is not sufficient to recast a party's silence as consent to a third-party release. *SunEdison*, 576 B.R. at 458–61. Creditors have no legal duty to vote on a plan, much less to respond to an offer to release non-debtors included in a plan solicitation. *See, e.g.*, 11 U.S.C. § 1126(a) (providing that creditors "may" vote on a plan); *SunEdison,* 576 B.R. at 460–61 (recognizing that creditors have no duty to speak regarding a plan that would allow a court to infer consent to third-party releases from silence). Consent thus cannot be inferred from their silence because "[t]he mere fact that an offeror states that silence will constitute acceptance does not deprive the offeree of his privilege to remain silent without accepting." RESTATEMENT (SECOND) OF CONTRACTS § 69 cmt. c (1981). Nor can it "impose on him any duty to speak." *Id.* § 69 cmt. a.

45.     Further, "[w]hen the circumstances are equally consistent with either of two facts, neither fact may be inferred." *See In re Couture Hotel Corp.*, 554 B.R. 369, 383 n.80 (Bankr. N.D. Tex. 2016). Consent thus cannot be inferred here because parties who are solicited but do not vote may have failed to vote for reasons other than an intention to assent to the releases. *SunEdison*, 576 B.R. at 461. This is especially true for those whose votes are not solicited at all—but who are instead sent a notice informing them they cannot vote, along with a form to opt out that they must return to avoid being bound by the third-party release.

46.     "Charging all inactive creditors with full knowledge of the scope and implications of the proposed third-party releases, and implying a 'consent' to the third-party releases based on the creditors' inaction, is simply not realistic or fair and would stretch the meaning of 'consent'

beyond the breaking point." *Chassix*, 533 B.R. at 81. "It is reasonable to require creditors to pay attention to what the debtor is doing in bankruptcy as it relates to the creditor's rights against the debtor. But as to the creditor's rights against third parties—which belong to the creditor and not the bankruptcy estate—a creditor should not expect that those rights are even subject to being given away through the debtor's bankruptcy." *Smallhold*, 665 B.R. at 721; *see also id.* at 719-20 (discussing *Chassix*). "A party's receipt of a notice imposing an artificial opt-out requirement, the recipient's *possible* understanding of the meaning and ramifications of such notice, and the recipient's failure to opt-out simply do not qualify" as consent. *Emerge Energy Services, LP*, No. 19-11563, 2019 WL 7634308, at *18 (Bankr. D. Del. Dec. 5, 2019) (emphasis in original). "[B]asic contract principles" require affirmative assent, not inferences drawn from inaction that in fact may reflect only "[c]arelessness, inattentiveness, or mistake." *Id.*

47.    Simply put, an "opt out mechanism is not sufficient to support the third-party releases . . . particularly with respect to parties who do not return a ballot (or are not entitled to vote in the first place)." *In re Washington Mut., Inc.*, 442 B.R. 314, 355 (Bankr. D. Del. 2011); *see also Chassix*, 533 B.R. at 81–82.

**G. Voting on a Plan Plus a Failure to Opt Out does Not Manifest Consent to a Non-Debtor.**

48.    Voting to accept a plan without checking an opt-out box does not constitute the affirmative consent necessary to reflect acceptance of an offer to enter a contract to release claims against non-debtors. *See* RESTATEMENT (SECOND) OF CONTRACTS § 69 cmt. a (1981). Voting to approve a plan plus a failure to opt out of a third-party release is nothing more than silence with respect to the offer to release claims against non-debtors. The act of voting on a chapter 11 plan without opting out is not conduct that "manifest[s] [an] intention that silence may operate as acceptance" of a proposal that the creditor release claims against non-debtors. RESTATEMENT

(SECOND) OF CONTRACTS § 69 cmt. a.  Impaired creditors have a federal right under the Bankruptcy Code to vote on a chapter 11 plan.  11 U.S.C. § 1126(a).  Merely exercising that right does not manifest consent to release claims against non-debtors.

Even more obviously, those who vote to reject the plan are not consenting to third-party releases by failing to mark an opt-out box.  Not only is there no "mutual agreement" as to the plan, much less the third-party release, the creditor has expressly stated its rejection of the plan.  As the court in *In re Chassix Holdings, Inc.*, reasoned: "[A] creditor who votes to reject a plan should also be presumed to have rejected the proposed third-party releases that are set forth in the plan. *The additional 'opt out' requirement, in the context of this case, would have been little more than a Court-endorsed trap for the careless or inattentive creditor.*"  533 B.R. 64, 79 (Bankr. S.D.N.Y. 2015) (emphasis added).

### H. Opt Outs Cannot Be Imposed Based on a Procedural Default Theory.

49.    Applicable state contract law cannot be disregarded on a procedural default theory, applied by some courts, under which creditors who remain silent are held to have forfeited their rights against non-debtors if they received notice of the non-debtor release but failed to object, just as they would forfeit their right to object to a debtor's plan if they failed timely to do so.[5]  *See, e.g., In re Arsenal Intermediate Holdings, LLC*, No. 23-10097, 2023 WL 2655592, at *5-*6 (Bankr. D. Del. Mar. 27, 2023), *abrogated by Smallhold, Inc.*, 665 B.R. at 716; *In re Mallinckrodt PLC*, 639 B.R. 837, 879-80 (Bankr. D. Del. 2022); *In re DBSD North America, Inc.*, 419 B.R. 179, 218-19 (Bankr. S.D.N.Y. 2009), *aff'd on other grounds*, 2010 WL 1223109 (S.D.N.Y. Mar. 24,

---

[5] Although the court in *Spirit* disclaimed relying on a default theory, *Spirit Airlines,* 2025 WL 737068, at *17, it based its holding on the same rationale: that a party may be deemed to consent based on notice and a failure to respond, *id.* at *9-*10, *12-*13.

2010), *rev'd in part and aff'd in part*, 634 F.3d 79 (2d Cir. 2011); *In re Robertshaw US Holding Corp.*, No. 24-90052, 2024 WL 3897812, at *17 (Bankr. S.D. Tex. 2024) (citing *Arsenal Intermediate Holdings, LLC*, 2023 WL 2655592, at *6-8). These courts reasoned that so long as the creditors received notice of a proposed non-debtor release and were informed of the consequences if they did not opt out or object to that release, there is no unfairness or deprivation of due process from binding them to the release. *Cf. Smallhold*, 665 B.R. at 708 (describing this reasoning as having treated a mere "failure to opt out" as "allow[ing] entry of the third-party release to be entered by default").

50.     This is wrong. First, when a party in litigation is bound to a result based on a failure to timely respond, it is not because the defaulting party has *consented* to an adverse ruling. Rather, "failure to make timely assertion of [a] right before a tribunal having jurisdiction to determine it" results in *forfeiture* of the right. *United States v. Olano*, 507 U.S. 725, 731 (1993). Forfeiture, unlike waiver, is not an intentional relinquishment of a known right. *Id*. at 733. *Cf. Smallhold*, 665 B.R. at 718 ("In this context, the word 'consent' is used in a shorthand, and somewhat imprecise, way. It may be more accurate to say that the counterparty forfeits its objection on account of its default."). Forfeiture principles thus do not show consent.

51.     Second, there is no basis to hold that parties have forfeited claims against non-debtor third parties based on their silence in response to a debtor's chapter 11 plan. No one has submitted the released claims for adjudication by the bankruptcy court. *See Olano*, 507 U.S. at 731.

52.     And "[u]nder established principles," courts may enter relief against a party who has procedurally defaulted by not responding "only after satisfying themselves that the relief the

plaintiff seeks is relief that is at least potentially available to the plaintiff" in contested litigation.[6] *Smallhold*, 665 B.R. at 709; *see also id*. at 722 ("[T]he obligation of a party served with pleadings to appear and protect its rights is limited to those circumstances in which it would be appropriate for a court to enter a default judgment if a litigant failed to do so."); *see also Thomson v. Wooster*, 114 U.S. 104, 113 (1885) (holding a decree *pro confesso* may only be entered if it "is proper to be decreed"); *Surtain v. Hamlin Terrace Found.*, 789 F.3d 1239, 1245 (11th Cir. 2015) ("Entry of default judgment is only warranted when there is a sufficient basis in the pleadings for the judgment entered.") (cleaned up).

53.     But a third-party release is not "an ordinary plan provision that can properly be entered by 'default' in the absence of an objection." *Smallhold*, 665 B.R. at 709. "It is unlike the listed cure amount where one can properly impose on a creditor the duty to object, and in the absence of such an objection bind the creditor to the judgment." *Id*. That is because, unlike for a creditor's claims against the debtor, the Bankruptcy Code affords no affirmative authority to order a release of claims against third parties. Because imposition of a nonconsensual non-debtor release is not relief available through a debtor's chapter 11 plan, it is not "appropriate to require creditors to object or else be subject to (or be deemed to 'consent' to) such a third-party release." *Id*. at 719-20.

54.     Because a nonconsensual third-party release is "*per se* unlawful," it follows that a third-party release "is not the kind of provision that would be imposed on a creditor on account of that creditor's default." *Id*. at 709. And besides the flawed default theory, there is "no other justification for treating the failure to 'opt-out' as 'consent' to the release [that] can withstand

---

[6] As discussed above, although the United States Trustee agrees with much of the analysis in *Smallhold*, he disagrees with its conclusion that voting on a plan combined with a failure to opt out constitutes consent.

analytic scrutiny." *Id*.  Because a chapter 11 plan cannot permissibly impose non-debtor releases without the affirmative consent of the releasing parties, a release cannot be imposed based on their mere failure to respond regarding the non-debtor release.[7]  Rather, an "*affirmative expression of consent* that would be sufficient as a matter of contract law" is required.  *Id*. at 720 (emphasis added).

## I.  The Exculpation Provisions in the Plan Violate Fifth Circuit Law

55.     To the extent that applicable law authorizes exculpation beyond 11 U.S.C. § 1125(e), the Plan's exculpation provision is overly broad in violation of Fifth Circuit precedent. The Fifth Circuit in 2022 affirmed that, following its prior decision in *Bank of New York Tr. Co., NA v. Official Unsecured Creditors' Comm*. (*In re Pac. Lumber Co*.) 584 F.3d 229 (5th Cir. 2009), "any exculpation in a Chapter 11 reorganization plan be limited to the debtor, the creditors' committee and its members for conduct *within the scope of their duties*, 11 U.S.C. § 1103(c), and the trustees *within the scope of their duties . . . .*" *In re Highland Cap. Mgmt., L.P*., 48 F.4th at 437 (5th Cir. 2022).(*emphasis added*).

56.     The Fifth Circuit in *Highland Capital* also analyzed whether the independent directors who were specifically appointed by the Official Committee of Unsecured Creditors in the Highland Capital's bankruptcy case, pursuant to an order entered by the bankruptcy court to act together as the bankruptcy trustee, could be exculpated and concluded:

> That leaves one remaining question:  whether the bankruptcy court can exculpate the Independent Directors under Pacific Lumber.  We answer in the affirmative. As the bankruptcy court's governance order clarified, nontraditional as it may be, the Independent Directors were appointed to act together as the bankruptcy trustee for Highland Capital.  Like a Debtors-in-possession, the Independent Directors are entitled to all the rights and powers of a trustee.  See 11 U.S.C. § 1107(a); 7 COLLIER ON BANKRUPTCY ¶ 1101.01.  It follows that the Independent

---

[7] For those reasons, the *Smallhold* court expressly disapproved of its prior decision in *Arsenal*, which had relied on the procedural default theory.  *See id.* at 716 ("On the central question presented, the Court concludes that its decision in *Arsenal* does not survive *Purdue Pharma*.").

Directors are entitled to the limited qualified immunity for any actions short of gross negligence.  See In re Hilal, 534 F.3d at 501.  Under this unique governance structure, the bankruptcy court legally exculpated the Independent Directors.

*In re Highland Cap. Mgmt., L.P.*, 48 F.4th at 437.

57.     The Debtors, the creditors' committee and its members, and trustees are the only parties for which the Fifth Circuit has allowed exculpation.  Under *Highland I*, the "Wind Down Debtors" as that term is defined in the Plan, are not entitled to exculpation.  "Wind-Down Debtors," is defined to mean, "on or after the Effective Date, any Debtor or any successor or assign thereto, by merger, consolidation, or otherwise, including any liquidating trust that may be established pursuant to Article IV of this Plan." The Wind-Down Debtors thus do not even come into existence until the Effective Date of the Plan and pursuant to Fifth Circuit law (and the terms of the Plan itself), the exculpation provided under the Plan applies only to actions taken during the period from the Petition Date through the Effective Date. Indeed, the Fifth Circuit in *Highland I* struck from the definition of exculpated parties numerous parties, including professionals retained by the Debtors and the Claimant Trust, among others.  *In re Highland Cap. Mgmt., L.P.*, 48 F.4th at 438.And the Fifth Circuit in *Highland Capital* emphasized that exculpation is limited solely to the statutory duties of those exculpated.  48 F.4th at 437. Thus, to be consistent with *Pacific Lumber* and *Highland I*, the definition of "Exculpated Party" in the Plan must exclude the Wind Down Debtors.

**J.   The Injunction and Related Gatekeeping Provisions Violate Fifth Circuit Precedent and the Bankruptcy Code.**

58.    The Bankruptcy Court may not approve the provisions at Art. IX.D and G that (i) enjoin actions against the Wind Down Debtors; and (ii) direct all claims against the Wind Down Debtors to the bankruptcy court.[8]

59.    The Fifth Circuit recently made this point clear with its *Highland II* decision when it stated, "[e]ven before *Purdue Pharma*, this court had held the same: that any provision that non-consensually releases non-debtors from liability for debts and/or conduct, **and any injunction that acts to shield non-debtors from such liability**, must be struck from a bankruptcy confirmation plan." *Highland II* at *12, (citing *In re Pac. Lumber Co.*, 584 F.3d 229, 252 (5th Cir. 2009)) (Fifth Circuit case law "seem[s] broadly to foreclose non-consensual non-debtor releases and permanent injunctions.") (emphasis added); *In re Vitro S.A.B. de C.V.*, 701 F.3d 1031, 1059, 1061-62 (5th Cir. 2012); *In re Zale Corp.*, 62 F.3d at 760 ("[W]e must overturn a § 105 injunction if it effectively discharges a nondebtor."). The Fifth Circuit further clarified that:

> the proper reading of *Highland I* is to require the bankruptcy court to narrow the definition of 'Protected Parties' used in the Gatekeeper Clause coextensively with the definition of 'Exculpated Parties' used in the Exculpation Provision, to read simply: 'collectively, (i) the Debtor; (ii) the Independent Directors, for conduct within the scope of their duties; (iii) the Committee; and (iv) the members of the Committee in their official capacities, for conduct within the scope of their duties.' Both (1) the opinion's plain language and (2) the change made to the opinion on rehearing elucidate this holding.

*Highland II* at *14; quoting *In re Highland Cap. Mgmt., L.P. (Highland I)*, 48 F.4th 419 (5th Cir. 2022).

---

[8] As the *Purdue* court noted, the Bankruptcy Code allows courts to issue an injunction in support of a non-consensual, third-party release ***in exactly one context***: asbestos-related bankruptcies, and these cases are not asbestos-related.  *See Purdue*, 144 S. Ct. at 2085 (citing 11 U.S.C. § 524(e)).

60.     To comply with the Fifth Circuit's directives in *Highland II*, the language in Art. IX.D. that all entities and all other parties in interest "permanently enjoined, from and after the Effective Date, from taking any of the following actions against, as applicable, the Debtors, Wind-Down Debtors, or the Exculpated Parties" must be stricken or limited to the Debtors and the Exculpated Parties. In addressing the injunction and gatekeeper, the Fifth Circuit in *Highland II* clarified that those protective parties must be limited to those parties entitled to exculpation as held in *Highland I*.

61.     Additionally, in *Highland II*, the Fifth Circuit also held that the *Barton* doctrine would allow for a gatekeeping provision, but only for claims brought "'against the trustee or other bankruptcy-court-appointed officer, for acts done in the actor's official capacity' in a bankruptcy proceeding, even if the bankruptcy court would not have jurisdiction to actually adjudicate those claims" *Highland II* at *13–14 (quoting *Villegas v. Schmidt*, 788 F.3d 156, 159 (5th Cir. 2015). Accordingly, the gatekeeping language in Art. IX.G. must be stricken from the Plan or, again, limited to cover only the Debtors and Exculpated Parties. The gatekeeping provision, as written, would require hundreds of non-debtor third parties to seek permission from the bankruptcy court to bring suit against the Wind Down Debtors, which do not exist until the Effective Date and therefore are not protected by the *Barton* doctrine.

62.     In light of the foregoing, the injunction and gatekeeping provisions are unlawful and must be limited to the parties that are properly exculpated under a plan, which in the present case are the Debtors, the Committee, and the members of the Committee in their capacity as such, and no other parties.

**K. The Plan Violates 11 U.S.C. § 1141(d)(3)**

63.     The Bankruptcy Code provides that "[t]he confirmation of a plan does not discharge a debtor if: (A) the plan provides for the liquidation of all or substantially all of the property of the estate; (B) the debtor does not engage in business after consummation of the plan; *and* (C) the debtor would be denied a discharge under § 727(a) of this title if the case were a case under chapter 7 of this title. 11 U.S.C. § 1141(d)(3).

64.     Even though the Plan triggers all the requirements of 11 U.S.C. § 1141(d)(3), thereby limiting Debtors from receiving a discharge, certain provisions of the Plan impermissibly seek to discharge and permanently enjoin the Holders of claims against the Debtors in violation of 11 U.S.C. § 1141(d)(3).

65.     Articles IX.D. and E. are in violation of 11 U.S.C. § 1141(d)(3).  Those provisions tell creditors that they take the distributions provided to given to them under the Plan and give up their rights against the Debtors.[9]

66.     Additionally, any provisions of the Plan that also state that Holders of Claims receive distributions "in full and final satisfaction, settlement, release" of their Claims effectively discharge the Debtors in violation of 11 U.S.C. § 1141(d)(3).

67.     The Plan's full and final settlement and release and permanent injunction provisions perform the same function as the discharge injunction under 11 U.S.C. § 524.  11 U.S.C. §§ 524(a)(2) and (3) describe the effect of a discharge as operating "as an injunction against the commencement or continuation of an action, the employment of process, or an act to collect, recover or offset" debts and liabilities of a debtor or against property of a debtor. 11 U.S.C. §§ 524(a)(2) and (3). The old adage of "if it walks like a duck and quacks like a duck, then it is a

---

[9] *See* Liquidation Plan at Article IV.A.

duck" remains true today. The provisions of the Plan operate as a discharge injunction against the Holders of Claims in violation of 11 U.S.C. § 1141(d)(3). *See, e.g., In re Bigler, LP,* 442 B.R. 537, 546 (Bankr. S.D. Tex. 2010) ("An injunction preventing the post-confirmation prosecution of claims would certainly operate as a discharge of the Debtors."); *In re SunCruz Casinos, LLC,* 342 B.R. 370, 380 (Bankr. S.D. Fla. 2006) ("The net effect of the provisions of § 1141(d)(3) is that a corporate debtor which is liquidated under chapter 11 and does not continue in business after its chapter 11 plan goes into effect does not receive a bankruptcy discharge.").

68.     The Debtors should remedy the Plan to comply with the Bankruptcy Code.  First, the Debtors should remove Articles IV.A. and IX.E. because they effectively violate 11 U.S.C. § 1141(d)(3).  Second, the Debtors should remove the language from the treatment of the various Classes "each Holder of a […] Claim will receive, in full and final satisfaction of such Claim." Third, the injunction provided for by the Plan can be set to expire upon completion of the liquidation activities provided for in the Plan and the Distribution Trust.

[Space Intentionally Blank]

## CONCLUSION

69.     The Court should not conditionally approve the Disclosure Statement and Solicitation Motion because they describe a Plan that will impermissibly impose third-party releases on parties who have not affirmatively and unambiguously consent to third-party releases, and contains discharge, gatekeeper and injunction provisions that are in violation of the Bankruptcy Code and controlling precedent. The Plan is facially unconfirmable because it runs afoul of *Purdue*, *Highland I*, *Highland II*, and the Bankruptcy Code. Thus, the Disclosure Statement should not be approved, and the Solicitation Motion be denied.


Dated:  June 2, 2025                                     Respectfully Submitted,

                                                        KEVIN M. EPSTEIN
                                                        UNITED STATES TRUSTEE

                                                        By: /s/Jayson B. Ruff
                                                        Jayson B. Ruff
                                                        Trial Attorney
                                                        Michigan Bar No. P69893
                                                        515 Rusk, Ste. 3516
                                                        Houston, TX  77002
                                                        Telephone:  (202)573-6960
                                                        Facsimile:  (713)718-4670


## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing was served by electronic means via ECF transmission to all Pacer System participants in these bankruptcy cases, on the 2nd day of June, 2025.

                                                        /s/Jayson B. Ruff
                                                        Jayson B. Ruff