**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | |
|---|---|
| In re: | Chapter 11 |
| CONN'S, INC, *et al.*[1] | Case No. 24-33357 (ARP) |
| Debtors. | (Jointly Administered) |

**DISCLOSURE STATEMENT FOR THE FIRST AMENDED JOINT**
**PLAN OF DISTRIBUTION OF CONN'S, INC. AND ITS DEBTOR AFFILIATES**

**SIDLEY AUSTIN LLP**
Duston McFaul (TX Bar No. 24003309)
Jeri Leigh Miller (TX Bar No. 24102176)
Maegan Quejada (TX Bar No. 24105999)
1000 Louisiana Street, Suite 5900
Houston, Texas 77002
Telephone:     (713) 495-4500
Facsimile:     (713) 495-7799
Email:          dmcfaul@sidley.com
                jeri.miller@sidley.com
                mquejada@sidley.com

Jackson T. Garvey (admitted *pro hac vice*)
One South Dearborn
Chicago, Illinois 60603
Telephone:     (312) 853-7000
Facsimile:     (312) 853-7036
Email:          jgarvey@sidley.com

*Counsel to the Debtors and Debtors in Possession*

---

[1] The Debtors in these chapter 11 cases, together with the last four digits of each Debtor's federal tax identification number, are:  Conn's, Inc. (2840), Conn Appliances, Inc. (0706), CAI Holding, LLC (2675), Conn Lending, LLC (9857), Conn Credit I, LP (0545), Conn Credit Corporation, Inc. (9273), CAI Credit Insurance Agency, Inc. (5846), New RTO, LLC (6400), W.S. Badcock LLC (2010), W.S. Badcock Credit LLC (5990), and W.S. Badcock Credit I LLC (6422).  The Debtor's service address is 2445 Technology Forest Blvd., Suite 800, The Woodlands, TX 77381.

This disclosure statement (this "**Disclosure Statement**") provides information regarding the *Joint Plan of Distribution of Conn's, Inc. and Its Debtor Affiliates* (as may be amended, supplemented, or otherwise modified from time to time, the "**Plan**"),[2] for which the Debtors will seek confirmation by the Bankruptcy Court. A copy of the Plan is attached hereto as **Exhibit A** and is incorporated herein by reference. The Debtors are providing the information in this Disclosure Statement to certain holders of Claims for the purpose of soliciting votes to accept or reject the Plan.

The Debtors, along with BRF Finance Co., LLC (the "**Plan Sponsor**") urge each Holder of a Claim or Interest to consult with its own advisors with respect to any legal, financial, securities, tax, or business advice in reviewing this Disclosure Statement, the Plan, and each proposed transaction contemplated by the Plan.

The Debtors strongly encourage holders of Claims in Classes 4, 5, and 6 to read this Disclosure Statement (including the Risk Factors described in Article XIV hereof) and the Plan in their entirety before voting to accept or reject the Plan. Assuming the requisite acceptances of the Plan are obtained, the Debtors will seek the Bankruptcy Court's approval of the Plan at the Confirmation Hearing.

---

**RECOMMENDATION BY THE DEBTORS AND PLAN SPONSOR**

EACH DEBTORS' BOARD OF DIRECTORS, MEMBER, OR MANAGER, AS APPLICABLE, HAS APPROVED THE TRANSACTIONS CONTEMPLATED BY THE PLAN AND DESCRIBED IN THIS DISCLOSURE STATEMENT, AND EACH DEBTOR, ALONG WITH THE PLAN SPONSOR, BELIEVE THAT THE COMPROMISES CONTEMPLATED UNDER THE PLAN ARE FAIR AND EQUITABLE, MAXIMIZE THE VALUE OF EACH OF THE DEBTORS' ESTATES, AND PROVIDE THE BEST RECOVERY TO STAKEHOLDERS. EACH OF THE DEBTORS AND THE PLAN SPONSOR THEREFORE STRONGLY RECOMMEND THAT ALL HOLDERS OF CLAIMS WHOSE VOTES ARE BEING SOLICITED SUBMIT BALLOTS TO **ACCEPT** THE PLAN BY RETURNING THEIR BALLOTS SO AS TO BE **ACTUALLY RECEIVED** BY THE CLAIMS AND NOTICING AGENT BY NO LATER THAN **JULY 11, 2025 AT 4:00 P.M. (PREVAILING CENTRAL TIME)** PURSUANT TO THE INSTRUCTIONS SET FORTH HEREIN AND ON THE BALLOT.

---

[2] Capitalized terms used but not defined herein shall have the meaning ascribed to such terms in the Plan. The summary of the Plan provided herein is qualified in its entirety by reference to the Plan. In the case of any inconsistency between the Disclosure Statement and the Plan, the Plan will govern.

THE DEBTORS ARE PROVIDING THE INFORMATION IN THIS DISCLOSURE STATEMENT TO HOLDERS OF CLAIMS FOR PURPOSES OF SOLICITING VOTES TO ACCEPT OR REJECT THE *JOINT PLAN OF DISTRIBUTION OF CONN'S, INC. AND ITS DEBTOR AFFILIATES*. NOTHING IN THIS DISCLOSURE STATEMENT MAY BE RELIED UPON OR USED BY ANY ENTITY FOR ANY OTHER PURPOSE. BEFORE DECIDING WHETHER TO VOTE FOR OR AGAINST THE PLAN, EACH HOLDER ENTITLED TO VOTE SHOULD CAREFULLY CONSIDER ALL OF THE INFORMATION IN THIS DISCLOSURE STATEMENT, INCLUDING THE RISK FACTORS DESCRIBED IN ARTICLE XIV HEREIN.

HOLDERS OF CLAIMS OR INTERESTS SHOULD NOT CONSTRUE THE CONTENTS OF THIS DISCLOSURE STATEMENT AS PROVIDING ANY LEGAL, BUSINESS, FINANCIAL, OR TAX ADVICE. THE DEBTORS URGE EACH HOLDER OF A CLAIM OR INTEREST TO CONSULT WITH ITS OWN ADVISORS WITH RESPECT TO ANY LEGAL, FINANCIAL, SECURITIES, TAX, OR BUSINESS ADVICE IN REVIEWING THIS DISCLOSURE STATEMENT, THE PLAN, AND THE PROPOSED TRANSACTIONS CONTEMPLATED THEREBY. FURTHERMORE, THE BANKRUPTCY COURT'S CONDITIONAL APPROVAL OF THE ADEQUACY OF THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE THE BANKRUPTCY COURT'S APPROVAL OF THE PLAN.

THIS DISCLOSURE STATEMENT CONTAINS, AMONG OTHER THINGS, SUMMARIES OF THE PLAN, CERTAIN STATUTORY PROVISIONS, AND CERTAIN EVENTS AND ANTICIPATED EVENTS IN THE CHAPTER 11 CASES. ALTHOUGH THE DEBTORS BELIEVE THAT THESE SUMMARIES ARE FAIR AND ACCURATE, THESE SUMMARIES ARE QUALIFIED IN THEIR ENTIRETY TO THE EXTENT THAT THEY DO NOT SET FORTH THE ENTIRE TEXT OF SUCH DOCUMENTS OR STATUTORY PROVISIONS OR EVERY DETAIL OF SUCH EVENTS. IN THE EVENT OF ANY INCONSISTENCY OR DISCREPANCY BETWEEN A DESCRIPTION IN THIS DISCLOSURE STATEMENT AND THE TERMS AND PROVISIONS OF THE PLAN OR ANY OTHER DOCUMENTS INCORPORATED HEREIN BY REFERENCE, THE PLAN OR SUCH OTHER DOCUMENTS WILL GOVERN FOR ALL PURPOSES. FACTUAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT HAS BEEN PROVIDED BY THE DEBTORS' MANAGEMENT EXCEPT WHERE OTHERWISE SPECIFICALLY NOTED. THE DEBTORS DO NOT REPRESENT OR WARRANT THAT THE INFORMATION CONTAINED HEREIN OR ATTACHED HERETO IS WITHOUT ANY MATERIAL INACCURACY OR OMISSION.

IN PREPARING THIS DISCLOSURE STATEMENT, THE DEBTORS RELIED ON FINANCIAL DATA DERIVED FROM THE DEBTORS' BOOKS AND RECORDS AND ON VARIOUS ASSUMPTIONS REGARDING THE DEBTORS' BUSINESSES. WHILE THE DEBTORS BELIEVE THAT SUCH FINANCIAL INFORMATION FAIRLY REFLECTS THE FINANCIAL CONDITION OF THE DEBTORS AS OF THE DATE HEREOF AND THAT THE ASSUMPTIONS REGARDING FUTURE EVENTS REFLECT REASONABLE BUSINESS JUDGMENTS, NO REPRESENTATIONS OR WARRANTIES ARE MADE AS TO THE ACCURACY OF THE FINANCIAL

INFORMATION CONTAINED HEREIN OR ASSUMPTIONS REGARDING THE
DEBTORS' BUSINESSES AND THEIR FUTURE RESULTS AND OPERATIONS,
INCLUDING ANY ASSUMPTIONS MADE IN THE FINANCIAL PROJECTIONS.  THE
DEBTORS EXPRESSLY CAUTION READERS NOT TO PLACE UNDUE RELIANCE
ON ANY FORWARD-LOOKING STATEMENTS CONTAINED HEREIN.

THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE, AND MAY NOT
BE CONSTRUED AS, AN ADMISSION OF FACT, LIABILITY, STIPULATION, OR
WAIVER.  THE DEBTORS OR ANY OTHER AUTHORIZED PARTY MAY SEEK TO
INVESTIGATE, FILE, AND PROSECUTE CLAIMS, AND MAY OBJECT TO CLAIMS
AFTER THE CONFIRMATION OR EFFECTIVE DATE OF THE PLAN
IRRESPECTIVE OF WHETHER THIS DISCLOSURE STATEMENT IDENTIFIES
ANY SUCH CLAIMS OR OBJECTIONS TO CLAIMS.

THE DEBTORS ARE MAKING THE STATEMENTS AND PROVIDING THE
FINANCIAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT AS
OF THE DATE HEREOF, UNLESS OTHERWISE SPECIFICALLY NOTED.
ALTHOUGH THE DEBTORS MAY SUBSEQUENTLY UPDATE THE INFORMATION
IN THIS DISCLOSURE STATEMENT, THE DEBTORS HAVE NO AFFIRMATIVE
DUTY TO DO SO, AND EXPRESSLY DISCLAIM ANY DUTY TO PUBLICLY
UPDATE ANY FORWARD-LOOKING STATEMENTS, WHETHER AS A RESULT OF
NEW INFORMATION, FUTURE EVENTS, OR OTHERWISE. HOLDERS OF CLAIMS
OR INTERESTS REVIEWING THIS DISCLOSURE STATEMENT SHOULD NOT
INFER THAT, AT THE TIME OF THEIR REVIEW, THE FACTS SET FORTH
HEREIN HAVE NOT CHANGED SINCE THIS DISCLOSURE STATEMENT WAS
FILED.  INFORMATION CONTAINED HEREIN IS SUBJECT TO COMPLETION,
MODIFICATION, OR AMENDMENT.  THE DEBTORS RESERVE THE RIGHT TO
FILE AN AMENDED OR MODIFIED PLAN AND RELATED DISCLOSURE
STATEMENT FROM TIME TO TIME.

THE DEBTORS HAVE NOT AUTHORIZED ANY ENTITY TO GIVE ANY
INFORMATION ABOUT OR CONCERNING THE PLAN OTHER THAN THAT
WHICH IS CONTAINED IN THIS DISCLOSURE STATEMENT.  THE DEBTORS
HAVE NOT AUTHORIZED ANY REPRESENTATIONS CONCERNING THE
DEBTORS OR THE VALUE OF THEIR PROPERTY OTHER THAN AS SET FORTH
IN THIS DISCLOSURE STATEMENT.

IF THE PLAN IS CONFIRMED BY THE BANKRUPTCY COURT AND THE
EFFECTIVE DATE OCCURS, ALL HOLDERS OF CLAIMS OR INTERESTS
(INCLUDING THOSE HOLDERS OF CLAIMS OR INTERESTS WHO DO NOT
SUBMIT BALLOTS TO ACCEPT OR REJECT THE PLAN, WHO VOTE TO REJECT
THE PLAN, OR WHO ARE NOT ENTITLED TO VOTE ON THE PLAN) WILL BE
BOUND BY THE TERMS OF THE PLAN AND THE RESTRUCTURING
TRANSACTIONS CONTEMPLATED THEREBY.

THE CONFIRMATION AND EFFECTIVENESS OF THE PLAN ARE SUBJECT
TO CERTAIN MATERIAL CONDITIONS PRECEDENT DESCRIBED HEREIN AND

SET FORTH IN ARTICLE VIII OF THE PLAN. THERE IS NO ASSURANCE THAT THE PLAN WILL BE CONFIRMED, OR IF CONFIRMED, THAT THE CONDITIONS REQUIRED TO BE SATISFIED FOR THE PLAN TO GO EFFECTIVE WILL BE SATISFIED (OR WAIVED).

YOU ARE ENCOURAGED TO READ THE PLAN AND THIS DISCLOSURE STATEMENT IN THEIR ENTIRETY BEFORE SUBMITTING YOUR BALLOT TO VOTE ON THE PLAN.

THE BANKRUPTCY COURT'S APPROVAL OF THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE A GUARANTEE BY THE BANKRUPTCY COURT OF THE ACCURACY OR COMPLETENESS OF THE INFORMATION CONTAINED HEREIN OR AN ENDORSEMENT BY THE BANKRUPTCY COURT OF THE MERITS OF THE PLAN.

THIS DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE BANKRUPTCY CODE AND BANKRUPTCY RULE 3016(B) AND IS NOT NECESSARILY PREPARED IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER SIMILAR LAWS. THIS DISCLOSURE STATEMENT HAS NOT BEEN APPROVED OR DISAPPROVED BY THE UNITED STATES SECURITIES AND EXCHANGE COMMISSION (THE "SEC") OR ANY SIMILAR FEDERAL, STATE, LOCAL, OR FOREIGN REGULATORY AGENCY, NOR HAS THE SEC OR ANY OTHER AGENCY PASSED UPON THE ACCURACY OR ADEQUACY OF THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.

THE DEBTORS HAVE SOUGHT TO ENSURE THE ACCURACY OF THE FINANCIAL INFORMATION PROVIDED IN THIS DISCLOSURE STATEMENT; HOWEVER, THE FINANCIAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT OR INCORPORATED HEREIN BY REFERENCE HAS NOT BEEN, AND WILL NOT BE, AUDITED OR REVIEWED BY THE DEBTORS' INDEPENDENT AUDITORS UNLESS EXPLICITLY PROVIDED OTHERWISE HEREIN.

# TABLE OF CONTENTS

ARTICLE I. QUESTIONS AND ANSWERS REGARDING THIS DISCLOSURE STATEMENT AND THE PLAN ......................................................................................... 1

    A.    What is chapter 11? ...................................................................................................... 1

    B.    Why are the Debtors sending me this Disclosure Statement? ........................................ 1

    C.    Am I entitled to vote on the Plan? ............................................................................... 1

    D.    What will I receive from the Debtors if the Plan is consummated? ................................. 2

    E.    What will I receive from the Debtors if I hold an Allowed Administrative Claim, DIP Claim, or a Priority Tax Claim? .................................................................................... 2

    F.    Are any regulatory approvals required to consummate the Plan? .................................... 2

    G.    What happens to my recovery if the Plan is not confirmed or does not go effective? ....... 2

    H.    If the Plan provides that I get a distribution, do I get it upon Confirmation or when the Plan goes effective, and what is meant by "Confirmation," "Effective Date," and "Consummation"? ....................................................................................................... 3

    I.    What are the sources of Cash and other consideration required to fund the Plan? ............ 3

    J.    Is there potential litigation related to the Plan? ............................................................ 3

    K.    Does the Plan preserve Causes of Action? .................................................................... 3

    L.    Will there be releases, exculpation, and injunction granted to parties in interest as part of the Plan? ................................................................................................................... 4

    M.    When is the deadline to vote on the Plan? .................................................................... 5

    N.    How do I vote on the Plan? .......................................................................................... 5

    O.    Why is the Bankruptcy Court holding a Confirmation Hearing? .................................... 5

    P.    What is the effect of the Confirmation Hearing? ........................................................... 5

    Q.    Who do I contact if I have additional questions with respect to this Disclosure Statement or the Plan? ................................................................................................................ 5

    R.    Do the Debtors recommend voting in favor of the Plan? ............................................... 6

    S.    Who supports the Plan? ............................................................................................... 6

ARTICLE II.  OVERVIEW OF THE PLAN ................................................................................ 1

    A.    Introduction ................................................................................................................. 1

    B.    The Plan. ..................................................................................................................... 1

    C.    The Adequacy of This Disclosure Statement ................................................................ 2

    D.    Summary of Classes and Treatment of Claims or Interests. ........................................... 3

    E.    Solicitation Package. .................................................................................................... 4

    F.    Non-Voting Status Package ......................................................................................... 4

    G.    Voting and Confirmation of the Plan. .......................................................................... 4

|  | 1. | Certain Factors to be Considered Prior to Voting. | 5 |
|  | 2. | Voting Procedures and Requirements. | 5 |
|  | 3. | Plan Objection Deadline. | 6 |
|  | 4. | Confirmation Hearing. | 6 |
|  | 5. | Confirmation. | 6 |
|  | 6. | Acceptance. | 7 |
|  | 7. | Feasibility. | 7 |
|  | 8. | Best Interests Test; Liquidation Analysis. | 7 |
|  | 9. | Compliance with Applicable Provisions of the Bankruptcy Code. | 8 |
|  | 10. | Alternatives to Confirmation and Consummation of the Plan. | 8 |
| H. |  | Releases by the Debtors and Third Parties Set Forth in the Plan. | 9 |

ARTICLE III. THE DEBTORS' CORPORATE HISTORY, STRUCTURE, AND BUSINESS OVERVIEW ........... 9

| A. |  | Corporate History. | 9 |
| B. |  | Business Operations. | 10 |
|  | 1. | Retail Segment. | 10 |
|  | 2. | Credit Segment. | 10 |
|  | 3. | W.S. Badcock. | 11 |
| C. |  | The Debtors' Prepetition Corporate and Capital Structure. | 12 |
|  | 1. | First Lien Revolving Credit Facility. | 12 |
|  | 2. | Second Lien Term Loan. | 13 |
|  | 3. | Third Lien Delayed Draw Term Loan. | 13 |
| D. |  | Asset-Backed Securitization Transactions. | 14 |
|  | 1. | Customer Receivables. | 14 |
|  | 2. | The Motus Term Loan to Non-Debtor CARF COL LLC. | 15 |
|  | 3. | Trade and Related Debt. | 15 |
| E. |  | Litigation. | 15 |
| F. |  | Events Leading to the Chapter 11 Filings. | 16 |
|  | 1. | Changes in Consumer Behavior. | 16 |
|  | 2. | Costs of Integrating the WSB Merger. | 17 |
|  | 3. | Macroeconomic Factors. | 17 |
|  | 4. | Operational Challenges. | 17 |
|  | 5. | Proposed Financing Transactions. | 18 |
|  | 6. | Alternative Transactions and Right Sizing the Company's Footprint. | 18 |
|  | 7. | Post-Petition Financing and Funding a Going Concern Sale. | 18 |

ARTICLE IV. EVENTS DURING CHAPTER 11 CASE .......................................................... 19

    A.   Commencement of the Chapter 11 Cases and the Debtors' Professionals. ..................... 19

    B.   First Day Relief. ............................................................................................................... 19

    C.   The Bidding Procedures. .................................................................................................. 20

    D.   Sale to Jefferson Capital. ................................................................................................. 22

    E.   Real Property and Lease Sales. ........................................................................................ 23

    F.   Sale of Certain Additional Consumer Finance Receivables and ABS Residuals. ........... 23

    G.   *De Minimis* Sale Transactions. ...................................................................................... 24

    H.   Going Out of Business Sales and Related Dealer Payments. ........................................... 25

    I.   Dealer Settlement. ............................................................................................................ 26

    J.   Assurant Settlement. ........................................................................................................ 26

    K.   Bar Dates. ......................................................................................................................... 27

    L.   KEIP Motion. ................................................................................................................... 28

    M.   Amendment and Transfer of DIP Facility. ..................................................................... 28

    N.   Creditors' Committee Appointment. ................................................................................ 28

    O.   El Paso Removal. ............................................................................................................. 28

    P.   Accelerated Payment Procedures. ................................................................................... 29

    Q.   Proposed Confirmation Schedule. ................................................................................... 29

ARTICLE V. CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS ...... 30

    A.   Administrative Claims, Priority Tax Claims, and Statutory Fees. .................................... 30

      1.   Administrative Claims. .............................................................................................. 30

      2.   DIP Claims. ............................................................................................................... 30

      3.   Professional Fee Claims. ........................................................................................... 31

      4.   Priority Tax Claims. .................................................................................................. 32

      5.   U.S. Trustee Statutory Fees. ..................................................................................... 32

    B.   Classification of Claims and Interests. ............................................................................ 32

    C.   Treatment of Claims and Interests. ................................................................................. 33

      1.   Class 1 – Other Secured Claims. ............................................................................... 33

      2.   Class 2 – Other Priority Claims. ............................................................................... 34

      3.   Class 3 – Prepetition ABL Secured Claims. ............................................................. 34

      4.   Class 4 – Prepetition 2L Secured Claims. ................................................................ 34

      5.   Class 5 – Prepetition 3L Secured Claims. ................................................................ 35

      6.   Class 6 – General Unsecured Claims. ........................................................................ 35

      7.   Class 7 – Intercompany Claims. ................................................................................ 36

**8.** Class 8 – Section 510(b) Claims. ................................................................. 36

**9.** Class 9 – Existing Equity Interests. .............................................................. 36

**10.** Class 10 – Intercompany Interests. ............................................................. 37

D. Reservation of Rights Regarding Claims and Interests. .................................. 37

E. Elimination of Vacant Classes. ........................................................................ 37

F. Voting Classes, Presumed Acceptance by Non-Voting Classes. ...................... 38

G. Controversy Concerning Impairment. ............................................................. 38

H. Subordination of Claims. ................................................................................. 38

I. Confirmation Pursuant to Section 1129(b) of the Bankruptcy Code. ............... 38

J. Postpetition Interest on Claims ........................................................................ 38

K. Insurance. ......................................................................................................... 38

ARTICLE VI. MEANS FOR IMPLEMENTATION OF THE PLAN ............................. 39

A. General Settlement of Claims and Interests. ................................................... 39

B. Sources of Consideration for Plan Distributions ............................................. 39

C. Sale Transactions. ............................................................................................. 39

D. Settlement of Certain Administrative Claims ................................................... 39

E. Wind-Down. ...................................................................................................... 40

**1.** Vesting of the Assets in the Wind-Down Debtors. ..................................... 40

**2.** Authority of Wind-Down Debtors. ............................................................. 40

**3.** Plan Administrator**. .................................................................................... 41

**4.** Dissolution of Governing Bodies of the Debtors. ...................................... 41

F. Distribution Trust .............................................................................................. 42

**1.** Creation and Governance of the Distribution Trust. ................................... 42

**2.** Distribution Trust Agreement. .................................................................... 43

**3.** Preservation of Privilege. ............................................................................ 44

**4.** Distribution Trust Fees and Expenses. ........................................................ 44

**5.** Dissolution of the Distribution Trust. ......................................................... 45

**6.** Single-Satisfaction of Claims. ................................................................... 45

**7.** Cooperation by the Debtors and the Wind-Down Debtors. ......................... 45

**8.** Abandonment of Distribution Trust Assets. ............................................... 46

**9.** Tax Treatment of the Distribution Trust. ..................................................... 46

G. Claims Reconciliation Process .......................................................................... 47

1. In General ..................................................................................................... 47

2. Specified Matters Pertaining to the Reconciliation of Administrative Claims .............. 48

H.   Retained Causes of Action .......................................................................... 48

I.   Corporate Action ......................................................................................... 48

J.   Cancellation of Existing Securities and Agreements .................................... 49

K.   Effectuating Documents; Further Transactions .......................................... 50

L.   Section 1146 Exemption from Certain Taxes and Fees ............................... 50

M.   Sale Order .................................................................................................. 50

N.   Separate Plans ............................................................................................ 50

O.   Settlement of Claims and Controversies .................................................... 50

P.   Closing the Chapter 11 Cases .................................................................... 51

ARTICLE VII. TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES
........................................................................................................................... 51

A.   Assumption and Rejection of Executory Contracts and Unexpired Leases. ................... 51

B.   Claims Based on Rejection of Executory Contracts or Unexpired Leases. ..................... 52

C.   Reservation of Rights. ................................................................................. 52

D.   Preexisting Obligations to the Debtors Under Executory Contracts and Unexpired Leases.
........................................................................................................................... 52

E.   Insurance Policies. ...................................................................................... 53

F.   Modifications, Amendments, Supplements, Restatements, or Other Agreements ........... 53

G.   Nonoccurrence of Effective Date ............................................................... 53

H.   Employee Compensation and Benefits. ....................................................... 53

ARTICLE VIII. PROVISIONS GOVERNING DISTRIBUTIONS ............................................ 54

A.   Distributions on Account of Claims Allowed as of the Effective Date. .......................... 54

B.   Compliance with Tax Requirements. ........................................................... 54

C.   Date of Distributions. .................................................................................. 55

D.   Disbursing Agent. ....................................................................................... 55

E.   Rights and Powers of Disbursing Agent. ..................................................... 55

F.   Surrender of Instruments. ............................................................................ 55

G.   Delivery of Distributions and Undeliverable or Unclaimed Distributions. .................... 56

H.   Manner of Payment. .................................................................................... 56

I.   Foreign Currency Exchange Rate. ............................................................... 56

J.   Setoffs and Recoupment. ............................................................................ 56

K.   Minimum Distribution. ............................................................................... 57

L.   Allocations. ................................................................................................. 57

M.   Distributions Free and Clear. ...................................................................... 57

N.   Claims Paid or Payable by Third Parties. .................................................... 57

**1.** Claims Paid by Third Parties. ............................................................... 57

**2.** Claims Payable by Third Parties. ........................................................... 58

**3.** Applicability of Insurance Policies. ...................................................... 58

ARTICLE IX. PROCEDURES FOR RESOLVING CONTINGENT, UNLIQUIDATED, AND DISPUTED CLAIMS ............................................................................................................. 58

A. Allowance of Claims. ................................................................................ 58

B. Claims Administration Responsibilities. ................................................. 58

C. Estimation of Claims and Interests. ........................................................ 58

D. Adjustment to Claims or Interests Without Objection. ......................... 59

E. Time to File Objections to Claims. .......................................................... 59

F. Disallowance of Claims or Interests. ....................................................... 59

G. Disallowance of Late Claims. .................................................................. 59

H. Disputed Claims Process. ......................................................................... 60

I. Amendments to Claims. ............................................................................ 60

J. No Distributions Pending Allowance. ..................................................... 60

K. Distributions After Allowance. ................................................................ 60

ARTICLE X. CONDITIONS PRECEDENT TO THE EFFECTIVE DATE ............................ 60

L. Conditions Precedent to the Effective Date. .......................................... 60

M. Waiver of Conditions. ............................................................................... 61

ARTICLE XI. RELEASE, INJUNCTION, AND RELATED PROVISIONS ............................ 62

A. Debtors Releases. ...................................................................................... 62

B. Third Party Releases. ................................................................................ 63

C. Exculpations. ............................................................................................. 63

D. Injunction. ................................................................................................. 64

E. Release of Liens. ....................................................................................... 64

F. Gatekeeper Provision. ............................................................................... 65

ARTICLE XII. RETENTION OF JURISDICTION ................................................................. 65

ARTICLE XIII. MISCELLANEOUS PROVISIONS .............................................................. 67

A. Modification and Amendment. ................................................................ 67

B. Effects of Confirmation on Modification. .............................................. 68

C. Revocation or Withdrawal of Plan. ......................................................... 68

D. Immediate Binding Effect. ....................................................................... 68

E. Additional Documents. ............................................................................. 68

F. Substantial Consummation. ...................................................................... 68

G. Reservation of Rights. .............................................................................. 69

H.  Successors and Assigns. .................................................................................. 69

I.  Determination of Tax Liabilities. ..................................................................... 69

J.  Notices. ........................................................................................................... 69

K.  Term of Injunctions or Stays. .......................................................................... 70

L.  Entire Agreement. ........................................................................................... 70

M.  Plan Supplement. ............................................................................................ 70

N.  Governing Law. ............................................................................................... 70

O.  Nonseverability of Plan Provisions. ................................................................ 71

ARTICLE XIV. RISK FACTORS .................................................................................... 71

A.  Bankruptcy Law Considerations. ..................................................................... 71

1.  The Amounts of Allowed Claims May Adversely Affect the Recovery of Some Holders of Allowed Claims. ................................................................................ 71

2.  Parties in Interest May Object to the Plan's Classification of Claims and Interests. ...... 72

3.  The Conditions Precedent to the Effective Date of the Plan May Not Occur. .............. 72

4.  The Debtors May Fail to Satisfy the Vote Requirements. ............................................. 72

5.  The Debtors May Not Be Able to Secure Confirmation of the Plan. ............................ 72

6.  The Debtors May Not Be Able to Secure Nonconsensual Confirmation Over Certain Impaired Non-Accepting Classes. ........................................................................... 73

7.  The Chapter 11 Cases May Be Converted to Cases Under Chapter 7 of the Bankruptcy Code. ........................................................................................................ 73

8.  The Debtors May Object to the Amount or Classification of a Claim. ......................... 73

9.  Contingencies Could Affect Votes of Impaired Classes to Accept or Reject the Plan. .. 73

10.  Releases, Injunctions, and Exculpation Provisions May Not Be Approved. ................. 74

11.  The Debtors' May Not Be Successful in Certain Claim Objections. ............................ 74

12.  The Debtors' Financial Projections May Prove Incorrect. ............................................ 74

13.  The Debtors' May Not Be Successful in Collecting Certain Tax Refunds. ................... 74

14.  The Tax Attributes May Be Rendered Unavailable. ..................................................... 75

B.  Allowance of Claims. ....................................................................................... 75

C.  Risks Related to Recoveries Under the Plan. .................................................... 75

1.  The Amounts of Allowed Claims May Adversely Affect the Recovery of Some Holders of Allowed Claims. ................................................................................ 75

2.  Any Valuation of Any Assets to be Distributed Under the Plan Is Speculative. ........... 76

3.  The Debtors Cannot Guarantee the Timing of Distributions. ....................................... 76

4.  Certain Tax Implications of the Debtors' Bankruptcy. ................................................. 76

D.  Risks Related to the Debtors' Businesses. ........................................................ 76

1.  The Debtors Will Be Subject to the Risks and Uncertainties Associated with the Chapter 11 Cases................................................................................................ 76

2.  Operating in Bankruptcy for a Long Period of Time May Harm the Debtors' Businesses. ............................................................................................................. 77

3.  The Debtors' Business Is Subject to Various Laws and Regulations That Can Adversely Affect the Cost, Manner, or Feasibility of Doing Business. ........................................... 77

4.  The Loss of Key Personnel Could Adversely Affect the Debtors' Operations. ............ 77

E.  Disclosure Statement Disclaimer. ......................................................................... 77

1.  The Financial Information Contained in This Disclosure Statement Has Not Been Audited.................................................................................................................... 77

2.  Information Contained in This Disclosure Statement Is For Soliciting Votes. ............ 78

3.  This Disclosure Statement Was Not Reviewed or Approved by the SEC.................... 78

4.  This Disclosure Statement May Contain Forward Looking Statements....................... 78

5.  No Legal or Tax Advice Is Provided to You by This Disclosure Statement. ............... 78

6.  No Admissions Made................................................................................................ 78

7.  Failure to Identify Potential Objections. .................................................................. 78

8.  No Waiver of Right to Object or Right to Recover Transfers and Assets. .................. 79

9.  Information Was Provided by the Debtors and Was Relied Upon by the Debtors' Advisors. ................................................................................................................. 79

10. Potential Exists for Inaccuracies, and the Debtors Have No Duty to Update.............. 79

11. No Representations Outside This Disclosure Statement are Authorized...................... 79

ARTICLE XV. CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES OF CONSUMMATION OF THE PLAN ............................................................................. 79

A.  Certain U.S. Federal Income Tax Consequences of the Plan to the Debtors.................. 81

1.  U.S. Federal Income Tax Consequences of the Sale Transactions............................... 81

2.  Cancellation of Debt and Reduction of Tax Attributes. ............................................. 81

B.  Certain U.S. Federal Income Tax Consequences of the Plan to U.S. Holders of Allowed Claims Entitled to Vote on the Plan......................................................................... 82

1.  U.S. Federal Income Tax Consequences to U.S. Holders of Allowed Claims in Voting Classes.................................................................................................................... 82

2.  Accrued Interest. ..................................................................................................... 83

3.  Market Discount....................................................................................................... 83

4.  Bad Debt Deduction................................................................................................. 83

C.  Tax Treatment of the Distribution Trust and Holders of Beneficial Interests Therein..... 84

1.  Classification of the Distribution Trust as a Liquidating Trust. ................................... 84

2.  General "Liquidating Trust" Tax Reporting by the Distribution Trust and Distribution Trust Beneficiaries.................................................................................................. 84

**3.** Tax Reporting for the Distribution Trust Assets Allocable to Disputed Claims. .......... 86

D. Certain U.S. Federal Income Tax Consequences of the Plan to Non-U.S. Holders of Allowed Claims Entitled to Vote on the Plan. .................................................................. 86

**1.** Gain Recognition. ........................................................................................ 86

**2.** Interest on Allowed Claims. ........................................................................ 87

E. Information Reporting and Back-Up Withholding. ............................................... 88

F. FATCA. ................................................................................................................ 88

G. Importance of Obtaining Professional Tax Assistance. ....................................... 89

ARTICLE XVI. ADDITIONAL INFORMATION ........................................................... 89

ARTICLE XVII. RECOMMENDATION AND CONCLUSION ............................................. 89

## <u>EXHIBITS</u>

Exhibit A      Joint Plan of Distribution of Conn's Inc. and Its Debtor Affiliates

Exhibit B      Corporate Organization Chart

## ARTICLE I.
## QUESTIONS AND ANSWERS REGARDING THIS DISCLOSURE STATEMENT AND THE PLAN

### A.      What is chapter 11?

Chapter 11 is the principal business restructuring chapter of the Bankruptcy Code.  In addition to permitting debtor rehabilitation, chapter 11 promotes equality of treatment for creditors and similarly situated equity interest holders, subject to the priority of distributions prescribed by the Bankruptcy Code.

The commencement of a chapter 11 case creates an estate that comprises all of the legal and equitable interests of the debtor as of the date the chapter 11 case is commenced.  The Bankruptcy Code provides that a debtor may continue to operate its business and remain in possession of its property as a "debtor in possession."

Consummating a chapter 11 plan is the principal objective of a chapter 11 case.  A bankruptcy court's confirmation of a plan binds the debtor, any person acquiring property under the plan, any creditor or equity interest holder of the debtor, and any other entity as may be ordered by the bankruptcy court.  Subject to certain limited exceptions, the order issued by a bankruptcy court confirming a plan provides for the treatment of the debtor's liabilities in accordance with the terms of the confirmed plan.

### B.      Why are the Debtors sending me this Disclosure Statement?

The Debtors are seeking to obtain Bankruptcy Court approval of the Plan.  Before soliciting acceptances of the Plan, section 1125 of the Bankruptcy Code requires the Debtors to prepare a disclosure statement containing adequate information of a kind, and in sufficient detail, to enable a hypothetical reasonable investor to make an informed judgment regarding acceptance of the Plan and to share such disclosure statement with all holders of claims whose votes on the Plan are being solicited.  This Disclosure Statement is being submitted in accordance with these requirements.

### C.      Am I entitled to vote on the Plan?

Your ability to vote on, and your distribution under, the Plan, if any, depends on what type of Claim or Interest you hold and whether you held that Claim or Interest as of the Voting Record Date (*i.e.*, as of June 4, 2025).  Each category of holders of Claims and Interests, pursuant to sections 1122(a) and 1123(a)(1) of the Bankruptcy Code, is referred to as a "Class." Each Class's respective voting status is set forth in Article III of the Plan and Article V of this Disclosure Statement.

Except as otherwise provided in the Plan, nothing in the Plan shall affect the Debtors' or the Plan Administrator's rights regarding any Unimpaired Claims, including all rights regarding legal and equitable defenses to, or setoffs or recoupments against, any such Unimpaired Claims.

D. **What will I receive from the Debtors if the Plan is consummated?**

A summary of the anticipated recovery to holders of Claims or Interests under the Plan is set forth in Article II.D. of this Disclosure Statement. Any estimates of Claims or Interests in this Disclosure Statement may vary from the final amounts allowed by the Bankruptcy Court. Your ability to receive distributions under the Plan depends upon the ability of the Debtors to obtain Confirmation and meet the conditions necessary to consummate the Plan.

THE PROJECTED RECOVERIES SET FORTH IN ARTICLE II.D. HEREIN ARE ESTIMATES ONLY AND THEREFORE ARE SUBJECT TO CHANGE. FOR A COMPLETE DESCRIPTION OF THE DEBTORS' CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS, REFERENCE SHOULD BE MADE TO THE ENTIRE PLAN.[3]

E. **What will I receive from the Debtors if I hold an Allowed Administrative Claim, DIP Claim, or a Priority Tax Claim?**

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims, DIP Claims, Professional Fee Claims, and Priority Tax Claims have not been classified and, thus, are excluded from the Classes of Claims and Interests set forth in Article III of the Plan.

A description of these Claims and their treatment is included in Article II of the Plan and Article V of this Disclosure Statement.

F. **Are any regulatory approvals required to consummate the Plan?**

At this time, the Debtors are evaluating which, if any, regulatory approvals are required to consummate the Plan. To the extent any such regulatory approvals or other authorizations, consents, rulings, or documents are necessary to implement and effectuate the Plan, however, it is a condition precedent to the Effective Date that they be obtained.

G. **What happens to my recovery if the Plan is not confirmed or does not go effective?**

In the event that the Plan is not confirmed or does not go effective, there is no assurance as to what precisely will happen. It is possible that any alternative may provide holders of Claims with less than they would have received pursuant to the Plan. For a more detailed description of potential consequences of extended Chapter 11 Cases, or of a liquidation scenario under chapter 7 of the Bankruptcy Code, see Article XIV of this Disclosure Statement, and the Liquidation Analysis to be filed subsequent to the Filing of this Disclosure Statement as part of the Plan Supplement.

---

[3] The recoveries set forth herein may change based upon changes in the amount of Claims that are "Allowed" as well as other factors related to the Debtors' Sale Transaction.

**H.      If the Plan provides that I get a distribution, do I get it upon Confirmation or when the Plan goes effective, and what is meant by "Confirmation," "Effective Date," and "Consummation"?**

"Confirmation" of the Plan refers to approval of the Plan by the Bankruptcy Court. Confirmation of the Plan does not guarantee that you will receive the distribution indicated under the Plan.  After Confirmation of the Plan by the Bankruptcy Court, there are conditions that need to be satisfied or waived so that the Plan can go effective.  Initial distributions to holders of Allowed Claims will only be made on the date the Plan becomes effective—the "Effective Date"—or as soon as reasonably practicable thereafter, as specified in the Plan. "Consummation" of the Plan refers to the occurrence of the Effective Date.  See Article X of this Disclosure Statement, entitled "Conditions Precedent to the Effective Date," for a discussion of conditions precedent to Consummation.

**I.      What are the sources of Cash and other consideration required to fund the Plan?**

The Debtors and the Plan Administrator, as applicable, shall fund distributions under the Plan with Cash on hand, including any amounts that may be owed by third parties on account of security deposits or refunds; proceeds from each of the sales under section 363(f) of the Bankruptcy Code of all or substantially all of the Debtors' assets, as described in more detail in Article IV of the Plan (the "Sale Transactions"); proceeds from the *De Minimis* Sale Transactions; proceeds from the monetization of the DIP Collateral and Prepetition Collateral following the Effective Date; proceeds from the monetization of the Remaining Real Property; proceeds, if any, from prosecution or settlement of the Retained Causes of Action other than Retained Causes of Action against Brian Kahn and his relevant affiliates; and proceeds from any other assets of the Debtors' estates, including any tax credits or refunds, all in accordance with the terms of the Plan.

**J.      Is there potential litigation related to the Plan?**

Parties in interest may object to the approval of this Disclosure Statement and may object to Confirmation of the Plan, which objections potentially could give rise to litigation.

In the event that it becomes necessary to confirm the Plan over the objection of certain Classes, the Debtors may seek confirmation of the Plan notwithstanding the dissent of such rejecting Classes.  The Bankruptcy Court may confirm the Plan pursuant to the "cramdown" provisions of the Bankruptcy Code, which allows the Bankruptcy Court to confirm a plan that has been rejected by an impaired Class if it determines that the Plan satisfies section 1129(b) of the Bankruptcy Code.

**K.      Does the Plan preserve Causes of Action?**

The Plan provides for the retention of certain Retained Causes of Action and Causes of Action of the Debtors that are not otherwise transferred or sold pursuant to the Sale Transactions, other than those that are expressly waived, relinquished, exculpated, released, compromised, or settled, as described in greater detail in Article IV.E of the Plan.

**L.      Will there be releases, exculpation, and injunction granted to parties in interest as part of the Plan?**

Yes, the Plan proposes to release the Released Parties and to exculpate the Exculpated Parties. The Debtors will also seek findings of fact and conclusions of law with regards to officers' and directors' performance of their duties as officers and directors of the Debtors. The Debtors' releases, third-party releases, exculpation, and injunction provisions included in the Plan are an integral part of the Debtors' overall restructuring efforts.

The Released Parties, the Exculpated Parties, and the Debtors' directors and officers have made substantial and valuable contributions to the Debtors' restructuring through efforts to negotiate and implement the Plan, which will maximize value of the Debtors for the benefit of all parties in interest. Accordingly, each of the Released Parties and the Exculpated Parties warrant the benefit of the release and exculpation provisions.

IMPORTANTLY, THE FOLLOWING PARTIES ARE INCLUDED IN THE DEFINITION OF "RELEASING PARTIES" AND WILL BE DEEMED TO HAVE EXPRESSLY, UNCONDITIONALLY, INDIVIDUALLY, AND COLLECTIVELY RELEASED AND DISCHARGED ALL CLAIMS AND CAUSES OF ACTION AGAINST THE DEBTORS AND THE RELEASED PARTIES: (A) THE DEBTORS AND EACH OF THE DEBTORS' ESTATES; (B) THE WIND-DOWN DEBTORS; (C) THE DIP LENDERS; (D) THE DIP AGENT; (E) THE PREPETITION ABL SECURED PARTIES; (F) THE PREPETITION 2L AGENT; (G) THE PREPETITION 2L SECURED PARTIES; (H) THE PLAN SPONSOR; (I) THE PREPETITION 3L PARTIES; (J) THE COMMITTEE AND ITS MEMBERS, EACH IN THEIR CAPACITIES AS SUCH; (K) ALL HOLDERS OF CLAIMS OR INTERESTS THAT VOTE TO ACCEPT THE PLAN AND WHO DO NOT AFFIRMATIVELY EXECUTE AND TIMELY RETURN A RELEASE OPT-OUT FORM; (L) ALL HOLDERS OF CLAIMS OR INTERESTS THAT ARE DEEMED TO ACCEPT THE PLAN AND WHO DO NOT AFFIRMATIVELY EXECUTE AND TIMELY RETURN A RELEASE OPT-OUT FORM; (M) ALL HOLDERS OF CLAIMS OR INTERESTS WHOSE VOTE TO ACCEPT OR REJECT THE PLAN IS SOLICITED BUT WHO DO NOT VOTE EITHER TO ACCEPT OR TO REJECT THE PLAN AND DO NOT AFFIRMATIVELY EXECUTE AND TIMELY RETURN A RELEASE OPT-OUT FORM; (N) ALL HOLDERS OF CLAIMS OR INTERESTS THAT VOTE TO REJECT THE PLAN OR ARE DEEMED TO REJECT THE PLAN AND WHO DO NOT AFFIRMATIVELY EXECUTE AND TIMELY RETURN A RELEASE OPT-OUT FORM; (O) EACH CURRENT AND FORMER AFFILIATE OF EACH ENTITY IN CLAUSE (A) THROUGH THE FOLLOWING CLAUSE (P); AND (P) EACH RELATED PARTY OF EACH ENTITY IN CLAUSES (A) THROUGH THIS CLAUSE (P) SOLELY TO THE EXTENT SUCH RELATED PARTY MAY ASSERT CLAIMS OR CAUSES OF ACTION ON BEHALF OF OR IN A DERIVATIVE CAPACITY BY OR THROUGH AN ENTITY IN CLAUSE (A) THROUGH CLAUSE (N); *PROVIDED* THAT, IN EACH CASE, AN ENTITY SHALL NOT BE A RELEASING PARTY IF IT: (I) ELECTS TO OPT OUT OF THE THIRD PARTY RELEASE; OR (II) TIMELY OBJECTS TO THE THIRD PARTY RELEASE THROUGH A FORMAL OBJECTION FILED ON THE DOCKET OF THE CHAPTER 11 CASES THAT IS NOT RESOLVED BEFORE THE CONFIRMATION HEARING. NOTWITHSTANDING THE FOREGOING, ANY PARTY WHO IS A RELEASED PARTY SHALL ALSO BE A RELEASING PARTY AND ANY

PARTY WHO IS A RELEASING PARTY SHALL ALSO BE A RELEASED PARTY. THE RELEASES ARE AN INTEGRAL ELEMENT OF THE PLAN.

Based on the foregoing, the Debtors believe that the release, exculpation, and injunction provisions in the Plan are necessary and appropriate and meet the requisite legal standard promulgated by the United States Court of Appeals for the Fifth Circuit. Moreover, the Debtors will present evidence at the Confirmation Hearing to demonstrate the basis for and propriety of the release and exculpation provisions. The release, exculpation, and injunction provisions are contained in Article IX of the Plan and Article XI of this Disclosure Statement.

**M.** **When is the deadline to vote on the Plan?**

The Voting Deadline is July 11, 2025, at 4:00 p.m. (prevailing Central Time).

**N.** **How do I vote on the Plan?**

Detailed instructions regarding how to vote on the Plan are contained on the ballot distributed to holders of Claims that are entitled to vote on the Plan (the "Ballot"). For your vote to be counted, the Ballot containing your vote must be properly completed, executed, and delivered as directed so that it is **actually received** by the Debtors' Notice and Claims Agent, Epiq Corporate Restructuring, LLC, **on or before the Voting Deadline of July 11, 2025, at 4:00 p.m. (prevailing Central Time)**.

**O.** **Why is the Bankruptcy Court holding a Confirmation Hearing?**

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Code to hold a hearing on Confirmation of the Plan and recognizes that any party in interest may object to Confirmation of the Plan. Concurrent with the Filing of the Plan and Disclosure Statement, the Debtors will request that the Bankruptcy Court schedule the Confirmation Hearing. All parties in interest will be served notice of the time, date, and location of the Confirmation Hearing once scheduled. The Confirmation Hearing may be adjourned from time to time without further notice.

**P.** **What is the effect of the Confirmation Hearing?**

The confirmation of a plan by a bankruptcy court binds the debtor, any person acquiring property under a plan, any creditor or equity interest holder of a debtor, and any other person or entity as may be ordered by the bankruptcy court in accordance with the applicable provisions of the Bankruptcy Code.

**Q.** **Who do I contact if I have additional questions with respect to this Disclosure Statement or the Plan?**

If you have any questions regarding this Disclosure Statement or the Plan, please contact the Debtors' Notice and Claims Agent via one of the following methods:

> *By regular mail, hand delivery, or overnight mail at:*
> Epiq Ballot Processing
> c/o Epiq Corporate Restructuring, LLC

P.O. Box 4420,
Beaverton, OR 97076

*By electronic mail at:*
ConnAppliancesInfo@epiqglobal.com

*By telephone (toll-free) at:*
(877) 848-5813

Copies of the Plan, this Disclosure Statement, and any other publicly filed documents in the Chapter 11 Cases are available upon written request to the Notice and Claims Agent at the address above or by downloading the documents from the Debtors' restructuring website at https://dm.epiq11.com/case/conns/info (free of charge) or via PACER at https://www.pacer.gov (for a fee) upon filing.

**R.**     **Do the Debtors recommend voting in favor of the Plan?**

Yes.  The Debtors believe that the Plan provides for a larger distribution to the Debtors' stakeholders than would otherwise result from any other available alternative.  The Debtors believe that the Plan is in the best interest of the Debtors' stakeholders, and that any alternatives (to the extent they exist) fail to realize or recognize the value inherent under the Plan.

**S.**     **Who supports the Plan?**

The Plan is supported by the Debtors and the Plan Sponsor.

**ARTICLE II.**
**OVERVIEW OF THE PLAN**

---

**RECOMMENDATION BY THE DEBTORS AND PLAN SPONSOR**

It is the Debtors' and Plan Sponsor's opinion that confirmation and implementation of the Plan is in the best interests of the Debtors' Estates and their creditors.  Therefore, the Debtors and Plan Sponsor recommend that all creditors whose votes are being solicited submit a ballot to **accept** the Plan.

---

A.    **Introduction.**

The following is a brief overview of certain material provisions of the Plan.  This overview is qualified by reference to the provisions of the Plan, which is attached hereto as **Exhibit A**, and the exhibits thereto, as amended from time to time.  In the event that any inconsistency or conflict exists between this Disclosure Statement and the Plan, the terms of the Plan will control.  Confirmation of the Plan and Consummation are subject to certain conditions precedent, which are summarized in Article X hereof.  There is no assurance that these conditions precedent will be satisfied or waived.  At the Confirmation Hearing, the Bankruptcy Court will confirm the Plan only if all of the applicable requirements of section 1129 of the Bankruptcy Code are met.  Among the requirements for confirmation of a chapter 11 plan are that the plan: (1) is accepted by the requisite holders of claims or interests in impaired classes under the plan; (2) is in the "best interests" of each holder of a claim or interest in each impaired class under the plan; (3) is feasible; and (4) complies with the applicable provisions of the Bankruptcy Code.  In this instance, only Holders of Claims in Classes 4, 5, and 6 are entitled to vote to accept or reject the Plan.  Because Classes 7, 8, and 9 will receive no distributions under the Plan, those Classes are deemed to reject the Plan.  Because Classes 1, 2, and 3 are Unimpaired, they are deemed to vote to accept the Plan.  *See* Article II.G.5 hereof for a discussion of the Bankruptcy Code's requirements for Plan Confirmation.

B.    **The Plan.**

The Debtors filed for chapter 11 bankruptcy protection on July 23, 2024 (the "Petition Date").  The Debtors have sold or are in the process of selling all or substantially all of their assets pursuant to section 363(f) of the Bankruptcy Code prior to confirmation of the Plan. Subsequent to confirmation, the Debtors intend to enter the next phase of these Chapter 11 Cases, which involves the wind-down of the Debtors and the monetization of any remaining assets or interests, with such proceeds to be distributed as set forth in the Plan.

A chapter 11 bankruptcy case permits a debtor to resolve its affairs and distribute the proceeds of its estate pursuant to a confirmed chapter 11 plan.  To that end, the Debtors have filed the Plan, the terms of which are more fully described herein, contemporaneously with the filing of this Disclosure Statement.  The Plan contemplates a liquidation and distribution of the Debtors and their Estates and is therefore referred to as a "plan of distribution."  The primary objective of the Plan is to maximize the value of recoveries to holders of Allowed Claims and to distribute all property of the Debtors' Estates that is or becomes available for distribution in accordance with the Bankruptcy Code and Plan.  The Debtors assert that the Plan accomplishes

1

this objective and is in the best interests of their Estates, and therefore seek to confirm the Plan. The Plan classifies Holders of Claims or Interests according to the type and nature of the Holder's Claim or Interest, as more fully described below.

The Plan designates the Classes of Claims against and Interests in the Debtors and specifies which Classes are: (1) Impaired or Unimpaired by the Plan; (2) entitled to vote to accept or reject the Plan in accordance with section 1126 of the Bankruptcy Code; or (3) deemed to accept or reject the Plan. Claims against the Debtors and Interests in the Debtors are classified in ten (10) separate Classes, as described herein.

## C.     The Adequacy of This Disclosure Statement.

Before soliciting acceptances of a proposed chapter 11 plan, section 1125 of the Bankruptcy Code requires a plan proponent to prepare a written disclosure statement containing information of a kind, and in sufficient detail, to enable a hypothetical reasonable investor to make an informed judgment regarding acceptance of the plan. The Debtors are providing this Disclosure Statement in accordance with those requirements. This Disclosure Statement includes, without limitation, information about:

- the Plan, including a summary, the procedures for voting on the Plan and projected recoveries thereunder (Article II hereof);

- the statutory requirements for confirming the Plan (Article II.G. hereof);

- the Debtors' organizational structures, business operations, and financial obligations (Article III hereof);

- the events leading to the filing of the Debtors' Chapter 11 Cases (Article III hereof);

- the major events during the Chapter 11 Cases, including significant pleadings filed in the Debtors' Chapter 11 Cases (Article III hereof);

- certain risk factors that holders of Claims should consider before voting to accept or reject the Plan (Article XIV hereof);

- the classification and treatment of Claims or Interests under the Plan, including identification of the Holders of Claims entitled to vote on the Plan (Article V hereof);

- the means for implementation of the Plan, the provisions governing distributions to certain Holders of Claims pursuant to the Plan, the procedures for resolving Disputed Claims and other significant aspects of the Plan (Article VI hereof);

- the releases contemplated by the Plan that are integral to the overall settlement of Claims and Interests pursuant to the Plan (Article XI hereof); and

- certain United States federal income tax consequences of the Plan (Article XV hereof).

### D.      Summary of Classes and Treatment of Claims or Interests.

The classification of Claims or Interests, the estimated aggregate amount of Claims in each Class and the amount and nature of distributions to Holders of Claims or Interests in each Class are summarized in the table below.   In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims, DIP Claims, Professional Fee Claims, and Priority Tax Claims have not been classified.   For a discussion of certain additional matters related to Administrative Claims, DIP Claims, Professional Fee Claims, and Priority Tax Claims, see Article II of the Plan and Article V herein.

Each amount designated in the table below as "Estimated Percentage Recovery" for each Class is the quotient of the estimated Cash or other assets to be distributed to Holders of Allowed Claims in that Class, divided by the estimated aggregate amount of Allowed Claims in that Class.   Each of the estimated Cash or other assets, and the estimated aggregate amount of Allowed Claims, have been made in ranges with both low and high estimates.   In determining those amounts, the Debtors have assumed that the Plan is consummated as described herein.

For a discussion of various factors that could materially affect the amount of assets to be distributed pursuant to the Plan, see Article XIV of this Disclosure Statement.

| SUMMARY OF ESTIMATED RECOVERIES | | | | |
|---|---|---|---|---|
| Class | Claim/Interest | Treatment of Claim/Interest | Projected Allowed Amount of Claims | Estimated % Recovery Under Plan |
| Class 1 | Other Secured Claims | Unimpaired; Not Entitled to Vote (Deemed to Accept) | $0 | N/A |
| Class 2 | Other Priority Claims | Unimpaired; Not Entitled to Vote (Deemed to Accept) | $358,337 | 100% |
| Class 3 | Prepetition ABL Secured Claims | Impaired; Entitled to Vote | $0[4] | 100% |
| Class 4 | Prepetition 2L Secured Claims | Impaired; Entitled to Vote | $101,451,893 | 30%–73% |
| Class 5 | Prepetition 3L Secured Claims | Impaired; Entitled to Vote | $50,000,000 | 0% |
| Class 6 | General Unsecured Claims | Impaired; Entitled to Vote | $375,186,681 | 1% |
| Class 7 | Intercompany Claims | Impaired; Not Entitled to Vote (Deemed to Reject) | N/A | N/A |
| Class 8 | Section 510(b) Claims | Impaired; | N/A | N/A |

---

[4] All amounts owed on Class 3 Prepetition ABL Secured Claims were paid in advance of the filing of this Disclosure Statement.

| | | Not Entitled to Vote (Deemed to Reject) | | |
|---|---|---|---|---|
| Class 9 | Existing Equity Interests | Impaired; Not Entitled to Vote (Deemed to Reject) | N/A | N/A |
| Class 10 | Intercompany Interests | Impaired; Not Entitled to Vote (Deemed to Reject) | N/A | N/A |

**E.      Solicitation Package.**

The package of materials to be sent to Holders of Claims entitled to vote to accept or reject the Plan (the "Solicitation Package") will contain:

- the Disclosure Statement (including the Plan and all other exhibits hereto);

- the notice of Confirmation Hearing;

- an appropriate form of Ballot, together with detailed voting instructions; and

- any additional documents that the Bankruptcy Court has ordered to be made available.

The Solicitation Package may also be obtained free of charge from Epiq Corporate Restructuring, LLC, the Debtors' Bankruptcy Court-appointed claims and noticing agent (the "Notice and Claims Agent") by: (1) visiting https://dm.epiq11.com/case/conns/info; (2) emailing the Notice and Claims Agent at ConnAppliancesInfo@epiqglobal.com; or (3) calling (877) 848-5813.

**F.      Non-Voting Status Package**

The package of materials to be sent to Holders of Claims or Interests not entitled to vote to accept or reject the Plan (the "Non-Voting Status Package") will contain:

- the notice of Confirmation Hearing;

- an appropriate Release Opt-Out Form, together with detailed instructions for completion and a pre-addressed, postage pre-paid return envelope; and

- any additional documentation that the Bankruptcy Court has ordered to be made available.

**G.      Voting and Confirmation of the Plan.**

The Debtors seek entry of an order with respect to the motion for Confirmation Hearing, which will, among other things, (1) conditionally approve this Disclosure Statement pursuant to section 1125 of the Bankruptcy Code and (2) establish Plan voting tabulation procedures, which include certain vote tabulation rules that temporarily allow or disallow Claims for voting

purposes (the "Tabulation Rules") pursuant to section 502 of the Bankruptcy Code and Bankruptcy Rule 3018.

1. <u>Certain Factors to be Considered Prior to Voting</u>.

There are a variety of factors that all holders of Claims entitled to vote on the Plan should consider prior to voting to accept or reject the Plan.  These factors may impact recoveries under the Plan, including:

- the financial information contained in this Disclosure Statement has not been audited and is based on an analysis of data available at the time of the preparation of the Plan and this Disclosure Statement;

- although the Debtors assert that the Plan complies with all applicable provisions of the Bankruptcy Code, the Debtors can neither assure such compliance nor that the Bankruptcy Court will confirm the Plan; and

- any delays of either Confirmation or Consummation could result in, among other things, increased Administrative Claims or Professional Fee Claims, which would likely reduce the recoveries to the Holders of Claims.

2. <u>Voting Procedures and Requirements</u>.

Pursuant to the Bankruptcy Code, only Classes of Claims against or Interests in a debtor that are "impaired" under the terms of a chapter 11 plan are entitled to vote to accept or reject a plan.  A class is "impaired" if the legal, equitable or contractual rights attaching to the claims or interests of that class are modified, other than by curing defaults and reinstating maturity.  Classes of Claims or Interests that are not impaired are not entitled to vote on the Plan and are conclusively presumed to have accepted the Plan.  In addition, Classes of Claims or Interests that do not receive distributions under the Plan are not entitled to vote on the Plan and are deemed to have rejected the Plan.  The classification of Claims or Interests is summarized, together with an indication of whether each Class of Claims or Interests is Impaired or Unimpaired, in Article II herein.  June 4, 2025 shall serve as the voting record date (the "Voting Record Date") for the purpose of determining which Holders of Filed or scheduled Claims in Classes 4, 5 and 6 are entitled to receive a Solicitation Package.

Voting on the Plan by each Holder of a Claim in Classes 4, 5, and 6 is important.  Please carefully follow all of the instructions contained on the Ballot(s) provided to you.  All Ballots must be completed and returned in accordance with the instructions provided.  To be counted, your ballot or ballots must be received by 4:00 p.m., prevailing Central Time, on July 11, 2025 (the "Voting Deadline") at the address set forth on the pre-addressed envelope provided to you.

If you are entitled to vote and you did not receive a Ballot, received a damaged Ballot or lost your Ballot, please call or email the Debtors' Notice and Claims Agent, at (877) 848-5813 (toll free), (949) 620-1088 (international) or ConnAppliancesInfo@epiqglobal.com.  Also, this Disclosure Statement, the Plan and all of the related exhibits and schedules are available, without charge, to any party in interest at http://dm.epiq11.com/case/Conns.

5

Ballots cannot be transmitted orally, by email, or by facsimile. Accordingly, you are urged to return your signed and completed Ballot, by hand delivery, overnight service, regular U.S. mail, or electronically via the Notice and Claims Agent's e-Ballot portal promptly, so that it is received by the Notice and Claims Agent before the Voting Deadline.

**3.**    Plan Objection Deadline.

The deadline to file objections to the Confirmation of the Plan (the "<u>Confirmation Objections</u>") is July 11, 2025, at 4:00 p.m. (prevailing Central Time) (the "<u>Objection Deadline</u>"). All Confirmation Objections must be in writing and must specify in detail the name and address of the objector, all grounds for the objection, and the amount of the Claim or Interest held by the objector. Any Confirmation Objection must be filed with the Bankruptcy Court and served on the Debtors, the Committee, and the U.S. Trustee on or before the Objection Deadline.

**4.**    Confirmation Hearing.

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court, after notice, to hold a hearing on confirmation of the Plan. The Debtors will request that the Bankruptcy Court conditionally approve this Disclosure Statement and set a combined hearing to approve this Disclosure Statement on a final basis and confirm the Plan. The Confirmation Hearing may, however, be continued or adjourned from time to time without further notice to parties in interest other than an adjournment announced in open court or a notice of adjournment Filed with the Bankruptcy Court and served in accordance with the Bankruptcy Rules. Subject to section 1127 of the Bankruptcy Code, the Plan may be modified, if necessary, prior to, during, or as a result of the Confirmation Hearing without further notice to parties in interest.

**5.**    Confirmation.

To confirm the Plan, the Bankruptcy Code requires that the Bankruptcy Court make a series of findings concerning the Plan and the Debtors, including that:[5]

- the Plan has classified Claims and Interests in a permissible manner;

- the Plan complies with the applicable provisions of the Bankruptcy Code;

- the Debtors have complied with the applicable provisions of the Bankruptcy Code;

- the Debtors, as proponents of the Plan, have proposed the Plan in good faith and not by any means forbidden by law;

- the disclosure required by section 1125 of the Bankruptcy Code has been made;

- the Plan has been accepted by the requisite votes, except to the extent that cramdown is available under section 1129(b) of the Bankruptcy Code, of creditors and equity interest holders;

---

[5] The descriptions contained herein are only a summary of certain confirmation requirements; they are not exhaustive of all confirmation requirements and should not be construed as such.

- the Plan is feasible;

- all U.S. Trustee Statutory Fees due and owing have been paid or the Plan provides for the payment thereof on the Effective Date; and

- the Plan is in the "best interests" of all Holders of Claims or Interests in an Impaired Class by providing to those Holders on account of their Claims or Interests property of a value, as of the Effective Date, that is not less than the amount that each Holder would receive or retain in a chapter 7 liquidation, unless each Holder of a Claim or Interest in that Class has accepted the Plan.

      **6.**    <u>Acceptance</u>.

A Plan is accepted by an Impaired Class of Claims if Holders of at least two-thirds in dollar amount and a majority in number of Claims of that Class vote to accept the Plan. Only those Holders of claims who actually vote (and are entitled to vote) to accept or to reject a plan count in this tabulation.

      **7.**    <u>Feasibility</u>.

Section 1129(a)(11) of the Bankruptcy Code requires that confirmation of a plan not be likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor (unless liquidation or reorganization is proposed in the Plan). Because the Plan proposes a liquidation of all of the Debtors' assets, for purposes of this test the Debtors have analyzed the ability of the Plan Administrator to meet its obligations under the Plan. Based on the Debtors' analysis, including the information contained in the liquidation analysis to be filed in the Plan Supplement (the "<u>Liquidation Analysis</u>"), regarding recoveries available to Holders of Allowed Claims under the Plan, the Plan Administrator will have sufficient assets to accomplish its tasks under the Plan. The Debtors have also prepared the consolidated financial projections (the "<u>Financial Projections</u>") for the monetization of their remaining assets, including the residual interest in certain consumer receivable portfolios and various state tax refunds the Debtors believe they are owed. The Financial Projections, and the assumptions on which they are based, are to be filed in the Plan Supplement. Therefore, the Debtors have determined that their liquidation pursuant to the Plan will meet the feasibility requirements of the Bankruptcy Code.

      **8.**    <u>Best Interests Test; Liquidation Analysis</u>.

Notwithstanding acceptance of the Plan by each Impaired Class, to confirm the Plan, the Bankruptcy Court must determine that the Plan is in the best interests of each Holder of a Claim or Interest in any Impaired Class who has not voted to accept the Plan. Accordingly, if an Impaired Class does not unanimously accept the Plan, the "best interests" test requires that the Bankruptcy Court find that the Plan provides to each member of that Impaired Class a recovery on account of the Holder's Claim or Interest that has a value, as of the Effective Date, at least equal to the value of the distribution that the Holder would receive if the Debtors were liquidated under chapter 7 of the Bankruptcy Code on the Effective Date.

To address the best interests test, subsequent to the Filing of this Disclosure Statement, the Debtors will prepare and File the Liquidation Analysis and Financial Projections as part of the Plan Supplement.

Because the Plan proposes a liquidation of all the Debtors' assets, the Debtors have analyzed factors that will impact recoveries (the "Recoveries") available to creditors in each scenario. These factors include professionals fees and expenses, asset disposition expenses, applicable taxes, potential Claims arising during the pendency of the Plan or chapter 7 cases and trustee fees and expenses. The Liquidation Analysis will include a summary of the Recoveries under the Plan and in a hypothetical chapter 7 liquidation.

In summary, the Debtors will demonstrate in the Liquidation Analysis that a chapter 7 liquidation would result in diminution in the Recoveries to be realized by Holders of Allowed Claims, as compared to the proposed distributions under the Plan. Consequently, the Debtors will demonstrate in the Liquidation Analysis that the Plan will provide a greater ultimate return to Holders of Allowed Claims than would a chapter 7 liquidation of the Debtors.

The Debtors do not anticipate that they will, and disclaim the obligation to, furnish updated business plans or Financial Projections to parties in interest after Confirmation. The Financial Projections were prepared by the Debtors with the assistance of their advisors in connection with the development and negotiation of the Plan and assume the Plan will be implemented according to its stated terms. The Financial Projections are based on forecasts of key economic variables and may be significantly impacted by, among other things, the servicing of the receivable portfolio, collectability of the receivables, the Debtors success in obtaining certain state tax refunds, inflation, consumer spending, and a variety of other factors. Consequently, the estimates and assumptions underlying the Financial Projections are inherently uncertain and are subject to material business, economic, and other uncertainties. Therefore, such Financial Projections, estimates, and assumptions are not necessarily indicative of current values or future performance, which may be less or more favorable than as set forth herein.

The Liquidation Analysis and Financial Projections should be read in conjunction with the assumptions, qualifications, and explanations set forth in the Disclosure Statement, the Plan, and the Plan Supplement, in their entirety, and the historical consolidated financial statements (including the notes and schedules thereto).

9.      Compliance with Applicable Provisions of the Bankruptcy Code.

Section 1129(a)(1) of the Bankruptcy Code requires that the Plan comply with the applicable provisions of the Bankruptcy Code. The Debtors considered each of these issues in the development of the Plan and have determined that the Plan complies with all provisions of the Bankruptcy Code.

10.      Alternatives to Confirmation and Consummation of the Plan.

The Debtors evaluated alternatives to the Plan, including alternative structures and terms of the Plan. While the Debtors concluded that the Plan is the best alternative and will maximize recoveries by Holders of Allowed Claims, if the Plan is not confirmed, the Debtors, or (subject to the Debtors' exclusive periods under the Bankruptcy Code to file and solicit acceptances of a

plan or plans) any other party in interest in the Chapter 11 Cases could attempt to formulate and propose a different plan.  Further, if no plan under chapter 11 of the Bankruptcy Code can be confirmed, the Chapter 11 Cases may be converted to chapter 7 cases.  In liquidation cases under chapter 7 of the Bankruptcy Code, a trustee would be appointed to liquidate the remaining assets of the Debtors and distribute proceeds to creditors.  The proceeds of the liquidation would be distributed to the respective creditors of the Debtors in accordance with the priorities established by the Bankruptcy Code.  For further discussion of the potential impact on the Debtors of the conversion of the Chapter 11 Cases to chapter 7 liquidation, see Article XIV.A of this Disclosure Statement.  The Debtors have determined that Confirmation and Consummation of the Plan is preferable to the available alternatives.

<strong>H.  <u>Releases by the Debtors and Third Parties Set Forth in the Plan.</u></strong>

Article IX of the Plan provides that each Released Party is deemed released by the Debtors and their Estates from any and all claims and Causes of Action except as set forth therein.  Article IX of the Plan also provides that each Released Party is deemed released by each Releasing Party from any and all claims and Causes of Action except as set forth therein.  The Debtors have determined that applicable law and the facts support those releases and that the Bankruptcy Court can and should approve them.

<strong>ARTICLE III.<br/>THE DEBTORS' CORPORATE HISTORY, STRUCTURE, AND BUSINESS<br/>OVERVIEW</strong>

<strong>A.  <u>Corporate History</u></strong>

The Debtors in the Chapter 11 Cases (collectively, the "<u>Debtors</u>," "<u>Conn's</u>" or the "<u>Company</u>") were founded in 1890 as a as a small heating and plumbing company.  The Company began selling home appliances out of its Beaumont store in 1937.  From that single store, the Company grew to become a national retailer and e-commerce business with 553 corporate and dealer retail stores, 22 distribution and service centers and 6 corporate offices across the Southeast, Mid-Atlantic, and Southwest United States.  The Company is headquartered in The Woodlands, Texas and, at the time of the Petition Date, employed approximately 3,800 people in 15 states.

Through its retail stores and e-commerce operations (the "<u>Retail Segment</u>"), the Company offered home furnishings and mattresses, appliances, consumer electronics, and related product offerings.  In addition to the Retail Segment, the Company differentiated itself in the marketplace through its in-house and third-party financing products (the "<u>Credit Segment</u>").  The in-house portion of the Credit Segment was complemented by the Company's relationships with third-party payment solutions providers, increasing the overall financing product offerings available to customers, while mitigating the Company's overall exposure to potential credit risks.

The Debtors' common stock was publicly traded and listed on the Nasdaq Stock Market ("<u>Nasdaq</u>") under the symbol "CONNQ."  On July 26, 2024, the Debtors received a notice of delisting from Nasdaq indicating that trading in the company's common stock would be suspended at the opening of business on August 6, 2024 and that the company's securities would

9

be removed from listing and registration on Nasdaq. Trading of the Debtors' common stock has transitioned to the OTC Bulletin Board or "pink sheets" market.

**B.    Business Operations.**

**1.    Retail Segment.**

The brick and mortar stores and the Company's eCommerce platform were carefully tailored to meet the needs of Conn's core consumer base and provide a diverse array of durable and modern consumer products for the home. Among the over 550 retail stores, 244 were corporate owned and 310 were dealer owned. These stores varied in size and offerings based on geographic location and consumer demands.

The primary retail products offered through the Retail Segment, sourced from vendors both domestically and internationally, can be broken out into the following categories:

- home appliance, including refrigerators, freezers, washers, dryers, dishwashers, and ranges from each of the leading consumer brands;

- furniture and mattress, including furniture and related accessories for the living room, dining room and bedroom, as well as both lay flat mattresses and mattress-in-a-box offerings;

- consumer electronics, including multiple television offerings, home theater audio, video game consoles, arcade gaming products, and portable audio equipment;

- home office, including computers, tablets, monitors, and accessories; and

- seasonal product offerings.

These products were further complemented by the Debtors' suite of consumer-focused service offerings. For example, to the extent any item was not directly stocked in the relevant location, the Debtors operated a number of regional distribution centers and small cross-dock facilities that enabled quick delivery, including next day delivery in many markets, of ordered product directly to the customer and the related in-home installation services.

In addition to delivery and installation services, the Debtors also provided additional product support services to their customers. Such services and offerings included à la carte product repair service, repair service contracts, and extended warranties. Further, also through third-party providers, the Debtors offered customers property, life, disability, and involuntary unemployment credit insurance, which was required for those purchases financed through the Company's in-house credit offerings.

**2.    Credit Segment.**

As noted above, in conjunction with its consumer product offerings, the Company offered its customers financing through its proprietary in-house credit programs, third-party financing, and by taking cash or credit card payments. Customer purchases that were made utilizing some

form of offered financing account for the substantial majority of the overall customer purchases with the Debtors.[6]

The in-house credit programs offered a much needed form of financing to consumers in need of household items they may otherwise not have access to through other retailors or lenders, as well as provided the Debtors with a significant competitive advantage in the marketplace.

Through its own internal credit underwriting department and developed credit strategy, which was separate and distinct from the Debtors' retail operations, the Company underwrote and determined whether to extend installment loans and credit capacity levels for retail customers.  In addition to auto-decision algorithms in the vast majority of instances, the Company employed credit underwriting personnel to make credit granting decisions using the Debtors' proprietary underwriting process.  That underwriting process evaluated a number of factors and elements, including, but not limited to, a calculus from: credit bureau information; income and address verification; current income and debt levels; the customer's previous credit history with the Company; and the particular product or products being purchased and financed.  Based on the Debtors' underwriting process, the applied models determined the finance terms, including down payment, limit amounts, and credit terms for which consumers may qualify.  The Debtors' credit underwriting arm was supported by its servicing and collections departments.  Its credit department also monitored the credit portfolio to identify delinquent accounts and either initiated collection efforts or implemented mitigation efforts with delinquent consumers if specific criteria were satisfied.

In connection with the WSB Merger (defined below), the Company acquired open revolving credit accounts, distinguishable from Conn's traditional installment loan credit accounts.  Those revolving credit accounts were originated under WSB's separate underwriting model.  Although the WSB revolving credit accounts remained open while maintaining a zero balance, the balances were generally paid by the customer over an eighteen (18) month period from the initial purchase.

**3.    W.S. Badcock.**

W.S. Badcock ("WSB") was founded in 1904 in Mulberry, Florida and operated in approximately 374 stores in the Southeastern United States, primarily in Florida and Georgia.  Prior to merging with the Company, WSB operated approximately 64 corporate locations and 310 independent dealer owned stores.  These WSB stores, branded "Badcock Home Furniture & more," provided customers with similar home furnishing merchandise to those offerings found in Conn's stores—furniture, appliances, bedding, electronics, home office equipment, accessories, and seasonal items.  Historically, WSB focused primarily on selling various furniture and related products, while Conn's started with stronger core appliance offerings.  Through the years, however, the product offerings of both expanded substantially, and, in connection with the WSB Merger (defined below), an integration process was initiated to utilize Conn's credit infrastructure, including underwriting, loan processing, and collections in Badcock stores.

---

[6] For the fiscal year 2024, approximately 61.3% of purchases were financed through the Company's proprietary in-house credit programs, approximately 23.1% of purchases were financed through the use of third-party financing and lease-to-own, and approximately 15.6% of purchases were made with cash or credit card.

On December 18, 2023, as part of a strategic expansion and growth initiative of the Company, Conn's executed a transaction through which W.S. Badcock LLC became a wholly-owned subsidiary of the Company (the "WSB Merger"). The WSB Merger was consummated as an all-stock deal with Conn's issuing 1,000,000 of its non-voting senior preferred shares convertible into a to-be created and issued class of non-voting common stock, subject to shareholder vote, representing 49.99% of Conn's outstanding common stock. Through the WSB Merger, the Company sought to strengthen and widen the Company's existing operations and customer reach and benefit from significant synergies around credit, merchandise, logistics, and more.

### C.     The Debtors' Prepetition Corporate and Capital Structure.

As of the Petition Date, Conn's had approximately $530 million in funded, secured debt obligations.

#### 1.     First Lien Revolving Credit Facility.

On March 29, 2021, Debtors Conn Appliances, Inc. ("CAI") Conn Credit I, LP ("CCI"), Conn Credit Corporation, Inc. ("CCC"), and Conn's entered into the Fifth Amended and Restated Loan and Security Agreement (the "Original JPM Loan Agreement" and the Original JPM Loan Agreement as amended or otherwise modified by the First JPM Amendment, the Second JPM Amendment, and Third JPM Amendment being referred to hereinafter as the "First Lien Loan Agreement") with the First Lien Agent, as the administrative agent and collateral agent to the lender parties thereto and certain lenders party thereto (the "First Lien Lenders"), which provided for a $650 million asset-based revolving credit facility (the "First Lien Facility") pursuant to which the lenders would extend revolving loans from time to time in an aggregate amount not to exceed the borrowing base.

The Original JPM Loan Agreement was amended on November 21, 2022 (the "First JPM Amendment"), again on February 21, 2023 (the "Second JPM Amendment"), again on December 18, 2023 (the "Third JPM Amendment"), and most recently on July 9, 2024 (the "Fourth JPM Amendment" and collectively with the First JPM Amendment, Second JPM Amendment, and Third JPM Amendment, the "JPM Amendments"). The JPM Amendments provided for, among other things, the adjustment to the applicable interest rates and margins, the addition of WSB as a borrower thereto and additional financial covenants. The Third JPM Amendment also resulted in a group of lenders that extended the maturity date of their revolving loans (the "Extending Class") and a group of lenders that declined to extend the maturity date of their revolving loans (the "Non-Extending Class"). The maturity date of revolving loans held by the Non-Extending Class was March 29, 2025. The maturity date of revolving loans held by the Extending Class was December 18, 2026. The Fourth JPM Amendment, executed July 16, 2024, among other things, (a) increased the applicable margin rate by 100 bps in respect of the revolving loans held by lenders consenting to the Fourth JPM Amendment and instituted other associated fees, (b) increased the maximum amount of revolving loans outstanding at any one time by $15 million to $415 million, and (c) required WSB to execute two mortgages in respect of certain real property owned by WSB.

The obligations of Debtors CAI, CCI, CCC, and WSB under the First Lien Facility were guaranteed by Conn's, Inc. and certain subsidiaries. The First Lien Facility was secured by liens on substantially all of the assets of the Debtors. On or around January 2025, the Debtors repaid all amounts owed under the First Lien Loan Agreement in full.

**2.** Second Lien Term Loan.

On February 21, 2023, Debtors Conn's, CAI, CCI, and CCC, entered into a second-lien term loan and security agreement with Pathlight Capital LP, as administrative agent and collateral agent, and the financial institutions party thereto, as lenders (the "Pathlight Term Loan"). The Pathlight Term Loan provided for an aggregate commitment of $100 million pursuant to a three-year secured term loan credit facility, which was fully drawn as of February 21, 2023. The Pathlight Term Loan was satisfied in full on December 18, 2023 with the proceeds from the Second Lien Loan Agreement (as defined below).

On December 18, 2023, Debtors Conn's, CAI, CCI, CCC, and WSB entered into a term loan and security agreement (the "Original Second Lien Loan Agreement" as amended or otherwise modified by the First BRF Amendment being referred to hereinafter as the "Second Lien Loan Agreement") with BRF Finance Co., LLC ("BRF") as administrative agent and collateral agent, and the financial institutions party thereto, as lenders.[7] The Original Second Lien Loan Agreement was amended on January 22, 2024 (the "First BRF Amendment").

The Second Lien Loan Agreement provides for term loans in the aggregate amount of $93 million (the "Second Lien Facility") with such term loans maturing on February 20, 2027. The Second Lien Facility was fully drawn as of December 18, 2023. Except as set forth therein, outstanding amounts under the Second Lien Facility bear interest at an aggregate rate per annum equal to the Term SOFR Rate (defined therein), subject to a 4.80% floor, plus 8.00%.

The obligations of Debtors CAI, CCI, CCC, and WSB under the Second Lien Facility are guaranteed by Conn's, Inc. and certain subsidiaries. The Second Lien Facility is secured by liens (subject to and second in priority to those liens under the First Lien Facility) on substantially all of the assets of the Debtors.

**3.** Third Lien Delayed Draw Term Loan.

On July 31, 2023, Debtors Conn's, CAI, CCI, and CCC entered into a delayed draw term loan and security agreement (the "Original Stephens Loan Agreement" and the Original Stephens Loan Agreement as amended or otherwise modified by the First Stephens Amendment being referred to hereinafter as the "Third Lien Loan Agreement") with Stephens Investments Holdings LLC, as administrative agent and a lender and Stephens Group, LLC, as a lender. The Third Lien Loan Agreement provides for an aggregate commitment of $50 million (the "Third Lien

---

[7] As disclosed in the *Declaration of Timothy J. Shilling in Support of Debtors' Emergency Motion for Entry of interim and Final Orders (I) Approving and Authorizing the Debtors to Assume and Perform Under the Store Closing Consulting Agreement, (II) Approving Procedures for Store Closing Sales, (III) Approving Modifications to Certain Customer Programs, (IV) Authorizing Bonuses for Non-Insider Employees of Closing Stores, and (V) Granting Related Relief*, the liquidator who conducted the going out of business sales, B. Riley Retail Solutions, LLC, was an indirect, wholly owned subsidiary of BRF.

Facility") and the delayed draw term loans were permitted to be funded in one or more borrowings until 90 days prior the maturity date (unless otherwise terminated in accordance with the terms thereof). The delayed draw term loans mature on May 22, 2027.

The Original Stephens Loan Agreement was amended on December 18, 2023, in connection with the WSB Merger and, among other things, joined WSB as a new borrower to the Third Lien Loan Agreement and added a required minimum EBITDA financial covenant.

Outstanding amounts under the Third Lien Facility bear interest at an aggregate rate per annum equal to the Term SOFR Rate (defined therein), subject to a 5.00% floor, plus 10.00%. Any undrawn amounts are subject to a monthly commitment fee of 5.00% per annum. The Third Lien Facility has been fully drawn.

The obligations of Debtors CAI, CCI, CCC, and WSB under the Third Lien Facility are guaranteed by Conn's, Inc. and certain subsidiaries. The Third Lien Facility is secured by liens on substantially all of the assets of the Debtors (subject to and third in priority to those liens under the First Lien Facility and Second Lien Facility).

### D.     **Asset-Backed Securitization Transactions.**

#### 1.     Customer Receivables.

The Company, in the ordinary course of business and as permitted under the First Lien Facility, caused the transfer of certain customer accounts receivable to bankruptcy remote special purposes entities (the "SPEs"), which then issued asset-backed notes secured by those transferred customer accounts receivables and restricted cash held by the SPEs (collectively, the "ABS Securitizations"). Specifically, under the ABS Securitizations, Debtors Conn Credit I, LP and W.S. Badcock LLC each sold the selected receivables to Conn Appliances Receivables Funding, LLC ("CARF"), a non-debtor, and W.S. Badcock Credit LLC and W.S. Badcock Credit I LLC, respectively (CARF, W.S. Badcock Credit LLC, and W.S. Badcock Credit I LLC, each, a "Depositor"). The Depositor then transferred the purchased receivables to a designated trust (the "Receivables Trust") pursuant to another purchase agreement. The Receivables Trust then issued a certificate to the Depositor representing 100% interest in the Receivables Trust (the "Receivables Trust Certificate"). The Depositor then sold the Receivables Trust Certificate to the issuer of the asset-backed notes (the "Issuer"). The purchase price for the Receivables Trust Certificate was paid by the Issuer to the Depositor in cash from the proceeds of the sale of the assert-backed notes.

Prior to the Petition Date, Debtor CAI retained the servicing of the securitized portfolio and, in turn, received a monthly servicing fee of 4.75% based on the outstanding balance of the securitized receivables.[8] Debtor CAI also holds all residual equity in each of the SPEs. Additionally, the Company retained refunds and rebates of earned premium with respect to the cancellation of credit insurance and repair service agreements and unearned commissions with respect to repair service agreements related to charged-off receivables.

---

[8] In additional to Conn's securitizations, the Company also used to service pre- and post-WSB Merger WSB securitizations.

The terms of the ABS Securitizations, generally, provide for all cash collections and other cash proceeds of the customer receivables first, to satisfy certain fees and expenses for the trustee, receivables trust trustee, back-up servicer, and issuer for certain fees and expenses on a *pari passu* basis, second, to the servicer on account of the servicing fee, third, to holders of issued notes in priority order, fourth, to satisfy certain reserve requirements, fifth, to pay certain additional fees and expenses to the trustee, receivables trust trustee, back-up servicer, and issuer, sixth, to the Company as the holder of non-issued notes, if any, and seventh, to residual equity.

**2.**     The Motus Term Loan to Non-Debtor CARF COL LLC.

Non-debtor CARF, pursuant to that certain term loan and security agreement dated as of April 9, 2024, (the "Motus Term Loan") with Motus Advisors, Inc. ("Motus"), as administrative agent, sold charged-off receivables to Debtor CCI which, in turn, sold those charged-off receivables to SPE non-debtor CARF COL LLC.

The Motus Term Loan provided for an aggregate commitment of $13,333,333.33 to CARF COL LLC pursuant to a secured term loan credit facility maturing on April 9, 2026, which was fully drawn on April 9, 2024.  Outstanding amounts under the Motus Term Loan bear interest at an aggregate rate per annum equal to 15.0%.  CARF COL LLC is required to make monthly scheduled amortization payments of the Motus Term Loan beginning May 2024.  In connection with the amounts payable by CARF COL LLC to the lenders under the Motus Term Loan, CARF COL LLC is required to pay the lenders an additional amount (the "MOIC Amount"), which represents a minimum guaranteed return on the Motus Term Loan.[9]  Assuming the lenders receive the MOIC Amount on or prior to April 30, 2025, all remaining obligations under the Motus Term Loan, including all outstanding amounts under the Motus Term Loan and accrued interest thereon, will extinguish and will be deemed paid in full.

**3.**     Trade and Related Debt.

As of the Petition Date, the Debtors estimated that they had approximately $200 million in obligations to trade and other general unsecured creditors.  These amounts consisted primarily of accounts payable to various trade creditors, utility providers, and other third-party service providers as of the Petition Date.

**E.     Litigation.**

The Debtors are involved in various lawsuits, claims, and other legal matters from time to time that arise in the ordinary course of business, including a number of personal injury cases originating in one or more of the states where they operate or do business.  Each of the cases against one or more of the Debtors were stayed by the filing of these Chapter 11 Cases.

---

[9] The MOIC Amount is calculated as a multiple of certain amounts payable by non-Debtor CARF COL LLC to the lenders under the Motus Term Loan that, if calculated on or before April 30, 2025, is equal to 1.40x, and if calculated after April 30, 2025, is equal to 1.50x.

F.      **Events Leading to the Chapter 11 Filings.**

A convergence of factors contributed to the Debtors' need to commence these Chapter 11 Cases.  Significant macroeconomic factors that have disrupted the retail industry generally have also impacted the Company, including temporal shifts in consumer spending, particularly with respect to furniture and other discretionary purchases, and increased costs of goods, wages, and services due to inflation among other factors.  The increasing cost of capital and funds related to higher interest rates have also contributed to reduced liquidity.  Internal factors, including costs associated with the post-WSB Merger integration, have further constrained the Debtors' liquidity.  Although the Company has been through cost-cutting initiatives and explored (and in certain instances executed on) a number of other potential alternatives to address the dire and immediate liquidity needs, including negotiating and executing amendments to existing debt facilities, none of those alternatives provided the necessary liquidity and time for the Company to restructure its business and develop an actionable turnaround strategy.  These Chapter 11 Cases provides the necessary breathing room to fully develop the path forward to benefit stakeholders.

1.      Changes in Consumer Behavior.

When the COVID-19 pandemic commenced in March 2020, many aspects of the U.S. and global economies came to halt.  Among other things, millions of workers stayed home and businesses shuttered to protect the health and safety of the general public.

As the initial shock of the pandemic subsided with stay at home orders still in place in many locations, consumer spending, particularly on durable goods, skyrocketed.  Buoyed by COVID-19 economic stimulus programs in the approximate aggregate amount of $5 trillion into the economy and consumers with excess funds due to physical lockdowns limiting the ability to consume services at pre-pandemic levels, demand for discretionary goods such as housewares, electronics and most products for the home increased to unprecedented levels as people sought to make purchases to improve their homes where they were now spending a significant portion of their time.  This shift in consumer spending "pulled-forward" demand for a number of purchases that would have otherwise been made over an extended period of time, artificially inflating demand in the short term to unsustainable levels.

As stay at home orders began lifting across the country, followed by the waning of the federal stimulus measures, consumers began to refocus their time and money on services versus goods and discretionary spending has steadily decreased.  The increase in spending on consumer goods during the height of the pandemic also "pulled forward" in time consumer spending on many of the Debtors' best-selling items, including furniture and appliances, leading to a lull in the following period.  At the same time, consumers had less spending power as inflationary pressure on goods coupled with increases in prevailing interest rates took hold.  The result of the foregoing was a sharp decline in demand for the Company's products and, relatedly, its credit offerings.

16

      2.      <u>Costs of Integrating the WSB Merger</u>.

The WSB Merger was part of a strategic initiative to expand, among other things, the Company's geographic footprint, customer base, and product offerings, and to achieve over time material cost and operational synergies.  The combination of the two businesses sought to enhance WSB's in-house credit offering with Conn's sophisticated credit infrastructure built through investments over the past six years and leverage the reach of a more diverse and larger organization with best-in-class payment solutions, broad product assortment, and a leading eCommerce platform.

Although the WSB Merger enabled the Company to realize certain synergies across the Conn's and WSB platforms, the full realization of all cost and revenue synergies was estimated to take approximately twelve to eighteen months.

      3.      <u>Macroeconomic Factors</u>.

Like many retailers and larger commercial businesses, Conn's has been met with challenging macroeconomic factors in recent years that have negatively impacted the Company. Although the COVID-19 pandemic saw a dramatic spike and "pull-forward" in consumer expenditures with respect to home remodeling and decorating, the steady increase of inflationary pressures and interest rates following the pandemic has had a substantial impact on consumer discretionary spending—resulting in consumers delaying financing for discretionary purchases.

Additionally, the Company has also relied upon cashflows generated by its ongoing activities and the issuance of debt to fund its operations and strategic initiatives over the past several years.  As discussed herein, the Company had approximately $530 million owed as of the Petition Date in connection with its funded debt obligations, and after the reduction of the commitment of the First Lien Facility, the cost of capital increased substantially with the other, junior, facilities.  The interest rates of those obligations fluctuate based on certain base rates (*i.e.*, SOFR).  As interest rates have steadily increased, so too have the expenses with the Company's credit alternatives.

Due to increased interest rate pressures, interest rate expense increased from approximately $25.7 million in the year ended January 31, 2021 to approximately $81.7 million in the year ended January 31, 2024.  The steady increase in interest rates and costs of capital, with minimal to no relief in the near term, detrimentally impacted the Company's ability to service its debt obligations.

      4.      <u>Operational Challenges</u>.

The cost of the Company's approximate 350 leases was exacerbated by the underperforming leased stores and location functionality.  In FY 2024, the Company spent approximately $77.4 million in lease obligations, over which $35 million related to underperforming stores.  Moreover, the WSB Merger resulted in certain redundant store locations that increase the drag on the Company's operations from lease expenses.  Although the Company pursued two separate initiatives in the last twelve months to engage with counterparties and reduce lease expense, each of those initiatives fell short in substantively reducing the impact of lease terms.  Given the Company's operational headwinds and financial

position, payment of lease obligations associated with non-performing leases ultimately caused significant strains on the Company's liquidity.

5.      Proposed Financing Transactions.

In December 2023, having identified a need for additional liquidity, the Company attempted to secure additional financing to address liquidity needs. Ultimately, however, those transaction were not able to be consummated.

6.      Alternative Transactions and Right Sizing the Company's Footprint.

The Company, with the assistance of its advisors, investigated and executed on numerous alternatives to address its liquidity needs. Together with its advisors, the Company worked on optimizing workstreams and streamlining processes and efficiencies to reduce costs. In an exercise to reduce lease liabilities, improve cash flows, and extend the runway to achieve an actionable transaction, the Company engaged advisors to negotiate with landlords and exit unprofitable locations that were a cash drag on operations.

Additionally, the Debtors initiated going out of business sales at certain of the Debtors' retail stores. In order to facilitate the orderly liquidation of inventory at those initial retail locations (and, subsequently, all of the Debtors' retail locations), the Debtors selected a liquidator from several proposals they received.

As discussed herein, the Company also pursued additional financing transactions to gain access to liquidity and meet restrictive financial covenants under the existing financing agreements.

7.      Post-Petition Financing and Funding a Going Concern Sale.

In pursuit of a going concern sale of the Debtors' business, the Company and its advisors were engaged in extensive negotiations with a potential stalking horse purchaser, certain of its junior stakeholders, as well as third-party lenders, in order to fund and conduct a pre- and post-petition marketing and in-court sale process.

To facilitate the Debtors' efforts to obtain the best financing terms currently available to them, in consultation with the Debtors, the Debtors' investment banker developed a targeted list of third parties outside of the Debtors' existing capital structure that may have been potentially interested in providing actionable postpetition financing to the Debtors (the "Prepetition Marketing Process"). This strategy to obtain the best financing terms available from the market was reflective of the practical realities of the Debtors' existing capital structure and the facts and circumstances of these Chapter 11 Cases, including the challenges associated with attempting to "prime" the Debtors' existing debt and the benefits of achieving consensus among key constituencies on the terms of a holistic restructuring transaction. Ultimately, the Debtors, in consultation with their advisors, determined there was no better alternative financing other than that being offered by those First Lien Lenders lending under a debtor in possession financing facility (the "DIP Facility").

18

In the days leading up to the Petition Date, the Debtors and their advisors engaged in negotiations with DIP Lenders around the terms of the DIP Facility.  The parties engaged in hard-fought, arm's-length negotiations in an effort to reach the best available material terms under the circumstances.  The DIP Facility was subject to certain milestone requirements, including, but not limited to, the requirement that the Debtors file a motion seeking authority from the Court to continue and/or initiate store closing sales at all retail locations and that such store closure sales be completed by October 31, 2024, as well as a motion seeking approval of procedures for rejection of the Debtors' leases.  All such motions were filed in the early days of these Chapter 11 Cases, each as discussed more fully below.

## ARTICLE IV.
## EVENTS DURING CHAPTER 11 CASE

### A.  <u>Commencement of the Chapter 11 Cases and the Debtors' Professionals.</u>

On July 23, 2024, each of the Debtors filed petitions for relief under chapter 11 of the Bankruptcy Code.

The Debtor retained, effective as of the Petition Date, Epiq Corporate Restructuring, LLC ("<u>Epiq</u>") as its Notice and Claims Agent [Docket No. 71].

### B.  <u>First Day Relief.</u>

On or soon after the Petition Date, the Debtors filed a number of motions and other pleadings (collectively the "<u>First Day Motions</u>") to ensure an orderly transition into chapter 11, including the following:

- motion to jointly administer these Chapter 11 Cases for procedural purposes only;

- motion to authorize the Debtors to obtain postpetition financing, use cash collateral, and grant adequate protection;

- motion relating to the continued use of the Debtor's existing cash management system and certain related relief;

- motion for authority to pay certain prepetition employee-related obligations and certain related relief;

- motion for authority to pay certain prepetition taxes and fees and certain related relief;

- motion to establish procedures for determining adequate assurance for the provision of utility services and to prohibit utility service providers from altering, refusing, or discontinuing service and certain related relief;

- motion for authority to maintain certain insurance policies and programs, to honor insurance obligations and for certain related relief;

19

- motion for authority to pay certain potential lien claimants;

- motion for entry of an order approving notification and hearing procedures for certain transfers of common stock;

- motion to authorize the Debtor to redact certain personally identifiable information and waive the requirements to file a list of all equity security holders;

- application to retain Epiq as the Debtors' Notice and Claims Agent;

- motion to authorize contract rejection and contract rejection procedures;

- motion to approve the bidding procedures; and

- motion to authorize the Debtors to pay prepetition dealer claims and continue dealer programs.

On July 24, 2024, and September 4, 2024, the Bankruptcy Court entered interim or final orders, as applicable, approving the First Day Motions. The First Day Motions and such orders, along with all other pleadings filed in the Chapter 11 Cases can be viewed free of charge at https://dm.epiq11.com/case/conns/info.

C.        **The Bidding Procedures.**

On July 26, 2024, the Debtors filed the *Debtors' Motion for Entry of (I) an Order (A) Approving Certain Bidding Procedures and the Form and Manner of Notice Thereof, (B) Scheduling an Auction and a Hearing on the Approval of the Sale of All or Substantially All of the Debtors' Assets, (C) Establishing Certain Assumption and Assignment Procedures and Approving the Manner of Notice Thereof, and (D) Granting Related Relief; and (II) an Order (A) Authorizing the Sale of All or Substantially All of the Debtors' Assets Free and Clear of All Encumbrances, (B) Approving the Assumption and Assignment of the Assumed Contracts, and (C) Granting Related Relief* [Docket No. 121] (the "Bidding Procedures Motion").

The Bidding Procedures Motion sought the sale of all or substantially all of the Debtors' assets, including, but not limited to: (1) a portfolio of outstanding Conn's consumer installment loans, (2) a portfolio of legacy WSB revolving accounts, (3) non-performing consumer loans, (4) the Debtors' credit originations and servicing platforms, and (5) other assets, including but not limited to intellectual property, owned real estate parcels, the Debtors' network of real estate leases, equity (residual accounts receivable rights) in the Debtors' bankruptcy remote special purpose entities, and inventory. The Bidding Procedures Motion also sought to establish bidding procedures (the "Bidding Procedures") and a sale timeline for the process.

The Court approved the Bidding Procedures Motion and the Bidding Procedures on August 20, 2024 with the entry of the *Order (A) Approving Certain Bidding Procedures and the Form and Manner of Notice thereof, (B) Scheduling an Auction and a Hearing on the Approval of the Sale of All or Substantially All of the Debtor's Assets, (C) Establishing Certain Assumption and Assignment Procedures and Approving the Manner of Notice thereof, and*

*(D) Granting Related Relief* [Docket No. 370] (the "Bidding Procedures Order"). The Bidding Procedures Order set the timeline for the sale process as follows:

| Transaction Milestones | |
|---|---|
| **Date and Time** (all in prevailing Central Time) | **Event or Deadline** |
| August 20, 2024, at 1:00 p.m. (CT) | Hearing on Approval of the Bidding Procedures |
| August 30, 2024 | Deadline to File Assumption and Assignment Notice |
| September 6, 2024 at 4:00 p.m. (CT) | Bid Deadline |
| September 10, 2024 at 10:00 a.m. (CT) | Determination of Qualified Bids |
| September 11, 2024 at 10:00 a.m. (CT) | Auction |
| Within 1 business day of conclusion of Auction | Deadline to Serve Post-Auction Notice |
| September 19, 2024 at 4:00 p.m. (CT) | Deadline to File Objection to Sale / Deadline to File Contract Objections |
| September 30, 2024 | Deadline to File Reply to Objections |
| October 1, 2024, subject to Court availability | Sale Hearing |

On September 6, 2024, the Debtors filed the *Notice of Extended Bid Deadline* [Docket No. 537], which extended the bid deadline (the "Bid Deadline") by two weeks to September 20, 2024, and extended the other transaction milestones as set forth therein.

On September 20, 2024, the Debtors filed the *Second Notice of Extended Bid Deadline* [Docket No. 668], which further extended the Bid Deadline by one week to September 27, 2024, and extended certain of the other transaction milestones as set forth therein.

On September 27, 2024, the Debtors filed the *Third Notice of Extended Bid Deadline* [Docket No. 697], which further extended the Bid Deadline to September 30, 2024, and extended certain of the other transaction milestones as set forth therein.

On October 2, 2024, the Debtors filed the *Notice of Filing of Stalking Horse Designation* [Docket No. 742] (the "Stalking Horse Supplement"), seeking the Court's approval (1) to designate Jefferson Capital Systems, LLC ("Jefferson Capital") as the stalking horse bidder for certain of the Debtors assets, (2) to grant bid protections to Jefferson Capital for the stalking horse bid, and (3) to enter into the stalking horse asset purchase agreement (the "Stalking Horse APA").

On October 6, 2024, the Debtors filed the *Notice of Revised Bidding Procedures Timeline* [Docket No. 779], setting the deadline to object to the Stalking Horse APA, scheduling a hearing for approval of the Stalking Horse APA, extending certain of the other transaction milestones as set forth therein.

On October 9, 2024, the Bankruptcy Court entered the *Order (I) Approving (A) Designation of Stalking Horse and (B) Stalking Horse Bid Protections and (II) Granting Related Relief* [Docket No. 806].

On October 10, 2024, the Debtors filed the *Notice of Revised Bidding Procedures Timeline for Real Property and Lease Assets* [Docket No. 814], which bifurcated the transaction milestones for the Debtors' real property and lease assets other than the real property leases located at (1) 5776 Stemmons Drive, San Antonio, Texas 78238; and (2) 200 N. Phosphate Boulevard, Mulberry, Florida 33860.

On October 11, 2024, the Debtors received confirmation that there would be no overbid of the assets covered by the Stalking Horse APA, meaning there were no other qualified bidders for such assets pursuant to Section IX of the Bidding Procedures. Accordingly, the Debtors, in consultation with the consultation parties, cancelled the auction scheduled for October 15, 2024, and designated Jefferson Capital as the successful bidder for the assets covered by the Stalking Horse APA.

### D.      Sale to Jefferson Capital.

On November 4, 2024, the Debtors filed the *Notice of First Amendment to the Stalking Horse Asset Purchase Agreement* [Docket No. 1029], which amended the Stalking Horse APA consistent with Section 9.3 thereof (the "Stalking Horse Amendment"). Specifically, the Stalking Horse Amendment: (1) provided for a consensual purchase price adjustment of $7.1 million to account for (a) the removal of non-performing loans (the "NPLs") included in the 2023 and 2024 ABS Securitizations from the schedules to the Stalking Horse APA; and (b) the addition of certain NPLs owned by the Debtors not previously included on the schedules; (2) provided for a second closing for the sale of certain NPLs included in the original schedules to the Stalking Horse APA that may not be available at the time of the first closing; (3) revised certain transition services obligations between the Debtors and Jefferson Capital; (4) provided for a post-closing servicing agreement between the Debtors and Jefferson Capital; and (5) revised certain definitions related to collections in the Stalking Horse APA. The Stalking Horse Amendment also contained a conditional waiver by Jefferson Capital to the October 31, 2024 deadline for entry of the sale order under Section 8.1(c)(v) of the Stalking Horse APA as long as such order was entered by no later than November 8, 2024.

On November 6, 2024, the Court entered the *Order (I) Authorizing the Sale of the Debtors' Assets, (II) Authorizing Assumption and Assignment of certain Executory Contracts and Unexpired Leases Related Thereto, and (III) Granting Related Relief* [Docket No. 1059] (the "Sale Order"), approving entry into the Stalking Horse Amendment and the sale transactions contemplated thereby with Jefferson Capital.

On December 3, 2024, the Debtors closed the first part of their sale transaction to Jefferson Capital in accordance with the Stalking Horse Amendment and the Sale Order (the "Initial Closing"). Following the Initial Closing, the Debtors redeemed the notes (the "2022-A Redemption") under that certain Base Indenture dated as of July 21, 2022 (the "Base Indenture"), by and between Conn's Receivables Funding 2022-A, LLC, as issuer (the "Issuer"), and Computershare Trust Company, National Association (the "Trustee"), as trustee (the "2022-A Base Indenture"), as supplemented by the Series 2022-A Supplement, dated as of July 21, 2022, between the issuer and trustee (together with the 2022-A Base Indenture, the "2022-A Indenture"). Following the 2022-A redemption, the Debtors closed the second part of their sale transaction to Jefferson Capital for those certain receivables that were, prior to

completion of the 2022-A Redemption, subject to the 2022-A Indenture (the "Second Closing"). The Second Closing was completed on January 15, 2025.

E.     **Real Property and Lease Sales.**

On October 16, 2024, the Debtors filed the *Notice of Selection of Successful Bidders as to Certain Lease Transactions* [Docket No. 844], designating twenty-four separate entities as successful bidders for certain lease assets and cancelling the auction with respect to those assets.

On October 17, 2024, the Debtors held an auction for certain other lease and real property assets (the "Auction"). On the record at the Auction, and in consultation with the consultation parties, the Debtors indefinitely adjourned the auction as to the owned real property assets of the Debtors.

Following the Auction, the Debtors filed the *Notice of Selection of Successful Bidders as to Certain Lease Transactions* [Docket No. 853], designating an additional six entities as successful bidders for certain lease assets. In addition, the Debtors filed the *Notice of Successful Bidder as to the Lease Related to Store #WSB-483* [Docket No. 936] on October 28, 2024, designating an additional lease inadvertently omitted from the prior designations as a successful bid for the relevant successful bidder.

The hearing on approval of the sale of the leased assets took place on October 30, 2024. The Bankruptcy Court approved the sales to the various successful bidders and the orders approving such sales were entered over the next several weeks [Docket Nos. 962, 963, 965, 966, 969, 970, 971, 972, 973, 974, 975, 976, 977, 978, 979, 980, 981, 982, 983, 985, 1005, 1006, 1007, 1015, 1017, 1024, 1059, 1062, 1072, 1165, 1166, 1305].

On January 30, 2025, the Debtors filed the *Notice of Cancellation of Previously Adjourned Real Estate Auction and Designation of Successful Bid for Certain Real Estate Assets* [Docket No. 1396], designating AutoZone Stores, LLC as the successful bidder for certain real property assets owned by the Debtors for an amount of $8,330,000. The Court entered an Order approving the sale of the real property on February 19, 2025, and such sale closed on March 17, 2025.

F.     **Sale of Certain Additional Consumer Finance Receivables and ABS Residuals.**

Following the Second Closing, the Debtors and their advisors turned their focus to marketing the Debtors' remaining assets, including: (1) the receivables currently subject to the 2022-A Indenture that were not sold to Jefferson Capital pursuant to the Second Closing, and (2) any residual interests of cash flows related to any of the Debtors' 23/24 Securitization Facilities (subsection (1) and (2) together, the "Remaining Assets").[10] The timeline for the sale of the Remaining Assets was set as follows:

---

[10] "23/24 Securitization Facilities" include: (a) the transaction established pursuant to that Note Purchase Agreement, dated August 7, 2023, by and among the Initial Purchasers (as defined therein), Conn Appliances, Inc., Conn's Inc., Conn Appliances Receivables Funding, LLC, and Conn's Receivables Funding 2023-A, LLC, and (b) the transaction established pursuant to that Note Purchase Agreement, dated January 19, 2024, by and among the

| *Transaction Milestones* | |
|---|---|
| **Date and Time** (all in prevailing Central Time) | **Event or Deadline** |
| January 24, 2025 | Bid Deadline |
| January 30, 2025 | Auction |
| January 31, 2025 | Deadline to Serve Post-Auction Notice |
| January 31, 2025 | Deadline to File Sale Order |
| February 6, 2025 | Deadline to File Objection to Sale / Deadline to File Contract Objections |
| February 9, 2025 | Deadline to File Reply to Objections |
| February 10, 2025 | Sale Hearing |
| February 14, 2025 | Sale Closing |

On January 13, 2025, the Debtors filed the *Notice of Revised Bidding Procedures Timeline for Additional Consumer Finance Receivables and ABS Residuals* [Docket No. 1338], which extended the bid deadline (the "Bid Deadline") to February 14, 2025, and extended the other transaction milestones as set forth therein.

On February 28, 2025, the Debtors filed the *Notice of Cancellation of Auction for Additional Consumer Finance Receivables and ABS Residuals* [Docket No. 1501], cancelling the Auction for the Remaining Assets.

### G.      *De Minimis* **Sale Transactions.**

On August 2, 2024, the Debtors filed the *Debtors' Motion for Entry of an Order Approving Procedures for the Sale, Transfer, and/or Abandonment of* De Minimis *Assets* [Docket No. 219] (the "*De Minimis* Procedures Motion"), seeking to establish procedures for the sale of certain assets with a sale price equal to or less than $2,000,000.  On August 26, 2024, the Court entered an order approving the *De Minimis* Procedures Motion.

On November 22, 2024, the Debtors filed a *Notice of* De Minimis *Asset Transaction* [Docket No. 1139], noticing the sale of certain real property located on Combee Road in Lakeland, Florida for $1,050,000 (the "Combee *De Minimis* Notice").  No objections were received to the Combee *De Minimis* Notice, and such sale closed on December 31, 2024.

On January 30, 2025, the Debtors filed a *Notice of* De Minimis *Asset Transaction* [Docket No. 1397], noticing the sale of certain Visa/Master Payment Card interchange fee settlement claims for $940,000 (the "Visa/Master *De Minimis* Notice").  No objections were received to the Visa/Master *De Minimis* Notice, and such sale closed in February 2025.

On January 30, 2025, the Debtors filed a *Notice of* De Minimis *Asset Transaction* [Docket No. 1402], noticing the sale of certain real property located in Mulberry, Florida for

Initial Purchasers (as defined therein), Conn Appliances, Inc., Conn's Inc., Conn Appliances Receivables Funding, LLC, and Conn's Receivables Funding 2024-A, LLC.

$800,000 (the "Mulberry *De Minimis* Notice").  No objections were received to the Mulberry *De Minimis* Notice, and such sale closed on March 20, 2025.

On April 28, 2025, the Debtors provided notice under the *De Minimis* procedures, noticing the sale of certain real property parcels located in Virginia, North Carolina, and South Carolina for $150,000 (the "Burst *De Minimis* Notice").  No objections were received to the Burst *De Minimis* Notice, which sale is expected to close by the end of May 2025.

### H.     Going Out of Business Sales and Related Dealer Payments.

On the Petition Date, the Debtors filed the *Debtors' Emergency Motion for Entry of Interim and Final Orders (I) Approving and Authorizing the Debtors to Assume and Perform under the Store Consulting Agreement, (II) Approving Procedures for Store Closing Sales, (III) Approving Modifications to Certain Customer Programs, (IV) Authorizing Bonuses for Non-Insider Employees of Closing Stores, and (V) Granting Related Relief* [Docket No. 10] (the "GOB Motion"), authorizing the Debtors to conduct going-out-of-business sales (the "GOB Sales") at their various owned and leased store locations.  The GOB Motion was approved on an interim and final basis on July 25, 2024 and August 22, 2024 respectively.

On the Petition Date, the Debtors also filed the *Debtors' Emergency Motion for Entry of an Order (I) Authorizing the Debtors to Pay (A) Pay Prepetition Dealer Claims in the Ordinary Course, and (B) Continue Dealer Programs in the Ordinary Course; and (II) Granting Related Relief* [Docket No. 7] (the "Dealer Compensation Motion"), seeking a streamlined compensation model for their various dealers (the "Dealers") whereby the Dealers would be paid a 25% commission on GOB Sales, plus an additional 5% commission payable at the conclusion of the GOB Sales (the "Bonus").  The Dealer Compensation Motion was approved on a final basis on July 24, 2024.

On or around August 6, 2024, the Debtors voluntarily agreed to improve the compensation terms for the Dealers to address concerns regarding the GOB Sales.  Specifically, the Debtors increased the Dealers' commission from 25% to 30% (the "Commissions"), in addition to the 5% Bonus, and agreed to pay a $5,000 monthly stipend per retail location (the "Stipend").  Subject to certain setoff rights permitted under the agreements with the Dealers, the Debtors paid each of the Commission and Stipend in the ordinary course during these Chapter 11 Cases.  The Debtors paid some, but not all, of the Bonus following the conclusion of the GOB Sales.

Following conclusion of the GOB Sales, the Debtors rejected each of the unexpired leases not previously assumed and assigned as part of the Sale Transactions.

On November 25, 2024, an ad hoc group of Dealers (the "Ad Hoc Dealer Group") filed the *Badcock Dealers' Emergency Motion to Compel Debtors to Pay Postpetition Dealer Compensation* [Docket No. 1149] (the "Motion to Compel").  The Debtors filed an objection to the Motion to Compel, noting that while they did not dispute the Bonus obligation or the Dealers' entitlement to the same, they did not have the authority under the budget for the DIP Facility to pay the Bonus to the Dealers on the timeline requested.

On December 9, 2024, the Bankruptcy Court held a hearing on the Motion to Compel. On March 27, 2025, the Court entered the *Order Partially Granting and Partially Denying Badcock Dealers' Emergency Motion to Compel Debtors to Pay Postpetition Dealer Compensation* [Docket No. 1590], which granted the Dealers an administrative expense claim for the Bonus.

### I.    Dealer Settlement.

On February 18, 2025, the Ad Hoc Dealer Group filed the *Badcock Dealers' Emergency Motion to Compel Debtors to File Surcharge Motion or, in the Alternative, for Leave, Standing, and Authority to Bring Surcharge Motion* [Docket No. 1480] (the "Motion to Compel Surcharge") seeking to compel the Debtors to file a motion to seek surcharge for the payment of the Bonus from the collateral of the Debtors' Prepetition 2L Secured Parties.  In response, both the Debtors and the Prepetition 2L Agent filed objections to the Motion to Compel Surcharge [Docket Nos. 1520 and 1518].  On March 6, 2025, Young & Pate, Inc., and its affiliates filed a joinder to the Motion to Compel Surcharge [Docket No. 1534].

The Debtors, the Ad Hoc Dealer Group, and the Prepetition 2L Agent negotiated a global resolution regarding surcharge and the payment of the Bonus, which resolution was documented via a settlement term sheet [Docket No. 1575-1] (the "Settlement Term Sheet").  On March 21, 2025, the Debtors filed the *Debtors' Emergency Motion for Entry of an Order (I) Approving Global Resolution and Settlement of Certain Disputes Between the Debtors, BRF Finance Co., LLC, and the Ad Hoc Group of Badcock Dealers Pursuant to Federal Rule of Bankruptcy Procedure 9019; (II) Approving Procedures for Dealers that Are Not Members of the Ad Hoc Group to Opt Out of Participation in the Settlement, and (III) Granting Related Relief* [Docket No. 1575] (the "9019 Motion").  On April 2, 2025, the Court entered an Order granting the 9019 Motion [Docket No. 1628] and approving the Settlement Term Sheet set forth therein.  Among other things, the Settlement Term Sheet provides for a payment distribution schedule on account of the Bonuses and mutual releases between and among the settling parties.

### J.    Assurant Settlement.

Prior to the Petition Date, the Debtors were parties to a number of agreements with Federal Warranty Service Corporation, United Service Protection, Inc., Assurant Service Protection, Inc., The Signal, L.P., American Bankers Life Assurance Company of Florida, American Bankers Insurance Company of Florida, Reliable Lloyds Insurance Company, Standard Guaranty Insurance Company, Voyager Indemnity Insurance Company, and associated affiliates (collectively, "Assurant") for the underwriting and provision of certain warranty and insurance products administered by the Debtors (such agreements, the "Assurant Agreements").

On October 14, 2024, Assurant filed its *Objection and Reservation of Rights of the Assurant Parties to the Debtors' (I) Notices of (A) Potential Assumption and Assignment of Executory Contracts and Unexpired Leases and (B) Cure Amounts; and (II) Motion to Approve the Sale of Substantially All of the Debtors' Assets Free and Clear of Encumbrances* [Docket No. 830], objecting to the sale to Jefferson Capital on the basis that, among other things, certain Assurant Agreements could not be assumed and assigned, the cure amounts for the Assurant

Agreements were in the multi-millions, and that the assets could not be sold to Jefferson Capital free and clear of Assurant's interests.

On January 10, 2025, the Debtors filed the *Debtors' Motion for Entry of an Order (I) Approving Global Resolution and Settlement of Certain Disputes Between the Debtors and Assurant Pursuant to Federal Rule of Bankruptcy Procedure 9019 and (II) Granting Related Relief* [Docket No. 1335] (the "Assurant 9019 Motion"), seeking approval of a settlement with Assurant (the "Assurant Settlement").

Pursuant to the Assurant Settlement, the Debtors paid Assurant $1.5 million and Assurant, in turn, agreed to honor the credit insurance coverages provided to the Debtors' customers, including honoring the Debtors' and any asset purchaser's, including Jefferson Capital's, interest under such coverage.  In addition, pursuant to the Assurant Settlement, the parties agreed to cooperate in good faith with respect to the refund of unearned premiums for contracts financed under the Debtors' financing programs, and Assurant agreed to make payment of relevant refunds to the servicer of the applicable receivable.  Finally, pursuant to the Assurant Settlement, the Debtors rejected the Assurant Agreements and the parties granted one another mutual releases of certain claims arising out of the Assurant Agreements.

The Bankruptcy Court entered an order approving the Assurant 9019 Motion and authorizing the Settlement on February 3, 2025.

### K.      Bar Dates.

On August 2, 2024, the Debtors filed the *Motion for Entry of an Order (I) Setting Bar Dates for Filing Proofs of Claim; (II) Approving Form and Manner for Filing Proofs of Claim; (III) Approving Notice of Bar Dates, and (IV) Granting Related Relief* [Docket No. 216] (the "Bar Date Motion").

On August 26, 2024, the Court entered the *Order (I) Setting Bar Dates for Filing Proofs of Claim; (II) Approving Form and Manner for Filing Proofs of Claim; (III) Approving Notice of Bar Dates, and (IV) Granting Related Relief* [Docket No. 418] (the "Bar Date Order") and established the following Bar Dates as requested by the Debtors:

- General Bar Date as of October 7, 2024 at 4:00 p.m. (prevailing Central Time);

- Governmental Bar Date as January 20, 2025;

- Rejection Damages Bar Date as the later of (a) the General Bar date and (b) thirty (30) days from the later of the date the rejection order is entered or the effective date of the rejection; and

- Amended Schedules Bar Date as the later of (a) the General Bar Date or the Governmental Bar Date, as applicable, and (b) thirty (30) days from the date on which the Debtors provide notice of an amendment to the Schedules.

L.     **KEIP Motion.**

On August 30, 2024, the Debtors filed the *Debtors' Motion for Entry of an Order (I) Authorizing the Debtors to Implement the Key Employee Incentive Plan and (II) Granting Related Relief* [Docket No 454], which sought to approve the Debtors' proposed key employee retention program for certain employees (the "KEIP Program").  On October 6, 2024, the Court entered the *Order (I) Authorizing the Debtors to Implement the Key Employee Incentive Plan and (II) Granting Related Relief* [Docket No. 777], by which the approved the Debtors' KEIP Program and the eligible employees.

M.     **Amendment and Transfer of DIP Facility.**

On December 6, 2024, the Debtors filed a *Notice of Amendment to DIP Credit Agreement* [Docket No. 1211] notifying the Bankruptcy Court and all parties in interest that, pursuant to Paragraph 2(b)(i) of the final order approving the DIP Facility, the Debtors and the DIP Lenders entered into that certain *Amendment No. 6 to Fifth Amended and Restated Loan and Security Agreement*, extending the maturity date of the DIP Facility and all defaults or events of default to the DIP Facility.

On December 19, 2024, B. Riley Commercial Capital, LLC filed a *Transfer of Claim Other than for Security* [Docket No. 1270] noticing the assignment of all outstanding claims under the DIP Facility to B. Riley Commercial Capital, LLC.

N.     **Creditors' Committee Appointment.**

On August 5, 2024, the U.S. Trustee filed *The United States Trustee's Notice of Appointment of Committee of Unsecured Creditors* [Docket No. 230], appointing a seven-person committee in these Chapter 11 Cases.

O.     **El Paso Removal.**

On May 1, 2023, Conn Appliances, Inc. commenced a state court action (the "El Paso State Court Action") seeking a judgement, in accordance with the provisions of the Texas Property Tax Code Chapter 42: (a) declaring that the El Paso Central Appraisal District errored by failing to deliver any Notices of Appraised Value to Conn Appliances, Inc., causing the subject properties to be excessively appraised; (b) fixing the appraised values of the subject properties in accordance with the requirements of the law to be changed and reflected on the 2022 appraisal roll as (i) $462,968; (ii) $5,068,073; (iii) $459,596; and (iv) $478,141, respectively; (c) entering any necessary orders to ensure equal treatment under the law for Conn Appliances, Inc. or any other orders necessary to preserve rights protected by and impose duties required by the law; (d) awarding Conn Appliances, Inc. against the El Paso Central Appraisal District all reasonable attorney's fees incurred in pursuing this action for review at all levels of Texas courts necessary to achieve a final, unappealable judgment; (e) awarding Conn Appliances, Inc. against the El Paso Central Appraisal District recovery of all costs of court; and (f) awarding Conn Appliances, Inc. such other and further relief, both special and general, at law or in equity, to which Conn Appliances, Inc. may show itself justly entitled.

On June 7, 2023, the El Paso Central Appraisal District filed an answer and asserted a general denial of all allegations made by Conn Appliances, Inc. In addition, on February 7, 2025, the El Paso Central Appraisal District filed the *Defendant's Plea to the Jurisdiction* asserting the state court lacked jurisdiction over the El Paso State Court Action.

The El Paso State Court Action has been stayed since the Petition Date. On March 5, 2025, the Debtors filed the *Notice of Removal* removing the El Paso State Court Action to the District Court for the Western District of Texas to be transferred to the District Court for the Southern District of Texas and referred to this Court.

P.   **Accelerated Payment Procedures.**

On April 14, 2025, the Debtors filed the *Emergency Motion for Entry of an Order (I) Approving the Accelerated Payment Procedures; and (II) Granting Related Relief Filed* [Docket No. 1652] seeking to establish a process for the accelerated payment of certain administrative expense claims under section 503(b)(9) of the Bankruptcy Code (the "Accelerated Payment Procedures"). On April 15, 2025, the Court entered the *Order (I) Approving the Accelerated Payment Procedures and (II) Granting Related Relief* [Docket No. 1656] (the "Accelerated Payment Procedures Order") approving the Accelerated Payment Procedures.

Under the Accelerated Payment Procedures, claimants had the right to opt in to receive the immediate payment of 30% of their allowed 503(b)(9) Claim, which payment shall be made within ten (10) days of the earlier of the May 15, 2025 at 4:00 p.m. (prevailing central time) (the "Accelerated Payment Opt-In Deadline") or their notification of intent to opt in. Claimants who wished to opt in to the Accelerated Payment Procedures were required to notify the Debtors by the Accelerated Payment Opt-In Deadline. Failure to opt in by the Accelerated Payment Opt-In Deadline resulted in the claimant not being eligible for any payment under the Accelerated Payment Procedures. Payment under the Accelerated Payment Procedures is in full and final satisfaction of any 503(b)(9) Claim, and each participating claimant shall waive any right to recovery on account of such 503(b)(9) Claim in these Chapter 11 Cases other than as set forth in the Accelerated Payment Procedures.

Q.   **Proposed Confirmation Schedule.**

On May 19, 2025, the Debtors filed a motion seeking, among other things, that the Court approve the proposed schedule and deadlines for Confirmation, which include:

| Date and Time (all in prevailing Central Time) | Event or Deadline |
|---|---|
| June 4, 2025 | Voting Record Date |
| June 9, 2025 at 9:00 a.m. CST (Virtual Only Hearing) | Disclosure Statement Hearing |
| June 13, 2025 | Solicitation Deadline |
| July 3, 2025 | Deadline to File Plan Supplement |
| July 11, 2025 at 4:00 p.m. CST | Voting Deadline |
| July 11, 2025 at 4:00 p.m. CST | Release Opt-Out Deadline |
| July 11, 2025 at 4:00 p.m. CST | Objection Deadline |

| July 18, 2025 at 10:00 a.m. CST (Virtual Only Hearing) | Confirmation Hearing |
|---|---|

# ARTICLE V.
# CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS

### A.  Administrative Claims, Priority Tax Claims, and Statutory Fees.

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims (including DIP Claims and Professional Fee Claims) and Priority Tax Claims have not been classified and, thus, are excluded from the Classes of Claims and Interests set forth in Article III of the Plan.

### 1.  Administrative Claims.

Except to the extent that a Holder of an Allowed Administrative Claim and the Debtors, the Distribution Trustee, the Wind-Down Debtors, or the Plan Administrator, as applicable, agree to a different treatment, including through participation in the settlement approved in the Dealer 9019 Motion or the Accelerated Payment Procedures, each Holder of an Allowed Administrative Claim (other than a DIP Claim or a Professional Fee Claim) shall receive, in full and final satisfaction of such Claim, an amount of Cash equal to the amount of such Allowed Administrative Claim in accordance with the following: (1) if Allowed on or prior to the Effective Date, then on the Effective Date or as soon as reasonably practicable thereafter, (2) if not Allowed as of the Effective Date, then no later than forty-five (45) days after the date on which an order Allowing such Administrative Claim becomes a Final Order, or (3) at such time and upon such terms as set forth in a Final Order of the Bankruptcy Court.

Except for Professional Fee Claims and Claims paid pursuant to the Accelerated Payment Procedures, and notwithstanding any prior Filing or Proof of Claim, Proofs of Claim seeking the allowance and payment of Administrative Claims must be Filed and served on the Debtors, Distribution Trustee, or the Plan Administrator (as applicable) and their counsel by no later than the Administrative Claims Bar Date pursuant to the procedures set forth in the Confirmation Order and the notice of the occurrence of the Effective Date.  The burden of proof for the allowance of Administrative Claims remains on the Holder of the Administrative Claims.

Except as otherwise provided in the Plan, holders of Administrative Claims that do not File and serve a Proof of Claim or application for payment of administrative expenses requesting the allowance of an Administrative Claim by the Administrative Claims Bar Date shall be forever barred, estopped, and enjoined from asserting Administrative Claims against the Debtors, the Wind-Down Debtors, the Distribution Trustee, the Plan Administrator, the Estates, or the Debtors' assets and properties, and any Administrative Claims shall be deemed disallowed as of the Effective Date unless otherwise ordered by the Bankruptcy Court.

### 2.  DIP Claims.

Except to the extent that a Holder of a DIP Claim and the Debtors or the Distribution Trustee, as applicable, agrees to a different treatment, each Holder of a DIP Claim shall receive,

in full and final satisfaction of such Claim, Cash in an amount equal to the Allowed amount of such DIP Claim.

The DIP Secured Party Expenses shall constitute Allowed Administrative Claims with priority over all administrative expenses of the kind specified in sections 503(b) and 507 of the Bankruptcy Code, except for the Professional Fee Claims, and shall be paid in full in Cash no later than the Effective Date and without any requirement to file a fee application with the Bankruptcy Court or for the Bankruptcy Court's review or approval.

**3.**      Professional Fee Claims.

All Professional Persons (other than OCPs) seeking awards by the Bankruptcy Court of compensation for services rendered or reimbursement of expenses incurred through and including the Confirmation Date under sections 327, 328, 330, 331, 503(b)(2), 503(b)(3), 503(b)(4), 503(b)(5), or 1103 of the Bankruptcy Code shall: (a) file, on or before the date that is forty five (45) days after the Confirmation Date, their respective applications for final allowances of compensation for services rendered and reimbursement of expenses incurred; and (b) be paid in full, in Cash, from the Professional Fee Reserve, or, if the amount in the Professional Fee Reserve is not sufficient to pay such claims, out of the Debtors' Distributable Cash, in such amounts as are Allowed by the Bankruptcy Court or authorized to be paid in accordance with the order(s) relating to or allowing any such Professional Fee Claim.  Objections to Professional Fee Claims must be Filed and served no later than twenty-one (21) days after the Filing of the Professional Fee Claim.

All requests for payment of Professional Fee Claims of OCPs shall be made pursuant to the OCP Order.  To the extent any Professional Fee Claims of the OCPs have not been Allowed pursuant to the OCP Order on or before the Effective Date, the amount of Professional Fee Claims owing to the OCPs shall be paid in Cash to such OCPs by the Debtors, Distribution Trustee, or the Plan Administrator (as applicable) as soon as reasonably practicable after such Professional Fee Claims are Allowed pursuant to the OCP Order.

Except as otherwise specifically provided in the Plan, from and after the Confirmation Date, the Debtors, Distribution Trustee, or the Plan Administrator, as applicable, shall, in the ordinary course of business and without any further notice to or action, order, or approval of the Bankruptcy Court, pay in Cash the reasonable and documented legal, professional, or other fees and expenses related to implementation of the Plan and Consummation incurred by the Debtors, Distribution Trustee, or the Plan Administrator, as applicable.  Upon the Confirmation Date, any requirement that Professionals comply with sections 327 through 331, 363, and 1103 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date shall terminate, and the Debtors, Distribution Trustee, or the Plan Administrator, as applicable, may employ and pay any Professional in the ordinary course of business without any further notice to or action, order, or approval of the Bankruptcy Court.

Professionals shall reasonably estimate their unpaid Professional Fee Claims and other unpaid fees and expenses incurred in rendering services to the Debtors before and as of the Confirmation Date, and shall deliver such estimate to the Debtors no later than two (2) Business Days before the Confirmation Date; *provided*, that such estimate shall not be deemed to limit the

amount of the fees and expenses that are the subject of the Professionals' final request for payment of Filed Professional Fee Claims. If a Professional does not provide an estimate, the Debtors may estimate the unpaid and unbilled fees and expenses of such Professional. The Debtors shall fund and reserve the Professional Fee Reserve until payment in full of all Allowed Professional Fee Claims. If the Professional Fee Reserve is insufficient to fund the full Allowed amounts of Professional Fee Claims, the remaining unpaid Allowed Professional Fee Claims shall be paid by the Plan Administrator from the Debtors' Distributable Cash. For the avoidance of doubt, the Professional Fee Reserve cannot be used to pay any secured, priority, or Administrative Claims until all Professional Fee Claims are satisfied or otherwise reserved for.

### 4. Priority Tax Claims.

On the Effective Date, or as soon as reasonably practicable thereafter, except to the extent a Holder of an Allowed Priority Tax Claim and the Wind-Down Debtors, Plan Administrator, or the Distribution Trustee, as applicable, agree to less favorable treatment for such Holder, in full and final satisfaction of the Allowed Priority Tax Claim, each Holder thereof will receive regular installment payments in Cash of a total value, as of the Effective Date of the Plan, equal to the Allowed amount of such Claim over a period ending not later than five (5) years after the Petition Date and in a manner not less favorable than the most favored nonpriority unsecured claim provided for in the Plan.

### 5. U.S. Trustee Statutory Fees.

All U.S. Trustee Statutory Fees due and payable, pursuant to 28 U.S.C. § 1930(a), prior to the Effective Date shall be paid by the Debtors (or the Plan Administrator on behalf of each of the Debtors) on the Effective Date. On and after the Effective Date, the Plan Administrator shall pay any and all U.S. Trustee Statutory Fees when due and payable, and shall file with the Bankruptcy Court quarterly reports in a form reasonably acceptable to the U.S. Trustee. Each of the Debtors and the Plan Administrator, as applicable, shall remain obligated to file post-confirmation quarterly reports and to pay quarterly fees to the U.S. Trustee until the earliest of that particular Debtor's case being closed, dismissed, or converted to a case under chapter 7 of the Bankruptcy Code. Notwithstanding anything to the contrary in the Plan, the U.S. Trustee shall not be required to File a Proof of Claim or any other request for payment of quarterly fees.

### B. Classification of Claims and Interests.

Except for the Claims addressed in Article II of the Plan, all Claims and Interests are classified in the Classes set forth below in accordance with sections 1122 and 1123(a)(1) of the Bankruptcy Code. A Claim or an Interest is classified in a particular Class only to the extent that the Claim or Interest qualifies within the description of that Class and is classified in other Class to the extent that any portion of the Claim or Interest qualifies within the description of such other Class. A Claim also is classified in a particular Class for the purpose of receiving distributions under the Plan only to the extent that such Claim is an Allowed Claim in that Class and has not been otherwise paid, released, or satisfied at any time.

The classification of Claims against and Interests in the Debtors pursuant to the Plan is as follows:

| Class | Claims and Interests | Status | Voting Rights |
|---|---|---|---|
| Class 1 | Other Secured Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| Class 2 | Other Priority Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| Class 3 | Prepetition ABL Secured Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| Class 4 | Prepetition 2L Secured Claims | Impaired | Entitled to Vote |
| Class 5 | Prepetition 3L Secured Claims | Impaired | Entitled to Vote |
| Class 6 | General Unsecured Claims | Impaired | Entitled to Vote |
| Class 7 | Intercompany Claims | Impaired | Not Entitled to Vote (Deemed to Reject) |
| Class 8 | Section 510(b) Claims | Impaired | Not Entitled to Vote (Deemed to Reject) |
| Class 9 | Existing Equity Interests | Impaired | Not Entitled to Vote (Deemed to Reject) |
| Class 10 | Intercompany Interests | Unimpaired/Impaired | Not Entitled to Vote (Deemed to Accept/ Deemed to Reject) |

C.   **Treatment of Claims and Interests.**

1.   Class 1 – Other Secured Claims.

a.   *Classification*:   Class 1 consists of all Other Secured Claims against the Debtors.

b.   *Treatment*:   On the Effective Date, or as soon as reasonably practicable thereafter, except to the extent that a Holder of an Allowed Other Secured Claim and the Debtors, Distribution Trustee, or the Plan Administrator, as applicable, agree to less favorable treatment for such Holder, in full and final satisfaction of the Allowed Other Secured Claim, each Holder thereof will receive:  (i) payment in full in Cash; (ii) delivery of the collateral securing any such Claim and payment of any interest required under section 506(b) of the

33

Bankruptcy Code; (iii) reinstatement of such Claim; or (iv) such other treatment rendering such Claim Unimpaired.

    c. *Voting*: Class 1 is Unimpaired, and Holders of Other Secured Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, Holders of Class 1 Other Secured Claims are not entitled to vote to accept or reject the Plan.

    2. <u>Class 2 – Other Priority Claims.</u>

    a. *Classification*:  Class 2 consists of all Other Priority Claims against the Debtors.

    b. *Treatment*:  On the Effective Date, or as soon as reasonably practicable thereafter, except to the extent that a Holder of an Allowed Other Priority Claim and the Debtors or the Distribution Trustee, as applicable, agree to a different treatment, each Holder of an Allowed Other Priority Claim shall receive, in full and final satisfaction of such Claim, an amount of Cash equal to the amount of such Allowed Other Priority Claim or such other treatment as would render the Claim Unimpaired.

    c. *Voting*:  Class 2 is Unimpaired, and Holders of Other Priority Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, Holders of Class 2 Other Priority Claims are not entitled to vote to accept or reject the Plan.

    3. <u>Class 3 – Prepetition ABL Secured Claims.</u>

    a. *Classification*:  Class 3 consists of the Prepetition ABL Secured Claims against the Debtors.

    b. *Treatment*:  On the Effective Date, or as soon as reasonably practicable thereafter, except to the extent that a Holder of an Allowed Prepetition ABL Secured Claim and the Debtors agree to less favorable treatment for such Holder, each Holder of an Allowed Prepetition ABL Secured Claim shall receive, in full and final satisfaction of such Claim, an amount of Cash equal to the amount of such Allowed Prepetition ABL Secured Claim.

    c. *Voting*:  Class 3 is Unimpaired, and Holders of Prepetition ABL Secured Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, Holders of Class 3 Prepetition ABL Secured Claims are not entitled to vote to accept or reject the Plan.

    4. <u>Class 4 – Prepetition 2L Secured Claims.</u>

    a. *Classification*:  Class 4 consists of the Prepetition 2L Secured Claims against the Debtors.

    b. *Treatment*:  On the Effective Date, or as soon as reasonably practicable thereafter, except to the extent that a holder of an Allowed Prepetition 2L Secured

Claim and the Debtors, Distribution Trustee, or Plan Administrator, as applicable, agree to less favorable treatment for such holder, each holder of an Allowed Prepetition 2L Secured Claim shall receive, in full and final satisfaction of such Claim, its share of the Distributable Cash up to the Allowed amount of the Prepetition 2L Secured Claim; *provided* that the treatment hereunder shall remain fully subject to the Prepetition ABL Intercreditor Agreement.  Notwithstanding the foregoing, the Prepetition 2L Secured Claims shall be voluntarily reduced, *pro rata*, on a dollar for dollar basis, by the amount of the Distribution Trust Distributable Cash.  Holders of Class 4 Prepetition 2L Secured Claims shall not participate in any distributions from the Distribution Trust.

        c.      *Voting*:  Class 4 is Impaired, and Holders of Prepetition 2L Secured Claims are entitled to vote to accept or reject the Plan.

        **5.**      Class 5 – Prepetition 3L Secured Claims.

        a.      *Classification*:  Class 5 consists of the Prepetition 3L Secured Claims against the Debtors.

        b.      *Treatment*:  On the Effective Date, or as soon as reasonably practicable thereafter, except to the extent that a Holder of an Allowed Prepetition 3L Secured Claim and the Debtors, the Distribution Trustee, or the Plan Administrator, as applicable, agree to less favorable treatment for such Holder, each Holder of an Allowed Prepetition 3L Secured Claim shall receive, in full and final satisfaction of such Claim, its *pro rata* share of any remaining Distributable Cash after payment of (i) all Allowed Class 4 Prepetition 2L Secured Claims, and (ii) Dealer Upside Payments; provided that the treatment hereunder shall remain fully subject to the Prepetition 3L Intercreditor Agreement; provided, further, that any Prepetition 3L Deficiency Claim shall constitute an Allowed General Unsecured Claim and, as a result, shall receive the same treatment as a Holder of an Allowed General Unsecured Claim in Class 6.

        c.      *Voting*:  Class 5 is Impaired, and Holders of Prepetition 3L Secured Claims are entitled to vote to accept or reject the Plan.

        **6.**      Class 6 – General Unsecured Claims.

        a.      *Classification*:  Class 6 consists of the General Unsecured Claims against the Debtors, including any  Prepetition 3L Deficiency Claim.

        b.      *Treatment*:  On the Effective Date, or as soon as reasonably practicable thereafter, except to the extent that a Holder of an Allowed General Unsecured Claim and the Debtors or the Distribution Trustee, as applicable, agree to less favorable treatment for such Holder, (i) each Holder of an Allowed General Unsecured Claim shall receive, in full and final satisfaction of such Claim, its *pro rata* share of the Distribution Trust Interests and (ii) each Holder of an Allowed Prepetition 3L Deficiency Claim shall receive, in full and final satisfaction of such Claim, its *pro rata* share of the Distribution Trust Interests on a ratable basis with all Holders of Allowed General Unsecured Claims.

c.      *Voting*:  Class 6 is Impaired, and Holders of General Unsecured Claims are entitled to vote to accept or reject the Plan.

**7.      Class 7 – Intercompany Claims.**

a.      *Classification*:  Class 7 consists of Intercompany Claims between and among the Debtors.

b.      *Treatment*:  On the Effective Date, all Intercompany Claims shall be cancelled, released, discharged, and extinguished and will be of no further force or effect, and Holders of such Claims shall not receive any distribution, property, or other value under the Plan on account of such Claims.

c.      *Voting*:  Class 7 is Impaired, and Holders of Intercompany Claims are conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Therefore, Holders of Class 7 Intercompany Claims are not entitled to vote to accept or reject the Plan.

**8.      Class 8 – Section 510(b) Claims.**

a.      *Classification*:  Class 8 consists of Section 510(b) Claims against the Debtors.

b.      *Treatment*:   On the Effective Date, or as soon as reasonably practicable thereafter, except to the extent that a Holder of a Section 510(b) Claim agrees to less favorable treatment, in full and final satisfaction and release of, and in exchange for such Section 510(b) Claim, each Holder thereof shall receive such treatment so as to be *pari passu* with the treatment afforded to Holders of Existing Equity Interests in Class 9.

c.      *Voting*: Class 8 is Impaired, and Holders of Section 510(b) Claims are conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Therefore, Holders of Class 8 Section 510(b) Claims are not entitled to vote to accept or reject the Plan.

**9.      Class 9 – Existing Equity Interests.**

a.      *Classification*:  Class 9 consists of all Existing Equity Interests in Conn's Inc.

b.      *Treatment*:   On the Effective Date, or as soon as reasonably practicable thereafter, except to the extent that a Holder of an Existing Equity Interest agrees to less favorable treatment, in full and final satisfaction and release of, and in exchange for Existing Equity Interests, each such holder thereof shall receive the following treatment: (i)  on the Effective Date, all Existing Equity Interests shall be deemed exchanged for one share of Conn's, Inc. common stock (the "Single Share"), which shall be issued to the Plan Administrator to hold in trust as custodian for the benefit of the former holders of Conn's, Inc. stock consistent with their former relative priority and economic entitlements, and the Single Share shall be recorded on the books and records maintained by the Plan Administrator; (ii) each former holder of

36

Conn's, Inc. stock (through their interest in the Single Share, as applicable) shall neither receive nor retain any property of the estate or direct interest in property of the estate on account of such Conn's stock; *provided*, that in the event that all Allowed Claims, other than Class 8 Claims, have been satisfied in full in accordance with the Bankruptcy Code and the Plan, each former holder of Conn's, Inc. stock may receive its share of any remaining assets of Conn's, Inc. consistent with such holder's rights of payment existing immediately prior to the commencement date *pro rata* with holders of Class 8 Claims unless otherwise determined by the Plan Administrator. On the date that these chapter 11 cases are closed, the Single Share issued on the Effective Date shall be deemed cancelled and of no further force and effect provided that such cancellation does not adversely impact the Debtors' estate; and (iii) the continuing rights of former holders of Conn's stock (including through their interest in Single Share or otherwise) shall be nontransferable except (A) by operation of law or (B) for administrative transfers where the ultimate beneficiary has not changed, subject to the Plan Administrator's consent.

> c. *Voting*: Class 9 is Impaired, and Holders of Existing Equity Interests are conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. Therefore, Holders of Class 9 Existing Equity Interests are not entitled to vote to accept or reject the Plan.

> **10.** Class 10 – Intercompany Interests.

> a. *Classification*: Class 10 consists of all Intercompany Interests in the Debtors.

> b. *Treatment*: On the Effective Date, all Intercompany Interests shall be either reinstated, or canceled, released, extinguished, and of no further force or effect without any distribution as determined between the Debtors and the Distribution Trustee, as applicable.

> c. *Voting*: Class 10 is Unimpaired/Impaired, and Holders of Intercompany Interests are conclusively deemed to have accepted or rejected the Plan pursuant to sections 1126(f) or 1126(g) of the Bankruptcy Code, respectively. Therefore, Holders of Class 10 Intercompany Interests are not entitled to vote to accept or reject the Plan.

> **D.** **Reservation of Rights Regarding Claims and Interests.**

Except as otherwise provided in the Plan or in other Final Orders of the Bankruptcy Court, nothing under the Plan shall affect the rights of the Debtors, the Plan Administrator, or the Distribution Trustee, as applicable, with respect to any Claims or Interests, including all legal and equitable defenses to, or setoffs or recoupments against, any such Claims or Interests.

> **E.** **Elimination of Vacant Classes.**

Any Class that, as of the commencement of the Confirmation Hearing, does not have at least one Holder of a Claim or Interest that is Allowed in an amount greater than zero for voting purposes shall be considered vacant, deemed eliminated from the Plan for purposes of voting to accept or reject the Plan, and disregarded for purposes of determining whether the Plan satisfies section 1129(a)(8) of the Bankruptcy Code with respect to such Class.

**F.**     <u>Voting Classes, Presumed Acceptance by Non-Voting Classes.</u>

With respect to each Debtor, if a Class contained Claims eligible to vote and no holder of Claims eligible to vote in such Class votes to accept or reject the Plan, the Plan shall be presumed accepted by the holders of such Claims in such Class.

**G.**     <u>Controversy Concerning Impairment.</u>

If a controversy arises as to whether any Claim or any Class of Claims is Impaired, the Bankruptcy Court shall, after notice and a hearing, determine such controversy on or before the Confirmation Hearing.

**H.**     <u>Subordination of Claims.</u>

The allowance, classification, and treatment of all Allowed Claims and Interests and the respective distributions and treatments under the Plan shall take into account and conform to the relative priority and rights of the Claims and Interests in each Class in connection with the Intercreditor Agreements and any contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, contract, section 510(b) of the Bankruptcy Code, or otherwise. Pursuant to section 510 of the Bankruptcy Code, the Debtors or the Distribution Trustee (as applicable) reserve the right to re-classify any Allowed Claim or Allowed Interest in accordance with any contractual, legal, or equitable subordination relating thereto.

**I.**     <u>Confirmation Pursuant to Section 1129(b) of the Bankruptcy Code.</u>

Section 1129(a)(10) of the Bankruptcy Code shall be satisfied for purposes of Confirmation by acceptance of the Plan by one or more of the Classes entitled to vote pursuant to Article III of the Plan. The Debtors hereby request confirmation of the Plan under section 1129(b) of the Bankruptcy Code with respect to any Class that is deemed to reject the Plan pursuant to section 1126(g) of the Bankruptcy Code. The Debtors reserve the right to request confirmation of the Plan under section 1129(b) of the Bankruptcy Code with respect to any voting Class that votes to reject the Plans.

**J.**     <u>Postpetition Interest on Claims</u>

Except as required by applicable bankruptcy law or otherwise expressly provided in the Plan, postpetition interest will not accrue or be payable on account of any Claim.

**K.**     <u>Insurance.</u>

Notwithstanding anything to the contrary in the Plan, if any Claim is subject to coverage under an Insurance Policy, payments on account of such Claim will first be made from proceeds of such Insurance Policy in accordance with the terms thereof, with the balance of such Claim, if any, treated in accordance with the provisions of the Plan governing the Class applicable to such Claim.

## ARTICLE VI.
## MEANS FOR IMPLEMENTATION OF THE PLAN

### A. General Settlement of Claims and Interests.

Pursuant to section 1123(b)(2) of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the distributions, releases, and other benefits provided pursuant to the Plan, upon the Effective Date, the provisions of the Plan shall constitute a good faith compromise of Claims, Interests, and controversies relating to the contractual, legal, and subordination rights that a creditor or an Interest Holder may have with respect to any Allowed Claim or Interest or any distribution to be made on account of such Allowed Claim or Interest. The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise and settlement of all such Claims, Interests, and controversies, as well as a finding by the Bankruptcy Court that such compromise or settlement is in the best interests of the Debtors, their Estates, and holders of such Claims and Interests, and is fair, equitable, and reasonable. Notwithstanding the entry of the Confirmation Order, the Accelerated Payment Procedures Order shall remain in full force and effect, and the Debtors shall continue to fulfill their obligations thereunder. The settlement reflected in the Accelerated Payment Procedures shall be incorporated as if fully set forth herein.

### B. Sources of Consideration for Plan Distributions

Subject to the provisions of the Plan concerning the Professional Fee Reserve or the Wind-Down Budget, distributions under the Plan shall be funded by (1) Cash on hand, including any amounts that may be owed by third parties on account of security deposits or refunds; (2) proceeds from the Sale Transactions; (3) proceeds from the *De Minimis* Sale Transactions; (4) proceeds from the monetization of the Prepetition Collateral following the Effective Date; (5) proceeds from the monetization of the Remaining Real Property; (6) the proceeds, if any, from prosecution or settlement of the Retained Causes of Action, other than Retained Causes of Action against Brian Kahn and his relevant affiliates; and (7) proceeds from any other assets of the Debtors' estates, including any tax credits or refunds.

### C. Sale Transactions.

The Debtors shall sell all or substantially all of their assets pursuant to the Sale Transactions and/or the *De Minimis* Sale Transactions and the entry of one or more corresponding Sale Orders. Following the Effective Date, the Wind-Down Debtors may continue to liquidate their assets and may enter into one or more Sale Transactions without further order of or notice to the Bankruptcy Court. The proceeds from the Sale Transactions and *De Minimis* Sale Transactions shall be used to fund the Plan Distributions according to the terms set forth in Article III of the Plan.

### D. Settlement of Certain Administrative Claims

The Debtors have settled certain administrative expense claims through the Court's approval of the Dealer 9019 Motion and the Accelerated Payment Procedures, both of which are incorporated herein by reference. Payments to Participating Dealers, including the Dealer Upside Payment, and to those Holders of Claims who elected to opt in to the Accelerated

39

Payment Procedures shall be made as set forth in the Accelerated Payment Procedures Order and the Dealer Settlement Order.

**E.** **Wind-Down.**

Before, on, and after the Effective Date, the Debtors, the Wind-Down Debtors, or the Plan Administrator, as applicable, shall enter into any transaction and shall take any actions as may be necessary or appropriate to effectuate the transactions contemplated by the Plan, including, but not limited to: (1) liquidating any asset, including as set forth in Article IV.C of the Plan; (2) prosecuting the Retained Causes of Action other than those Retained Causes of Action that constitute Distribution Trust Assets, along with any other claims or causes of action of the Debtors preserved herein; (3) executing and delivering appropriate agreements or other documents of consolidation, conversion, disposition, transfer, or dissolution containing terms that are consistent with the terms of the Plan and that satisfy the requirements of applicable law; (4) completing and filing any tax return required to be filed by the Debtors or Wind-Down Debtors, as applicable; and (5) any and all other actions that the Debtors, the Wind-Down Debtors, or the Distribution Trustee determine are necessary or appropriate to effectuate the Plan.

**1.** Vesting of the Assets in the Wind-Down Debtors.

Except as otherwise provided in the Plan, the Confirmation Order, or any agreement, instrument, or other document incorporated herein or therein, or any agreement, instrument, or other document incorporated in the Plan or the Plan Supplement, on the Effective Date, the assets of the Debtors, other than the Distribution Trust Assets, shall vest in the Wind-Down Debtors for the purpose of liquidating the Estates, free and clear of all Liens, Claims, charges, or other encumbrances. On and after the Effective Date, except as otherwise provided for in the Plan, the Debtors and the Wind-Down Debtors may operate their business and use, acquire, or dispose of property, and compromise or settle any Claims, Interests, or Causes of Action, other than those Causes of Action that are Distribution Trust Assets, without supervision or approval by the Bankruptcy Court and free and clear of any restrictions of the Bankruptcy Code or the Bankruptcy Rules other than restrictions expressly imposed by the Plan or the Confirmation Order. The Debtors shall fund the Wind-Down Budget for the benefit of the Wind-Down Debtors on the Effective Date of the Plan.

**2.** Authority of Wind-Down Debtors.

On and after the Effective Date, the Wind-Down Debtors shall continue in existence for purposes of (a) winding down the Debtors' business and affairs as expeditiously as reasonably possible, including, but not limited to, surrendering licenses and collecting on remaining assets, (b) funding the Administration and Priority Claims Reserve, making distributions from the same on account of Allowed Other Priority Claims, and making quarterly distributions from the same to the Distribution Trustee for distributions on account of Allowed Claims, (c) enforcing and prosecuting claims, interests, rights, and privileges under the Retained Causes of Action (except for those Retained Causes of Action that constitute Distribution Trust Assets, including, for the avoidance of doubt, Avoidance Actions), if any, in an efficacious manner and only to the extent the benefits of such enforcement or prosecution are reasonably believed to outweigh the costs

associated therewith, (d) filing appropriate tax returns, and (e) administering the Plan. The Wind-Down Debtors shall be deemed to be substituted as the party-in-lieu of the Debtors in all matters, including (a) motions, contested matters, and adversary proceedings pending in the Bankruptcy Court, and (b) all matters pending in any courts, tribunals, forums, or administrative proceedings outside of the Bankruptcy Court, in each case without the need or requirement for the Plan Administrator to file motions or substitutions of parties or counsel in each such matter.

3.    Plan Administrator.

On the Effective Date, the authority, power, and incumbency of the persons acting as managers, officers, directors, sale director, or governing body of the Wind-Down Debtors shall be deemed to have resigned, solely in their capacities as such, and the one or more new boards of directors chosen by the Debtors, subject to the consent of the Plan Sponsor, which consent may be conditioned or withheld in the Plan Sponsor's sole discretion, shall be appointed as the directors of the Wind-Down Debtors, and shall succeed to the powers of the Wind-Down Debtors' directors and other Governing Bodies. On and after the Effective Date, the Plan Administrator shall be deemed the sole remaining officer or manager of the Wind-Down Debtors. From and after the Effective Date, the authority of the Plan Administrator and the new board of the Wind-Down Debtors shall be set forth in the New Organizational Documents. The foregoing shall not limit the authority of the Wind-Down Debtors or the Plan Administrator, as applicable, to continue the employment of any former manager or officer, including pursuant to any transition services agreement or other agreement entered into on or after the Effective Date. Following the Effective Date, the Plan Administrator is given full power of attorney and had the authority to execute and/or endorse documentation on behalf of the Debtors and Wind-Down Debtors in furtherance of the Plan, including but not limited to, the filing of final tax returns and the dissolution of the Wind-Down Debtors.

4.    Dissolution of Governing Bodies of the Debtors.

As of the Effective Date, the current board shall be dissolved without any further action required on the part of the Debtors or the Debtors' officers, directors, managers, shareholders, members, or governing bodies, and any remaining officers, directors, managers, or managing members of any Debtor shall be dismissed without any further action required on the part of any such Debtor, the equity holders of the Debtors, the officers, directors, managers, or governing body, as applicable, of the Debtors, or the members of any Debtor; *provided*, *however*, the Plan Administrator may retain certain officers as required under applicable law, including for regulatory purposes. Subject in all respects to the terms of the Plan, the Wind-Down Debtors shall be dissolved as soon as practicable on or after the Effective Date.

The New Organizational Documents shall be filed in connection with the Plan Supplement and shall name one or more boards of directors who will govern the Wind-Down Debtors. Subject in all respects to the terms of the Plan and the Plan Administration Agreement, the Plan Administrator shall have the power and authority to take any action necessary to wind down and dissolve any of the Wind-Down Debtors, and shall be authorized to: (a) file a certificate of dissolution for any of the Wind-Down Debtors, together with all other necessary corporate and company documents, to effect the dissolution of the Wind-Down Debtors under the applicable laws of its state of formation; and (b) complete and file all final or otherwise

required federal, state, and local tax returns and pay taxes required to be paid for any of the Debtors or Wind-Down Debtors, and pursuant to section 505(b) of the Bankruptcy Code, request an expedited determination of any unpaid tax liability of any of the Debtors, Wind-Down Debtors, or their Estates for any tax incurred during the administration of such Debtor's or Wind-Down Debtor's Chapter 11 Case, as determined under applicable tax laws.

### F.    **Distribution Trust**

#### 1.    Creation and Governance of the Distribution Trust.

On or before the Effective Date, the Debtors shall irrevocably transfer all of their rights, title, and interest in and to the Distribution Trust Assets to the Distribution Trust, which Distribution Trust Assets or interests in the Distribution Trust Assets, shall automatically and irrevocably vest or shall be deemed to automatically and irrevocably vest in the Distribution Trust as of the Effective Date.   The Debtors and the Distribution Trustee shall execute the Distribution Trust Agreement and shall take all steps necessary to establish the Distribution Trust and the Distribution Trust Interests, in each case, in accordance with the Plan and the Distribution Trust Agreement, including on or before the Effective Date, the transfer of the Distribution Trust Distributable Cash to the Distribution Trust.   In the event of any conflict between the terms of the Plan and the terms of the Distribution Trust Agreement, the terms of the Plan shall govern.   The Distribution Trust Assets shall automatically and irrevocably vest in the Distribution Trust as provided herein, without further action by any Person, free and clear of all Claims, Liens, Interests, charges, and other encumbrances, and such transfer shall be exempt from any stamp, real estate transfer, mortgage reporting, sales, use, or other similar tax.

After the Effective Date, neither the Debtors, the Wind-Down Debtors, nor any other party shall have any interest in the Distribution Trust Assets except as expressly set forth herein. To the extent the Debtors or the Wind-Down Debtors are holding or receive any Distribution Trust Assets on or after the Effective Date, they shall hold such Distribution Trust Asset in trust for the benefit of the Distribution Trust and promptly turnover such Distribution Trust Asset to the Distribution Trust in accordance with the Plan.   To the extent that any Distribution Trust Assets cannot be transferred to the Distribution Trust because of a restriction on transferability under applicable non-bankruptcy law or the Plan that is not superseded or preempted by the Bankruptcy Code, the Distribution Trust's interest in any such Distribution Trust Assets shall be a lien upon and security interest in such Distribution Trust Asset, perfected without any need to file financing statements, mortgages, or any similar recordation, and such Distribution Trust Asset shall be deemed to have been retained by the Debtors or the Wind-Down Debtors, as applicable, and the Distribution Trustee shall be deemed to have been designated as a representative of the Debtors  or the Wind-Down Debtors, as applicable, pursuant to section 1123(b)(3)(B) of the Bankruptcy Code solely to enforce and pursue such Distribution Trust Asset on the behalf of the Debtors, or Wind-Down Debtors, as applicable.

The Distribution Trustee shall be the exclusive administrator of the assets of the Distribution Trust (including the Distribution Trust Assets) for purposes of 31 U.S.C. § 3713(b) and 26 U.S.C. § 6012(b)(3), as well as a representative of the Estate of each of the Debtors appointed pursuant to section 1123(b)(3)(B) of the Bankruptcy Code with respect to any matters involving the allowance, administration, settlement, or compromise of Class 6 General

Unsecured Claims and Administrative Claims that were not otherwise Allowed or satisfied by the Debtors on or before the Effective Date, and as a party in interest with respect to each of the Debtors with respect to any matters involving the allowance, administration, settlement, or compromise of Other Security Claims or Other Priority Claims, for the purpose of carrying out the Distribution Trustee's duties under the Distribution Trust Agreement. The Distribution Trustee shall be a party in interest under section 1109(b) of the Bankruptcy Code for the purposes of (x) the claims reconciliation process, including administering, settling, compromising, or objecting to Administrative Claims, Other Security Claims, Other Priority Claims, or Class 6 General Unsecured Claims that were not otherwise Allowed or satisfied by the Debtors on or before the Effective Date and (y) any other matter affecting the Distribution Trust; *provided* that the Distribution Trustee shall not have the right to object to the allowance of the Class 5 Prepetition 3L Secured Claims or any Prepetition 3L Deficiency Claim; *provided further* that the Distribution Trustee may otherwise be a party in interest with the prior written consent of the Wind-Down Debtors or as otherwise ordered by the Bankruptcy Court.

The Distribution Trust shall be governed by the Distribution Trust Agreement and administered by the Distribution Trustee. The powers, rights, and responsibilities of the Distribution Trustee shall be specified in the Distribution Trust Agreement and shall include, without limitation, the authority and responsibility to take the actions set forth in Article IV.F of the Plan. Among other things, the Distribution Trustee shall have the sole power and responsibility to distribute and allocate the Distribution Trust Net Assets to the Distribution Trust Beneficiaries on account of such beneficiaries' Distribution Trust Interests in accordance with the treatment set forth in the Plan for Class 6. The Distribution Trust Agreement may include reasonable and customary provisions that allow for indemnification by the Distribution Trust and the Distribution Trustee; *provided* that, for the avoidance of doubt, any such indemnification shall be by the Distribution Trust and the Distribution Trustee alone and shall not implicate the Debtors, the Plan Administrator, the Plan Sponsor, or the Wind-Down Debtors. The Distribution Trust may retain and employ Persons and professionals, in the Distribution Trustee's sole discretion and without the need for approval of the Bankruptcy Court, to aid the Distribution Trust in carrying out its purpose as set forth in the Plan and the Distribution Trust Agreement. The Distribution Trust may, in its sole discretion, retain or employ a disbursing agent, which may be the Disbursing Agent, in accordance with the Distribution Trust Agreement. For the avoidance of doubt, notwithstanding anything in the Plan to the contrary, distributions to the Holders of Distribution Trust Interests shall be governed by the Distribution Trust Agreement.

Any and all of the Distribution Trust Interests shall be non-transferrable other than if transferred by will, intestate, succession, or otherwise by operation of law. In addition, any and all Distribution Trust Interests will not be registered pursuant to the Securities Act or any applicable state or local securities law pursuant to section 1145 of the Bankruptcy Code, and will be exempt from the Investment Company Act of 1940, as amended, pursuant sections 7(a) and 7(b) of that Act and section 1145 of the Bankruptcy Code.

>    2.    Distribution Trust Agreement.

A substantially final draft of the Distribution Trust Agreement will be filed with the Plan Supplement and generally will provide for, among other things: (i) the automatic and irrevocable transfer of the Distribution Trust Assets to the Distribution Trust, free and clear of any Claims,

Liens, Interests, charges, or other encumbrances; and (ii) the administration of claims according to the terms and conditions set forth in Article IV.F of the Plan.  The Distribution Trust Agreement may include reasonable and customary provisions that allow for the limitation of liability of the Distribution Trustee and its professionals, agents, and advisors, among others, and for indemnification of such Persons by the Distribution Trust or the Distribution Trustee.  Any such indemnification shall be the sole responsibility of the Distribution Trust and shall constitute Distribution Trust Expenses payable solely from the Distribution Trust Assets.  The Distribution Trustee shall be responsible for all decisions and duties with respect to the Distribution Trust and the Distribution Trust Assets, except as otherwise expressly provided for in the Plan, the Confirmation Order, or the Distribution Trust Agreement.   Upon the Effective Date, the Distribution Trust Agreement shall conclusively be deemed binding upon and enforceable against each of the Distribution Trust Beneficiaries, without any further action by any Person or Entity.

On a quarterly basis, the Distribution Trustee shall remit to the Plan Administrator a summary of all Administrative Claims Allowed, compromised, or otherwise settled during the prior quarter.  Within five (5) days receipt of such summary, the Plan Administrator shall transfer to the Distribution Trust such amounts as are necessary to satisfy the Administrative Claims from the Administrative and Priority Claims Reserve.

### 3. Preservation of Privilege.

The Wind-Down Debtors and the Distribution Trustee shall enter into a common interest agreement whereby the Wind-Down Debtors will be able to share documents, information, or communications (whether written or oral) relating to the Administrative Claims, Other Priority Claims, Prepetition 3L Secured Claims, and General Unsecured Claims.  The Distribution Trust shall seek to preserve and protect all applicable privileges attaching to any such documents, information, or communications.   The Distribution Trust's receipt of such documents, information or communications shall not constitute a waiver of any privilege.  All privileges shall remain in the control of the Debtors or the Wind-Down Debtors, as applicable, and the Debtors or the Wind-Down Debtors, as applicable, retain the sole right to waive their own privileges.   Reasonable agreements will be made with the Distribution Trustee such that confidential information and privileges are preserved, while permitting the Distribution Trustee to use, as necessary to administer the Distribution Trust, such information and privilege; absent such agreements, either the Distribution Trustee or the Wind-Down Debtors may present the issue to the Bankruptcy Court for resolution.

### 4. Distribution Trust Fees and Expenses.

From and after the Effective Date, the Distribution Trustee, on behalf of the Distribution Trust, shall, in the ordinary course of business and without the necessity of any approval by or notice to the Bankruptcy Court, pay the Distribution Trust Expenses from the Distribution Trust Assets.  The Distribution Trust Expenses shall be payable from Distribution Trust Assets on a consolidated basis without allocation among the Debtors' Estates.  The Debtors, the Wind-Down Debtors, or the Plan Administrator (as applicable) shall not be responsible for any costs, fees, or expenses of the Distribution Trust.

5.     Dissolution of the Distribution Trust.

The Distribution Trustee and the Distribution Trust shall be discharged or dissolved, as the case may be, at such time as all distributions required to be made by the Distribution Trustee under the Plan have been made; *provided* that in no event shall the Distribution Trust be dissolved later than five (5) years from the Effective Date unless the Bankruptcy Court, upon motion made within the six (6) month period before such fifth anniversary (and, in the event of further extension, by order of the Bankruptcy Court, upon motion made within six (6) months before the end of the preceding extension), determines that a fixed period extension (not to exceed three (3) years, together with any prior extensions) is necessary to facilitate or complete the recovery on, liquidation and distribution of, the Distribution Trust Net Assets.

Upon dissolution of the Distribution Trust, any remaining Distribution Trust Net Assets shall be distributed to Holders of Allowed General Unsecured Claims in accordance with the Plan and the Distribution Trust Agreement, subject to the terms and conditions set forth herein and in the Confirmation Order; *provided*, *however*, that if the Distribution Trustee reasonably determines that such remaining Distribution Trust Net Assets are insufficient to render a further distribution practicable, the Distribution Trustee may apply to the Bankruptcy Court for authority to: (i) reserve any amount necessary to dissolve the Distribution Trust, (ii) donate any balance to a charitable organization (A) described in Section 501(c)(3) of the Internal Revenue Code, (B) exempt from U.S. federal income tax under Section 501(a) of the Internal Revenue Code, (C) not a "private foundation" as defined in Section 509(a) of the Internal Revenue Code, and (D) that is unrelated to the Debtors, the Wind-Down Debtors, the Distribution Trust, and any insider of the Distribution Trustee, and (iii) dissolve the Distribution Trust.

6.     Single-Satisfaction of Claims.

Notwithstanding anything to the contrary in the Plan, in no event shall holders of claims administered by the Distribution Trust recover, on account of any such Claim, more than 100% of their Allowed Claim from the Distribution Trust or the Wind-Down Debtors, as applicable.

7.     Cooperation by the Debtors and the Wind-Down Debtors.

The Debtors or the Wind-Down Debtors, as applicable, upon reasonable notice, shall reasonably cooperate with the Distribution Trustee and any professionals retained by the Distribution Trust in the administration of the Distribution Trust, including by (i) providing reasonable access to officers, directors, employees, personnel, advisors, and, subject to Article IV.F.3 of the Plan, pertinent documents, including books and records, to the extent the Debtors or the Wind-Down Debtors have such information and/or documents, to the Distribution Trustee any professionals retained by the Distribution Trust; *provided*, in each case that the Distribution Trust, acting by and through the Distribution Trustee, agrees upon request to reimburse reasonable out-of-pocket expenses for the collection of documents, copying, or similar expenses, that would not otherwise be borne by the Wind-Down Debtors; and (ii) providing quarterly distributions to the Distribution Trust from the Administrative and Priority Claims Reserve sufficient to satisfy the quarterly distributions of Allowed Administrative Claims and Allowed Other Priority Claims.  The Wind-Down Debtors agree to provide not less than thirty

45

(30) days' written notice to the Distribution Trustee and any known professionals retained by the Distribution Trust prior to filing any motion to close these Chapter 11 Cases.

### 8.   Abandonment of Distribution Trust Assets.

If, in the Distribution Trustee's reasonable judgment, the Distribution Trustee believes in good faith that any of the Distribution Trust Assets have inconsequential value to the Distribution Trust or the Distribution Trust Beneficiaries, the Distribution Trustee shall have the right to cause the Distribution Trust to abandon or otherwise dispose of such property, including, but not limited to, by way of donation to a non-profit 501(c)(3) organization that the Distribution Trustee may select in its discretion.

### 9.   Tax Treatment of the Distribution Trust.

In furtherance of Article IV.E.9 of the Plan, (i) it is intended that the Distribution Trust be classified for U.S. federal income tax purposes as a "liquidating trust" within the meaning of Treasury Regulation section 301.7701-4(d) and guidance promulgated in respect thereof, including Revenue Procedure 94-45, 1994-2 C.B. 684, and, thus, as a "grantor trust" within the meaning of sections 671 through 679 of the Tax Code consistent with the terms of the Plan, and, accordingly, all assets held by the Distribution Trust are intended to be deemed for U.S. federal income tax purposes to have been distributed by the Debtors or the Wind-Down Debtors, as applicable, directly to the Holders of Allowed Class 6 General Unsecured Claims, including any Prepetition 3L Deficiency Claims, in respect of such Claims, and then contributed by such Holders of Allowed Class 6 General Unsecured Claims, including any Prepetition 3L Deficiency Claims, to the Distribution Trust in exchange for their *pro rata* interests in the Distribution Trust; (ii) the Holders of Allowed Class 6 General Unsecured Claims, including any Prepetition 3L Deficiency Claims, shall be treated as the beneficiaries and grantors of the Distribution Trust; (iii) the primary purpose of the Distribution Trust shall be the liquidation and distribution of the Distribution Trust Net Assets in accordance with Treasury Regulation section 301.7701-4(d), including the resolution of General Unsecured Claims, including any Prepetition 3L Deficiency Claims, in accordance with the Plan, with no objective to continue or engage in the conduct of a trade or business; (iv) all parties (including, without limitation, the Debtors and the Estates, and Holders of Allowed Class 6 General Unsecured Claims, including any Prepetition 3L Deficiency Claims, receiving interests in the Distribution Trust, and the Distribution Trustee) shall report consistently with such treatment (including the deemed receipt of the Distribution Trust Assets, subject to applicable liabilities and obligations, by the Holders of Class 6 General Unsecured Claims, including any Prepetition 3L Deficiency Claims, followed by the deemed transfer of such Distribution Trust Assets to the Distribution Trust); (v) all parties shall report consistently for federal income tax purposes, and otherwise, with the valuation of the Distribution Trust Assets transferred to the Distribution Trust as determined by the Distribution Trustee (or its designee); (vi) the Distribution Trustee shall be responsible for filing returns for the Distribution Trust as a grantor trust pursuant to Treasury Regulation section 1.671-4(a); (vii) the Distribution Trustee shall annually send to each holder of an interest in the Distribution Trust a separate statement regarding the receipts and expenditures of the trust as relevant for U.S. federal income tax purposes; (viii) all items of income, deductions, and credit loss of the Distribution Trust shall be allocated for federal income tax purposes to the holders of General Unsecured Claims based on their respective interests in the Distribution Trust, including the holders of General Unsecured

46

Claims holding Disputed Claims, in such manner as the Distribution Trustee deems reasonable and appropriate; and (viii) subject to definitive guidance from the Internal Revenue Service or a court of competent jurisdiction to the contrary (including the receipt by the Distribution Trustee of a private letter ruling if the Distribution Trustee so requests one, or the receipt of an adverse determination by the Internal Revenue Service upon audit if not contested by the Distribution Trustee), the Distribution Trustee may timely elect to (x) treat any portion of the Distribution Trust allocable to Disputed Claims as a "disputed ownership fund" governed by Treasury Regulation section 1.468B-9 (and make any appropriate elections) and (y) to the extent permitted by applicable law, report consistently with the foregoing for state and local income tax purposes. If a "disputed ownership fund" election is made for all or any portion of the Distribution Trust, all impacted parties (including the Debtors and the Estates, and, to the extent applicable, holders of General Unsecured Claims, and the Distribution Trustee), and solely with respect to the impacts assets, shall report for United States federal, state, and local income tax purposes consistently with such election.

Any taxes (including with respect to earned interest, if any) imposed on the Distribution Trust, including as a result of an election to be treated as a "disputed ownership fund" shall be paid by the Distribution Trustee out of the assets of the Distribution Trust (and reductions shall be made to amounts disbursed from the account to account for the need to pay such taxes). The Distribution Trustee may request an expedited determination of taxes of the Distribution Trust, including any reserve for Disputed Claims, under section 505(b) of the Bankruptcy Code for all tax returns filed for, or on behalf of, the Distribution Trust for all taxable periods through the dissolution of the Distribution Trust.

The Distribution Trust shall continue to have all of the rights and powers granted to the Distribution Trust as set forth in the Plan and applicable non-bankruptcy law, and the Distribution Trustee shall also have the rights, powers, and obligations set forth in the Distribution Trust Agreement.

### G.    Claims Reconciliation Process

#### 1.    In General

Pursuant to the powers and authority vested in the Plan Administrator or the Wind-Down Debtors, as applicable, pursuant to this Plan, the Confirmation Order, and the Plan Administration Agreement, the Plan Administrator, acting on behalf of the Wind-Down Debtors, shall be responsible for conducting the claims reconciliation process with respect to any matters involving the allowance, administration, settlement, or compromise of Administrative Claims, Other Secured Claims, Other Priority Claims, and Class 5 Prepetition 3L Secured Claims that were not otherwise Allowed or satisfied by the Debtors on or before the Effective Date. In accordance with Article IV.F hereof, the Distribution Trustee, acting on behalf of the Distribution Trust, shall be a representative of the Estate of each of the Debtors appointed pursuant to section 1123(b)(3)(B) of the Bankruptcy Code with respect to any matters involving the allowance, administration, settlement, or compromise of Class 6 General Unsecured Claims and Administrative Claims that were not otherwise Allowed or satisfied by the Debtors on or before the Effective Date.

2.      **Specified Matters Pertaining to the Reconciliation of Administrative Claims**

The following shall govern the claims reconciliation process with respect to Administrative Claims, including administering, settling, compromising, or objecting to Administrative Claims: (i) the Plan Administrator, acting on behalf of the Wind-Down Debtors, shall have the primary responsibility of administering, settling, compromising, or objecting to Administrative Claims; (ii) the Distribution Trustee, acting on behalf of the Distribution Trust, shall have the secondary responsibility of administering, settling, compromising, or objecting to Administrative Claims (other than Professional Fee Claims); (iii) the Plan Administrator shall provide no less than five (5) business days' notice to the Distribution Trustee of the terms of any settlement or comprise prior to settling or compromising any Administrative Claim, unless such period is shortened or waived by the Distribution Trustee; (iv) if the Distribution Trustee disagrees with the Plan Administrator's decision to settle or compromise any such Administrative Claim and such disagreement cannot be resolved within a reasonable timeframe, the Distribution Trustee's sole remedy is to elect to undertake the primary responsibility of administering, settling, compromising, or objecting to such Administrative Claim, in which case the Plan Administrator shall no longer bear responsibility for the administration of such Administrative Claim but shall retain the right to consult with the Distribution Trustee regarding the administration of such Administrative Claim, *provided* that any settlement agreed to by the Distribution Trustee must be no less favorable to the Wind-Down Debtors than a settlement or compromise previously agreed to by the Plan Administrator (unless otherwise agreed); and (v) the Plan Administrator and the Distribution Trustee shall work in good faith to collaboratively conduct the claims reconciliation process with respect to Administrative Claims.

H.      **Retained Causes of Action**

In accordance with section 1123(b) of the Bankruptcy Code, the Plan Administrator or the Distribution Trust, as applicable, shall retain and may enforce all rights to commence and pursue, as appropriate, any and all Retained Causes of Action and Causes of Action of the Debtors that are not otherwise transferred or sold pursuant to the Sale Transactions, whether arising before or after the Petition Date, and the Plan Administrator's or Distribution Trust's, as applicable, rights to commence, prosecute, or settle such Retained Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date, other than the Causes of Action released by the Debtors pursuant to the releases and exculpations contained in the Plan, including in Article IX of the Plan, which shall be deemed released and waived by the Debtors, the Plan Administrator, and the Distribution Trust as of the Effective Date.  No Entity (other than the Released Parties) may rely on the absence of a specific reference in the Plan, the Plan Supplement, or the Disclosure Statement to any Cause of Action against it as any indication that the Plan Administrator or Distribution Trust, as applicable, will not pursue any and all available Causes of Action of the Debtors against it.

I.      **Corporate Action**

On the Effective Date and following satisfaction of the Debtors' distribution and funding requirements set forth in the Plan, the Debtors shall be dissolved for all purposes unless the Plan Administrator determines that dissolution can have any adverse impact Wind-Down; *provided,*

that neither the Debtors nor any party released pursuant to Article IX of the Plan shall be responsible for any liabilities that may arise as a result of non-dissolution of the Debtors; *provided further*, that nothing in the Plan shall be construed as relieving the Debtors or the Plan Administrator (as applicable) of their duties to pay U.S. Trustee Statutory Fees as required by the Bankruptcy Code and applicable law until such time as a final decree is entered in the Debtors' Chapter 11 Cases or the cases are dismissed or converted to cases under chapter 7 of the Bankruptcy Code.  The Plan Administrator shall submit with the appropriate governmental agencies a copy of the Confirmation Order, which Confirmation Order shall suffice for purposes of obtaining a Certificate of Dissolution from the applicable Secretary of State for each State in which a Debtor operates.

Without limiting the foregoing, on the Effective Date and following satisfaction of the Debtors' distribution and funding requirements set forth in the Plan, the Debtors shall have no further duties or responsibilities in connection with implementation of the Plan, and the directors and officers of the Debtors shall be deemed to have resigned and the employees of the Debtors terminated.  From and after the Effective Date, the Plan Administrator shall be authorized to act on behalf of the Estates in accordance with the terms set forth in the Plan or the Confirmation Order.

## J.    Cancellation of Existing Securities and Agreements

Except for the purpose of evidencing a right to a distribution under the Plan and except as otherwise set forth in the Plan and subject in all respect to the Intercreditor Agreements, on the Effective Date, all prepetition credit documents, agreements, instruments, notes, certificates, indentures, mortgages, securities and other documents evidencing any Claim or Interest, and any rights of any Holder in respect thereof, shall be deemed cancelled and of no further force or effect and the obligations of the Debtors thereunder shall be deemed fully satisfied, released, and discharged and, as applicable, shall be deemed to have been surrendered to the Plan Administrator.  The holders of or parties to such cancelled instruments, securities, and other documentation shall have no rights arising from or related to such instruments, securities, or other documentation or the cancellation thereof, except the rights provided for pursuant to the Plan.

Notwithstanding such cancellation and discharge, the Intercreditor Agreements, including any amendments thereto, shall continue in effect solely for purposes of (1) allowing Holders of Prepetition ABL Secured Claims, Prepetition 2L Secured Claims, and Prepetition 3L Secured Claims to receive Plan Distributions under or in connection with the Plan; (2) enforcing the rights, claims, and interests of the Prepetition ABL Agent, the Prepetition 2L Agent, and the Prepetition 3L Agent vis-à-vis any parties other than the Debtors, the Wind-Down Debtors, or the Plan Administrator; (3) permitting the Prepetition ABL Agent, the Prepetition 2L Agent, and the Prepetition 3L Agent to appear and be heard in the Chapter 11 Cases or in any proceedings in the Bankruptcy Court or any other court relating to the Prepetition ABL Credit Agreement, the Prepetition 2L Credit Agreement, and the Prepetition 3L Credit Agreement, as applicable; (4) enforcing any obligations owed to the Prepetition ABL Agent, the Prepetition 2L Agent, or the Prepetition 3L Agent under the Plan; and (5) to permit the Prepetition ABL Agent, the Prepetition 2L Agent, or the Prepetition 3L Agent to perform any function necessary to effectuate the foregoing or the making of any Plan Distributions; *provided* that the cancellation

49

thereunder shall not itself alter the obligations or rights among third parties other than the Debtors and the Wind-Down Debtors.

### K.  Effectuating Documents; Further Transactions

Upon entry of the Confirmation Order, the Debtors, the Wind-Down Debtors, Distribution Trust, or the Plan Administrator (as applicable) shall be authorized to execute, deliver, file, or record such contracts, instruments, releases, consents, certificates, resolutions, programs, and other agreements or documents, and take such acts and actions as may be reasonable, necessary, or appropriate to effectuate, implement, consummate, and/or further evidence the terms and conditions of the Plan and any transactions described in or contemplated by the Plan.  The Debtor, the Wind-Down Debtors, Distribution Trust, the Plan Administrator, all Holders of Claims receiving distributions pursuant to the Plan, and all other parties in interest shall, from time to time, prepare, execute, and deliver any agreements or documents, and take any other actions as may be necessary or advisable to effectuate the provisions and intent of the Plan.

### L.  Section 1146 Exemption from Certain Taxes and Fees

Pursuant to section 1146(a) of the Bankruptcy Code, any transfers of property pursuant to the Plan shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, stamp act, real estate transfer tax, mortgage recording tax, or other similar tax or governmental assessment, and upon entry of the Confirmation Order, the appropriate state or local governmental officials or agents shall forgo the collection of any such tax or governmental assessment and accept for filing and recordation all such instruments or other documents governing or evidencing such transfers without the payment of any such tax, recordation fee, or governmental assessment.

### M.  Sale Order

Notwithstanding anything to the contrary in the Plan, nothing in the Plan shall affect, impair or supersede the Sale Orders or Sale Documents, each of which remains in full force and effect and governs in the event of any inconsistency with the Plan.

### N.  Separate Plans

Notwithstanding the combination of separate plans of distribution for the Debtors set forth in the Plan for purposes of economy and efficiency, the Plan constitutes a separate chapter 11 plan for each Debtor.  Accordingly, if the Bankruptcy Court does not confirm the Plan with respect to one or more Debtors, it may still confirm the Plan with respect to any other Debtor that satisfies the confirmation requirements of section 1129 of the Bankruptcy Code.

### O.  Settlement of Claims and Controversies

Pursuant to Section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, the provisions of the Plan will constitute a good faith compromise and settlement of all claims or controversies held by the Debtors, the Committee, and the Holders of Claims and Interests that are settled by the Plan.  The entry of the Confirmation Order will constitute the Bankruptcy

Court's approval, as of the Effective Date, of the compromise or settlement of all such claims or controversies and the Bankruptcy Court's finding that such compromise or settlement is in the best interests of the Debtors and their Estates, and is fair, equitable and reasonable. Notwithstanding any other provision in the Plan, the settlements are approved among the parties that have agreed to them (among any other party who has expressly entered into a written settlement), and the treatment of claims and interests is being afforded pursuant to Confirmation by satisfying the requirements of Section 1129.

### P.     Closing the Chapter 11 Cases

The Wind-Down Debtors shall, promptly after the full administration of the Chapter 11 Cases, file with the Bankruptcy Court all documents required by Bankruptcy Rule 3022 and any applicable order of the Bankruptcy Court to close the Chapter 11 Cases; *provided* that, as of the Effective Date, the Wind-Down Debtors may submit separate orders to the Bankruptcy Court closing certain individual Chapter 11 Cases and changing the caption of the Chapter 11 Cases accordingly, *provided further* that matters concerning Claims may be heard and adjudicated in one of the Debtors' Chapter 11 Cases that remains open regardless of whether the applicable Claim is against a Debtor in a Chapter 11 Case that is closed.  Nothing in the Plan shall authorize the closing of any case effective as of a date that precedes the date any such order is entered. Any request for such relief shall be made on motion served on the U.S. Trustee and the Distribution Trust, and the Bankruptcy Court shall rule on such request after notice and a hearing.  Upon the filing of a motion to close the last Chapter 11 Case remaining open, the Wind-Down Debtors shall file a final report with respect to all of the Chapter 11 Cases.

## ARTICLE VII.
## TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

### A.     Assumption and Rejection of Executory Contracts and Unexpired Leases.

On the Effective Date, except as otherwise provided herein (which exclusion includes the Insurance Policies and Assumed Employee Plans), all Executory Contracts or Unexpired Leases not previously assumed, assumed and assigned, or rejected pursuant to an order of the Bankruptcy Court will be deemed rejected, in accordance with the provisions and requirements of sections 365 and 1123 of the Bankruptcy Code other than those Executory Contracts or Unexpired Leases that are the subject of a motion to assume that is pending on the Confirmation Date.

Assumption of any Executory Contract or Unexpired Lease pursuant to the Sale Documents or the Plan, and payment of any cure amounts relating thereto, shall, upon satisfaction of the applicable requirements of section 365 of the Bankruptcy Code, result in the full, final, and complete release and satisfaction of any Claims or defaults, whether monetary or nonmonetary, including defaults or provisions restricting the change in control of ownership interest composition or other bankruptcy-related defaults, arising under any assumed Executory Contract or Unexpired Lease at any time prior to the effective date of assumption.

B.     **Claims Based on Rejection of Executory Contracts or Unexpired Leases.**

If the rejection of an Executory Contract or Unexpired Lease pursuant to the Plan and Confirmation Order results in a Claim, then, unless otherwise ordered by the Court, such Claim shall be forever barred and shall not be enforceable against the Debtors, the Estates, the Plan Administrator, or any of their respective assets and properties unless a Proof of Claim is Filed with the Notice and Claims Agent and served upon counsel to the Plan Administrator within thirty (30) days of the Effective Date.

The foregoing applies only to Claims arising from the rejection of an Executory Contract or Unexpired Lease under the Plan and Confirmation Order; any other Claims held by a party to a rejected Executory Contract or Unexpired Lease shall have been evidenced by a Proof of Claim Filed by the applicable Bar Date or shall be barred and unenforceable.  Claims arising from the rejection of Executory Contracts or Unexpired Leases under the Plan and Confirmation Order shall be classified as General Unsecured Claims and shall, if Allowed, be treated in accordance with the provisions herein.

**Any Claims arising from the rejection of an Executory Contract or Unexpired Lease pursuant to the Plan and Confirmation Order that are not timely Filed within thirty (30) days of the Effective Date will be disallowed automatically, forever barred from assertion, and shall not be enforceable against, as applicable, the Debtors, the Estates, the Plan Administrator, or any of their respective assets and properties.**

C.     **Reservation of Rights.**

Neither the exclusion nor the inclusion by the Debtors of any contract or lease on any exhibit, schedule, or other annex to the Plan or in the Plan Supplement, nor anything contained in the Plan, shall constitute an admission by the Debtors that any such contract or lease is or is not an Executory Contract or Unexpired Lease or that the Debtors, the Plan Administrator, or their respective affiliates has any liability thereunder.  Except as explicitly provided in the Plan, nothing in the Plan shall waive, excuse, limit, diminish, or otherwise alter any of the defenses, claims, Causes of Action, or other rights of the Debtors or the Plan Administrator under any executory or non-executory contract or unexpired or expired lease.  If there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of its assumption under the Plan, the Debtors or Wind-Down Debtors, as applicable, shall have thirty (30) days following entry of a Final Order resolving such dispute to alter their treatment of such contract or lease.

D.     **Preexisting Obligations to the Debtors Under Executory Contracts and Unexpired Leases.**

Rejection of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise shall not constitute a termination of preexisting obligations owed to the Debtors under such Executory Contracts or Unexpired Leases.  In particular, the Debtors expressly reserve and do not waive any right to receive, or any continuing obligation of a counterparty to provide, warranties, indemnity or continued maintenance obligations.  The Debtors also expressly reserve any and all rights with respect to the applicability (or non-applicability) of any non-bankruptcy laws to the contrary.

E. **Insurance Policies.**

Each Assumed Insurance Policy shall be deemed an Executory Contract and shall be automatically assumed or assumed and assigned by the applicable Debtor, effective as of the Effective Date, pursuant to sections 365 and 1123 of the Bankruptcy Code.  Each Non-Assumed Insurance Policy shall be deemed an Executory Contract and shall be rejected by the applicable Debtor, effective as of the Effective Date, pursuant to sections 365 and 1123 of the Bankruptcy Code.

For the avoidance of doubt, coverage for defense and indemnity under the Insurance Policies shall remain available to all individuals within the definition of "Insured" in the Insurance Policies.  Furthermore, for the avoidance of doubt, no coverage for indemnity under any previous insurance policy shall be assumed pursuant to the Plan.  In addition, after the Effective Date, all officers, directors, agents, or employees of the Debtors who served in such capacity at any time before the Effective Date shall be entitled to the full benefits of the Insurance Policies (including any "tail" policy) in effect or purchased as of the Effective Date for the full term of such policy regardless of whether such officers, directors, agents, and/or employees remain in such positions after the Effective Date, in each case, to the extent set forth in the Insurance Policies.

F. **Modifications, Amendments, Supplements, Restatements, or Other Agreements**

Modifications, amendments, supplements, and restatements to a prepetition Executory Contract and/or Unexpired Lease that have been executed by the Debtors during the Chapter 11 Cases shall not be deemed to alter the prepetition nature of the Executory Contract or Unexpired Lease.

G. **Nonoccurrence of Effective Date**

In the event that the Effective Date does not occur, the Bankruptcy Court shall retain jurisdiction with respect to any request to extend the deadline for assuming or rejecting Unexpired Leases pursuant to section 365(d)(4) of the Bankruptcy Code.

H. **Employee Compensation and Benefits.**

All employment policies, and all compensation and benefits plans, policies, and programs of the Debtors applicable to their respective employees, retirees, and nonemployee directors other than the Assumed Employee Plans, including all savings plans, retirement plans, healthcare plans, disability plans, severance benefit plans, incentive plans, and life, accidental death, and dismemberment insurance plans, are deemed to be, and shall be treated as, Executory Contracts under the Plan and, on the Effective Date, shall be rejected pursuant to sections 365 and 1123 of the Bankruptcy Code.  Each of the Assumed Employee Plans shall be treated as Executory Contracts under the Plan and, on the Effective Date, shall be assumed pursuant to sections 365 and 1123 of the Bankruptcy Code.

# ARTICLE VIII.
## PROVISIONS GOVERNING DISTRIBUTIONS

### A.     Distributions on Account of Claims Allowed as of the Effective Date.

As of the close of business on the Distribution Record Date, the various transfer registers for each of the Classes of Claims or Interests as maintained by the Debtors, or their respective agents, shall be deemed closed, and there shall be no further changes in the record holders of any of the Claims or Interests.  The Disbursing Agent shall have no obligation to recognize any ownership transfer of the Claims or Interests occurring on or after the Distribution Record Date.  The Disbursing Agent shall be entitled to recognize and deal for all purposes in the Plan only with those record holders stated on the transfer ledgers as of the close of business on the Distribution Record Date, to the extent applicable.

Except as otherwise provided herein, the Disbursing Agent shall make distributions to Holders of Allowed Claims as of the Distribution Record Date at the address for each such Holder as indicated on the Debtors' records as of the date of any such distribution; *provided*, that the manner of such distributions shall be determined at the discretion of the Disbursing Agent; *provided further*, that to the extent a Proof of Claim has been filed, the address for each Holder of an Allowed Claim shall be deemed to be the address set forth in any Proof of Claim Filed by that Holder.

### B.     Compliance with Tax Requirements.

In connection with the Plan, any Person issuing any instrument or making any distribution or payment in connection therewith, shall comply with all applicable withholding and reporting requirements imposed by any federal, state, or local taxing authority.  In the case of a non-Cash distribution that is subject to withholding, the distributing party may require the intended recipient of such distribution to provide the withholding agent with an amount of Cash sufficient to satisfy such withholding tax as a condition to receiving such distribution or withhold an appropriate portion of such distributed property and either (1) sell such withheld property to generate Cash necessary to pay over the withholding tax (or reimburse the distributing party for any advance payment of the withholding tax) or (2) pay the withholding tax using its own funds and retain such withheld property.  The distributing party shall have the right not to make a distribution under the Plan until its withholding or reporting obligation is satisfied pursuant to the preceding sentences.  Any amounts withheld pursuant to the Plan shall be deemed to have been distributed to and received by the applicable recipient for all purposes of the Plan.

Any party entitled to receive any property as an issuance or distribution under the Plan shall, upon request, deliver to the withholding agent or such other Person designated by the Plan Administrator the appropriate IRS Form or other tax forms or documentation requested by the Plan Administrator to reduce or eliminate any required federal, state, or local withholding.  If the party entitled to receive such property as an issuance or distribution fails to comply with any such request for a one hundred eighty (180) day period beginning on the date after the date such request is made, the amount of such issuance or distribution shall irrevocably revert to the Plan Administrator and any Claim in respect of such distribution under the Plan shall be forever barred from assertion against such Debtor, the Plan Administrator, or their respective property.

54

Notwithstanding the above, each Holder of an Allowed Claim or Interest that is to receive a distribution under the Plan shall have the sole and exclusive responsibility for the satisfaction and payment of any tax obligations imposed on such Holder by any Governmental Unit, including income, withholding, and other tax obligations, on account of such Plan Distribution.

**C.      Date of Distributions.**

Distributions made after the Effective Date to holders of Allowed Claims shall be deemed to have been made on the Effective Date and no interest shall accrue or be payable with respect to such Claims or any distribution related thereto.  In the event that any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on or as soon as reasonably practicable after the next succeeding Business Day, but shall be deemed to have been completed as of the required date.

**D.      Disbursing Agent.**

Except as may be otherwise provided in the Sale Order, all distributions under the Plan shall be made by the Disbursing Agent on and after the Effective Date and as provided in the Plan.  The Disbursing Agent shall not be required to give any bond or surety or other security for the performance of its duties.  The Debtors shall use commercially reasonable efforts to provide the Disbursing Agent with the amounts of Claims and the identities and addresses of Holders of Claims, in each case, as set forth in the Debtors' books and records.  The Debtors shall cooperate in good faith with the Disbursing Agent to comply with the reporting and withholding requirements outlined in the Plan.

**E.      Rights and Powers of Disbursing Agent.**

The Disbursing Agent may (1) effect all actions and execute all agreements, instruments, and other documents necessary to carry out the provisions of the Plan; (2) make all distributions contemplated hereby; and (3) perform such other duties as may be required of the Disbursing Agent pursuant to the Plan or as deemed by the Disbursing Agent to be necessary and proper to implement the provisions of the Plan.

**F.      Surrender of Instruments.**

As a condition precedent to receiving any distribution under the Plan, each holder of a certificated instrument or note must surrender such instrument or note held by it to the Plan Administrator or its designee.  Any holder of such instrument or note that fails to (1) surrender the instrument or note; or (2) execute and deliver an affidavit of loss or indemnity reasonably satisfactory to the Plan Administrator and furnish a bond in form, substance, and amount reasonably satisfactory to the Plan Administrator within six (6) months of being entitled to such distribution shall be deemed to have forfeited all rights and claims and may not participate in any distribution under the Plan.

G.      **Delivery of Distributions and Undeliverable or Unclaimed Distributions.**

Subject to applicable Bankruptcy Rules, all distributions to Holders of Allowed Claims shall be made by the Disbursing Agent, who shall transmit such distributions to the applicable Holders of Allowed Claims or their designees.

If any distribution to a holder of an Allowed Claim (1) is returned as undeliverable for lack of a current address or otherwise; or (2) is not cashed or otherwise presented for collection by the holder of the Allowed Claim within ninety (90) calendar days after the mailing of such distribution, the Plan Administrator shall be authorized to cancel such distribution check and file with the Bankruptcy Court the name and last known address of the holder of undeliverable distribution or uncashed distribution, as applicable.  If, after the passage of thirty (30) calendar days after such Filing, the payment or distribution on the Allowed Claim still cannot be made, then (1) the holder of such Claim shall cease to be entitled to the undeliverable distribution or uncashed distribution, which will revert to the Plan Administrator; and (2) the Allowed Claim of such holder shall be deemed disallowed and expunged for purposes of further distributions under the Plan.

H.      **Manner of Payment.**

Except as specifically provided herein, at the option of the Debtors or the Plan Administrator, as applicable, any Cash payment to be made under the Plan may be made by a check or wire transfer or as otherwise required or provided in applicable agreements or customary practices of the Debtors.

I.      **Foreign Currency Exchange Rate.**

As of the Effective Date, any Claim asserted in currency other than U.S. dollars shall be automatically deemed converted to the equivalent U.S. dollar value using the exchange rate for the applicable currency as published in *The Wall Street Journal*, on the Petition Date.

J.      **Setoffs and Recoupment.**

The Debtors and the Plan Administrator, pursuant to the Bankruptcy Code (including section 553 of the Bankruptcy Code), and applicable bankruptcy and/or non-bankruptcy law, without the approval of the Bankruptcy Court and upon no less than fourteen (14) calendar days' notice to the applicable Holder of a Claim, or as may be agreed to by the Holder of a Claim, may, but shall not be required to, set off against or recoup against any Allowed Claim and the distributions to be made pursuant to the Plan on account of such Allowed Claim, any claims of any nature whatsoever that the Debtors or their Estates may have against the Holder of such Allowed Claim; *provided*, that neither the failure to effect such a setoff or recoupment nor the allowance of any Claim in the Plan shall constitute a waiver or release by the Debtors or the Plan Administrator of any such claim the Debtors or their Estates may have against the holder of such Claim.

K.      **Minimum Distribution.**

No payment of Cash in an amount of less than one thousand U.S. dollars ($1,000.00) shall be required to be made on account of any Allowed Claim.  Such undistributed amount may instead be used in accordance with the Plan and the Wind-Down Budget.  If the Cash available for the final distribution is less than the cost to distribute such funds, the Plan Administrator may donate such funds to the unaffiliated charity of its choice.

L.      **Allocations.**

Except as otherwise provided in the Plan or as otherwise required by law, distributions with respect to an Allowed Claim shall be allocated first to the principal portion of such Allowed Claim (as determined for U.S. federal income tax purposes) and, thereafter, to the remaining portion of such Allowed Claim, if any.

M.      **Distributions Free and Clear.**

Except as otherwise provided in the Plan, any distribution or transfer made under the Plan, including distributions to any Holder of an Allowed Claim, shall be free and clear of any Liens, Claims, encumbrances, charges, and other interests, and no other entity shall have any interest, whether legal, beneficial, or otherwise, in property distributed or transferred pursuant to the Plan.

N.      **Claims Paid or Payable by Third Parties.**

1.      Claims Paid by Third Parties.

If a Holder of a Claim receives a payment or other satisfaction of its Claim other than through the Debtors, Wind-Down Debtors, Distribution Trustee, or Plan Administrator, as applicable, on account of such Claim, such Claim shall be reduced by the amount of such payment or satisfaction without an objection to such Claim having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court, and if the Claim was paid or satisfied in full other than through the Debtors, Wind-Down Debtors, Distribution Trustee, or Plan Administrator, as applicable, then such Claim shall be disallowed and any recovery in excess of a single recovery in full shall be paid over to the Plan Administrator without an objection to such Claim having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court.  To the extent a Holder of a Claim receives a distribution on account of such Claim and receives payment or satisfaction from a party that is not the Debtors, Wind-Down Debtors, Distribution Trustee, or Plan Administrator, as applicable, on account of such Claim, such Holder shall, within fourteen (14) calendar days of receipt thereof, repay or return the distribution to the Debtors, Wind-Down Debtors, Distribution Trustee, or Plan Administrator, as applicable, to the extent the Holder's total recovery on account of such Claim from the third party and under the Plan exceeds the amount of such Claim as of the date of any such distribution under the Plan.

### 2.     Claims Payable by Third Parties.

No distributions under the Plan shall be made on account of an Allowed Claim that is payable pursuant to one of the Debtors' or Wind-Down Debtors' as  applicable, Insurance Policies until the holder of such Allowed Claim has exhausted all remedies with respect to such Insurance Policy.  To the extent that one or more of the Debtors' or Wind-Down Debtors', as applicable, insurers agrees to satisfy in full or in part a Claim (if and to the extent adjudicated by a court of competent jurisdiction), then immediately upon such insurers' agreement, the applicable portion of such Claim may be expunged without an objection to such Claim having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court.

### 3.     Applicability of Insurance Policies.

Except as otherwise provided in the Plan, distributions to Holders of Allowed Claims shall be in accordance with the provisions of any applicable insurance policy.  Except as set forth in Article IX of the Plan, nothing in the Plan shall constitute or be deemed a waiver of any Cause of Action that the Debtors or any Entity, including the Wind-Down Debtors and the Plan Administrator, may hold against any other Entity, including insurers under any policies of insurance, nor shall anything contained herein constitute or be deemed a waiver by such insurers of any defenses, including coverage defenses, held by such insurers.

## ARTICLE IX.
## PROCEDURES FOR RESOLVING CONTINGENT, UNLIQUIDATED, AND DISPUTED CLAIMS

### A.     Allowance of Claims.

After the Effective Date, the Plan Administrator or Distribution Trustee, as applicable, shall have and retain any and all rights and defenses that the Debtor had with respect to any Claim or Interest immediately prior to the Effective Date.

### B.     Claims Administration Responsibilities.

Except as otherwise specifically provided in the Plan, after the Effective Date, the Plan Administrator or Distribution Trustee, as applicable, shall have the sole authority to: (1) File, withdraw, or litigate to judgment, objections to Claims or Interests; (2) settle or compromise any Disputed Claim without any further notice to or action, order, or approval by the Bankruptcy Court; and (3) administer and adjust the Claims Register to reflect any such settlements or compromises without any further notice to or action, order, or approval by the Bankruptcy Court.

### C.     Estimation of Claims and Interests.

Before or after the Effective Date, the Debtors, Distribution Trustee, or Plan Administrator, as applicable, may (but are not required to) at any time request that the Bankruptcy Court estimate any Disputed Claim that is contingent or unliquidated pursuant to section 502(c) of the Bankruptcy Code for any reason, regardless of whether any party previously has objected to such Claim or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court shall retain jurisdiction to estimate any such Claim,

including during the litigation of any objection to any Claim or during the appeal relating to such objection.

Notwithstanding any provision otherwise herein, a Claim that has been expunged or disallowed from the Claims Register, but that either is subject to appeal or has not been the subject of a Final Order, shall be deemed to be estimated at zero dollars ($0.00) unless otherwise ordered by the Bankruptcy Court.  In the event that the Bankruptcy Court estimates any contingent or unliquidated Claim, that estimated amount shall constitute a maximum limitation on such Claim for all purposes under the Plan (including for purposes of distributions), and the Debtors, Distribution Trustee, or Plan Administrator, as applicable, may elect to pursue any supplemental proceedings to object to any ultimate distribution on such Claim.

### D.      Adjustment to Claims or Interests Without Objection.

Any Claim that has been paid, satisfied, or assumed by Purchasers in the Sale Transactions, or any Claim that has been amended or superseded, may be adjusted or expunged on the Claims Register by the Debtors, Distribution Trustee, or Plan Administrator, as applicable, without an objection to such Claim having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court.

### E.      Time to File Objections to Claims.

Except as otherwise provided herein, any objections to Claims shall be Filed on or before the Claims Objection Bar Date (as such date may be extended upon presentment of an order to the Bankruptcy Court by the Debtors, Distribution Trustee, or Plan Administrator, as applicable).

### F.      Disallowance of Claims or Interests.

Except as otherwise expressly set forth herein, all Claims and Interests of any Entity from which property is sought by the Debtors under sections 542, 543, 550, or 553 of the Bankruptcy Code or that the Debtors, Distribution Trustee, or Plan Administrator, as applicable, allege is a transferee of a transfer that is avoidable under sections 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of the Bankruptcy Code shall be disallowed if: (1) the Entity, on the one hand, and the Debtors, Distribution Trustee, or Plan Administrator, as applicable, on the other hand, agree or the Bankruptcy Court has determined by Final Order that such Entity or transferee is liable to turn over any property or monies under any of the aforementioned sections of the Bankruptcy Code; and (2) such Entity or transferee has failed to turn over such property by the date set forth in such agreement or final order.

### G.      Disallowance of Late Claims.

Except as provided in the Plan or otherwise agreed to by the Debtors, Wind-Down Debtors, Distribution Trustee, or the Plan Administrator, as applicable, any holder of a Claim Filed via Proof of Claim after the Bar Date shall not receive any distributions on account of such Claims, unless on or before the Confirmation Hearing such late Claim has been deemed timely Filed by a Final Order.

### H.     Disputed Claims Process.

All Claims held by Persons or Entities against whom or which the Debtor has commenced a proceeding asserting a Cause of Action under sections 542, 543, 544, 545, 547, 548, 549, or 550 of the Bankruptcy Code or that is a transferee of a transfer avoidable under section 522(f), 522(h), 544, 545, 548, 549 or 724(a) of the Bankruptcy Code shall be deemed Disputed Claims pursuant to section 502(d) of the Bankruptcy Code and holders of such Claims shall not be entitled to vote to accept or reject the Plan. A Claim deemed Disputed pursuant to Article VII.I of the Plan shall continue to be Disputed for all purposes until the relevant proceeding against the Holder of such Claim has been settled or resolved by a Final Order and any sums due to the Debtors, Wind-Down Debtors, Distribution Trustee, or the Plan Administrator, as applicable, from such holder have been paid.

### I.     Amendments to Claims.

Except as provided in the Plan, on or after the Effective Date, without the prior authorization of the Bankruptcy Court or the Plan Administrator, a Claim may not be Filed or amended and any such new or amended Claim Filed shall be deemed disallowed in full and expunged without any further notice to or action, order, or approval of the Bankruptcy Court.

### J.     No Distributions Pending Allowance.

If an objection to a Claim, Proof of Claim, or portion thereof is Filed, no payment or distribution provided under the Plan shall be made on account of such Claim, Proof of Claim, or portion thereof unless and until the Disputed Claim becomes an Allowed Claim.

### K.     Distributions After Allowance.

To the extent that a Disputed Claim ultimately becomes an Allowed Claim, distributions shall be made to the Holder of such Allowed Claim in accordance with the provisions of the Plan. As soon as practicable after the date that the order or judgment of the Bankruptcy Court allowing any Disputed Claim becomes a Final Order, the Disbursing Agent shall provide to the Holder of such Claim the distribution to which such Holder is entitled under the Plan as of the Effective Date, without any interest, dividends, or accruals to be paid on account of such Claim. No interest shall accrue or be paid on any Claim with respect to the period from the Effective Date to the date a final distribution is made on account of such Claim.

## ARTICLE X.
## CONDITIONS PRECEDENT TO THE EFFECTIVE DATE

### L.     Conditions Precedent to the Effective Date.

The occurrence of the Effective Date of the Plan is subject to each of the following conditions precedent:

      1.     The Bankruptcy Court shall have entered the DIP Orders, and the DIP Orders shall not have been vacated, stayed, or modified without the prior written consent of the

DIP Agent, and there shall be no default or event of default existing under the DIP Credit Agreement.

2. All of the DIP Claims, including the DIP Secured Party Expenses, shall have been paid in full in accordance with the terms and conditions set forth in the DIP Orders and Article II of the Plan.

3. The Bankruptcy Court shall have approved the Disclosure Statement as containing adequate information with respect to the Plan within the meaning of section 1125 of the Bankruptcy Code.

4. The Bankruptcy Court shall have entered the Confirmation Order, which shall not have been stayed, reversed, vacated, amended, supplemented, or otherwise modified.

5. The Plan Administrator shall have been appointed and accepted his or her appointment.

6. The Distribution Trust Agreement shall have been executed and the Distribution Trust Assets shall have irrevocably vested or be deemed to have vested in the Distribution Trust.

7. All requisite filings with governmental authorities and third parties shall have become effective, and all such governmental authorities and third parties shall have approved or consented to the transactions contemplated in the Plan, to the extent required.

8. All documents contemplated hereby to be executed and delivered on or before the Effective Date shall have been executed and delivered.

9. All statutory fees and obligations then due and payable to the U.S. Trustee shall have been paid in full.

10. The Administrative and Priority Claims Reserve shall not exceed the Administrative and Priority Claims Reserve Cap.

11. The Professional Fee Reserve shall have been fully funded pursuant to the terms of the Plan.

**M.     Waiver of Conditions.**

Unless otherwise specifically provided for in the Plan, the conditions set forth in Article VIII.A of the Plan may be waived, in whole or in part, in writing by the Debtors and, with respect to VIII.A.1–2, the DIP Agent, and with respect to VIII.A.10, the Plan Sponsor, each in their respective sole and absolute discretion, without notice to any other parties in interest or the Bankruptcy Court and without a hearing.

## ARTICLE XI.
## RELEASE, INJUNCTION, AND RELATED PROVISIONS

**A.      Debtors Releases.**

**Effective as of the Effective Date, pursuant to Section 1123(b) of the Bankruptcy Code, to the fullest extent allowed by applicable law, each Released Party is hereby deemed conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged by each and all of the Debtors, their Estates, and the Wind-Down Debtors, in each case on behalf of themselves and their respective successors, assigns, and representatives, and any and all other Entities who may purport to assert any claim or Cause of Action, directly or derivatively, by, through, for, or because of the foregoing Entities, from any and all claims and Causes of Action, and liabilities whatsoever, including any derivative claims, asserted by or assertable on behalf of any of the Debtors, their Estates, or the Wind-Down Debtors, as applicable, whether known or unknown, foreseen or unforeseen, matured or unmatured, suspected or unsuspected, existing or hereinafter arising, contingent or non-contingent, liquidated or unliquidated, secured or unsecured, assertable, directly or derivatively, in law (or any applicable rule, statute, regulation, treaty, right, duty or requirement), equity, contract, tort, or otherwise, that the Debtors, their Estates, or the Wind-Down Debtors would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim against, or Interest in, a Debtor or other Entity, or that any Holder of any Claim against, or Interest in, a Debtor or other Entity could have asserted on behalf of the Debtors, based on or relating to, or in any manner arising from, in whole or in part, the Debtor-Related Matters.  Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release (1) any obligations arising pursuant to or after the Effective Date of any party or Entity under the Plan, the Accelerated Payment Procedures, the Confirmation Order, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan; or (2) any Causes of Action included as a Retained Cause of Action, including the Avoidance Actions, or (3) any claims related to any act or omission that is determined in a Final Order by a court of competent jurisdiction to have constituted bad faith, fraud, willful misconduct, or gross negligence, but in all respects such Entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan.**

**Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the Debtor Releases, which include by reference each of the related provisions and definitions contained in the Plan and, further, shall constitute the Bankruptcy Court's finding that the Debtor Releases are:  (1) in exchange for the good and valuable consideration provided by the Released Parties; (2) a good faith settlement and compromise of the claims or Causes of Action released by the Debtor Releases; (3) in the best interests of the Debtors, the Estates, and all Holders of Claims and Interests; (4) fair, equitable, and reasonable; (5) given and made after reasonable investigation by the Debtors and after due notice and opportunity for hearing; and (6) a bar to any of the Debtors, their Estates, or the Wind-Down Debtors, as applicable, asserting any claim or Cause of Action released pursuant to the Debtor Releases.**

B.      **Third Party Releases.**

Effective as of the Effective Date, each of the Releasing Parties shall be deemed to have conclusively, absolutely, unconditionally, irrevocably, and forever, released and discharged each of the Released Parties from any and all claims, Causes of Action, and liabilities whatsoever, whether known or unknown, foreseen or unforeseen, matured or unmatured, suspected or unsuspected, existing or hereinafter arising, contingent or non-contingent, liquidated or unliquidated, secured or unsecured, assertable, directly or derivatively, in law (or any applicable rule, statute, regulation, treaty, right, duty or requirement), equity, contract, tort, or otherwise, that such Releasing Party would have been legally entitled to assert in its own right (whether individually or collectively) or otherwise based on or relating to, or in any manner arising from, in whole or in part, the Debtor-Related Matters.  Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release (1) any obligations arising pursuant to or after the Effective Date of any party or Entity under the Plan, the Accelerated Payment Procedures, the Confirmation Order, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan; (2) any Causes of Action included as a Retained Cause of Action; or (3) actual fraud, willful misconduct, or gross negligence as determined by a Final Order.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the Third Party Release, which includes by reference each of the related provisions and definitions contained in the Plan, and, further, shall constitute the Bankruptcy Court's finding that the Third Party Release is:  (1) consensual; (2) essential to the confirmation of the Plan; (3) given in exchange for the good and valuable consideration provided by the Released Parties, including the Released Parties' contributions to facilitating the restructuring and implementing the Plan; (4) a good faith settlement and compromise of the claims or Causes of Action released by the Third Party Release; (5) in the best interests of the Debtors and their Estates; (6) fair, equitable, and reasonable; (7) given and made after due notice and opportunity for hearing; and (8) a bar to any of the Releasing Parties asserting any claim or Cause of Action released pursuant to the Third Party Release.

C.      **Exculpations.**

Effective as of the Effective Date, to the fullest extent permissible under applicable law and without affecting or limiting either the Debtor Releases or the Third Party Release, and except as otherwise specifically provided in the Plan or the Confirmation Order, no Exculpated Party shall have or incur liability for, and each Exculpated Party hereby is exculpated from any claim or Cause of Action related to, any act or omission in connection with, relating to, or arising out of the negotiation, solicitation, confirmation, execution, or implementation of, as applicable, the Debtor-Related Matters, except for claims related to any act or omission that is determined in a Final Order by a court of competent jurisdiction to have constituted bad faith, fraud, willful misconduct, or gross negligence, but in all respects such Entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan. Notwithstanding anything to the contrary in the foregoing, an Exculpated Party shall be

entitled to exculpation solely for actions taken from the Petition Date through the Effective Date, and the exculpation set forth above does not exculpate (1) any obligations arising pursuant to or after the Effective Date of any party or Entity under the Plan, the Accelerated Payment Procedures, the Confirmation Order, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan; or (2) any Causes of Action included as a Retained Cause of Action.

D.      **Injunction.**

Except as otherwise expressly provided in the Plan or for obligations issued or required to be paid pursuant to the Plan, the Accelerated Payment Procedures, or the Confirmation Order, all Entities that have held, hold, or may hold claims or interests that have been released pursuant to the Plan provisions setting forth the releases granted by the Debtors or the Releasing Parties, or are subject to exculpation pursuant to the article of the Plan which provides for the exculpation of the Exculpated Parties shall be permanently enjoined, from and after the Effective Date, from taking any of the following actions against, as applicable, the Debtors, Wind-Down Debtors, or the Exculpated Parties: (1) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such claims or interests; (2) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against such Entities on account of or in connection with or with respect to any such claims or interests; (3) creating, perfecting, or enforcing any lien or encumbrance of any kind against such Entities or the property or the estates of such Entities on account of or in connection with or with respect to any such claims or interests; (4) asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from such Entities or against the property of such Entities on account of or in connection with or with respect to any such Claims or Interests unless such Entity has, on or before the Effective Date, asserted such setoff right in a document filed with the Bankruptcy Court explicitly preserving such setoff, and notwithstanding an indication of a Claim or Interest or otherwise that such Entity asserts, has, or intends to preserve any right of setoff pursuant to applicable law or otherwise; and (5) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such claims or interests released or settled pursuant to the Plan.

Upon the Bankruptcy Court's entry of the Confirmation Order, all Holders of Claims and Interests and other parties in interest, along with their respective present or former employees, agents, officers, directors, or principals, shall be enjoined from taking any actions to interfere with the implementation or consummation of the Plan by the Debtors, the Wind-Down Debtors, the Plan Administrator, and their respective affiliates, employees, advisors, officers and directors, or agents.

E.      **Release of Liens.**

Except as otherwise provided in the Plan or in any contract, instrument, release, or other agreement or document created pursuant to the Plan, on the Effective Date and concurrently with the applicable distributions made pursuant to the Plan, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estate shall be fully released and

discharged, and all of the right, title, and interest of any holder of such mortgages, deeds of trust, Liens, pledges, or other security interests shall revert to the Debtors and their successors and assigns.

If any Holder of an Other Secured Claim or any agent for such Holder has filed or recorded publicly any Liens and/or security interests to secure such Holder's Other Secured Claim, as soon as practicable on or after the Effective Date, such Holder (or the agent for such holder) shall take any and all steps requested by the Plan Administrator that are necessary or desirable to record or effectuate the cancellation and/or extinguishment of such Liens and/or security interests, including the making of any applicable filings or recordings, and the Plan Administrator shall be entitled to make any such filings or recordings on such holder's behalf.

## F.     **Gatekeeper Provision.**

No party may commence, continue, amend, or otherwise pursue, join in, or otherwise support any other party commencing, continuing, amending, or pursuing, a Cause of Action of any kind against the Released Parties or the Exculpated Parties that relates to, or is reasonably likely to relate to any act or omission in connection with, relating to, or arising out of, a Cause of Action subject to Article IX.A, Article IX.B, and Article IX.C without first (1) requesting a determination from the Bankruptcy Court, after notice and a hearing, that such Cause of Action represents a colorable claim against a Released Party or Exculpated Party, and is not a Claim that the Debtors released under the Plan, which request must attach the complaint or petition proposed to be filed by the requesting party; and (2) obtaining from the Bankruptcy Court specific authorization for such party to bring such Cause of Action against any such Released Party or Exculpated Party.  Any party that obtains such determination and authorization and subsequently wishes to amend the authorized complaint or petition to add any Causes of Action not explicitly included in the authorized complaint or petition must obtain authorization from the Bankruptcy Court before filing any such amendment in the court where such complaint or petition is pending.  The Bankruptcy Court will have sole and exclusive jurisdiction to determine whether a Cause of Action is colorable and, only to the extent legally permissible, will have jurisdiction to adjudicate the underlying colorable Cause of Action.

## ARTICLE XII.
## RETENTION OF JURISDICTION

On and after the Effective Date, the Bankruptcy Court shall retain exclusive jurisdiction, pursuant to 28 U.S.C. §§ 1334 and 157, over all matters arising in or related to the Chapter 11 Cases for, among other things, the following purposes:

1.      Allow, disallow, determine, liquidate, classify, estimate, or establish the priority, secured or unsecured status, or amount of any Claim or Interest, including the resolution of any request for payment of any Administrative Claim and the resolution of any and all objections to the secured or unsecured status, priority, amount, or allowance of Claims or Interests.

2.      Resolve any cases, controversies, suits, or disputes that may arise in connection with Claims, including Claim objections, allowance, disallowance, subordination, estimation, and distribution.

3. Decide and resolve all matters related to the granting and denying, in whole or in part of, any applications for allowance of compensation or reimbursement of expenses to Professionals authorized pursuant to the Bankruptcy Code or the Plan.

4. Resolve any matters related to: (a) the assumption or assumption and assignment of any Executory Contract or Unexpired Lease to which a Debtor is party or with respect to which a Debtor may be liable and to hear, determine, and, if necessary, liquidate, any cure amount arising therefrom; and/or (b) any dispute regarding whether a contract or lease is or was executory or expired.

5. Adjudicate, decide, or resolve any motions, adversary proceedings, contested, or litigated matters, and any other matters, and grant or deny any applications involving the Debtors that may be pending on the Effective Date.

6. Adjudicate, decide, or resolve any and all matters related to section 1141 of the Bankruptcy Code.

7. Adjudicate, decide, or resolve any motions, adversary proceedings, contested, or litigated matters.

8. Enter and implement such orders as may be necessary or appropriate to execute, implement, or consummate the provisions of the Plan and all contracts, instruments, releases, and other agreements or documents created in connection with the Plan or the Disclosure Statement.

9. Resolve any cases, controversies, suits, disputes, or Causes of Action that may arise in connection with the interpretation or enforcement of the Plan or any Entity's obligations incurred in connection with the Plan.

10. Issue injunctions, enter and implement other orders or take such other actions as may be necessary or appropriate to restrain interference by any Entity with enforcement of the Plan.

11. Resolve any cases, controversies, suits, disputes, or Causes of Action with respect to the releases, injunctions, and other provisions contained in the Plan and enter such orders as may be necessary or appropriate to implement such releases, injunctions, and other provisions.

12. Enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason modified, stayed, reversed, revoked, or vacated.

13. Determine any other matters that may arise in connection with or related to the DIP Loan Documents, the Sale Documents, the Disclosure Statement, the Plan, and the Confirmation Order.

14. Ensure that distributions to holders of Allowed Claims are accomplished pursuant to the provisions of the Plan.

15.     Resolve any cases, controversies, suits, disputes, or Causes of Action with respect to the repayment or return of distributions and the recovery of additional amounts owed by any holder for amounts not timely repaid.

16.     Adjudicate any and all disputes arising from or relating to distributions under the Plan.

17.     Consider any modifications of the Plan, to cure any defect or omission, or to reconcile any inconsistency in any Bankruptcy Court order, including the Confirmation Order.

18.     Hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of the Plan or the Confirmation Order.

19.     Hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code.

20.     To recover all assets of the Debtors and property of the Debtors' Estates, wherever located.

21.     To hear and determine any Causes of Action that may be brought by the Plan Administrator.

22.     To hear and determine any other rights, claims, or Causes of Action held by or accruing to the Debtors Distribution Trustee, or the Plan Administrator, as applicable, pursuant to the Bankruptcy Code or any applicable state or federal statute or legal theory.

23.     Adjudicate, decide, or resolve any and all matters related to the Distribution Trust or the Distribution Trust Assets.

24.     Enter an order or final decree concluding or closing the Chapter 11 Cases.

25.     Enforce all orders previously entered by the Bankruptcy Court.

26.     Hear any other matter over which the Court has jurisdiction.

## ARTICLE XIII.
## MISCELLANEOUS PROVISIONS

### A.     Modification and Amendment.

The Plan may be amended, modified, or supplemented by the Debtors in the manner provided for by section 1127 of the Bankruptcy Code or as otherwise permitted by law, without additional disclosure pursuant to section 1125 of the Bankruptcy Code.  In addition, after the Confirmation Date, the Debtors may remedy any defect or omission or reconcile any inconsistencies in the Plan or the Confirmation Order with respect to such matters as may be necessary to carry out the purposes of effects of the Plan, and any Holder of a Claim or Interest that has accepted the Plan shall be deemed to have accepted the Plan as amended, modified, or supplemented.

**B.** **Effects of Confirmation on Modification.**

Entry of the Confirmation Order shall mean that all modifications or amendments to the Plan since the solicitation thereof are approved pursuant to section 1127(a) of the Bankruptcy Code and do not require additional disclosure or re-solicitation under Bankruptcy Rule 3019.

**C.** **Revocation or Withdrawal of Plan.**

The Debtors reserve the right to revoke or withdraw the Plan prior to the Effective Date as to any or all of the Debtors.  If, with respect to a Debtor, the Plan has been revoked or withdrawn prior to the Effective Date, or if confirmation or the occurrence of the Effective Date as to such Debtor does not occur on the Effective Date, then, with respect to such Debtor (1) the Plan shall be null and void in all respects; (2) any settlement or compromise embodied in the Plan (including the fixing or limiting to an amount any Claim or Interest or Class of Claims or Interests), assumption or rejection of executory contracts or unexpired leases affected by the Plan, and any document or agreement executed pursuant to the Plan shall be deemed null and void; and (3) nothing contained in the Plan shall (a) constitute a waiver or release of any Claim by or against, or any Interest in, such Debtor or any other Person, (b) prejudice in any manner the rights of such Debtor or any other Person, or (c) constitute an admission of any sort by any Debtor or any other Person.

**D.** **Immediate Binding Effect.**

Notwithstanding Bankruptcy Rules 3020(e), 6004(h), 7062, or otherwise, upon the occurrence of the Effective Date, the terms of the Plan shall be immediately effective and enforceable and deemed binding upon and inure to the benefit of the Debtors, Distribution Trustee, or Plan Administrator, as applicable, the holders of Claims and Interests, the Released Parties, and each of their respective successors and assigns.  Any action to be taken on the Effective Date may be taken on or as soon as reasonably practicable thereafter.

**E.** **Additional Documents.**

On or before the Effective Date, the Debtors may File with the Bankruptcy Court such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan.  The Debtors, Distribution Trustee, or Plan Administrator, as applicable, and all Holders of Claims or Interests receiving distributions pursuant to the Plan and all other parties in interest shall, from time to time, prepare, execute, and deliver any agreements or documents and take any other actions as may reasonably be necessary or advisable to effectuate the provisions and intent of the Plan or the Confirmation Order.

**F.** **Substantial Consummation.**

On the Effective Date, the Plan shall be deemed to be substantially consummated (within the meaning set forth in section 1101 of the Bankruptcy Code) pursuant to section 1127(b) of the Bankruptcy Code.

### G.     Reservation of Rights.

The Plan shall have no force or effect unless and until the Bankruptcy Court enters the Confirmation Order.  None of the Filing of the Plan, any statement or provision contained in the Plan, or the taking of any action by the Debtors with respect to the Plan, the Disclosure Statement, or the Plan Supplement shall be or shall be deemed to be an admission or waiver of any rights of the Debtors with respect to the Holders of Claims or Interests prior to the Effective Date.

### H.     Successors and Assigns.

The rights, benefits, and obligations of any Entity named or referred to in the Plan shall be binding on, and shall inure to the benefit of any heir, executor, administrator, successor or assign, beneficiaries or guardian, if any, of each Entity.

### I.     Determination of Tax Liabilities.

As of the Effective Date, the Plan Administrator (to the extent not the responsibility of the Purchasers) will be responsible for preparing and filing any tax forms or returns on behalf of the Debtors' or Wind-Down Debtors' Estates; *provided*, that the Plan Administrator shall not be responsible for preparing or filing any tax forms for Holders of Interests in the Debtors, but shall provide such Holders with any information reasonably required to prepare such forms.  The Debtors, the Plan Administrator, and the Distribution Trust shall have the right to request an expedited determination of any tax liability pursuant to section 505 of the Bankruptcy Code, including on any unpaid liability of the Debtors' or Wind-Down Debtors' Estates for any tax incurred during the administration of these Chapter 11 Cases.

### J.     Notices.

In order for all notices, requests, and demands to or upon the Debtors, Distribution Trustee, or Plan Administrator, as applicable, to be effective such notices, requests and demands shall be in writing (including by electronic mail) and, unless otherwise expressly provided herein, shall be deemed to have been duly given or made when actually delivered or, in the case of notice by email, when received, and served on or delivered to the following parties:

| Debtors | Counsel to the Debtors |
|---|---|
| Conn's, Inc.<br>10077 Grogan's Mill Road, Suite 303<br>The Woodlands, TX 77380<br>Attention: Mark Renzi<br>Email: mrenzi@thinkbrg.com | Sidley Austin LLP<br>1000 Louisiana Street, Suite 5900<br>Houston, TX 77002<br>Attention: Duston McFaul<br>Email: DMcfaul@sidley.com |
| **Plan Administrator** | **Distribution Trustee** |
| To be included in the Plan Supplement. | To be included in the Plan Supplement. |

After the Effective Date, Persons, or Entities that wish to continue to receive documents pursuant to Bankruptcy Rule 2002 must File a renewed request to receive documents pursuant to Bankruptcy Rule 2002.  After the Effective Date, the Plan Administrator is authorized to limit the list of Entities receiving documents pursuant to Bankruptcy Rule 2002 to those Entities that Filed such renewed requests.

### K.      Term of Injunctions or Stays.

Except as otherwise provided in the Plan, to the maximum extent permitted by applicable law and subject to the Bankruptcy Court's post-confirmation jurisdiction to modify the injunctions and stays under the Plan (1) all injunctions with respect to or stays against an action against property of the Debtors or the Debtors' Estates arising under or entered during the Chapter 11 Cases under sections 105 or 362 of the Bankruptcy Code, and in existence on the date the Confirmation Order is entered, shall remain in full force and effect until such property is no longer property of the Debtors or the Debtors' Estates; and (2) all other injunctions and stays arising under or entered during the Chapter 11 Cases under sections 105 or 362 of the Bankruptcy Code shall remain in full force and effect until the earliest of (a) the date that the Chapter 11 Cases are closed pursuant to a final order of the Bankruptcy Court, or (b) the date that the Chapter 11 Cases are dismissed pursuant to a final order of the Bankruptcy Court.  All injunctions or stays contained in the Plan or the Confirmation Order shall remain in full force and effect indefinitely.

### L.      Entire Agreement.

On the Effective Date, the Plan and the Plan Supplement supersede all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, all of which have become merged and integrated into the Plan.

### M.      Plan Supplement.

All exhibits and documents included in the Plan Supplement are incorporated into and are a part of the Plan as if set forth in full in the Plan.  Copies of such exhibits and documents shall be made available upon written request to the Debtors' counsel or the Plan Administrator's counsel (as applicable) at the address above or by downloading such exhibits and documents free of charge from the Notice and Claims Agent's website.  All documents in the Plan Supplement are considered an integral part of the Plan and shall be deemed approved by the Bankruptcy Court pursuant to the Confirmation Order.

### N.      Governing Law.

Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and Bankruptcy Rules) or unless otherwise specifically stated, the laws of the State of Delaware, without giving effect to the principles of conflict of laws, shall govern the rights, obligations, construction, and implementation of the Plan, any agreements, documents, instruments, or contracts executed or entered into in connection with the Plan (except as otherwise set forth in those agreements, in which case the governing law of such agreement shall control), and corporate governance matters.

O.      **Nonseverability of Plan Provisions.**

If any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as altered or interpreted.  Notwithstanding any such holding, alteration, or interpretation, the remainder of the terms and provisions of the Plan will remain in full force and effect and will in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation.

The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is the following: (1) valid and enforceable pursuant to its terms; (2) integral to the Plan and may not be deleted or modified without the consent of the Debtors, Distribution Trustee, or the Plan Administrator, as applicable; and (3) nonseverable and mutually dependent.

## ARTICLE XIV.
## RISK FACTORS

Prior to voting on the Plan, Holders of Claims in Classes 4, 5, and 6, as well as entities in non-voting Classes, should consider carefully the risk factors described below, as well as all of the information contained in this Disclosure Statement, including the Exhibits hereto.  These risk factors should not, however, be regarded as constituting the only risks involved in connection with the Plan and its implementation.  See Article XV of this Disclosure Statement for a discussion of tax law considerations.

A.      **Bankruptcy Law Considerations.**

The occurrence or non-occurrence of any or all of the following contingencies, and any others, could affect distributions available to holders of Allowed Claims under the Plan but will not necessarily affect the validity of the vote of the Impaired Classes to accept or reject the Plan or necessarily require a re-solicitation of the votes of holders of Claims in such Impaired Classes.

1.      The Amounts of Allowed Claims May Adversely Affect the Recovery of Some Holders of Allowed Claims.

If the transactions contemplated in the Plan are not implemented, the Debtors will consider all available restructuring alternatives, including filing an alternative chapter 11 plan, converting to a chapter 7 plan, and any other transaction that would maximize the value of the Debtors' Estates.  The terms of any alternative restructuring proposal may be less favorable to holders of Claims against and Interests in the Debtors than the terms of the Plan as described in this Disclosure Statement.

Any material delay in the Confirmation of the Plan, the Chapter 11 Cases, or the threat of rejection of the Plan by the Bankruptcy Court would add substantial expense and uncertainty to the process.

71

The uncertainty surrounding a prolonged restructuring would have other adverse effects on the Debtors.  For example, it would adversely affect:

- The Debtors' liquidity;

- How the Debtors' businesses are viewed by regulators, investors, lenders, and credit ratings agencies; and

- The Debtors' business relationships with customers and vendors.

      **2.**    <u>Parties in Interest May Object to the Plan's Classification of Claims and Interests</u>.

There is no guarantee that the Bankruptcy Court will agree with the classification of Claims and Interests as proposed by the Plan.  Section 1122 of the Bankruptcy Code provides that a chapter 11 plan may place a claim or an equity interest in a particular class only if that claim or interest is substantially similar to the other claims or interests in that class.  As is described herein, the Debtors believes that the Plan's classification of Claims and Interests complies with the requirements under the Bankruptcy Code.  Nevertheless, there can be no assurance that the Bankruptcy Court will reach the same conclusion.

      **3.**    <u>The Conditions Precedent to the Effective Date of the Plan May Not Occur</u>.

As more fully set forth in Article VIII of the Plan, the confirmation and Effective Date of the Plan are subject to a number of conditions precedent.  If such conditions precedent are not waived or not met, the confirmation and Effective Date of the Plan will not take place.  In the event that the Effective Date does not occur, the Debtors may seek confirmation of a new plan or be forced to pivot to a chapter 7 liquidation.

      **4.**    <u>The Debtors May Fail to Satisfy the Vote Requirements</u>.

If votes are received in number and amount sufficient to enable the Bankruptcy Court to confirm the Plan, the Debtors intend to seek, as promptly as practicable thereafter, confirmation of the Plan.  In the event that sufficient votes are not received, the Debtors may need to seek to confirm an alternative chapter 11 plan or transaction.  There can be no assurance that the terms of any such alternative chapter 11 plan or other transaction would be similar or as favorable to the holders of Interests and Allowed Claims as those proposed in the Plan, and the Debtors do not believe that any such transaction exists or is likely to exist that would be more beneficial to the Estates than the Plan.

      **5.**    <u>The Debtors May Not Be Able to Secure Confirmation of the Plan</u>.

There is no guarantee that the Plan will be confirmed.  If the Plan, or a substantially similar plan, is not confirmed, the terms and timing of any plan of distribution ultimately confirmed in the Chapter 11 Cases, and the treatment of Claims and Interest will be unknown.  In addition, if the Plan is not confirmed, a significant risk exists that the Chapter 11 Cases may be

converted to cases under chapter 7. In that event, the Debtors believe that creditor recoveries would be substantially diminished.

### 6. The Debtors May Not Be Able to Secure Nonconsensual Confirmation Over Certain Impaired Non-Accepting Classes.

In the event that any impaired class of claims or interests does not accept a chapter 11 plan, a bankruptcy court may nevertheless confirm a plan at the proponents' request if at least one impaired class (as defined under section 1124 of the Bankruptcy Code) has accepted the plan (with such acceptance being determined without including the vote of any "insider" in such class), and, as to each impaired class that has not accepted the plan, the bankruptcy court determines that the plan "does not discriminate unfairly" and is "fair and equitable" with respect to the dissenting impaired class(es). The Debtors believe that the Plan satisfies these requirements, and the Debtors may request such nonconsensual Confirmation in accordance with subsection 1129(b) of the Bankruptcy Code. Nevertheless, there can be no assurance that the Bankruptcy Court will reach this conclusion. In addition, the pursuit of nonconsensual confirmation or Consummation of the Plan may result in, among other things, increased expenses relating to professional compensation.

### 7. The Chapter 11 Cases May Be Converted to Cases Under Chapter 7 of the Bankruptcy Code.

If the Bankruptcy Court finds that it would be in the best interest of creditors and/or the debtor in a chapter 11 case, the Bankruptcy Court may convert a chapter 11 bankruptcy case to a case under chapter 7 of the Bankruptcy Code. In such event, a chapter 7 trustee would be appointed or elected to liquidate the debtor's assets for distribution in accordance with the priorities established by the Bankruptcy Code. The Debtors believe that liquidation under chapter 7 would result in significantly smaller distributions being made to creditors than those provided for in the Plan because of (a) additional administrative expenses involved in the appointment of a chapter 7 trustee, and (b) additional expenses and Claims, some of which would be entitled to priority, that would be generated during the liquidation.

### 8. The Debtors May Object to the Amount or Classification of a Claim.

Except as otherwise provided in the Plan, the Debtors reserve the right to object to the amount or classification of any Claim under the Plan. The estimates set forth in this Disclosure Statement cannot be relied upon by any Holder of a Claim where such Claim is subject to an objection. Any Holder of a Claim that is subject to an objection thus may not receive its expected share of the estimated distributions described in this Disclosure Statement.

### 9. Contingencies Could Affect Votes of Impaired Classes to Accept or Reject the Plan.

The distributions available to Holders of Allowed Claims under the Plan can be affected by a variety of contingencies, including, without limitation, whether the Bankruptcy Court orders certain Allowed Claims to be subordinated to other Allowed Claims. The occurrence of any and all such contingencies, which could affect distributions available to Holders of Allowed Claims

73

under the Plan, will not affect the validity of the vote taken by the Impaired Classes to accept or reject the Plan or require any sort of revote by the Impaired Classes.

The estimated Claims and creditor recoveries set forth in this Disclosure Statement are based on various assumptions, and the actual Allowed amounts of Claims may significantly differ from the estimates. Should one or more of the underlying assumptions ultimately prove to be incorrect, the actual Allowed amounts of Claims may vary from the estimated Claims contained in this Disclosure Statement. Moreover, the Debtors cannot determine with any certainty at this time, the number or amount of Claims that will ultimately be Allowed. Such differences may materially and adversely affect, among other things, the percentage recoveries to Holders of Allowed Claims under the Plan.

          **10.**    <u>Releases, Injunctions, and Exculpation Provisions May Not Be Approved</u>.

Certain parties may believe that they have valid objections to the release and exculpation provisions in the Plan. The Debtors believe that any such objection is without merit; however, in the event that such objection is sustained by the Bankruptcy Court and such release and/or exculpation provisions are modified or stricken from the Plan, consenting parties may withdraw their support for the Plan, which may result in the Debtors being unable to confirm the Plan or any other chapter 11 plan.

          **11.**    <u>The Debtors' May Not Be Successful in Certain Claim Objections</u>.

The Debtors believe that they have valid objections to certain timely-filed administrative and/or priority Proofs of Claim, including Claim Number 224 filed by the Texas Comptroller of Public Accounts (the "<u>Comptroller</u>") against Conn Appliances, Inc. in the amount of $24,546,162.48, of which the Comptroller asserts $23,010,849.52 is entitled to priority status (the "<u>Comptroller Claim</u>"). The Debtors understand the Comptroller Claim is based upon an audit of the Debtors' use of certain bad debt credits to reduce their sales and use tax returns for the period from July 2011 to December 2022. The Debtors believe that their use of the bad debt credits was proper under the relevant statutes and that the Debtors owe the Comptroller no sum for the audit period. The Debtors also believe the Comptroller owes the Debtors approximately $12 million in refunds and overpayments for the same period. Despite the Debtors' beliefs, the Debtors may be unsuccessful in their challenge to the Comptroller Claim, which may result in the Debtors being unable to confirm the Plan or any other chapter 11 plan.

          **12.**    <u>The Debtors' Financial Projections May Prove Incorrect</u>.

The Debtors and their advisors have prepared Financial Projections based on their anticipated entitlement to collections of certain consumer receivables held at non-debtor special purpose entities. The collectability of these receivables is based on a number of factors, including servicing, which can cause the amounts collected to vary. The Debtors' ability to pay Claims as set forth under the Plan from the proceeds collected may be affected as a result of variations in collectability of these receivables.

          **13.**    <u>The Debtors' May Not Be Successful in Collecting Certain Tax Refunds</u>.

The Debtors believe they are entitled to certain tax refunds from states in which they had operated, with estimates of amounts owed ranging from $0 to $10.6 million.  The Debtors anticipate funding distributions under the Plan from, among other things, these state tax refunds.  If the Debtors are unsuccessful in obtaining the refunds, it may affect their ability to consummate the Plan or any other chapter 11 plan.

14.     The Tax Attributes May Be Rendered Unavailable.

Pursuant to the Plan, a single share of Conn, Inc. common stock will be issued for the benefit of former holders of Conn's, Inc. Existing Equity Interests, pursuant to which the former holders of Conn's, Inc. Existing Equity Interests will maintain their economic interests in any residual assets of the Debtors after the satisfaction of all Allowed Claims, which economic interests will be nontransferable except by operation of law.  Accordingly, consistent with the intended treatment of the Plan as a plan of liquidation for federal income tax purposes, the Debtors do not believe that the Plan should result in an ownership change of the tax group.  There is no assurance that the IRS will not challenge this position and, due to a lack of direct authoritative guidance in the context of a liquidating chapter 11 plan, there is no assurance that the IRS would not successfully assert a contrary position (including with respect to the treatment for federal income tax purposes of the holders of Claims as continuing creditors and not as effective equity holders of the Debtors throughout the liquidation process).

If, notwithstanding the Debtors' position, an ownership change were considered to occur (by reason of the creditors' contingent interest under the Plan in any sale proceeds being recharacterized as a stock interest), the availability of the Debtors' Tax Attributes thereafter would be severely limited and may be rendered effectively unavailable.

B.      Allowance of Claims.

This Disclosure Statement has been prepared based on preliminary information concerning the Debtors' books and records.  The actual amount of Allowed Claims may differ from the Debtors' current estimates.

C.      Risks Related to Recoveries Under the Plan.

1.      The Amounts of Allowed Claims May Adversely Affect the Recovery of Some Holders of Allowed Claims.

The distributions available to Holders of Allowed Claims in Classes 4, 5, and 6 under the Plan can be affected by a variety of contingencies, including, without limitation, the amount of Allowed Administrative Claims, Priority Tax Claims, Other Secured Claims, and Other Priority Claims, thereby reducing the amount of distributions available for other Holders of Allowed Claims.  The Debtors cannot determine with any certainty at this time the number or amount of such Claims that will ultimately be Allowed.  Thus, the projected recoveries for Holders of Allowed Claims in Classes 4, 5, and 6 disclosed in this Disclosure Statement are highly speculative.

> ### 2. Any Valuation of Any Assets to be Distributed Under the Plan Is Speculative.

Any valuation of any of the assets to be distributed under the Plan is necessarily speculative.  Accordingly, the ultimate value, if any, of these assets could materially affect, among other things, recoveries to the Holders of Allowed Claims in Classes 4, 5, and 6.

> ### 3. The Debtors Cannot Guarantee the Timing of Distributions.

The timing of actual distributions to Holders of Allowed Claims may be affected by many factors that cannot be predicted.  Therefore, the Debtors cannot guarantee the timing of any recovery on an Allowed Claim.

> ### 4. Certain Tax Implications of the Debtors' Bankruptcy.

Holders of Allowed Claims should carefully review Article XV of this Disclosure Statement, "Certain U.S. Federal Income Tax Consequences of Consummation of the Plan," for a description of certain tax implications of the Plan and the Debtors' Chapter 11 Cases.

### D. Risks Related to the Debtors' Businesses.

> ### 1. The Debtors Will Be Subject to the Risks and Uncertainties Associated with the Chapter 11 Cases.

For the duration of the Chapter 11 Cases, the Debtors' ability to consummate the transactions contemplated in the Plan will be subject to the risks and uncertainties associated with bankruptcy.  These risks include the following: (a) ability to develop, confirm, and consummate the transactions specified in the Plan; (b) ability to obtain Bankruptcy Court approval with respect to motions Filed in the Chapter 11 Cases from time to time; (c) ability to enter into value maximizing Sale Transactions; (d) ability of third parties to seek and obtain Bankruptcy Court approval to terminate or shorten the exclusivity period for the Debtors to propose and confirm a chapter 11 plan, to appoint a chapter 11 trustee, or to convert the Chapter 11 Cases to chapter 7 proceedings; and (e) the actions and decisions of the Debtors' creditors and other third parties who have interests in the Chapter 11 Cases that may be inconsistent with the Debtors' plans.

These risks and uncertainties could affect the Debtors' businesses and operations in various ways.  For example, negative events associated with the Chapter 11 Cases could adversely affect the Debtors' relationships with suppliers, service providers, customers, employees, and other third parties, which in turn could adversely affect the Debtors' Sale Transactions.  Also, the Debtors need the prior approval of the Bankruptcy Court for transactions outside the ordinary course of business, which may limit the Debtors' ability to respond timely to certain events or take advantage of certain opportunities.  Because of the risks and uncertainties associated with the Chapter 11 Cases, the Debtors cannot accurately predict or quantify the ultimate impact of events that occur during the Chapter 11 Cases that may be inconsistent with the Debtors' plans.

      2.      <u>Operating in Bankruptcy for a Long Period of Time May Harm the Debtors' Businesses.</u>

A long period of operations under Bankruptcy Court protection could have a material adverse effect on the Debtors' Sale Transactions and liquidity. So long as the proceedings related to the Chapter 11 Cases continue, senior management will be required to spend a significant amount of time and effort dealing with the bankruptcy, and the Debtors will be required to incur substantial costs for professional fees and other expenses associated with the administration of the Chapter 11 Cases.

      3.      <u>The Debtors' Business Is Subject to Various Laws and Regulations That Can Adversely Affect the Cost, Manner, or Feasibility of Doing Business</u>.

The Debtors' operations are subject to various federal, state, and local laws and regulations, including occupational health and safety laws. The Debtors may be required to make large expenditures to comply with such regulations. Failure to comply with these laws and regulations may result in the suspension or termination of operations and subject the Debtors to administrative, civil and criminal penalties, which could have a material adverse effect on the recoveries set forth in the Plan.

      4.      <u>The Loss of Key Personnel Could Adversely Affect the Debtors' Operations.</u>

The Debtors' operations are dependent on a relatively small group of key management personnel and a highly-skilled employee base. The Debtors' recent liquidity issues and the Chapter 11 Cases have created distractions and uncertainty for key management personnel and employees. As a result, the Debtors have experienced and may continue to experience increased levels of employee attrition. Because competition for experienced personnel can be significant, the Debtors may be unable to find acceptable replacements with comparable skills and experience and the loss of such key management personnel could adversely affect the Debtors' ability to operate their businesses for the benefit of maximizing value during the Sale Transactions.

**E.**      **Disclosure Statement Disclaimer.**

      1.      <u>The Financial Information Contained in This Disclosure Statement Has Not Been Audited</u>.

In preparing this Disclosure Statement, the Debtors and their advisors relied on financial data derived from the Debtors' books and records that was available at the time of such preparation. Although the Debtors have used their reasonable business judgment to ensure the accuracy of the financial information, and any conclusions or estimates drawn from that financial information, provided in this Disclosure Statement, and although the Debtors believe that the financial information herein fairly reflects the financial condition of the Debtors, the Debtors are unable to warrant that the financial information contained herein, or any conclusions or estimates drawn therefrom, is without inaccuracies.

2.      Information Contained in This Disclosure Statement Is For Soliciting Votes.

The information contained in this Disclosure Statement is for the purpose of soliciting acceptances of the Plan and may not be relied upon for any other purpose.

3.      This Disclosure Statement Was Not Reviewed or Approved by the SEC.

This Disclosure Statement was not filed with the SEC under the Securities Act or applicable state securities laws.  Neither the SEC nor any state regulatory authority has passed upon the accuracy or adequacy of this Disclosure Statement or the exhibits or the statements contained in this Disclosure Statement.

4.      This Disclosure Statement May Contain Forward Looking Statements.

This Disclosure Statement may contain "forward looking statements" within the meaning of the "safe harbor" provisions of the Private Securities Litigation Reform Act of 1995, as amended.  Statements containing words such as "may," "believe," "anticipate," "expect," "intend," "plan," "project," "projections," "business outlook," "estimate," or similar expressions constitute forward-looking statements and may include, without limitations, information regarding the Debtors' expectations with respect to future events.  These forward-looking statements are subject to a number of risks, uncertainties and assumptions, including those risks described in this Article.

5.      No Legal or Tax Advice Is Provided to You by This Disclosure Statement.

This Disclosure Statement is not legal advice to you.  The contents of this Disclosure Statement should not be construed as legal, business or tax advice.  Each Holder of a Claim or an Interest should consult his or her own legal counsel, accountant or other applicable advisor with regard to any legal, tax and other matters concerning his, her or its Claim or Interest.  This Disclosure Statement may not be relied upon for any purpose other than to determine how to vote on the Plan or object to Confirmation of the Plan.

6.      No Admissions Made.

The information and statements contained in this Disclosure Statement will neither (a) constitute an admission of any fact or liability by any entity (including, without limitation, the Debtors) nor (b) be deemed evidence of the tax or other legal effects of the Plan on the Debtors, Holders of Allowed Claims or Interests, or any other parties in interest.

7.      Failure to Identify Potential Objections.

No reliance should be placed on the fact that a particular Cause of Action or potential objection to a particular Claim or Interest is, or is not, identified in this Disclosure Statement. The Plan Administrator may, pursuant to the Plan, object to applicable Claims or Interests after the Effective Date of the Plan irrespective of whether this Disclosure Statement identifies a particular Cause of Action or objection to a Claim.

8.     <u>No Waiver of Right to Object or Right to Recover Transfers and Assets</u>.

The vote by a Holder of a Claim or Interest for or against the Plan does not constitute a waiver or release of any claims, causes of action or rights of the Debtors (or any entity, as the case may be) to object to that Holder's Claim or Interest, or recover any preferential, fraudulent or other voidable transfer of assets, regardless of whether any claims or causes of action of the Debtors or their Estates are specifically or generally identified in this Disclosure Statement.

9.     <u>Information Was Provided by the Debtors and Was Relied Upon by the Debtors' Advisors</u>.

The Debtors' advisors have relied upon information provided by the Debtors in connection with the preparation of this Disclosure Statement.  Although the Debtors' advisors have performed certain limited due diligence in connection with the preparation of this Disclosure Statement, they have not independently verified the information contained in this Disclosure Statement.

10.     <u>Potential Exists for Inaccuracies, and the Debtors Have No Duty to Update</u>.

The statements contained in this Disclosure Statement are made by the Debtors as of the date of this Disclosure Statement, unless otherwise specified in this Disclosure Statement, and the delivery of this Disclosure Statement after the date of this Disclosure Statement does not imply that there has not been a change in the information set forth in this Disclosure Statement since that date.  While the Debtors have used their reasonable business judgment to ensure the accuracy of all of the information provided in this Disclosure Statement and in the Plan, the Debtors nonetheless cannot, and do not, confirm the current accuracy of all statements appearing in this Disclosure Statement.  Further, although the Debtors may subsequently update the information in this Disclosure Statement, the Debtors have no affirmative duty to do so unless ordered to do so by the Bankruptcy Court.

11.     <u>No Representations Outside This Disclosure Statement are Authorized</u>.

No representations concerning or relating to the Debtors, the Chapter 11 Cases, or the Plan are authorized by the Bankruptcy Court or the Bankruptcy Code, other than as set forth in this Disclosure Statement.  Any representations or inducements made to secure your acceptance or rejection of the Plan that are other than as contained in, or included with, this Disclosure Statement should not be relied upon by you in arriving at your decision.  You should promptly report unauthorized representations or inducements to counsel to the Debtors and the U.S. Trustee.

## ARTICLE XV.
## CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES OF CONSUMMATION OF THE PLAN

The following discussion summarizes certain U.S. federal income tax consequences of the implementation of the Plan to the Debtors and certain Holders of Allowed Claims.  The following summary is based on the Internal Revenue Code of 1986, as amended (the "<u>IRC</u>"),

Treasury Regulations promulgated thereunder, judicial decisions, administrative rules and pronouncements as in effect on the date hereof. Changes in such rules or new interpretations thereof may have retroactive effect and could significantly affect the U.S. federal income tax consequences described herein. This summary addresses certain U.S. federal income tax consequences only to Holders of Claims that are entitled to vote (i.e., Holders of Claims in Classes 4, 5, and 6) and it does not address the U.S. federal income tax consequences to Holders of Interests or to Holders of Claims that are not entitled to vote on the Plan. The U.S. federal income tax consequences of the Plan are complex and are subject to significant uncertainties.

This discussion does not address all aspects of U.S. federal income taxation that may be relevant to a particular Holder of an Allowed Claim in light of such Holder's particular facts and circumstances. In addition, this summary addresses only U.S. federal income taxes. Thus, the following discussion does not address foreign, state, or local tax consequences, or any estate, gift, or other non-income tax consequences, of the Plan, nor does it purport to address the U.S. federal income tax consequences of the Plan to Holders of Allowed Claims that are subject to special treatment under the IRC (including, for example, Persons who are related to the Debtors within the meaning of the IRC, Holders liable for the alternative minimum tax, Holders whose functional currency is not the U.S. dollar, Holders that received their Claims as compensation, broker dealers, banks, mutual funds, insurance companies, financial institutions, small business investment companies, regulated investment companies, tax exempt organizations, governmental entities, pass-through entities such as partnerships or S corporations and investors therein, and Holders of Claims who are themselves in bankruptcy). Accordingly, this summary should not be relied upon for purposes of determining the specific tax consequences of the Plan with respect to a particular Holder of a Claim.

If a partnership (including any entity or arrangement treated as a partnership for U.S. federal income tax purposes) holds an Allowed Claim, the tax treatment of a partner or other investor in such partnership will generally depend upon the status of the partner or investor and the activities of the partnership. If you are a partner or other investor in a partnership holding an Allowed Claim, you should consult your tax advisors.

For purposes of this discussion, a "U.S. Holder" is a beneficial owner of Allowed Class 4, 5, or 6 Claims that is: (A) an individual citizen or resident of the United States for U.S. federal income tax purposes; (B) a corporation (or other entity treated as a corporation for U.S. federal income tax purposes) created or organized under the laws of the United States, any state thereof or the District of Columbia; (C) an estate the income of which is subject to U.S. federal income taxation regardless of the source of such income; or (D) a trust (1) if a court within the United States is able to exercise primary jurisdiction over the trust's administration and one or more United States persons have authority to control all substantial decisions of the trust or (2) that has a valid election in effect under applicable Treasury Regulations to be treated as a United States person (as defined in the IRC), and a "Non-U.S. Holder" is a Holder (other than an entity treated as a partnership for U.S. federal income tax purposes) that is not a U.S. Holder.

The following discussion assumes that the Plan will be implemented as described herein and does not address the tax consequences if the Plan is not carried out. Furthermore, this discussion assumes that Holders of Allowed Claims only hold Claims in a single Class. This discussion further assumes that the various debt and other arrangements to which a Debtor is a

party will be respected for U.S. federal income tax purposes in accordance with their form.  In addition, a substantial amount of time may elapse between the confirmation date and the receipt of a final distribution under the Plan.  Events subsequent to the date of this Disclosure Statement, such as additional tax legislation, court decisions or administrative changes, could affect the U.S. federal income tax consequences of the Plan and the transactions contemplated thereunder.

This summary of the U.S. federal income tax consequences of the Plan is not binding on the Internal Revenue Service ("IRS"), and no ruling will be sought or has been sought from the IRS with respect to any of the tax aspects of the Plan, no opinion of counsel has been obtained or will be obtained by the Debtors with respect thereto, and no tax opinion is given by this Disclosure Statement.  The U.S. federal income tax consequences of certain aspects of the Plan may therefore be uncertain due to the lack of applicable legal authority and may be subject to administrative or judicial interpretations that differ from the discussion below.

The following discussion is not exhaustive and the U.S. federal income tax consequences to each Holder of an Allowed Claim will differ and will depend on factors specific to each such Holder, including (A) whether the Holder's Allowed Claim (or portion thereof) constitutes a claim for principal or interest; (B) the origin of the Holder's Allowed Claim; (C) whether the Holder reports income using the accrual or cash basis method; (D) whether the Holder receives distributions under the Plan in more than one taxable year; (E) whether the Holder has previously included in income any accrued but unpaid interest with respect to the Allowed Claim; and (F) whether the Holder has previously taken a bad debt deduction or otherwise recognized a loss with respect to the Allowed Claim.  The discussion is not a substitute for careful tax planning and professional tax advice based upon the individual circumstances of each Holder of an Allowed Claim.  Accordingly, each Holder of an Allowed Claim is strongly urged to consult with its own tax advisor regarding the U.S. federal, state, local, and foreign income and other tax consequences of the Plan.

## A.   Certain U.S. Federal Income Tax Consequences of the Plan to the Debtors.

### 1.   U.S. Federal Income Tax Consequences of the Sale Transactions.

The proposed Sale Transactions contemplated by the Plan are expected to be treated as taxable sales of the Debtors' assets for U.S. federal income tax purposes.  As a result, the Debtors generally will recognize taxable gain or loss equal to the "amount realized" on the Sale Transactions, less the aggregate adjusted basis in the assets that are subject to the Sale Transactions.  The amount realized on the Sale Transactions will generally be equal to the cash proceeds from the Sale Transactions or, in the case of a credit bid, the fair market value of the assets transferred in the credit bid.   The federal income tax consequences of the Sale Transactions for the Debtors will also depend upon the availability of the Debtors' tax attributes, as described below, which the Debtors are still reviewing and analyzing.

### 2.   Cancellation of Debt and Reduction of Tax Attributes.

In general, absent an exception, a taxpayer will realize and recognize cancellation of indebtedness income ("COD Income") upon satisfaction of its outstanding indebtedness for total consideration less than the amount of such indebtedness.  Under section 108 of the IRC, a

taxpayer will not, however, be required to include COD Income in gross income if the taxpayer is under the jurisdiction of a court in a case under chapter 11 of the Bankruptcy Code and the discharge of debt occurs pursuant to that proceeding (the "Bankruptcy Exception").  The Debtors expect the consummation of the Plan will produce COD Income.  Because the cancellation of the Debtors' indebtedness will occur in a case brought under the Bankruptcy Code, the Debtors will be under the jurisdiction of the Bankruptcy Court in such case and the cancellation of the Claims will be pursuant to the Plan, the Debtors will not be required to include any COD Income realized as a result of the implementation of the Plan in taxable income under the Bankruptcy Exception.

Instead, as a consequence of such exclusion, a taxpayer-debtor must reduce its tax attributes by the amount of COD Income that it excluded from gross income pursuant to section 108 of the IRC.  Such reduction in tax attributes occurs only after the tax for the year of the debt discharge has been determined.  In general, tax attributes will be reduced in the following order: (a) net operating losses and carryforwards; (b) general business credit carryovers; (c) minimum tax credit carryovers; (d) capital loss carryovers; (e) tax basis in assets; (f) passive activity loss and credit carryovers; and (g) foreign tax credits carryovers.  Any excess COD Income over the amount of available tax attributes will generally not give rise to U.S. federal income tax and will generally have no other U.S. federal income tax impact.  Alternatively, a debtor with COD Income may elect first to reduce the basis of its depreciable assets pursuant to section 108(b)(5) of the IRC.

The Debtors estimate that as of January 31, 2024, they had approximately $8.7 million of federal net operating losses and the Debtors may generate additional losses as a result of the Sale Transactions.  These losses and certain other of the Debtors' tax attributes may be subject to reduction by reason of COD Income realized upon consummation of the Plan.  The Debtors have not yet determined the amount of their tax attributes that will be reduced by COD Income.  If the Debtors are liquidated following consummation of the Plan, however, any such tax attributes are not expected to have meaningful value.

**B.      Certain U.S. Federal Income Tax Consequences of the Plan to U.S. Holders of Allowed Claims Entitled to Vote on the Plan.**

**1.      U.S. Federal Income Tax Consequences to U.S. Holders of Allowed Claims in Voting Classes.**

In accordance with the Plan, each Holder of Allowed Claims in Classes 4, 5, and 6 may receive the proceeds from the transactions contemplated in the Plan.  Each U.S. Holder of Allowed Claim in Classes 4, 5, and 6 will recognize gain or loss upon consummation of the Plan equal to the difference between the "amount realized" by such U.S. Holder and such U.S. Holder's adjusted tax basis in his, her or its Claim (other than any tax basis attributable to accrued but unpaid interest and possibly accrued original issue discount ("OID")).  The amount realized will include the amount of any Cash received from the Debtor, less the amount (if any) allocable to accrued but unpaid interest, as discussed below under the heading "Accrued Interest."  Any such gain or loss realized by a U.S. Holder generally should constitute capital gain or loss to such U.S. Holder, unless such Claim is not a capital asset in the hands of such U.S. Holder.   If an Allowed Claim in Classes 4, 5, or 6 as applicable, is a capital asset and it has been held for more

than one year, the U.S. Holder will realize long-term capital gain or loss. The deductibility of capital losses is subject to limitations.

### 2. Accrued Interest.

A U.S. Holder of an Allowed Claim generally will recognize ordinary income to the extent that such Holder receives Cash or property that is allocable to accrued but unpaid interest that such Holder has not yet included in its income. If an Allowed Claim includes interest, and if the U.S. Holder receives less than the amount of the Allowed Claim pursuant to the Plan, the U.S. Holder must allocate the Plan consideration between principal and interest. The Plan provides that all distributions to a U.S. Holder of an Allowed Claim will apply first to the principal amount of such Claim until such principal amount is paid in full and then to any interest accrued on such Claim prior to the Petition Date. There is no assurance, however, that the IRS will respect this treatment and will not determine that all or a portion of amounts distributed to such U.S. Holder, and attributable to principal under the Plan, is properly allocable to interest. U.S. Holders of Allowed Claims are urged to consult their own tax advisors in this regard. If the Plan consideration allocable to interest with respect to an Allowed Claim is less than the amount that the U.S. Holder has previously included as interest income, the previously included but unpaid interest may be deducted, generally as a loss.

### 3. Market Discount.

A U.S. Holder that purchased its Claims from a prior holder at a "market discount" (relative to the principal amount of the Claims at the time of acquisition) may be subject to the market discount rules of the IRC. In general, a debt instrument is considered to have been acquired with "market discount" if the holder's adjusted tax basis in the debt instrument is less than (a) its stated principal amount or (b) in the case of a debt instrument issued with OID, its adjusted issue price, in each case, by at least a *de minimis* amount.

Under the market discount rules, the U.S. Holder is required to treat any gain on the sale, exchange, retirement or other disposition of the Allowed Claim (other than in respect of a Claim for accrued but unpaid interest) as ordinary income to the extent of the market discount that the U.S. Holder has not previously included in income and which is treated as having accrued on the Allowed Claim at the time of its payment or disposition.

### 4. Bad Debt Deduction.

A U.S. Holder who receives in respect of an Allowed Claim an amount less than the U.S. Holder's tax basis in the Claim may be entitled in the year of receipt (or in an earlier or later year) to a bad debt deduction in some amount under IRC Section 166(a). The rules governing the character, timing and amount of bad debt deductions place considerable emphasis on the facts and circumstances of the U.S. Holder, the obligor and the instrument with respect to which a deduction is claimed. U.S. Holders of Allowed Claims, therefore, are urged to consult their tax advisors with respect to their ability to take such a deduction.

C.    **Tax Treatment of the Distribution Trust and Holders of Beneficial Interests Therein**

1.    Classification of the Distribution Trust as a Liquidating Trust.

The Distribution Trust is intended to qualify as a "liquidating trust" for U.S. federal income tax purposes (other than with respect to any portion of the assets transferred to the Distribution Trust and allocable to, or retained on account of, Disputed Claims, as discussed below). In general, a liquidating trust is not a separate taxable entity but rather is treated for U.S. federal income tax purposes as a "grantor" trust (i.e., a pass-through entity). The IRS, in Revenue Procedure 94-45, 1994-2 C.B. 684, set forth the general criteria for obtaining an IRS ruling as to the grantor trust status of a liquidating trust under a chapter 11 plan. The Distribution Trust will be structured with the intention of complying with such general criteria. Pursuant to the Plan, and in conformity with Revenue Procedure 94-45, all parties to the Distribution Trust (including, without limitation, the Debtors, Holders of Allowed Class 5 Prepetition 3L Secured Claims and Allowed Class 6 General Unsecured Claims receiving interests in the Distribution Trust, and the Distribution Trustee) will be required to treat the transfer of the Distribution Trust Assets to the Distribution Trust as (1) a transfer of the Distribution Trust Assets (subject to any obligations relating to those assets) directly to the Holders of Allowed Class 5 Prepetition 3L Secured Claims and Allowed Class 6 General Unsecured Claims receiving interests in the Distribution Trust (other than to the extent any of the Distribution Trust Assets are allocable to Disputed Claims), followed by (2) the transfer by such holders to the Distribution Trust of the Distribution Trust Assets in exchange for interests in the Distribution Trust. Accordingly, except in the event of contrary definitive guidance, Holders of Allowed Class 5 Prepetition 3L Secured Claims and Allowed Class 6 General Unsecured Claims receiving interests in the Distribution Trust (i.e., the Distribution Trust Beneficiaries) would be treated for U.S. federal income tax purposes as the grantors and owners of their respective share of the Distribution Trust Assets transferred to the Distribution Trust (other than such Distribution Trust Assets as are allocable to Disputed Claims). Although the following discussion assumes that the Distribution Trust will be treated as a liquidating trust for U.S. federal income tax purposes, no ruling will necessarily be requested from the IRS concerning the tax status of the Distribution Trust as a grantor trust. Accordingly, there can be no assurance that the IRS will not take a contrary position to the classification of the Distribution Trust as a grantor trust. If the IRS were to successfully challenge such classification, the U.S. federal income tax consequences to the Distribution Trust and the U.S. Holders of Allowed Class 5 Prepetition 3L Secured Claims and Allowed Class 6 General Unsecured Claims receiving interests in the Distribution Trust could vary from those discussed herein. Certain U.S. federal income tax consequences of the Distribution Trust or portions thereof being treated as a "disputed ownership fund" within the meaning of Treasury Regulation section 1.468B-9 are also discussed below.

2.    General "Liquidating Trust" Tax Reporting by the Distribution Trust and Distribution Trust Beneficiaries.

For all U.S. federal income tax purposes, all parties to the Distribution Trust (including, without limitation, the Debtors, Holders of Allowed Class 6 General Unsecured Claims receiving interests in the Distribution Trust, and the Distribution Trustee) must treat the Distribution Trust as a grantor trust of which holders of beneficial interests in the Distribution Trust (as determined

for U.S. federal income tax purposes) are the owners and grantors.  Accordingly, Holders of Allowed Class 6 General Unsecured Claims receiving interests in the Distribution Trust are treated for U.S. federal income tax purposes as the direct owners of an undivided interest in the Distribution Trust (other than any assets allocable to Disputed Claims), consistent with their economic interests therein.  The Distribution Trustee will file tax returns for the Distribution Trust treating the Distribution Trust as a grantor trust pursuant to section 1.671-4(a) of the Treasury Regulations.  The Distribution Trustee also will annually send to each holder of a beneficial interest in the Distribution Trust a separate statement regarding the receipts and expenditures of the Distribution Trust as relevant for U.S. federal income tax purposes and will instruct all such holders to use such information in preparing their U.S. federal income tax returns or to forward the appropriate information to such holder's underlying beneficial holders with instructions to utilize such information in preparing their U.S. federal income tax returns.

All taxable income and loss of the Distribution Trust will be allocated among, and treated as directly earned and incurred by, holders of beneficial interests in the Distribution Trust with respect to such holder's undivided interest in the Distribution Trust Assets (and not as income or loss with respect to its prior Claims), with the possible exception of any taxable income and loss allocable to any assets allocable to, or retained on account of, Disputed Claims.  The character of any income and the character and ability to use any loss will depend on the particular situation of the holder of Claims receiving interests in the Distribution Trust.

As soon as reasonably practicable after the transfer of the Distribution Trust Assets to the Distribution Trust, the Distribution Trustee will make a good faith valuation of the Distribution Trust Assets.  All parties to the Distribution Trust (including, without limitation, the Debtors, Holders of Allowed Class 6 General Unsecured Claims receiving interests in the Distribution Trust, and the Distribution Trustee) must report consistently with such valuation for all U.S. federal income tax purposes.  The valuation will be made available, from time to time, as relevant for tax reporting purposes.

The U.S. federal income tax obligations of a U.S. Holder with respect to its beneficial interests in the Distribution Trust are not dependent on the Distribution Trust distributing any cash or other proceeds, subject to any portion(s) of the Distribution Trust allocable to Disputed Claims.  Thus, U.S. Holders of Allowed Class 6 General Unsecured Claims receiving interests in the Distribution Trust may incur a U.S. federal income tax liability with respect to its allocable share of Distribution Trust's income even if the Distribution Trust does not make a concurrent distribution to the U.S. Holder.  In general, other than in respect of cash retained on account of Disputed Claims, a distribution of cash by the Distribution Trust will not be separately taxable to a beneficial owner of the Distribution Trust since the beneficial owner is already regarded for U.S. federal income tax purposes as owning the underlying assets (and was taxed at the time the cash was earned or received by Distribution Trust).  U.S. Holders are urged to consult their tax advisors regarding the appropriate U.S. federal income tax treatment of any subsequent distributions of cash originally retained by the Distribution Trust on account of Disputed Claims.

The Distribution Trust will comply with all applicable governmental withholding requirements.  If any beneficiaries of the Distribution Trust are not U.S. persons, the Distribution Trustee may be required to withhold up to 30% of the income or proceeds allocable to such persons, depending on the circumstances (including whether the type of income is subject to a

lower treaty rate). As indicated above, the foregoing discussion of the U.S. federal income tax consequences of the Plan does not generally address the consequences to holders of General Unsecured Claims or non-U.S. Holders; accordingly, such holders should consult their tax advisors with respect to the U.S. federal income tax consequences of the Plan, including owning an interest in the Distribution Trust.

3. <u>Tax Reporting for the Distribution Trust Assets Allocable to Disputed Claims</u>.

Subject to definitive guidance from the IRS or a court of competent jurisdiction to the contrary (including the receipt by the Distribution Trustee of an IRS private letter ruling if the Distribution Trustee so requests one, or the receipt of an adverse determination by the IRS upon audit if not contested by the Distribution Trustee), the Distribution Trustee (A) may elect to treat any of the Distribution Trust Assets allocable to, or retained on account of, Disputed Claims (a "<u>Disputed Claims Reserve</u>") as a "disputed ownership fund" governed by section 1.468B-9 of the Treasury Regulations, if applicable, and (B) to the extent permitted by applicable law, will report consistently for state and local income tax purposes.

Accordingly, if a "disputed ownership fund" election is made with respect to a Disputed Claims Reserve, such reserve will be subject to tax annually on a separate entity basis on any net income earned with respect to such assets (including any gain recognized upon the disposition of such assets). All distributions from such reserves will be treated as received by holders in respect of their Claims as if distributed by the Debtors. All parties to the Distribution Trust (including, without limitation, the Debtors and Holders of Allowed Class 6 General Unsecured Claims receiving interests in the Distribution Trust, and the Distribution Trustee) will be required to report for tax purposes consistently with the foregoing.

**D.     Certain U.S. Federal Income Tax Consequences of the Plan to Non-U.S. Holders of Allowed Claims Entitled to Vote on the Plan.**

Whether a Non-U.S. Holder of Allowed Claims in Classes 4, 5, and 6 realizes gain or loss on the consummation of the Plan and the amount of such gain or loss is determined in the same manner as set forth above in connection with U.S. Holders.

1. <u>Gain Recognition.</u>

Any gain recognized by a Non-U.S. Holder of Allowed Claims in Classes 4, 5, and 6 generally will not be subject to U.S. federal income tax with respect to property (including Cash) received in exchange for such Claim, unless:

- such Non-U.S. Holder is engaged in a trade or business in the United States to which such gain is "effectively connected" for U.S. federal income tax purposes (and, if required, by an applicable income tax treaty, the Non-U.S. Holder maintains a permanent establishment or fixed base in the United States to which gain is attributable); or

- if such Non-U.S. Holder is an individual, such Holder is present in the United States for 183 days or more during the taxable year of the disposition and certain other requirements are met.

Gain described in the first situation above generally will be subject to U.S. federal income tax on a net income basis at the regular rates. A Non-U.S. Holder that is a foreign corporation also may be subject to a branch profits tax at a rate of 30 percent (or such lower rate specified by an applicable income tax treaty) on such effectively connected gain, as adjusted for certain items.

Gain described in the second situation above will be subject to U.S. federal income tax at a rate of 30 percent (or such lower rate specified by an applicable income tax treaty), which may be offset by certain U.S. source capital losses of the Non-U.S. Holder (even though the individual is not considered a resident of the United States), provided the Non-U.S. Holder has timely filed U.S. federal income tax returns with respect to such losses.

Non-U.S. Holders should consult their tax advisors regarding any applicable income tax treaties that may provide for different rules.

## 2.  Interest on Allowed Claims.

Payments to a Non-U.S. Holder that are attributable to accrued but untaxed interest on its Claim generally will not be subject to U.S. federal income or withholding tax, provided that the withholding agent has received or receives, prior to payment, appropriate documentation (generally, IRS Form W-8BEN or W-8BEN-E) establishing that the Non-U.S. Holder is not a U.S. person, unless:

a.  the Non-U.S. Holder actually or constructively owns 10 percent or more of the total combined voting power of all classes of the Debtors' stock entitled to vote (after application of certain attribution rules);

b.  the Non-U.S. Holder is a "controlled foreign corporation" that is a "related person" with respect to the Debtors as described in Section 881(c)(3)(C) of the IRC;

c.  the Non-U.S. Holder is a bank receiving interest described in Section 881(c)(3)(A) of the IRC; or

d.  such interest is effectively connected with the conduct by the Non-U.S. Holder of a trade or business within the United States and, if required by an applicable income tax treaty, is attributable to a U.S. permanent establishment or fixed base of the Non-U.S. Holder (in which case, provided the Non-U.S. Holder provides a properly executed IRS Form W-8ECI (or successor form) to the withholding agent, the Non-U.S. Holder (x) generally will not be subject to withholding tax, but (y) will be subject to U.S. federal income tax in the same manner as a U.S. Holder (unless an applicable income tax treaty provides otherwise), and a Non-U.S. Holder that is a corporation for U.S. federal income tax purposes may also be subject to a branch profits tax with respect to such Non-U.S. Holder's effectively connected earnings and profits that are attributable to the accrued but untaxed interest at a rate of 30 percent (or at a reduced rate or exemption from tax under an applicable income tax treaty)).

A Non-U.S. Holder that does not qualify for exemption from withholding tax pursuant to clauses (a)–(d) above generally will be subject to withholding of U.S. federal income tax on such interest or imputed interest at a 30 percent rate (or at a reduced rate or exemption from tax under an applicable income tax treaty).  To claim such treaty exemption, the Non-U.S. Holder must provide the applicable withholding agent with a properly executed IRS Form W-8BEN or W-8BEN-E (or other applicable documentation) claiming a reduction in or exemption from withholding tax under the benefit of an income tax treaty between the United States and the country in which the Non-U.S. Holder resides or is established.  For purposes of providing a properly executed IRS Form W-8BEN or W-BEN-E, special procedures are provided under applicable Treasury Regulations for payments through qualified foreign intermediaries or certain financial institutions that hold customers' securities in the ordinary course of their trade or business.

The certifications described above must be provided to the applicable withholding agent prior to the payment of interest and must be updated periodically.  Non-U.S. Holders that do not timely provide the applicable withholding agent with the required certification, but that qualify for a reduced rate under an applicable income tax treaty, may obtain a refund of any excess amounts withheld by timely filing an appropriate claim for refund with the IRS.  Non-U.S. Holders should consult their tax advisors regarding their entitlement to benefits under any applicable income tax treaty.

### E.    <u>Information Reporting and Back-Up Withholding.</u>

Generally, information reporting requirements will apply to all payments or distributions under the Plan, unless you are an exempt recipient.  Additionally, a Holder may be subject to backup withholding at applicable rates, unless the Holder (1) is a person exempt from backup withholding and, when required, demonstrates this or (2) timely provides a correct taxpayer identification number ("<u>TIN</u>") (generally in the form of a properly executed IRS Form W-9 (or a suitable substitute form)) for a U.S. Holder, or applicable IRS Form W-8 (or a suitable substitute form) for a Non-U.S. Holder (or otherwise establishes such Non-U.S. Holder's eligibility for an exemption) and timely provides the other information, makes the representations required by such form and complies with the other requirements of the backup withholding rules.  A Holder that does not timely provide a correct TIN also may be subject to penalties imposed by the IRS.  Backup withholding is not an additional tax.  Any amounts withheld under the backup withholding rules will be allowed as a refund or a credit against your U.S. federal income tax liability provided the required information is properly furnished to the IRS.

### F.    <u>FATCA.</u>

Under Sections 1471 to 1474 of the Tax Code (commonly referred to as the Foreign Account Tax Compliance Act ("<u>FATCA</u>")), unless otherwise subject to an exception, foreign financial institutions and certain other foreign entities must report certain information with respect to their U.S. account holders and investors or be subject to 30% withholding on the receipt of  "withholdable payments."  For this purpose, "withholdable payments" are generally U.S. source payments of fixed or determinable, annual or periodical income (including interest).  FATCA withholding will apply even if the applicable payment would not otherwise be subject to U.S. federal nonresident withholding tax.

Each Non-U.S. Holder should consult its own tax advisor regarding the possible impact of these rules, including the availability of an exemption on such Non-U.S. Holder's ownership of the consideration being received under the Plan.

### G.       Importance of Obtaining Professional Tax Assistance.

The foregoing is intended to be only a summary of certain U.S. federal income tax consequences of the Plan and is not a substitute for careful tax planning with a tax professional. The U.S. federal, state, local, and foreign income and other tax consequences of the Plan are complex and in some cases uncertain.  Such consequences may also vary based on the individual circumstances of each Holder of an Allowed Claim.  Accordingly, each Holder of an Allowed Claim is strongly urged to consult with his, her, or its own tax advisor regarding the U.S. federal, state, local, and foreign income and other tax consequences of the Plan.

## ARTICLE XVI.
## ADDITIONAL INFORMATION

Any statements in this Disclosure Statement concerning the provisions of any document are not necessarily complete, and in each instance reference is made to such document for the full text thereof.  Certain documents described or referred to in this Disclosure Statement have not been attached as exhibits because of the impracticability of furnishing copies of these documents to all recipients of this Disclosure Statement.  The Debtors will file all exhibits to the Plan with the Bankruptcy Court and make them available for review by no later than seven days before the deadline to object to Confirmation, subject to any amendments or modifications thereto.

## ARTICLE XVII.
## RECOMMENDATION AND CONCLUSION

For all of the reasons set forth in this Disclosure Statement, the Debtors believes that the Confirmation and consummation of the Plan is preferable to all other alternatives.  Consequently, the Debtors urge all Holders of Claims in Classes 4, 5, and 6, the only Classes entitled to vote on the Plan, to vote to accept the Plan and to evidence their acceptance by duly completing and returning their ballots so that they will be received on or before the Voting Deadline.

Dated:  June 7, 2025

Respectfully submitted,

 /s/ *Mark A. Renzi*
By: Mark A. Renzi
Chief Restructuring Officer
Conn's Inc. and its direct and indirect
subsidiaries